## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JMR CAPITAL HOLDINGS, INC.,
a New Jersey Company,
MSG CONTRACTING, CORP.,
a New Jersey Company,
SCALE BEYOND, LLC, a New
Jersey Limited Liability Company and
ON TOP ROOFING, CORP.,
a New Jersey Company.

        Plaintiffs,

v.                                   Case No. _____

MDR UNITED, LLC, a Pennsylvania
Limited Liability Company,
JOSHUA HOFFMANNN, an individual,
BRANDON ZUREK, an individual,
JOSH SKOLNICK, an individual,
CHRIS PHALEN, an individual, LUKE
SCHWARTZ, an individual and
THOMAS RICKETTS, an individual.

        Defendants.

_____/

## COMPLAINT FOR DAMAGES

Plaintiffs, JMR CAPITAL HOLDINGS, INC., MSG CONTRACTING CORP., SCALE

BEYOND, LLC and ON TOP ROOFING, CORP (collectively, "Plaintiffs"), by and through

undersigned counsel, hereby sue Defendants, MDR UNITED, LLC ("MDR"), JOSHUA

HOFFMANN ("Hoffmann"), BRANDON ZUREK ("Zurek"), JOSH SKOLNICK ("Skolnick"),

LUKE SCHWARTZ ("Schwartz"), CHRIS PHALEN ("Phalen") and THOMAS RICKETTS

("Ricketts") (collectively "Defendants"), and in support thereof, state as follows:

## PARTIES, JURISDICTION AND VENUE

1.      This is an action for damages in excess of Seventy-Five Thousand Dollars

($75,000.00), exclusive of attorneys' fees, costs, and interest.

2.      Plaintiff, JMR Capital Holdings, Inc., is a New Jersey corporation having its principal place of business at 760 Route 10, Whippany, NJ, 07981. On October 4, 2022, under an Assignment of Franchise Agreements, JMR Capital Holdings, Inc. assumed the franchise agreement executed by Ryan Fitzpatrick and Michael Fitzpatrick (the "Fitzpatricks").

3.      Plaintiff, MSG Contracting Corp., is a New Jersey corporation, with a principal business address at 164 Edgemont Road, Watchung, New Jersey 07069. On October 5, 2022, under an Assignment of Franchise Agreements, MSG Contracting Corp. assumed the franchise agreements executed by Michael Greenstein ("Greenstein").

4.      Plaintiff, Scale Beyond, LLC, is a New Jersey limited liability company with a principal business address at 22 Madison Ave., Suite 103 A, Paramus, New Jersey 07652. On October 20, 2022, under an Assignment of Franchise Agreements, Scale Beyond, LLC, assumed the franchise agreements executed by Anthony Traficante ("Traficante") and Jose Beras ("Beras").

5.      Plaintiff, On Top Roofing Co., is a New Jersey company with its principal place of business at 505 Drakestown Road, Flanders, New Jersey 07836. On or about August 13, 2023, under an Assignment of Franchise Agreements, On Top Roofing Co. assumed the franchise agreements executed by Don Gaudreau ("Gaudreau").

6.      Defendant, MDR United, LLC ("MDR"), is a Pennsylvania limited liability company and has its principal place of business at 2525 N. 117th Avenue, Third Floor, Omaha, Nebraska 68164.

7.      Defendant, Joshua Hoffmann, is an individual of the age of majority and a citizen of the State of Illinois. Hoffmann is subject to personal jurisdiction under N.J. Ct. R. 4:4-4(b)(1), which extends New Jersey's jurisdictional reach as far as due process permits. In his role as a

senior MDR executive, he participated in and directed the misrepresentations and franchise-sales communications sent into New Jersey and knowingly engaged in conduct aimed at inducing New Jersey residents to purchase Mighty Dog Roofing franchises.

8.      Defendant, Brandon Zurek, is an individual of the age of majority and a citizen of the State of Nebraska. Zurek is subject to personal jurisdiction under N.J. Ct. R. 4:4-4(b)(1) because he personally communicated with New Jersey franchise prospects, transmitted financial-performance representations and SBA-financing materials into New Jersey, and knowingly directed fraudulent information to Plaintiffs located in this State. His conduct was purposefully aimed at inducing New Jersey residents to purchase Mighty Dog Roofing franchises.

9.      Defendant, Josh Skolnick, is an individual of the age of majority and a citizen of the State of Nebraska. Skolnick is subject to personal jurisdiction under N.J. Ct. R. 4:4-4(b)(1) because he oversaw and approved franchise-sales activities directed at New Jersey prospects, participated in creating and disseminating the deceptive FDDs used in this State, and profited from franchise fees paid by New Jersey franchisees. His conduct was purposefully directed at New Jersey and forms a core part of the claims asserted here.

10.      Defendant, Luke Schwartz, is an individual of the age of majority and a citizen of the State of Nebraska. Schwartz is subject to personal jurisdiction under N.J. Ct. R. 4:4-4(b)(1) because he participated in the franchise-sales process directed at New Jersey residents, including taking part in communications and presentations that conveyed misleading financial information into this State. His conduct was purposefully aimed at New Jersey and forms part of the actionable scheme.

11.      Defendant, Thomas Ricketts, is an individual of the age of majority and a citizen of the State of Nebraska. Ricketts is subject to personal jurisdiction under N.J. Ct. R. 4:4-4(b)(1)

because he made financial-performance representations to New Jersey franchisees, knowingly directed fraudulent inducement communications into this forum, and engaged in conduct aimed at inducing New Jersey residents to purchase Mighty Dog Roofing franchises. His actions were purposefully directed at New Jersey and are integral to the claims asserted here.

12.     Defendant, Chris Phalen, is an individual of the age of majority and a citizen of the State of Nebraska. Phalen is subject to personal jurisdiction under N.J. Ct. R. 4:4-4(b)(1) because he participated in franchise-recruitment activities directed at New Jersey residents and took part in providing false profitability representations and operational assurances to Plaintiffs in this State. His conduct was purposefully aimed at New Jersey and forms part of the fraudulent scheme alleged.

13.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a). The parties are citizens of different states and the matter in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

14.     Venue of this action is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to the claims alleged in this pleading arose in this judicial district.

## **NATURE OF THE ACTION**

15.     This action seeks rescission and compensatory damages from MDR, and compensatory damages from the individual Defendants—who acted at all relevant times as MDR's agents—based on misrepresentations that were intended to, and did, induce each Plaintiff to enter into a franchise relationship with MDR.[1]

---

[1] Each Plaintiff entity is owned by the individuals who initially signed the Franchise Agreements. The individuals assigned their respective Franchise Agreements to entities wholly owned by them. For simplicity, "Plaintiffs" will refer interchangeably to those individuals who initially entered into the Franchise Agreements and their respective entities.

16.    Specifically, Plaintiffs fell prey to a fraudulent scheme orchestrated by Defendants who promoted false and misleading information about the start-up costs and exaggerated financial success of franchisees within MDR's franchise system. MDR also made unlawful financial performance representations and engaged in other unfair and deceptive business practices that harmed Plaintiffs.

17.    MDR—a newly formed company with no prior experience in the roofing industry—embarked on a calculated fraudulent inducement scheme to sell franchises through deception. Despite having no operational history, infrastructure, or proprietary technology, MDR marketed itself as offering a unique and "proprietary" method that would allow franchisees to earn profit margins nearly triple the industry average. To support this illusion, MDR disseminated phony financial performance representations. These falsified and selectively presented figures, coupled with fabricated claims of a proprietary business model that did not exist, were designed to fraudulently induce unsuspecting franchisees under false pretenses of profitability and operational sophistication.

## THE FTC FRANCHISE RULE

18.    The Federal Trade Commission ("FTC") has promulgated laws requiring the delivery to prospective franchisees of a Franchise Disclosure Document, or "FDD," containing twenty-three (23) separate categories of information concerning, *inter alia*, the franchisor, its management, its litigation history, its financial position and the material terms and conditions of the franchise prior to the execution of any agreement by a prospective franchisee (hereinafter referred to as "the FTC Franchise Rule").

19.    For instance, 16 C.F.R. § 436.5(b) requires a franchisor to, *inter alia*, "[d]isclose by name and position the franchisor's directors, trustees, general partners, principal officers, and any

other individuals who will have management responsibility relating to the sale or operation of franchises offered by this document."

20.     The information contained in the FDD must strictly comply with the specific content requirements of the FTC Franchise Rule, which sets forth the precise language that must be "accurately, clearly, and concisely stated" in each designated section.

21.     The FTC Franchise Rule also requires that a franchisor attach certain documents to the FDD, including a copy of all proposed agreements regarding the franchise offering, such as, *inter alia*, the franchise agreement, the franchisor's audited financial statements, and an acknowledgment of receipt.

22.     A prospective franchisee must be provided with an FDD at least fourteen (14) calendar days before the prospective franchisee signs a binding agreement with, or makes any payment to, the franchisor in connection with the sale of the franchise.

23.     Before furnishing an FDD, the franchisor must advise the prospective franchisee of the formats in which the FDD is made available and, if the FDD is provided by e-mail, the franchisor must also provide the prospective franchisee directions for accessing the document on the Internet within the fourteen-day time period.

24.     Among others, the FTC Franchise Rule requires a franchisor to include a low to high estimate of the estimated cost for a franchisee to establish and open the franchised business. This cost must include everything from build-out costs to reserve capital for the first three months of operation. *See* 16 C.F.R. § 436.4(g).

25.     The FTC Franchise Rule also prohibits a franchisor from making "financial performance representations" that are not included in the FDD and do not meet certain specified criteria.

26.    The FTC Franchise Rule defines a "financial performance representation" as follows:

> any representation, including any oral, written, or visual representation, to a prospective franchisee, including a representation in the general media, that states, expressly or by implication, a specific level or range of actual or potential sales, income, gross profits or net profits. The term includes a chart, table, or mathematical calculation that shows possible results based on a combination of variables

16 C.F.R. § 436.1(e).

27.    To the extent that a franchisor intends to disclose any financial performance representations to a prospective franchisee, as a matter of law, it may do so solely: (a) if there is a reasonable basis and written substantiation for the representation, and (b) such a representation is made solely in Item 19 of the FDD.

## GENERAL ALLEGATIONS

28.    From 2021 to 2022, each Plaintiff, through its respective principals, learned about the Mighty Dog Roofing franchise system and became interested in the possibility of purchasing a Mighty Dog Roofing franchise to open and operate in New Jersey.

29.    MDR represented to each Plaintiff that the Mighty Dog Roofing franchise was designed for semi-absentee ownership, expressly claiming that franchisees would need to devote only about 10 hours per week, that day-to-day operations could be delegated to hired staff, and that franchisees could continue other employment or business ventures. MDR reinforced these assurances through PowerPoint presentations and publicly available YouTube videos, all of which portrayed the franchise as a management-light business that could be successfully operated with minimal owner involvement. Additionally, MDR represented that it wanted franchisees who had little to no experience in roofing.

30.    In order to induce Plaintiffs to invest in the Mighty Dog Roofing franchise system,

MDR, through its representatives, provided to Plaintiffs illegal financial performance representations in violation of the FTC Franchise Rule. Specifically, prior to the execution of the Franchise Agreements, MDR's representatives provided each Plaintiff' principal with an MDR Unit Economics Excel worksheet (the "Workbooks").

31.     The Workbooks contained selective and misleading financial performance representations outside of Item 19. The Workbooks forecasted misleading and inflated revenue, gross profit, and net margins to induce Plaintiffs into signing Franchise Agreements. MDR's representatives, i.e., Defendants Ricketts, Hoffmann, Zurek and Phalen, represented to Plaintiffs that these forecasts were based off prior franchisee performance, which was untrue.[2]

32.     Following the presentation of the Workbooks, MDR provided each Plaintiff with a copy of its Franchise Disclosure Document ("FDD").  For example, the Fitzpatricks were provided with a April 29, 2021 FDD, as amended on January 14, 2022, while Greenstein, Traficante and Beras were provided with the April 29, 2022 FDD, as amended on May 4, 2022 and August 5, 2022.

***MDR manipulates and distorts numbers in Item 19 of its FDD***

33.     The financial performance representations contained in Item 19 of the April 29, 2021 FDD provided to the Fitzpatricks were deceptive because they purported to provide a reliable basis for franchisee profitability while simultaneously disclaiming their own accuracy and completeness. As shown in Item 19, the data was drawn from only two outlets—Greenville and Charlotte—neither of which reflected typical franchise operations.

---

[2] Specifically, Defendant Ricketts presented the Workbook to the Fitzpatricks on or around December 9, 2021. Defendant Hoffmann presented the Workbook to Greenstein on or July 5, 2022. Defendant Phalen provided Traficante and Beras with the Workbook on or around June 1, 2022. Defendant Zurek provided the Workbook to Gaudreau on or around June 6, 2023.

34.     These outlets were not representative of newly established Mighty Dog Roofing franchises, as they operated under different trademarks, supplier relationships, cost structures, and local market conditions. Moreover, upon information and belief, the financial data reported for the Greenville outlet was distorted by MDR before being included in the FDD, further rendering the Item 19 representations false and misleading.

35.     The profit margins presented in Item 19 are not realistic when compared to independent industry benchmarks. Independent sources confirm that typical roofing contractors operate with EBITDA margins in the range of 10% to 15%, depending on region and scale of operations.   By contrast, the margins MDR represented in Item 19, which were 28% to 34%, are over triple industry norms and were materially inflated.[3]

36.     Despite being a newly-launched franchise system, MDR represented that its franchisees achieve profit margins far in excess of industry averages—effectively triple the low-teens margins typical in the roofing sector. MDR knew or should have known that such representations were false, misleading, and designed to fraudulently induce prospective franchisees into purchasing its franchises.

37.     Further, Item 20 of the FDD reflects that there were eight franchised outlets operating as of the end of 2018, and that the number of franchised outlets remained constant at eight through 2020. MDR selectively withheld financial information from the remaining six franchised outlets.[4]

---

[3] In addition to the misleading data in Item 19, Ricketts assured the Fitzpatricks that they would generate approximately one million dollars ($1,000,000) in revenue during their first year of operations and an additional one million five hundred thousand dollars ($1,500,000) during the second (2nd) year of operations. Ricketts instructed the Fitzpatricks to use these numbers to secure an SBA loan.

[4] On or about March 1, 2022, the Fitzpatricks' requested that MDR provided the financial data for the remaining six (6) outlets.  In response, Ricketts refused and stated that MDR was "not comfortable formally releasing updated financials without a full FDD disclosure." The FDD was subsequently amended,

38.    Indeed, the selective presentation of data from the two (2) franchises that were operating under preferential terms and completely unrealistic financial information was in stark contrast to the requirements set forth in 16 C.F.R. §436.5(s) requiring complete and accurate financial performance representations, 16 C.F.R. §436.7(a) mandating that all disclosures be accurate and not misleading and 16 C.F.R. §436.9(c) prohibiting misleading financial performance representations.

39.    Similarly, the Item 19 financial performance representations that MDR included in the April 29, 2022 FDD that was provided to Greenstein, Traficante and Beras were false and misleading.[5] The disclosure purported to present typical franchise profitability but was based on information from only five "Conforming Franchisees" out of approximately forty-one locations in operation during the relevant period, representing barely twelve percent of the system. These few outlets operated between January 1, 2021 and March 31, 2022, at a time when the franchise system was just recently launched and heavily supported by MDR. The financial results of these early locations were not representative of an ordinary franchisee's performance.

40.    Further, upon information and belief, MDR also manipulated individual franchise data to create the appearance of inflated profitability. Specifically, MDR took the financial data for franchisee Chris Rahill's location and despite his objection to same, MDR manipulated the results of his location so that his franchise appeared to be profitable even though it was not. MDR included the fraudulent data in Item 19.

_____

but this critical information remained undisclosed.

[5] In addition to the misrepresentations in Item 19, Defendants Hoffmann and Zurek assured Greenstein he could expect to generate approximately one to three million dollars in revenues each year by purchasing five territories. Defendants Skolnick and Beutler assured Traficante and Beras they could expect to generate one to three million dollars ($1,000,000.00 - $3,000,000.00) in revenue within the first year of operating their business and that revenues would increase after each year. Defendant Phalen reiterated these representations to Traficante and Beras when he stated that every franchisee has "taken out an SBA loan and generated enough revenue to pay it off within the first year of operations."

41.     MDR further inflated reported profitability by inventing a non-standard metric labeled "Contracted EBITDA," defined as Total Annual Contracted Revenue less Cost of Goods Sold and Total Expenses. This definition departed from generally accepted accounting principles by measuring uncollected contract revenue rather than actual receipts. It also omitted required and recurring expenses, including owner compensation, training, insurance, and mandatory brand and technology fees. Through the use of this non-standard metric, MDR falsely represented EBITDA margins exceeding twenty-two percent (22%), more than double the ten to fifteen percent (10 – 15%) EBITDA margins recognized by independent roofing-industry benchmarks.

42.     By presenting these inflated and selectively derived figures as "EBITDA" without disclosing their limitations, MDR intentionally misrepresented the financial performance of the Mighty Dog Roofing franchise system in violation of 16 C.F.R. § 436.5(s)(3) and applicable state franchise and consumer-protection laws. Plaintiffs relied on these deceptive representations in deciding to invest in the Mighty Dog franchise system and ultimately suffered significant damages in reliance on such fraudulent information.

43.     Lastly, in the May 10, 2023 FDD that MDR provided to Gaudreau, MDR engaged in the same pattern of distortion by presenting multiple conflicting methodologies designed to inflate perceived franchise profitability.  In the Item 19 tables, MDR divided franchises into the "Top 10 %," "Top 25 %," "Top 50 %," "Top 75 %," and "Bottom 25 %," but the underlying metrics—Average Revenue, Gross Profit Margin, and Expenses as a % of Revenue—were derived using inconsistent bases of calculation. For instance, "Gross Profit Margin" was calculated using only Direct Costs of Goods Sold and omitted nearly all fixed and recurring overhead such as payroll, insurance, rent, royalties, technology fees, and marketing contributions—producing artificially high margins exceeding fifty percent (50%) for the "Top 10 %" of outlets. No roofing

contractor in the United States operates at those levels as industry EBITDA margins rarely exceed ten – fifteen percent (10–15 %).

44.     MDR then applied a wholly separate formula for "Expenses as a % of Revenue," in which key cost categories were selectively included and/or excluded without any consistent standard. By using one formula to reduce costs in the Gross Profit Margin table and another to inflate revenue in the Average Revenue table, MDR manufactured the illusion of extraordinarily profitable units. Through such manipulation of data, MDR represented the same reporting group to achieve both high revenue and low expense ratios—a statistical impossibility in a labor-intensive service business like roofing.

45.     Upon information and belief, the manipulated tables were structured to intentionally mislead prospective franchisees into believing that Mighty Dog Roofing franchises routinely achieve gross margins between 40–50 % and expense ratios below 30%, suggesting EBITDA margins double or triple industry norms. In truth, the apparent "profitability" was a mathematical artifact created by altering definitions and methodologies from one table to the next. By shifting between Gross Profit, Expenses as a % of Revenue, and Average Revenue—each calculated using different denominators and cost exclusions—MDR presented a false and internally inconsistent picture of franchise performance in violation of 16 C.F.R. § 436.5(s)(3) and parallel state franchise laws.

46.     In addition to the false and misleading representations in Item 19, MDR's representations in Item 11 were also in violation of the FTC Franchise Rule. Item 11 requires franchisors to "disclose the franchisor's principal assistance and related obligations of both the franchisor and franchisee."

47.     In Item 11 of the FDD, MDR represents that it provides thirty-two (32) hours of

classroom training and an additional sixteen (16) hours of on-the-job training. On top of this, MDR represented that it provides franchisees comprehensive operational guidance and ongoing assistance in connection with the operations of a Mighty Dog Roofing franchise. Unbeknownst to Plaintiffs at the time, such statements were false and misleading and designed to induce naïve prospects into investing in the Mighty Dog Roofing franchise system.

48.    Upon information and belief, Defendants Skolnick, Zurek, and Schwartz were in charge of creating, and did, in fact, create various aspects of the 2021, 2022 and 2023 FDDs.

49.    MDR also falsely represented that franchisees did not need roofing experience to operate the business and that it could be managed as a semi-absentee business. Relying on these assurances, each Plaintiff hired a General Manager along with some sales personnel. Despite following MDR's directions, each Plaintiff's respective principal was forced to devote a minimum of forty (40) hours per week in day-to-day operations, confirming that the "no-roofer" and "absentee-owner" representations were false and misleading.

50.    In addition, Plaintiffs obtained a Small Business Administration ("SBA") loan arranged through either Huntington Bank or First Bank of the Lake, which was approved based on the false and misleading financial information contained in the Workbooks.[6] MDR's representative(s), specifically its Financing Director, Zurek, and later, Schwartz, worked in conjunction with the bank's loan officers, mischaracterizing the franchise's financial performance and projected earnings to secure financing approval.[7] This deceitful submission of information

---

[6] The Fitzpatricks' SBA loan was approved on April 6, 2022. Greenstein's SBA loan was pre-approved on September 7, 2022 and closed on January 9, 2023. Traficante's and Beras's SBA loan was pre-approved on January 11, 2023 and closed on March 14, 2023. Gaudreau's SBA loan was pre-approved on August 26, 2023 and closed on September 15, 2023.

[7] Zurek was the Finance Director from November 2021 to October 2022, and Schwartz was the Finance Director from October 2022 to August 2023.

further induced each Plaintiff to proceed with the franchise purchase under false pretenses.

51.     Between March 11, 2022 through June 19, 2023, and in direct reliance on the information contained in the Workbooks and the representations that MDR made in the FDD, Plaintiffs acquired multiple territories from MDR. For example, the Fitzpatricks acquired three (3) territories from MDR by executing three (3) separate and distinct Franchise Agreements.[8]

52.     Similarly, on or about July 28, 2022, and in direct reliance on the information contained in the Workbook and the representations made in the FDD, Traficante acquired three (3) territories from MDR by executing three (3) separate and distinct Franchise Agreements. [9]

53.     On or about November 9, 2022, and in direct reliance on the information contained in the Workbook and the representations made in the FDD, Greenstein acquired five (5) territories from MDR by executing five (5) separate and distinct Franchise Agreements.[10]

54.     On or about June 19, 2023, and in direct reliance on the information contained in the Workbook and the representations made in the FDD, Gaudreau acquired three (3) territories from MDR by executing three (3) separate and distinct Franchise Agreements. [11]

55.     Under the terms of the Franchise Agreements, MDR owed various obligations to Plaintiffs. However, after Plaintiffs opened their franchise, it became plainly apparent to Plaintiffs that MDR had sold a franchise opportunity to Plaintiffs without having the personnel, infrastructure, and resources necessary to fulfill the obligations owed to Plaintiffs under the terms of the Franchise Agreements.

---

[8] A true and correct copy of one of the Franchise Agreements executed by the Fitzpatricks, is annexed hereto as **Exhibit "A."**

[9] A true and correct copy of one of the Franchise Agreements executed by Traficante is annexed hereto as **Exhibit "B"**.

[10] A true and correct copy of one of the Franchise Agreements executed by Greenstein is annexed hereto as **Exhibit "C"**.

[11] A true and correct copy of one of the Franchise Agreements executed by Gaudreau is annexed hereto as **Exhibit "D"**.

56.     Specifically, MDR materially breached the terms of the Franchise Agreement by, *inter alia*, failing to:

(a)     establish national advertising and brand promotion in breach of Paragraph 3.7 of the Franchise Agreements;

(b)     deliver the agreed upon video productions for use on social media, actors and actresses' compensation, and video editing in accordance with Paragraph 3.10 of the Franchise Agreement;

(c)     provide digital marketing and website management despite collecting an initial lump sum plus ongoing Digital Management Fee in accordance with Paragraph 3.11 of the Franchise Agreement;

(d)     provide local SEO optimization during the first year of operations despite collecting a Local Brand Optimization Fee in breach of Paragraph 3.6 of the Franchise Agreement.

57.     Plaintiffs, on numerous occasions, engaged in telephone meetings with MDR's representatives, including Lincoln Zehr and Don Scheider, to discuss their grievances with MDR as outlined herein. Much to their disappointment, MDR deflected all blame and offered no help whatsoever.

58.     Between February 12, 2025 through July 15, 2025, each Plaintiff, through undersigned counsel, sent MDR a letter demanding rescission of the Franchise Agreement.

59.     The actual costs and operational realities of the franchise provided dramatically different from Defendants' oral and written representations resulting in significant losses. Had MDR provided accurate and complete disclosures as required by the FTC Franchise Rule, 16 C.F.R. §§ 436 and 437, Plaintiffs would not have entered into a franchise relationship with MDR nor invested time and financial resources into this venture. As such, Plaintiffs could have avoided their substantial investment and financial losses.

60.     All conditions precedent to bringing this action have been waived, excused, performed, or otherwise occurred.

61.     As a result of Defendants' wrongful conduct, as described herein, and Plaintiffs' need to protect and enforce their legal rights, Plaintiffs have retained the undersigned attorneys and are obligated to pay said firm attorneys' fees. Pursuant to Paragraph 22.8 of the respective Franchise Agreements, Plaintiffs seek to recover their attorneys' fees and costs from MDR.

## CAUSES OF ACTION
### Count I – Fraudulent Misrepresentation
### (All Plaintiffs against All Defendants)

62.     Plaintiffs reassert and reallege the allegations contained within Paragraph 1 through 61, *supra*, as of fully set forth herein.

63.     As fully set forth in Paragraphs 30 – 51, *supra*, and at all times material to this action, Defendants: (a) made numerous false representations to Plaintiffs; (b) of existing material fact; (c) with knowledge that such representations were false; (d) with the intent that the representations induce injurious action; (e) with consequent injury to Plaintiffs; (f) acting in reasonable reliance thereon, as outlined above.

64.     Defendants' false representations of material fact were made knowingly and intentionally and were intended to induce Plaintiffs to enter into the Franchise Agreements.

65.     Defendants, given their position of superiority over the information that they were supplying to Plaintiffs, intended for Plaintiffs to rely upon the foregoing misrepresentations to their detriment.

66.     Plaintiffs acted in justifiable reliance on Defendants' false representations by entering into a franchise relationship with MDR through the execution of the Franchise Agreements.

67.     Plaintiffs would not have executed the Franchise Agreements and proceeded to invest substantial sums of time, effort, and money in Mighty Dog Roofing franchise concept but

for the above misrepresentations of material facts by Defendants.

68.     Defendants acted intentionally, willfully, and/or recklessly and within wanton disregard for the rights of Plaintiffs in making the material misrepresentations and engaging in the deceptive conduct described above.

69.     As a direct, proximate, and foreseeable result of Defendants' fraudulent conduct, Plaintiffs have suffered and continue to suffer substantial damages.

**WHEREFORE**, Plaintiffs, JMR CAPITAL HOLDINGS, INC., MSG CONTRACTING CORP., SCALE BEYOND, LLC, and ON TOP ROOFING, CORP, respectfully request that this Honorable Court enter a judgment in their favor and against Defendants, MDR UNITED, LLC, JOSHUA HOFFMANN, BRANDON ZUREK, JOSH SKOLNICK, CHRIS PHALEN, LUKE SHWARTZ and THOMAS RICKETTS, for: (i) rescission of the Franchise Agreement; (ii) compensatory damages, plus pre- and post-judgment interest, in an amount to be proven at trial; and (iii) such other and further relief as this Honorable Court deems just and proper.

### Count II – Negligent Misrepresentation
### (All Plaintiffs Against All Defendants)

70.     Plaintiffs reassert and reallege the allegations contained within Paragraph 1 through 61, *supra*, as of fully set forth herein.

71.     As fully set forth in Paragraphs 30 – 51, *supra*, and at all times material to this action, Defendants: (a) made numerous false representations to Plaintiffs; (b) of existing material fact; (c) with knowledge that such representations were false; (d) with the intent that the representations induce injurious action; (e) with consequent injury to Plaintiffs; (f) acting in reasonable reliance thereon, as outlined above.

72.     Defendants' negligent representations of material fact were made knowingly and intentionally and were intended to induce Plaintiffs to execute the Franchise Agreements and invest

substantial sums of time, effort, and money and were also designed to mislead Plaintiffs as to the true and correct facts relating to the franchised business.

73.     Had it not been for the negligent misrepresentations of existing material fact made by Defendants, Plaintiffs would not have executed the Franchise Agreement with MDR.

74.     As a direct, proximate, and foreseeable result of Defendants' wrongful and negligent conduct, Plaintiffs have suffered and continue to suffer substantial damages.

**WHEREFORE**, Plaintiffs, JMR CAPITAL HOLDINGS, INC., MSG CONTRACTING CORP., SCALE BEYOND, LLC, and ON TOP ROOFING, CORP respectfully request that this Honorable Court enter a judgment in their favor and against Defendants, MDR UNITED, LLC, JOSHUA HOFFMANN, BRANDON ZUREK, JOSH SKOLNICK, CHRIS PHALEN, LUKE SCHWARTZ, and THOMAS RICKETTS, for: (i) compensatory damages, plus pre- and post-judgment interest, in an amount to be proven at trial; and (ii) such other and further relief as this Honorable Court deems just and proper.

### Count III – Breach of Contract
### (All Plaintiffs against Defendant MDR)

75.     Plaintiffs reassert and reallege the allegations contained within Paragraph 1 through 61, *supra*, as of fully set forth herein.

76.     The Franchise Agreements are valid and binding contracts between Plaintiffs and MDR.

77.     Plaintiffs have fully performed all conditions and obligations to be performed on their part under the Franchise Agreements.

78.     As reflected in Paragraphs 56 – 57, *supra*, MDR failed to perform its obligations under the terms of the Franchise Agreements with each group of Plaintiffs.

79.     As a result of MDR's material breaches of the Franchise Agreements, Plaintiffs

18

have suffered and continue to suffer damages.

**WHEREFORE**, Plaintiffs, JMR CAPITAL HOLDINGS, INC., MSG CONTRACTING CORP., SCALE BEYOND, LLC, and ON TOP ROOFING, CORP demand judgment in their favor and against Defendant, MDR UNITED, LLC, for: (i) compensatory damages, plus pre- and post-judgment interest, in an amount to be proven at trial; (ii) reasonable costs and attorneys' fees pursuant to Section 22.8 of the Franchise Agreement; and (iii) such other and further relief as this Honorable Court deems just and proper.

### Count IV – Breach of Implied Covenant of Good Faith and Fair Dealing
### (All Plaintiffs Against Defendant MDR)

80.    Plaintiffs reassert and reallege the allegations contained within Paragraph 1 through 61 and 76 through 79, *supra*, as of fully set forth herein.

81.    The Franchise Agreements and the relationship between Plaintiffs and MDR give rise to a mutually implied covenant of good faith and fair dealing. MDR had a duty to act in good faith and to fairly deal with Plaintiffs in carrying out the terms and provisions of the Franchise Agreements and was prohibited from engaging in arbitrary or unreasonable conduct that had the effect of preventing Plaintiffs from receiving the fruits of the Franchise Agreements.

82.    MDR breached the express and implied terms of the Franchise Agreements by acting arbitrarily, unreasonably, and inconsistent with the reasonable expectations of the parties and by failing to exercise good faith in carrying out the terms of the Franchise Agreements.

83.    As a direct, proximate, and foreseeable result of MDR's material breaches of its implied duty of good faith and fair dealing, Plaintiffs have suffered and continue to suffer substantial damages.

**WHEREFORE**, Plaintiffs, JMR CAPITAL HOLDINGS, INC., MSG CONTRACTING CORP., SCALE BEYOND, LLC, and ON TOP ROOFING, CORP respectfully request that this

Honorable Court demand enter a in their favor and against Defendant, MDR UNITED, LLC for:

(i) compensatory damages, plus pre- and post-judgment interest, in an amount to be proven at trial;

(ii) reasonable costs and attorneys' fees pursuant to Section 22.8 of the Franchise Agreement; and

(iii) such other and further relief as this Honorable Court deems just and proper.

### Count V – Violation of the New Jersey Consumer Fraud Act
### (All Plaintiffs Against All Defendants)

84.     Plaintiffs reassert and reallege the allegations contained within Paragraph 1 through 61, *supra*, as of fully set forth herein.

85.     Defendants' conduct constitutes "unlawful practices" within the meaning of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-2, including, but not limited to: (a) affirmative misrepresentations; (b) knowing omissions and concealment of material facts; and (c) unconscionable commercial practices made in connection with the advertisement, offer, sale, and subsequent performance of the Mighty Dog Roofing franchise opportunity to Plaintiffs.

86.     As set forth in Paragraphs 30 – 51, *supra*, Defendants knowingly provided Plaintiffs with illegal and deceptive financial performance representations, inflated profitability metrics, fabricated or distorted franchisee financial data, undisclosed recurring operating costs, and false statements concerning training, operational support, and the semi-absentee nature of the business model.

87.     Defendants' unlawful conduct was made with the intent that Plaintiffs rely upon the foregoing misrepresentations and omissions when deciding whether to purchase Mighty Dog Roofing franchises. Plaintiffs reasonably relied upon these representations and omissions when investing substantial time, money, and resources into entering and operating the franchise.

88.     As a direct and proximate result of Defendants' unlawful practices, Plaintiffs suffered an "ascertainable loss" within the meaning of the NJCFA, including, but not limited to:

(a) overpayment for franchise territories; (b) expenses incurred in reliance upon Defendants' misrepresentations; (c) losses resulting from the materially different and undisclosed operating costs, margins, and performance of the franchise; and (d) lost profits and other consequential damages arising from the inability to achieve the financial results Defendants deceptively represented.

**WHEREFORE**, Plaintiffs, JMR CAPITAL HOLDINGS, INC., MSG CONTRACTING CORP., SCALE BEYOND, LLC, and ON TOP ROOFING, CORP respectfully request that this Honorable Court enter a judgment in their favor and against Defendants, MDR UNITED, LLC, JOSHUA HOFFMANN, BRANDON ZUREK, JOSH SKOLNICK, CHRIS PHALEN, LUKE SCHWARTZ, and THOMAS RICKETTS, for: (i) compensatory damages, as well as pre- and post-judgment interest, in an amount to be proven at trial; (ii) treble damages;; (iii) attorneys' fees and costs; and (iv) any such other and further relief as this Honorable Court deems just and proper.

**Count VI – Violation of the Pennsylvania Unfair
Trade Practices and Consumer Protection Law
(All Plaintiffs against all Defendants)**

89.     Plaintiffs reassert and reallege the allegations contained within Paragraph 1 through 61, *supra*, as of fully set forth herein.

90.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq., declares unlawful any "unfair methods of competition" and "unfair or deceptive acts or practices" in the conduct of trade or commerce.

91.     Defendants engaged in unfair and deceptive acts and practices within the meaning of the UTPCPL in connection with the marketing and sale of Mighty Dog Roofing franchises to Plaintiffs.

92. Such deceptive acts and practices include, but are not limited to:

(a)   selectively presenting and manipulating Item 19 financial-performance data while omitting available and materially different data from the broader system;

(b)   providing financial materials, projections, and profitability metrics that were incomplete, misleading, or fabricated;

(c)   representing that the franchise could be successfully operated on a semi-absentee basis even though Defendants knew that an owner-operator model was required; and

(d)   misrepresenting the scope, adequacy, and quality of MDR's training, marketing, and operational support, including concealing MDR's lack of personnel and infrastructure necessary to perform its promised obligations.

93.    Defendants' deceptive acts and practices had the capacity to mislead a reasonable prospective franchisee and did in fact mislead Plaintiffs.

94.    Plaintiffs reasonably relied on Defendants' misrepresentations and omissions in deciding to purchase Mighty Dog Roofing franchises and, as a direct and proximate result, suffered ascertainable losses, including franchise fees, development and start-up costs, operational losses, and other consequential damages. Defendants' violations of the UTPCPL were willful and knowing, entitling Plaintiffs to treble damages pursuant to 73 P.S. § 201-9.2(a).

95.    Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs are also entitled to recover their reasonable attorneys' fees and costs.

**WHEREFORE**, Plaintiffs, JMR CAPITAL HOLDINGS, INC., MSG CONTRACTING CORP., SCALE BEYOND, LLC, and ON TOP ROOFING, CORP, respectfully request that this Honorable Court demand enter a judgment  against Defendants, MDR UNITED, LLC, JOSHUA HOFFMANN, BRANDON ZUREK, JOSH SKOLNICK, CHRIS PHALEN, LUKE SCHWARTZ, and THOMAS RICKETTS, for: (i) compensatory damages, plus pre- and post-judgment interest; (ii) treble damages pursuant to 73 P.S. § 201-9.2; (iii) attorneys' fees and costs; and (iv) such other and further relief as this Honorable Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on issues so triable.


Dated: December 11, 2025    Respectfully submitted,

           /s/ Jeffrey D. Catrambone

           **SCIARRA CATRAMBONE CURRAN & GRAY, LLC**
           1130 Clifton Avenue
           Clifton, NJ 07013
           Phone:  (973) 242-2442
           Fax:     (973) 242-3118
           jcatrambone@sciarralaw.com
           *Local Counsel /Attorneys of Record for Plaintiffs*

           **ZARCO EINHORN SALKOWSKI, P.A.**
           *Counsel for Plaintiffs*
           One Biscayne Tower
           2 S. Biscayne Blvd., 34th Floor
           Miami, Florida 33131
           Telephone: (305) 374-5418
           Facsimile: (305) 374-5428
           ***(to seek admission pro hac vice)***

             **ROBERT M. EINHORN**
             Florida Bar No. 858188
             E-mail: reinhorn@zarcolaw.com
             Secondary e-mail: imorfi@zarcolaw.com
             Tertiary e-mail: eservice@zarcolaw.com
             **HIMANSHU M. PATEL**
             Florida Bar No. 0167223
             E-mail: hpatel@zarcolaw.com
             Secondary e-mail: acoro@zarcolaw.com
             **ROBERT M. GALLINAR**
             Florida Bar No. 1030780
             E-mail: rgallinar@zarcolaw.com
             Secondary e-mail: bryan@zarcolaw.com

# Exhibit A

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

# MDR UNITED LLC



# FRANCHISE AGREEMENT

# TABLE OF CONTENTS

**SECTION**                                                                                           **PAGE**

DATA SHEET ..................................................................................................................... IV

FRANCHISEE AFFIRMATIONS AND ACKNOWLEDGEMENTS…………………………………V

1    GRANT OF FRANCHISE ................................................................................................. 2

2    TERM AND RENEWAL ................................................................................................... 5

3    FEES .................................................................................................................................. 7

4    PROPRIETARY MARKS ................................................................................................. 12

5    CONFIDENTIAL INFORMATION ................................................................................ 14

6    FRANCHISOR'S OBLIGATIONS ................................................................................... 16

7    FRANCHISEE'S OBLIGATIONS ................................................................................... 18

8    TRAINING ........................................................................................................................ 26

9    INSURANCE ..................................................................................................................... 28

10   FINANCIAL RECORDS AND REPORTS ....................................................................... 30

11   BOOKS AND RECORDS .................................................................................................. 31

12   ADVERTISING .................................................................................................................. 32

13   INDEPENDENT CONTRACTOR; INDEMNIFICATION .............................................. 37

14   SALE OR TRANSFER ...................................................................................................... 38

15   BREACH AND TERMINATION ...................................................................................... 42

16   RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION ............................. 46

17   COVENANTS .................................................................................................................... 48

18   DISPUTE RESOLUTION ................................................................................................. 50

19   REPRESENTATIONS ....................................................................................................... 52

20   GUARANTEE OF PRINCIPALS THEIR AND SPOUSES ............................................. 54

21   NOTICES ........................................................................................................................... 54

22   MISCELLANEOUS ........................................................................................................... 54

23   ACKNOWLEDGMENTS ................................................................................................... 56

# EXHIBITS

Exhibit A – Personal Guaranty and Guaranty of Spouses
Exhibit B – Conditional Assignment of Franchisee's Telephone Numbers, Facsimile
        Numbers and Domain Names
Exhibit C – Confidentiality and Restrictive Covenant Agreement for Employees
Exhibit D – Electronic Funds Withdrawal Authorization
Exhibit E – Site Selection Addendum
Exhibit F – Collateral Assignment of Lease
Exhibit G – Territory Map
Exhibit H – Multi Unit Addendum

© 2021 MDR United LLC
Franchise Agreement

# DATA SHEET

| | |
|---|---|
| Franchisee: | Michael Fitzpatrick |
| | 35 Lewis Ave. |
| | Summit, New Jersey 07901 |
| | |
| | Ryan Fitzpatrick |
| | 1700 Park Avenue, Apt. 811 |
| | Weehawken, NJ 07086 |
| | |
| Guarantors: | Michael Fitzpatrick |
| | 35 Lewis Ave. |
| | Summit, New Jersey 07901 |
| | |
| | Ryan Fitzpatrick |
| | 1700 Park Avenue, APT 811 |
| | Weehawken, NJ 07086 |
| | |
| Effective Date: | March 11, 2022 |
| | |
| Approved Location: | _____ |
| | |
| | _____ |
| | |
| Protected Territory: | See "Territory 1" set forth on the Map attached as Exhibit "G" to Franchise Agreement |
| | |
| Telephone Number: | Michael Fitzpatrick:  (718) 772-4989 |
| | Ryan Fitzpatrick:     (646) 210-7218 |
| | |
| E-Mail Address: | Michael Fitzpatrick:  mfitzpat23@yahoo.com |
| | Ryan Fitzpatrick:     fitzpatrick.ryan11@gmail.com |
| | |
| Initial Franchise Fee: | $59,500.00 |

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

## MDR UNITED LLC
## FRANCHISE AGREEMENT

### FRANCHISEE AFFIRMATIONS AND ACKNOWLEDGEMENTS

As you know, MDR United LLC ("we", "us" or "Mighty Dog Roofing"), and you are preparing to enter into a Franchise Agreement for the operation of a Mighty Dog Roofing franchise (a "Franchised Business"). The purposes of this Questionnaire are to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes\_\_\_\_ No \_\_\_\_ 1.  Have you received and personally reviewed the Franchise Agreement, as well as each exhibit or schedule attached to this agreement, you intend to enter into with us?

Yes\_\_\_\_ No \_\_\_\_ 2.  Do you understand that this Questionnaire pertains and relates to each and all of the Franchise Agreements, if more than one (1) Franchise Agreement, you intend to enter into with us?

Yes\_\_\_\_ No \_\_\_\_ 3.  Have you received and personally reviewed the Franchise Disclosure Document we provided?

Yes\_\_\_\_ No \_\_\_\_ 4.  Did you sign a receipt for the Disclosure Document indicating the date you received it?

Yes\_\_\_\_ No \_\_\_\_ 5.  Do you understand all the information contained in the Disclosure Document and the Franchise Agreement you intend to enter into with us?

Yes\_\_\_\_ No \_\_\_\_ 6.  Have you reviewed the Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor and discussed the benefits and risks of operating a Franchised Business with these professional advisor(s)?

Yes\_\_\_\_ No \_\_\_\_ 7.  Do you understand the success or failure of your Franchised Business will depend in large part upon your skills, abilities and efforts and those of the persons you employ, as well as many factors beyond your control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace?

Yes\_\_\_\_ No \_\_\_\_ 8.  Do you understand we have only granted you certain protected territorial rights under the Franchise Agreement and that we have reserved certain rights under the Franchise Agreement?

© 2021 MDR United LLC
Franchise Agreement

Yes____ No ____  **X  X**  9.  Do you understand we and our affiliates retain the exclusive unrestricted right to engage, directly or through others, in the providing of services under the Franchisor's Proprietary Marks or other marks, at any location outside your Protected Territory, without regard to the proximity of these activities to the premises of your Franchised Business?

Yes____ No ____  **X  X**  10.  Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be mediated, at our option, in Bucks County, Pennsylvania?

Yes____ No ____  **X  X**  11.  Do you understand the Franchise Agreement provides you can only collect compensatory damages on any claim under or relating to the Franchise Agreement and you are not entitled to any punitive, consequential or other special damages?

Yes____ No ____  **X  X**  12.  Do you understand the sole entity or person against whom you may bring a claim under the Franchise Agreement is MDR United LLC?

Yes____ No ____  **X  X**  13.  Do you understand all persons whose names appear on the Franchise Agreement must successfully complete the appropriate initial training program(s) before we will allow the Franchised Business to open or consent to a transfer of that Franchised Business?

Yes____ No ____  **X  X**  14.  Do you understand that we require you to successfully complete certain initial training program(s) and if you do not successfully complete the applicable training program(s) to our satisfaction, we may terminate your Franchise Agreement?

Yes____ No ____  **X  X**  15.  Do you understand we do not have to sell you a franchise or additional franchises or consent to your purchase of existing franchises?

Yes____ No ____  **X  X**  16.  Do you understand that we will send written notices, as required by your Franchise Agreement, to either your Franchised Business or home address until you designate a different address by sending written notice to us?

Yes____ No ____  **X  X**  17.  Do you understand that we will not approve your purchase of a Franchised Business, or we may immediately terminate your Franchise Agreement, if we are prohibited from doing business with you under any anti-terrorism law enacted by the United States Government?

Yes____ No ____  **X  X**  18.  Is it true that no broker, employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Franchised Business that is not contained in the Disclosure Document or that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____  **X  X**  19.  Is it true that no broker, employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a Franchised Business will generate, that is not

© 2021 MDR United LLC
Franchise Agreement

contained in the Disclosure Document or that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____  20.  Is it true that no broker, employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____  21.  Is it true that no broker, employee or other person providing services to you on our behalf has solicited or accepted any loan, gratuity, bribe, gift or any other payment in money, property or services from you in connection with a Franchised Business purchase with exception of those payments or loans provided in the Disclosure Document?

Yes____ No ____  22.  Did you receive the Franchise Disclosure Document at least fourteen (14) days before you completed and signed this Questionnaire?

Yes____ No ____  23.  Did you receive the Franchise Agreement at least seven (7) days before you completed and signed this Questionnaire?

**YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.**

DocuSigned by:

*Michael Fitzpatrick*
_____
5F20519C80ED417...

Michael Fitzpatrick, individually

Dated: ____3/11/2022_____

DocuSigned by:

*Ryan Fitzpatrick*
_____
79E11698D2F04FD...

Ryan Fitzpatrick, individually

Dated: ____3/11/2022_____

© 2021 MDR United LLC
Franchise Agreement

# MDR UNITED LLC
## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective this 11th day of March, 2022, by and between MDR United LLC, a Pennsylvania limited liability company, with its principal place of business at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee").

## RECITALS

A.      Through the expenditure of a considerable amount of time, effort, and money, Franchisor has developed a system for the operation of Mighty Dog Roofing businesses (each, a "Franchised Business") that offer, sell and perform roofing services in residential and commercial properties, including: (i) new and replacement roofing services; (ii) emergency tarping services; (iii) gutter replacement; (iv) attic insulation; and (v) other products, services and events that Franchisor may approve and modify from time to time (collectively, the "Approved Products and Services").

B.      Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which include: (i) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Services to customers; (ii) certain proprietary products developed by Franchisor; (iii) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (iv) Franchisor's centralized System-wide call center (the "Call Center"); (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential operations manual (the "Operations Manual") that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.      The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin and intellectual property, including, without limitation, the MIGHTY DOG ROOFING word mark pending registration on the Principal Register of the United States Patent and Trademark (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.      Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Protected Territory").

E.      Franchisee desires to establish and operate a Franchised Business within the

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

Protected Territory hereinafter designated, to use in connection therewith the Franchisor's System and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.     Franchisor wishes to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.     Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

# 1     GRANT OF FRANCHISE

1.1     **Grant and Acceptance**.  Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business.  Except as otherwise provided in this Agreement, Franchisee may offer, sell and perform Franchisor's Approved Products and Services within the Protected Territory set forth in Section 1.2 herein. Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional protected territories.

1.2     **Protected Territory**.  Except as otherwise provided in this Agreement and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third-party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Protected Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including without limitation, those rights set forth in Sections 1.4 through Section 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Protected Territory provided that (a) Franchisee will not be operating within another franchisee's Protected Territory, and (b) Franchisee received Franchisor's prior written consent, which may be withheld for any reason. Other than these operations, Franchisee is not permitted to operate the Franchised Business outside of the Protected Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Protected Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and specifications as set forth in the Operations Manual (as defined in Section 6.1). If more than 5% of Franchisee's Gross Revenues are derived from approved operations from or within a specific location or area that is outside of the Protected

Territory, to continue to operate in that area, Franchisee must either purchase an additional franchise and execute a separate franchise agreement for that operation or purchase an additional territory covering such territory.

  1.3 **Approved Location**.  Franchisee must operate the Franchised Business only at the approved location identified in the Data Sheet (the "Approved Location").  Franchisee shall operate the Franchised Business from an approved office/warehouse or flex space located in the Protected Territory that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee will need to lease approximately 1,500 to 2,000 square feet of commercial real estate for the office/warehouse or flex space and to securely store equipment/inventory. Franchisor may, but is not required to, allow Franchisee to utilize a home office or cooperative space of 1,500 to 2,000 square feet as an Approved Location during the first six (6) months of operations. Franchisee may not utilize a home office or cooperative space at any time without Franchisor's prior written consent. The office may be located in the warehouse or flex space, provided that it meets Franchisor's standards and specifications. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. Franchisee must secure its Approved Location within ninety (90) days of executing this Agreement in the event the parties have not agreed on an Approved Location prior to executing this Agreement. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (attached hereto as Exhibit E), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

  1.4 **National and  Regional Accounts**. Franchisor has the  exclusive right to create National and Regional Account ("NORA") programs for a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations, Chain Customers (as defined below) and other similar organizations for the benefit of the System. Franchisor or any party Franchisor may designate has the exclusive right to solicit and service NORA customers within or outside of the Protected Territory, including, the right to offer and sell Approved Products and Services. Franchisee may not solicit, service or otherwise pursue any NORA relationships, whether the contacts for these relationships are in the Protected Territory or not, without Franchisor's prior written consent. Franchisee may not service, solicit or otherwise pursue a relationship with a NORA or potential NORA or any of its members or associates, without notice to Franchisor and Franchisor's prior written consent. Any dispute as to whether a particular customer is considered a NORA customer will be determined by Franchisor, and its determination will be final and binding. A Chain Customer´is a non-residential customer, a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations whose presence is not confined within any one particular territory. Following the execution of a contract with or the acceptance of a bid by a NORA customer which contemplates the provision of services to one or more NORA locations within the Protected Territory, Franchisor may, at its sole option, provide Franchisee the option to perform such services pursuant to the terms and conditions of the NORA contract or on such terms and conditions as Franchisor determines in its sole discretion. In order to service any NORA customers, Franchisee must enter into Franchisor's then-current form of NORA participation agreement, the terms of which

will govern all NORA work. Franchisee is not entitled to any right to compensation or consideration for work performed by others in the Protected Territory for National Accounts.

    1.4.1    Franchisor also shall have the right, exercisable in its sole discretion, to:

    A.    provide, directly or through any other licensee or franchisee utilizing the Proprietary Marks, services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract; and/or

    B.    contract with another party to provide such services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract between Franchisor and the NORA customer, utilizing the Proprietary Marks or any other trademarks, service marks or trade names.

Neither the direct provision by Franchisor (or a System franchisee, licensee, or Franchisor's agent or designee) of services to NORA customers, nor Franchisor's contracting with another party to provide such services shall constitute a violation of Franchisee's rights in the Protected Territory. Franchisee disclaims any compensation or consideration for work performed by others in the Protected Territory on account of NORA customers within the Protected Territory.

    1.5    **Reservation of Rights**. Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Services, and otherwise use the Proprietary Marks and System, within the Protected Territory is non-exclusive and Franchisor and its affiliates expressly reserve the right to: (i) establish and operate, and license third parties the right to establish and operate, Franchised Businesses using the Proprietary Marks and System at any location outside of the Protected Territory; (ii) acquire, merge with, engage in joint ventures with, or otherwise affiliate with, and thereafter own and operate and franchise others the right to own and operate, any business of any kind regardless of location, except for businesses that offer roof repair and roof replacement within the Protected Territory; (iii) establish and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark, other than the Proprietary Marks, at any location, within or outside the Protected Territory; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service NORAs within and outside the Protected Territory as set forth more fully in Section 1.4; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center in accordance with Section 1.8 of this Agreement; (vii) sell and distribute, directly or indirectly, or license others to sell and distribute within or outside the Protected Territory, directly or indirectly, any products, services or merchandise, including Approved Products and Services, from any location or to any purchaser or through any alternative channel or method of distribution including, but not limited to, via retail and wholesale distribution, in supermarkets, hardware stores, club stores and other retail facilities, via mail order and e-commerce channels; and (viii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

    1.6    **Events of Catastrophe**. Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliates and/or other System franchisees may be permitted to provide support to

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

Franchisee and/or perform work in the Protected Territory, including the provision of labor, materials, equipment, and project management on projects in the Protected Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Protected Territory.

1.7    **Alternate Channels of Distribution.**  Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Protected Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine.  Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Services as described in this Section 1.7; or (ii) to share in any of the proceeds received by any such party therefrom.

1.8    **Right to Service Customers in Protected Territory; Use of Call Center.**

1.8.1    Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Protected Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and (a) Franchisee does not respond to the assignment within a time period Franchisor deems in its sole discretion appropriate under the circumstances, or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems appropriate in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that the Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Protected Territory has been subjected to a disaster or catastrophe.

1.8.2    Franchisee agrees and acknowledges that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Protected Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

## 2    TERM AND RENEWAL

2.1    **Term**.  The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

2.2    **Renewal**.  Franchisee has the right to renew this Agreement for one successive, additional ten (10) year period, provided Franchisee has met the following conditions:

2.2.1    Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

2.2.2    Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Protected Territory acceptable to Franchisor;

2.2.3    Franchisee has completed, to Franchisor's satisfaction, ninety (90) days prior to the expiration of the then-current term, any updates to all required equipment, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications and, Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

2.2.4    Franchisee is not in breach of any provision of this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

2.2.5    Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

2.2.6    Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without limitation, increased royalty and other fees and insurance requirements);

2.2.7    Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to providing the Approved Products and Services at any location within the Protected Territory;

2.2.8    Franchisee and its principals execute a general release in the form Franchisor prescribes; and

2.2.9    Franchisee pays a renewal fee in the amount of twenty percent (20%) of the then-current initial franchise fee.

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

## 3   FEES AND MANNER OF PAYMENT

3.1   **Initial Franchise Fee**.  In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee, calculated as follows (the "Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | Cumulative Number Owner Occupied Homes |
|---|---|---|---|
| #1 | $59,500 | $59,500 | 50,000 |
| #2 | $99,500 | $40,000 | 100,000 |
| #3 | $129,500 | $30,000 | 150,000 |
| #4 | $159,500 | $30,000 | 200,000 |
| #5 | $189,500 | $30,000 | 250,000 |

The Initial Franchise Fee is due at the signing of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise others.

3.2   **Royalty Fee**.  Franchisee must pay Franchisor a weekly royalty fee (the "Royalty") in an amount equal to the greater of: (i) six- and one-half percent (6.5%) of Gross Revenues Collected during the immediately preceding week; or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.1.

3.2.1   *Minimum Royalty Fee and Annual Gross Revenue Requirements*.

Franchisee must meet and maintain the following weekly Minimum Royalty Fees per Territory throughout the Term. Franchisee's weekly Minimum Royalty Fees are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Mighty Dog Roofing Business(es) have been open and operating.

Franchisee's Minimum Royalty Fees are as follows:

| Months of Operation | Minimum Royalties Per Week Per Territory | | | | |
|---|---|---|---|---|---|
| | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |

| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

In addition, Franchisee must meet and maintain the following minimum annual Gross Revenue requirements ("Minimum Annual Revenue Requirements") per Territory throughout the Term. Franchisee's Minimum Annual Revenue Requirements are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Mighty Dog Roofing Business(es) have been open and operating.

Franchisee's Minimum Annual Revenue Requirements are as follows:

| Minimum Annual Revenue Requirement Per Territory | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

The parties will true-up all Royalty payments, whether actual or Minimum Royalty Fee payments for each applicable 12-month period, at the period's end by evaluating each period's obligations on an annualized basis. In the event Franchisee's fails to meet the above Minimum Royalty Fees or Minimum Annual Revenue Requirements, Franchisor may terminate the Protected Territory or otherwise terminate this Agreement.

However, Franchisee will not be subject to a Minimum Royalty Fee during the first twelve (12) months of operations on the condition that Franchisee strictly complies with all its obligations during the first twelve (12) months of operations and Franchisee shall pay the Royalty fee equal to six- and one-half percent (6.5%) of Gross Revenues Collected by the Franchised Business during the first twelve (12) months of operations.

"Gross Revenues Collected" means any and all revenue or other compensation actually collected by Franchisee from customers of the Franchised Business.

"Gross Revenues" are defined in the Franchise Agreement to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by or on account of the operation of the Franchised Business at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including but not limited to cash, services, in kind from barter and/or exchange, on credit or otherwise as well as business interruption insurance proceeds. Gross Revenues shall also include the total amount of all sales for labor, material, equipment and/or services performed or rendered by: (a) Franchisee, or (b) any third-party subcontractors or agents of Franchisee who perform services for Franchisee's customers or clients as part of Franchisee's services. Gross Sales shall also include all commissions, finder's fees, referral fees, construction management fees or other compensation received by Franchisee on the value of any work performed. Franchisee agrees that all Royalty Fees, including any Minimum Royalty Fee, are non-refundable. However, the definition of Gross Revenues does not include sales tax that is collected from customers and transmitted to the appropriate taxing authorities.

        *3.2.2 Special Programs.* Franchisor reserves the right, but not the obligation, to

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

3.3    **Gross Revenue Reporting**.  Franchisee agrees to report Gross Revenue in such form or format as Franchisor may specify from time to time.  Franchisor may, at any time, and from time to time, modify the required form or format.  Franchisor reserves the right to require Franchisee to provide Franchisor with verified Gross Revenue Reports in the event Franchisor is unable to process electronic funds transfer based upon information Franchisee inputs into the POS System. Each Gross Revenue Report must set forth: (i) Gross Revenues Collected generated during the previous week; (ii) calculation of the Royalty and Brand Fund Contribution (as defined below); and (iii) any other information Franchisor may require.  If a Gross Revenue Report is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the electronic funds transfer, then Franchisor may withdraw additional funds through an electronic funds transfer from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the electronic funds transfer, then Franchisor will credit the excess amount to the payment of Franchisee's future obligations.

3.4    **Method of Payment**.  With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement, or any other agreement between Franchisee and Franchisor or its affiliates, from the bank account Franchisee provides to Franchisor for use in connection with EFT Program (the "EFT Account").  Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks, and credit card receipts.  At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Authorization Form attached as Exhibit D to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer.  Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account.  Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement by such other means as Franchisor may specify from time to time.

3.5    **Opening Package**.  Prior to opening its Franchised Business, Franchisee must purchase from Franchisor, or an affiliate or designated vendor, the required opening package at its then-current cost, which includes items such as tarp, catch all system, and small promotional materials such as yard signs, clothing, printed items, pitch books, a vehicle wrap and other equipment, tools, and supplies related to the operation of your franchise (the "Opening Package").

3.6    **First Year Local Brand Optimization**.  Prior to opening the Franchised Business, Franchisee must pay to Franchisor and/or Franchisor's designated vendor a local brand optimization fee (the "Local Brand Optimization Fee") in the amount of $12,000, in connection with the costs of local SEO optimization.  After the initial year of operations, Franchisor reserves the right to require Franchisee to expend Franchisor's then-current Local Brand Optimization each year.

3.7 **Brand Fund Contribution**. As set forth more fully in Section 12.3 of this Agreement, Franchisor has established a national brand fund for advertising and brand promotion (the "Brand Fund"). Franchisee shall make weekly contributions of two percent (2%) of Gross Revenues Collected by the Franchised Business for sales made during the immediately preceding week (the "Brand Fund Contribution"). Presently, Brand Fund Contributions are to be paid as directed by Franchisor via the EFT Program, or as otherwise required by the Operations Manual or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenues Collected during the Term of this Agreement.

3.8 **Technology Fee and Software Fee**. Prior to opening, Franchisee must pay Franchisor a technology fee (the "Technology Fee") of $3,500 and a software fee (the "Software Fee") of $6,000 for the first year of operations, which Franchisor will collect on Franchisee's behalf and remit to its designated vendors. The Software Fee covers the costs of various software programs Franchisee must utilize in connection with the operation of the Franchised Business and the Technology Fee covers the costs associated with system network functions, updating microsites, and call center interfacing software. Thereafter, Franchisee must pay Franchisor or its designated vendors, on a monthly basis, its then-current Technology Fee and Software Fee associated with using and maintaining the required computer hardware and software, hosting services and solutions, and any other technology used in the operation of the Franchised Business, and such payment shall be made in the manner prescribed by Franchisor or the designated vendor(s), as applicable, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer requirements or as required by the third-party service provider(s) or by any regulatory agency.

3.9 **Call-Center Fee**. Franchisor, or its affiliate, has established and will operate a Call Center which will field all calls and manage prospective and existing customers and route/assign work/inquiries as Franchisor deems necessary in its discretion, and as further described in Section 6.6. Franchisee must pay Franchisor, or its affiliate, all associated start-up fee(s), monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call-Center Fee"), which are subject to change at any time. Franchisee shall pay the first year Call-Center Fee of $3,600 prior to commencing operations of the Franchised Business. After the first year of operations, Franchisee will be billed $300 monthly. Lead fees and surcharges will be paid as incurred or as Franchisor requires. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the Call Center or as required by any third-party service provider(s) or by any regulatory agency, at any time upon providing reasonable notice to Franchisee. Franchisor may require Franchisee to pay the Call Center Fees to Franchisor directly for its operation of the Call Center, or for Franchisor to make payment on Franchisee's behalf to its affiliate or another third-party provider it designates. Franchisor may require Franchisee to make payment directly to such affiliate or third-party provider in its sole discretion.

3.10 **Creative Media Fund Fee.** Prior to attending training, Franchisee must pay Franchisor a Creative Media Fee of $5,000 to cover costs associated with video production, actors and actresses' compensation, video editing of videos. These videos are designed for national use on social media, YouTube, and other digital platforms. This is a one-time fee.

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

3.11    **Monthly Digital Management Fee.**  Franchisee must pay Franchisor's designee, currently, Franchisor's affiliate, Franchise Rocket, a monthly Digital Management Fee (the "Digital Management Fee"), currently $500 per month for 1 Territory, $1,000 for 2 or 3 Territories; and $1,500 for 4 or 5 Territories. As of the Effective Date, the Digital Management Fee covers the following items: (i) Management and SEO optimization of one micro site and GMB page; (ii) management and optimization of one digital campaign; (iii) two (2) hours of graphic design support; (iv) site directory management; and (v) basic reputation management. The Digital Management Fee is paid on a per territory basis. Franchisor reserves the right to modify the Digital Management Fee as Franchisor modifies the digital marketing and advertising requirements that Franchisee must use for the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Digital Management Fee, including the party to whom payment is made, at any time upon providing reasonable notice. Franchisee must comply with all such modifications.

3.12    **Late and/or Under Payments and Interest**. All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company, and other amounts which Franchisee owes to the Franchisor and/or its affiliated company, not received on or before the due date, shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to the Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one and one half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement.

3.13    **No Right to Off Set**. Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.14    **Non-Exclusive Remedies**. Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waive, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

3.15    **Taxes on Payments**.  In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.16    **Administrative Fee**. Franchisee must pay Franchisor its then-current administrative fee (the "Administrative Fee") in the event Franchisor makes and processes any amendments, modifications, or otherwise supplements this Agreement at the request of Franchisee or is otherwise required due to Franchisee's actions.

3.17    **Outstanding A/R Collection Fee**. Franchisor has the right to assist Franchisee in collecting outstanding balances from Franchisee's customers for amounts more than 60 days past due.  If Franchisor assists in collecting such outstanding amounts, Franchisee must pay Franchisor a fee in the amount of 15% of the amount collected.

3.18    **Insurance Claims Assistance Fee**. Prior to opening, Franchisee must pay

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

Franchisor a fee of $1,000 to cover Franchisor's costs in providing Franchisee insurance claim assistance services, in which Franchisor will investigate the building requirements on a state, county and at local level in Franchisee's market in order to assist Franchisee in preparing insurance claims. Such costs may be used to cover market visits and third-party vendors costs are non-refundable upon payment.

3.19    **Memberships and Subscriptions**. Franchisee must participate in all membership and subscription services that franchisor requires. Currently, Franchisee must participate in the Owens Corning Platinum Preferred Contractor program immediately upon launching the Franchised Business and pay all dues associated with the program, currently $2,500 per year, which are subject to increases from time to time. Franchisees must continue this annual membership, or any similar membership that Franchisor may require from time to time.

3.20    **Franchise Resources Fee**. Franchisee must pay to Franchisor's designated vendor a monthly Franchise Resources Fee in the amount designated by Franchisor. As of January 1, 2022, the Franchise Resources Fee is $399 per month. This fee may cover, among other designated resources, designated vendor fees for bookkeeping services. Franchisor reserves the right to increase the Franchise Resource Fee up to 0.5% of Franchisee's total Gross Revenues Collected. Franchisor also reserves the right to modify the Franchise Resources Fee, to modify the franchise resource requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Franchise Resources Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee. Franchisor reserves the right to require Franchisee to use Franchisor's designated vendors for payroll, sales tax filing, and other related services.

3.21    **Annual Conference Fee**. Franchisee must pay to Franchisor an annual fee for Franchisee's registration and attendance to Franchisor's annual conference for the System (the "Annual Conference"), if held by Franchisor, and as further described in Section 6.8. Franchisee and Franchisee management (if applicable) must register for and attend the Annual Conference and pay Franchisor the then-current registration and attendance fee (the "Annual Conference Fee"), which shall not exceed $1,000 per attendee. If Franchisee does not register for the Annual Conference, Franchisee must pay Franchisor a fee of $1,000.

3.22    **Drone Kit Fee**. Franchisee must pay to Franchisor's designated vendor a Drone Kit Fee for the first year of operations. As of January 1, 2022, the Drone Kit Fee is $6,900. After the first year of operations, Franchisee must pay Franchisor's designated vendors, on a monthly basis. As of January 1, 2022, the monthly Drone Kit Fee is $269. Franchisor also reserves the right to modify the Drone Kit Fee, to modify the franchise resource requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Drone Kit Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee

# 4    PROPRIETARY MARKS

4.1    **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**.

4.1.1    Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

DocuSign Envelope ID: C421B2CD-88E8-4416-AD96-B4C8B45B6B60

4.1.2    Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Protected Territory and in sales and marketing for the Franchised Business.

4.1.3    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable.  Franchisee may not use the Proprietary Marks in connection with the offer or sale of any services or products which Franchisor has not authorized for use in connection with the System.  Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name.  Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use.  Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (collectively the "Proprietary Material"). Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material.  Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement.  In the event of any litigation relating to Franchisee's use of the Proprietary Material,

Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution including, without limitation, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

    4.1.9    Franchisee expressly understands and acknowledges that:

    4.1.9.1 Franchisor or its affiliates or licensors own all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

    4.1.9.2 The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

    4.1.9.3 During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

    4.1.9.4 Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

    4.1.9.5 Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

    4.1.9.6 Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

    4.1.9.7 Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder. Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within ten (10) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

## 5    CONFIDENTIAL INFORMATION

    5.1    **Nondisclosure**. During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information. Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any Confidential Information, as defined in Section 5.2. Upon

termination or expiration of this Agreement, regardless of reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately and Franchisee may not use the Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2 **Confidential Information**. Confidential Information hereby includes, without limitation, any and all confidential, proprietary, and trade secret information relating to the operation of a Franchised Business, such as: all financial, operational, technical and marketing information; the Operations Manual and Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; cost data; pricing information; business plans; financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; photographs, devices, samples, models, and illustrations; software developed by or for Franchisor; customer lists and any information relating to Franchisor's customers or the customers of other System franchisees; patent, trademark, service mark, and copyright applications; information relating to inventions, discoveries, software and any other research and development information; methods of conducting the Business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; any information of a customer not generally known or available to the public; any Trade Secrets (as defined in Section 5.3 of this Agreement), or of a customer of Franchisor, or of any other franchisee; and any information about or originating from any Franchisee which, if it was information of Franchisor, are expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3 **Trade Secrets**. Notwithstanding Section 5.2, trade secret means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4 **Employees and Subcontractors**. All of Franchisee's employees and subcontractors must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Franchised Business. Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement attached as Exhibit C to this Agreement. Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5 **New Concepts.** If Franchisee, or Franchisee's employees, principals or subcontractors, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all

DocuSign Envelope ID: C121B2CD-89E8-4416-AD96-B4C8B45B6B60

necessary related information, without compensation. Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent applications, trademarks, copyrights and other intellectual property rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentations for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

     **5.6   Customer Privacy**.  Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop. Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

## 6    FRANCHISOR'S OBLIGATIONS

     **6.1   Operations Manual**. Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual and intranet system, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre-opening procedures, systems and procedures, personnel policies, specifications for vehicles, supplies, equipment and inventory, marketing, accounting and bookkeeping and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of the Franchisor, constituting a trade secret of Franchisor, and may not be, shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System.

     **6.2   Opening Package; Initial Equipment and Supplies**.  Franchisor, or its affiliates will provide Franchisee with an Opening Package upon Franchisee's payment of the required fees. Franchisor will also provide a list of all items, equipment, and supplies needed to open and operate the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), which may include Franchisor and its affiliates, with which Franchisee must comply.

6.3   **Ongoing Assistance**.  Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means.  If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current training fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion.  Franchisor may also use the Operations Manual, as defined in Section 6.6, to provide some self-serve training materials.

6.4   **Additional Training**.  As set forth more fully in Section 8.2, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee and Franchisee's personnel to attend such additional training at a location to be selected by Franchisor. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility.  If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.5   **Remedial Training**. In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to remedial training (in addition to any required training under Section 6.4). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current tuition training fee to provide such remedial training.

6.6   **Call Center**.  Franchisor has established and maintains a centralized call center for the purpose of accepting telephone, internet and other inquiries from potential customers and forwarding such customer information to the appropriate franchisee (the "Call Center"). Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay in connection with administering and maintaining this service. Franchisor has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls as it deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Protected Territory. All Mighty Dog Roofing related phone numbers and internet lead sources are required to be ported to or directed to Franchisor.

6.7   **Pricing**. Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. Franchisee may charge whatever prices it deems appropriate without regard to Franchisor's suggested pricing.

6.8    **Annual Conference**. Franchisor may, in Franchisor's discretion, hold an annual conference at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if it chooses to charge a registration fee in its sole discretion. Franchisor reserves the right to charge Franchisee a fee to cover convention expenses in the event the Franchisee chooses not to attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals, and salaries during the Annual Conference, are Franchisee's sole responsibility. Franchisor may use National Fund Contributions for purposes related to the Annual Conference, including costs related to productions, programs, and materials.

# 7    FRANCHISEE'S OBLIGATIONS

7.1    **Site Location and Lease Approval**.    Franchisee shall operate the Franchised Business from an approved commercial office/warehouse or flex space that meets Franchisor's then-current standards and specifications for an Approved Location and located within the Protected Territory. Franchisee will need to lease approximately 1,500 to 2,000 square feet of separate commercial office/warehouse or flex space for Franchisee's office and storage space to securely store all equipment, supplies and inventory.    Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location for Franchisee to operate the Franchised Business as of the date Franchisee signs this Agreement, the parties shall enter into Franchisor's prescribed form of Site Selection Addendum, the terms of which shall govern the parties' site selection obligations. Franchisor has the right to review, evaluate and approve Franchisee's proposed lease for the Approved Location ("Lease") prior to execution.    Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form attached hereto as Exhibit F.

7.1.1    *Relocation*. If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Protected Territory to complete the unexpired portion of the term of this Agreement.    Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within forty-five (45) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its reasonable costs and expenses associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation.

7.1.2    *Franchised Business Appearance and Approved Location Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout, and design of a Franchised Business. Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete

DocuSign Envelope ID: C421B2CD-83E8-4416-AD96-B4C8B45B6B60

construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permits requirements, and any other applicable local, state, or federal law.

       7.1.3 *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

      7.2    **Training**. Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program as set forth more fully in Section 8 of this Agreement. Franchisor has the right to require up to two (2) individuals to attend in addition to Franchisee.

      7.3    **Opening Requirements**. Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. In addition to any other pre-opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Protected Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, supplies, and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers, that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program as described defined in this Agreement, as well as any other pre-opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement.

      7.4    **Purchasing Requirements**.

      7.4.1   *Compliance with Standards*. Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System. Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same. Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion. Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

      7.4.2   *Designated and Approved Suppliers*. Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "Approved Supplier"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliate and/or a third

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

party may be one of several, or the only, Approved Supplier of any item. Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue on any products or services that Franchisor, Franchisor's affiliates or Franchisor's Approved Suppliers supply and/or provide to Franchisee. Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

       7.4.3    *Supplier Approval.*    In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known. At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier. Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency, and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information. Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate. Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

       7.4.3.1 Franchisee, or the proposed supplier, must pay Franchisor in advance for Franchisor's reasonable costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

       7.4.3.2 Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

       7.4.3.3 Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third-party to supply, provided that third-party executes Franchisor's prescribed form of non-disclosure agreement.

       7.4.3.4 Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

7.4.3.5 Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

7.4.4 *System Suppliers.* Franchisor may establish business relationships, from time to time, with suppliers, including affiliates of Franchisor, who may produce and/or provide certain goods or services that Franchisee is required to purchase from only that supplier (each a "System Supplier"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software, and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally. Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product or ability to obtain product only on less favorable credit terms. Accordingly, Franchisee agrees to pay System Suppliers as and when due. Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

7.5 **Authorized Products and Services**. Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization. Franchisee shall at all times maintain sufficient levels of inventory, as specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees. In the event Franchisee wishes to offer any Approved Products or Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Services.

7.6 **Operations**.

7.6.1 *Hours of Operation.* Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

7.6.2 *Maintenance of Premises and Project Sites.* Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual. Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

7.6.3 *Personnel/Staffing.* Franchisee must employ a sufficient number of qualified, competent personnel, offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain

and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

7.6.4    *Compliance with Operations Manual and Training of Employees.* Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual and shall continue such training and instruction as long as each employee is employed.  Franchisee shall cause any third-party subcontractor engaged by Franchisee to perform work on behalf of Franchisee with respect to the Franchised Business to comply with all applicable requirements of this Agreement, including, but not limited to, Franchisor's quality and performance standards.  The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

7.6.5    *Management Participation.* Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote his or her personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon Franchisee's written request, Franchisor shall permit Franchisee to employ a manager to manage the day-to-day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program before assuming any managerial responsibility. The Franchised Business must, at all times, be staffed with at least one (1) individual who has successfully completed Franchisor's initial training program as set forth in Section 8.1.  In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business.  In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly.

7.6.6    *Working Capital.* Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7    *Equipment and Inventory.* Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with representative vehicles, supplies, equipment and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by the Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand. In the event that Franchisee's accounts receivable grows in excess of 40% of Franchisee's overall Gross Revenues Collected or Franchisee's backlog of jobs reaches 12 weeks, Franchisee must, at Franchisor's request, invest in additional infrastructure and/or equipment and employees to adequately service customers and the Protected Territory efficiently.

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

7.6.8    *Products with Proprietary Marks*. Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor.

7.6.9    *Market Research*. Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.7    **Franchised Business Inspection.**  Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

7.8    **Computer Software and Hardware**.

7.8.1    *Computer System*. Franchisor shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, applications, and hardware be used by Franchisee, including without limitation: (a) a compatible computer system that complies with Franchisor's standards and specifications and is capable of operating financial and other business software; (b) printers and other peripheral hardware or devices; (c) archival back-up systems; and (d) Internet access mode and bandwidth (collectively, the "Computer System").

7.8.2    *Required Software*. Franchisor shall have the right, but not the obligation, to develop or designate: (a) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's proprietary software (collectively, the "Required Software"), which Franchisee must license from Franchisor; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee must install at its expense; (c) the tangible media upon which Franchisee records data; and (d) the database file structure of the Computer System.

7.8.3    *Compliance with Requirements*. At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section 7.8.3 shall be at Franchisee's sole cost and expense.

7.8.4    *Franchisor's Access.* Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section 7.8 within thirty (30) days of opening the Franchised Business.

7.8.5    *Proprietary Software.* Franchisor has a proprietary interest in all databases, lists, templates, programs and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create programs that conduct, among other things, scheduling, accounting, inventory, and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's confidential information.

7.8.6    *Computer Network.* Franchisee is required to participate in any System-wide computer network, intranet system, or extranet system that Franchisor implements and may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor on-line; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) to complete any initial or ongoing training, in the event Franchisor makes such training accessible through this medium. Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

7.9    **Personal Conduct**.  Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

7.10    **Best Efforts**.  Franchisee (or Franchisee's principals or designated manager) must devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Protected Territory.  Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and System. Franchisee acknowledges that Franchisee's (or Franchisee's principals' or designated manager) violation of the terms in this Section 7.10 will be a material breach of this Agreement, and Franchisor may terminate

DocuSign Envelope ID: C421B2CD-83E8-4416-AD96-B4C8B45B6B60

this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

7.11    **Telephone and Email Access.**  Franchisor reserves the right to procure and supply dedicated telephone numbers and email accounts associated with the Franchised Business.

7.12    **Payment of Debts**.  Franchisee is solely responsible for: selecting, retaining and paying Franchisee's employees; the payment of all invoices for the purchase of goods and services used in connection with operating the Franchised Business; and determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business. Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors, and creditors on a timely basis. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System suppliers and System franchisees. Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, personal property and real estate taxes arising from Franchisee's operation of the Franchised Business. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13    **Compliance with Applicable Laws.**  Franchisee must comply with all applicable federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to occupational hazards and health, trademark and copyright infringement, fair marketing laws, consumer protection, trade regulation, workers' compensation, unemployment insurance, withholding and payment of Federal and State income taxes and social security taxes and sales, use and property taxes, and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the operation of the Franchised Business). Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors. Franchisee agrees to be solely responsible for all employment decisions and to comply with all state, federal, and local hiring laws and functions of the Franchised Business, including without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part-time. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates.

7.14    **Trade Secrets and Confidential Information**.  Franchisee and all employees and subcontractors must maintain the confidentiality of all Confidential Information as set forth in Section 5 of this Agreement.

7.15    **Image**. Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other roofing service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service. Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System. Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity and increase the demand for the products sold and services rendered by System franchisees. Franchisee agrees to comply with the standards, specifications and requirements

Franchisor set forth in order to uniformly convey the distinctive image of a Mighty Dog Roofing franchised business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16    **Pending Actions.** Franchisee shall notify Franchisor, in writing, within five (5) days of the commencement of any action, suit or proceeding and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17    **Standard Maintenance and System Conformity.** Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s), equipment, tools and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

7.18    **Customer Service.** Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, warranties on any Approved Products or Services offered or sold by the Franchised Business, refund policies and other standards and specifications.

7.19    **Warranty.** Franchisee agrees to offer and honor such warranty on all materials and workmanship sold by Franchisee as Franchisor may designate from time to time in the Operations Manual or otherwise in writing. Franchisee shall cooperate with Franchisor warranty claims and shall make no statements or admissions as to liability. Franchisee shall promptly report all warranty claims to Franchisor and shall undertake all warranty work under the Proprietary Marks. All costs associated with administering and honoring the warranty service shall be borne by Franchisee. Franchisee agrees that it shall remain liable during the Term or upon the termination or expiration of this Agreement for all warranties issued by Franchisee. If Franchisee does not remedy, in full, any warranty claim made by a customer within a reasonable amount of time after receiving notice of such claim, as determined by Franchisor in its sole discretion, Franchisee and its principals acknowledge and agree that Franchisor may thereafter address such warranty claim, and Franchisee and principals are required to promptly reimburse Franchisor for all warranty costs or customer reimbursements incurred by Franchisor plus Franchisor's then current administration charge.

# 8    TRAINING

8.1    **Initial Training Program.** Franchisor will provide Franchisee (or one of Franchisee's principal owners if Franchisee is a business entity) and up to two (2) additional

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

individuals that Franchisee designates with Franchisor's then-current initial training program (the "Initial Training Program") tuition-free, subject to the availability and schedule of Franchisor's training personnel, for a total of three (3) individual attendees. Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's facility in Omaha, Nebraska, or other location that Franchisor may designate, prior to commencing operations of the Franchised Business. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. The Initial Training Program lasts up to twenty (20) days, and Franchisee will be solely responsible for costs and expenses Franchisee and its representative(s) incur in connection with attending the Initial Training Program, including travel, lodging, meals or any wages incurred for Franchisee's employees. In the event Franchisor permits Franchisee to employ a Designated Manager (as defined in this Agreement), such Designated Manager must attend and complete the Initial Training Program to Franchisor's satisfaction prior to commencing any managerial duties of the Franchised Business. Franchisor reserves the right to substitute any in-person training for virtual training at its discretion.

8.1.1    *Timing for Completion*. Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction prior to opening the Franchised Business and within one hundred eighty (180) days from the date this Agreement is fully executed. In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction, then Franchisor may terminate this Agreement.

8.1.2    *Additional Employees*. In the event Franchisee wishes for more than two (2) additional persons to participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee. All training related expenses for Franchisee's additional personnel, including transportation to and from the training site, lodging, meals, and salaries during training, are Franchisee's sole responsibility.

8.1.3    *Replacement Personnel*. In the event Franchisee or Franchisee's employee or attendee fails to complete the Initial Training Program to Franchisor's satisfaction, the respective person may repeat the course, or, in the case of an employee or attendee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Failure by Franchisee, an employee or any Replacement Personnel to complete the initial training program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

8.1.4    *Employee Training*. Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their respective duties in connection with the Franchised Business prior to such employee(s) undertaking these duties.

8.1.5    *Training Materials*. Franchisor may provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel. Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel. Updated training materials may be available to Franchisee in the Operations Manual or by other means in Franchisor's sole discretion. All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates'

title or rights in or to the training materials. Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

8.2    **Additional and Remedial Training.** Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable), estimators, installers, and other employees to attend additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then-current tuition fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals, and employee wages incurred). Additional and/or refresher training may take place at Franchisor's facility in Omaha, Nebraska, or any other location that Franchisor may designate. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

8.3    **Reasonable Training and Assistance Requests**. Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then-current tuition fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Franchisor's facility in Omaha, Nebraska, or on-site at Franchisee's Approved Location or within the Protected Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

## 9    INSURANCE

9.1    **General**. Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual or otherwise in writing.  In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such insurance and minimum policy limits that are reasonable and customary in the roofing services industry. The insurance policy or policies must be in effect upon the earlier of: (a) thirty (30) days prior to opening the Franchised Business; or (b) upon signing a lease agreement for the premises of the Franchised Business. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's respective, past, present, and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys, and agents against any loss, liability, personal injury, death, property damage or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use, or occupancy of the Franchised Business.  Franchisee shall have MDR United LLC, and its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds as an additional insured under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. The employment practices liability policy is required to: (a) have an endorsement as listed on Form CG 20 29 or its equivalent; and (b) name Franchisor as Co-Defendant. Franchisor reserves the right to amend, modify, and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice through the Operations Manual or otherwise in writing by Franchisor.  Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Franchisee must provide Franchisor with certificates of insurance evidencing the required coverage

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

at least 30 days prior to opening. Franchisee shall continue to provide Franchisor with certificates of insurance evidencing the required coverage and any other documentation in connection therewith on an annual basis or as otherwise specified in the Operations Manual.

9.2     **Designation of Carrier; Insurance Rating, Approval, and Certification.** Franchisor has the sole right, exercisable at any time and upon notice to Franchisee, to designate a vendor or supplier, which may include an affiliate of Franchisor, from whom Franchisee must purchase all insurance policies required by Franchisor to operate the Franchised Business. All insurance carriers must be approved by Franchisor in advance and in writing.  All insurance policies must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance Report.  Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy.  Franchisee agrees to carry such insurance as may be required by the lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law.  Franchisee must deliver a certificate of insurance to Franchisor at least thirty (30) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary and non-contributory to any policy or policies held by Franchisor or its affiliates.

9.3     **Designees.** All policies will list Franchisor, its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds and contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's agreement based on changes in risk factors for which Franchisee will comply with upon written notice from Franchisor.

9.4     **Claims Cancellation.**  Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations.  Franchisee has a twenty-four (24) hour opportunity to cure any lapses in insurance coverage.  No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certification of insurance which demonstrates compliance with this Section 9.

9.5     **Failure to Maintain Insurance.**  If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a reasonable administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6     **Modification of Requirements.**  Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

9.7     **Third Party Subcontractors - Insurance.** Franchisee agrees not to permit any third party subcontractor to perform any work or offer any services on behalf of Franchisee in respect of the Franchised Business unless such subcontractor maintains insurance coverage in such amounts

and types as Franchisee is required to maintain under the provisions of this Section 9, with the specific addition that subcontractors cannot exclude principals from its Workers' Compensation coverage and that liability policies name Franchisor as an additional insured. Franchisee agrees to maintain evidence that such insurance by its subcontractors is in effect and to provide such proof of insurance as Franchisor may require, in its sole discretion, from time to time.

## 10    FINANCIAL RECORDS AND REPORTS

10.1    **Reporting.** Franchisee must maintain, for at least five (5) fiscal years from their preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section 10.1 in accordance with generally accepted accounting principles.

10.1.1    Franchisee will, at its expense, submit to the Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2    Each financial statement shall be signed by Franchisee or by an individual authorized by the Franchisee, attesting that the statement is true and correct and prepared in accordance with the Franchisor's requirements.

10.1.3    Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider.

10.1.4    Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including all reports set forth in the Operations Manual.

10.2    **Tax Returns.** In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns.

10.3    **Right to Disclose Information.** Franchisor has the right to disclose data derived from the reports Franchisee furnishes.

10.4    **Bookkeeping/Accounting Service.** To ensure Franchisee is properly reporting to Franchisor financial records and reports, Franchisee must use the services of one of Franchisor's designated and preferred bookkeeping service providers. Franchisee is required to pay the bookkeeping service its then current fee which is subject to future increases.

DocuSign Envelope ID: C121B2CD-89E8-4416-AD96-B4C8B45B6B60

10.5    **Monthly Profit and Loss Statements**. Franchisee must send Franchisor finalized profit and loss statements by the 21st of the following month. Failure to do so upon 15 days' written notice is grounds for termination of the Franchise Agreement under Section 15.3.8.

# 11    BOOKS AND RECORDS

11.1    **Records and Audits**. Franchisee must maintain accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business, including a complete listing of all work performed by any subcontractors. Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours, to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider(s). If any audit reveals that Franchisee has understated Franchisee's financial information, including but not limited to Royalty or National Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12) month period, Franchisee must pay the reasonable cost of such audit and/or inspection, including the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for royalty and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

11.2    **Corporate or Limited Liability Company Franchisee Records**. If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

11.2.1   Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by-laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

11.2.2 Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

11.2.3   All members with or shareholders of Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by the Franchisor (see Exhibit "A" to this Agreement). All members and/or shareholders shall also be individually subject to the non-disclosure and confidentiality provisions as set forth in this Agreement, as well as any and all in-term and post-term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "Publicly Held Corporation").

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

11.2.4  The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to-day operations of the business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

11.2.5 All issued and outstanding stock certificates of such corporation shall bear the following legend:

*EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between _____ and MDR United LLC, dated _____.*

## 12    ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1    **Generally**.  With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing.  If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received.  If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing.  Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2    **Internet Website**. Franchisee must have and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section 12.2 from time to time in its sole discretion.

12.2.1  Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by franchised businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2  Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

DocuSign Envelope ID: C421B2CD-83E8-4416-AD96-B4C8B45B6B60

12.2.3   Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s).

12.2.4   Franchisor may use a portion of the National Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

12.2.5   Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.mightydogroofing.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

12.3    **Brand Fund**.  Franchisor has established a Brand Fund for the common benefit of System franchisees. Franchisor requires Franchisee to participate in and contribute weekly two percent (2%) of the Franchised Business's Gross Revenues Collected to the Brand Fund. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenues Collected during the term of this Agreement. Franchisee must pay the Brand Fund Contribution directly to the Brand Fund via EFT on a weekly basis on the same basis as the Royalties.  Franchisor reserves the right to modify the frequency, manner, or method of payment upon providing reasonable notice to Franchisee.

12.3.1  Franchisor may use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis.  Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: the cost of preparing and producing internet, television, radio, magazine and newspaper advertising campaigns; the cost of direct mail and outdoor billboard advertising; the cost of soliciting National Accounts; the cost of public relations activities and advertising agencies; the cost of developing and maintaining an Internet website; personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit

directly or on a pro rata basis from such expenditures. The Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available". Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the Mighty Dog Roofing brand.

12.3.2 Franchisor may periodically assist franchises to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys"). The cost of such programs will be borne by the Brand Fund. The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System established minimum standards for such Surveys.

12.3.3 Franchisor has the right to reimburse itself from the Brand Fund for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4 In Franchisor's sole discretion, units owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit Franchisor and its units, even though the units operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5 Franchisor will prepare on an annual basis and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund. The statement will be presented to Franchisee upon Franchisee's written request. The Brand Fund is not required to be independently audited.

12.3.6 Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7 Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8 Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9 Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

12.4    **Regional Advertising and Promotional Cooperative**. Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited

DocuSign Envelope ID: C421B2CD-83E8-4416-AD96-B4C8B45B6B60

towards the Local Marketing Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1   Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2   Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local marketing;

12.4.3   No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4   Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Marketing Requirement;

12.4.5   Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6   Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7   Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

**12.5   Grand Opening and Local Marketing.**

12.5.1   *Grand Opening Advertising Requirement*.   In connection with the grand opening campaign of the Franchised Business ("Grand Opening Campaign"), Franchisee shall spend a minimum amount of ten thousand dollars ($10,000) prior to opening the Franchised Business to satisfy Franchisee's advertising requirements for the Grand Opening Campaign ("Grand Opening Advertising Requirement"). Any Grand Opening Advertising Requirement expense must be conducted in accordance with Franchisor's standards and specification, as described in the Operations Manual or this Agreement. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Grand Opening Advertising Requirement expenditures.

12.5.2   *Local Advertising Expenditures*.   In addition to the Brand Fund Contributions described above in Section 12.3, during the first three (3) months of operations of the Franchised Business, Franchisee must spend $6,000 each month on local marketing and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Expenditures") through approved online vendors and/or in telephone directories distributed within Franchisee's Protected Territory, as well as direct mail and other forms of media advertising Franchisor may

specify. Thereafter, Franchisee must spend at least five percent (5%) of Gross Revenues Collected during the immediately preceding calendar month on Local Advertising Expenditures. Franchisee must spend the Local Advertising Expenditures as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Expenditures must be expended within Franchisee's Protected Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Expenditures must be expended regardless of the amount(s) spent by other System franchisees on local marketing. Franchisee may spend any additional sums Franchisee wishes on local marketing. Franchisee must submit, for Franchisor's approval, all proposed advertising and promotional materials prior to Franchisee's use or distribution. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Local Advertising Expenditures. Franchisor shall have the right to review Franchisee's books and records to determine these expenditures.  If Franchisee does not meet the minimum Local Advertising Expenditures requirement, Franchisor shall have the right to require Franchisee to pay to Franchisor any such deficiency amount (the "Local Advertising Expenditure Deficiency"). Franchisor shall have the right to spend the Local Advertising Expenditure Deficiency on local advertising for the Franchised Business, or require that the Local Advertising Expenditure Deficiency be paid to the Brand Fund as an additional contribution. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center. If Franchisee desires to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit the materials Franchisee desires to use to Franchisor for prior written approval at least 30 days prior to Franchisee's intended use or publication. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of Franchisee's proposed materials within 15 days of the date Franchisor received the proposed materials from Franchisee. If Franchisee does not receive Franchisor's written approval during that period, the proposed materials shall be deemed disapproved. Once approved, Franchisee may use the materials unless Franchisor withdraws or revokes approval, which Franchisor may do at any time upon written notice. All advertising must prominently display the Proprietary Marks and must comply with any standards Franchisor establishes, as specified in the Operations Manual or in any other writing.  Franchisor may require Franchisee to discontinue using any advertising or marketing material within a specified time frame, and at Franchisee's own cost and expense.

       12.5.3 *Local Brand Optimization Fee*.  Prior to opening, Franchisee must pay to Franchisor a Local Brand Optimization Fee of $12,000 for the first year of operations, which Franchisor collects and remits to its designated vendors.

       12.5.4 *Creative Media Fund Fee*. Prior to opening, Franchisee must pay to Franchisor a Creative Media Fund Fee of $5,000 to cover costs associated with video production, actors' and actresses' compensation and video editing to create videos for national use on social media, YouTube, and other digital platforms.

       12.6 **Advisory Council**. Franchisor reserves the right to establish a Mighty Dog Roofing Advisory Council for the purpose of exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts ("Advisory Council"). If established, elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

Advisory Council from time to time, in its sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to, exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change, or dissolve any Advisory Council at any time in its sole discretion.

## 13    INDEPENDENT CONTRACTOR; INDEMNIFICATION

13.1    **Independent Contractor Status**.    Franchisee is an independent contractor responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated Mighty Dog Roofing business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors.  It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2    **Indemnification**.    Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for all claims, obligations, liabilities and damages ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising, and the sale and installation of all Approved Products by Franchisee, its employees or subcontractors and all warranty claims; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals. For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive and other damages, and costs reasonably incurred in the defense of any action, including attorneys', attorney assistants' and expert

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable in Franchisor's sole discretion. Such an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 14    SALE OR TRANSFER

14.1    **Transfer**. Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchise Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein.

14.2    **Death or Disability**.

14.2.1 *Representative's Right to Continue as Franchisee.* In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative, or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180 Day Period"), such person (a) meets Franchisor then-current standards to become a franchisee, as described in Section 14.3.2.5, and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporate or limited liability company franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

14.2.2 *Franchised Business Operation During and After 180 Day Period.* Franchisor is under no obligation to operate the Franchised Business or incur any obligation on behalf of any incapacitated franchisee, during or after the 180 Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180 Day Period. In the event of Franchisee's death, disability, absence or otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and

under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time-to-time in Franchisor's sole and absolute discretion. Franchisor may pay itself a reasonable amount to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3    **Ownership Changes**.  A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership, (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer or any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement.  A transfer pursuant to (i) and (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1  *Right of First Refusal.*    If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth in Section 14.4 hereof), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party.  Franchisee shall obtain from the third party and provide Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent").  If Franchisor elects not to accept the offer within a thirty (30) day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent subject to the conditions for approval set forth in Section 14.3.2 hereof.  Franchisee shall affect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section 14.3.1.  Any material change in the terms of the offer shall be deemed a new proposal subject to Franchisor's right of first refusal.  So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder, or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner, in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2  *Conditions for Approval*.  Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business, at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

transfer of the Franchise Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1   All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors, are satisfied;

14.3.2.2   Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's designated/approved suppliers and vendors, within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3   Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the release shall not be inconsistent with any applicable state statute regulating franchising;

14.3.2.4 That the transferor and transferee have executed a mutual general release, relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5   Franchisee or transferee shall provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6   The transferee shall demonstrate to Franchisor's satisfaction that he or she meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business to be transferred; and has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7   That, at Franchisor's option, the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8   Franchisee shall pay Franchisor a transfer fee equal to twenty percent (20%) of Franchisor's then-current Initial Franchise Fee per Protected Territory that is being transferred to transferee. In the event Franchisee transfers multiple Protected Territories at once,

DocuSign Envelope ID: C121B2CD-83F8-4416-AD96-B4C8B45B6B60

Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Protected Territories being transferred, by any amount;

14.3.2.9  The transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

14.3.2.10 Franchisee (and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company), and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11 The transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits, and licenses required for the operation of the Franchised Business;

14.3.2.12 To the extent required by the terms of any leases or other agreements, the lessors or other parties must have consented to the proposed transfer;

14.3.2.13 The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14 Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15 The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under the transferee's franchise agreement;

14.3.2.16 Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of disclosure document and Franchisor shall not be liable for any representations not included in the disclosure document;

14.3.2.17 Franchisor's approval of the transfer shall not constitute a waiver of any claims Franchisor may have against the transferring party;

14.3.2.18 Franchisor shall have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder; and

14.3.2.19 In any event, Franchisor may withhold or condition Franchisor's consent to any transfer as Franchisor deems appropriate based on the circumstances of the transfer or otherwise.

14.4      **Transfer to a Corporation or Limited Liability Company**.  If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fee set forth in Sections 14.3.2.7, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

14.4.1   The corporation or limited liability company is newly organized, and its activities are confined to operating the Franchised Business;

14.4.2   Franchisee is, and at all times remains, the owner of at least fifty-one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3   The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4   All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty; and

14.4.5   At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations, and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.5   **Franchisor's Right to Transfer**.  Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement in Franchisor's sole discretion.

## 15     BREACH AND TERMINATION

15.1   **Automatic Termination**.  This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

15.1.1   *Voluntary Bankruptcy*.  If Franchisee or any principal makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2   *Involuntary Bankruptcy*.  If proceedings are commenced to have Franchisee or any of its principals adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within 60 days.

15.1.4   *Loss of Premises*. If Franchisee loses the right to occupy the premises or operate the Franchised Business from the Approved Location.

15.2   **With Notice and Without Opportunity to Cure**.  Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1   *Criminal Acts*.  If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2 *Fraud.* If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3 *Other Actions.* If Franchisee or Franchisee's principals, including any shareholder, member, guarantors or agents, engage in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4 *Misrepresentation.* If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation.

15.2.5 *Failure to Complete Training.* If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6 *Repeated Breaches.* If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any 12-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7 *Breach of Other Agreements.* If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8 *Misuse of the Proprietary Marks or Confidential Information.* If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9 *Discloses Confidential Information or Trade Secrets.* If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual, or any other Confidential Information or Trade Secret provided to Franchisee by the Franchisor or any of its affiliates to any third party;

15.2.10 *Violation of Law.* If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the public.

15.2.11 *Violation of In-term Restrictive Covenant.* If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

DocuSign Envelope ID: C421B2CD-83E8-4416-AD96-B4C8B45B6B60

15.2.12 *Liens.*  If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13 *Insolvency.*  If Franchisee or any of Franchisee's principals become insolvent.

15.2.14 *Abandonment.*  If Franchisee voluntarily or otherwise abandons the Franchised Business.  The term "abandon" includes any conduct which indicates a desire or intent to discontinue operations of the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15 *Unauthorized Transfer.* If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof;

15.2.16 *Unauthorized Products or Services.*  If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17 *Unapproved Purchases.*  If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18 *Proprietary Software.*  If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19 *Insurance.*  If Franchisee fails to maintain insurance, purchase insurance from designated vendors, or to repay Franchisor for insurance paid for by it, or otherwise fail to adhere to the requirements of Section 9.

15.2.20 *Government Regulations.*  If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21 *Government Actions.*  If any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22 *Anti-Terrorist Activities.*  If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23 *Personal Use of Franchised Business Property.*  If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24 *Insufficient Funds.*  If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12) month period.

15.2.25 *Failure to Open.*  If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26 *Operating Outside of Protected Territory*. If Franchisee operates the Franchised Business outside of the Protected Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27 *Violation of Best Efforts*. If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.2.28 *Failure to Meet Minimum Annual Revenue Requirements or Minimum Royalty Fees.* If Franchisee fails to meet the Minimum Annual Revenue Requirements or Minimum Royalty Fee for any territory granted hereunder in any period.

15.3.   **Upon 15 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if any of the following defaults remains uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1 *Nonpayment.*  If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's system suppliers or vendors.

15.3.2 *Endorsement of Checks.*  If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3  *Failure to Maintain Sufficient Marketing Materials and Supplies*.  If Franchisee fails to maintain sufficient levels marketing materials and other supplies necessary to adequately develop the Protected Territory and meet consumer demand.

15.3.4 *Interruption of Service.*  If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5 *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.*  If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel, as Franchisor requires from time to time.

15.3.6 *Quality Control.*  If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

15.3.7 *Licenses and Permits.*  If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.3.8 *Profit and Loss Statements*. If Franchisee fails to submit finalized Profit & Loss statements by the twenty-first (21st) of each month (or other date Franchisor may require).

15.4   **Upon 30 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement, or any

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5    **Step in Rights**.  In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right, or any other rights, Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured, and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all reasonable costs and overhead, if any, incurred in connection with its operation of the Franchised Business including, without limitations, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business.

15.6    **Nonwaiver**.  Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

# 16    RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1    **Franchisee's Obligations**.  Upon termination of this Agreement, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost and expense:

16.1.1    Immediately cease all operations under this Agreement;

16.1.2    Immediately pay Franchisor all unpaid fees, and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3    Discontinue immediately the use of the Proprietary Marks;

16.1.4    Immediately cease using the proprietary software and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days and immediately and permanently cease use of such information and materials;

16.1.5    Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or Social Media Pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name attached hereto as Exhibit B, and transfer all usernames and passwords for all Social Media Pages to Franchisor;

16.1.6  Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease attached as Exhibit F, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7  Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks as Franchisor directs and all items which are a part of the trade dress of the System-immediately, no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8  Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9  Immediately cease to communicate with all Mighty Dog Roofing customers;

16.1.10 Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11 Permit Franchisor to make final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration, or transfer;

16.1.12 Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13 Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System; and

16.1.14 Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15 Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16.

16.2      **Option to Purchase Personal Property.** Upon the termination or expiration of this Agreement, Franchisor, or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice. For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10) year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes). Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property that is subject to a lease or finance agreement, the purchase price of such personal property shall

equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable. Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

16.3    **Exclusions.** Franchisor may exclude from the personal property purchased under Section 16.2 cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

16.4    **Damages, Costs, and Expenses.**   In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 17    COVENANTS

Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

17.1    **During the Term of This Agreement.** During the term of this Agreement, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.1.1  Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or  (ii) such person's ownership of  a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

17.1.2  Directly or indirectly induce or seek to induce anyone employed by

Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.1.3  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.2    **After the Term of This Agreement.**  For a period of two (2) years after the expiration, transfer or termination of this Agreement, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers, directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.2.1  Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (a) within the Protected Territory, (b) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (c) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or  (ii) such person's ownership of  a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

17.2.2  Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.2.3  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.3    **Intent and Enforcement**.  It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law.  Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable.  In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach.  Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other Mighty Dog Roofing franchisees, and the System.  Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement.  Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm.  Franchisee acknowledges and agrees on Franchisee's own behalf and on behalf of the persons who are liable under this Section 17 that each has previously worked or been gainfully employed in other careers and that the provisions of this Section 17 in no way prevent any such person from earning a living.  Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during any default under this Section.

17.4    **Employees.**  Franchisee shall ensure that Franchisee's principals, managers,

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

employees, and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit C to the Franchise Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

     17.5    **No Defense**.  Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

# 18    DISPUTE RESOLUTION

     18.1    **Choice of Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws principals.

     18.2    **Internal Dispute Resolution.**  Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management, after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party.  This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

     18.3    **Mediation; Arbitration**.  At Franchisor's option, all claims or disputes between Franchisee and Franchisor or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisee and Franchisor or its affiliates, or any of the parties' respective rights and obligations arising from such agreement, which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above, must be submitted first to mediation, in Bucks County, Pennsylvania under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Franchisee as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.  Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor.  Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and Franchisor and Franchisee shall share mediation costs equally.  This agreement to mediate shall survive any termination or expiration of this Agreement.

     18.3.1   The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 18.3 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

18.3.1.1    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

18.3.1.2    Any claims pertaining to or arising out of any warranty issue;

18.3.1.3    Any of the restrictive covenants contained in this Agreement.

18.3.1.4    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

18.3.1.5    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency

18.4    **Selection of Venue**.  Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests.  The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Bucks County, Pennsylvania and the jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania.  Franchisee acknowledges that this Agreement has been entered into in the Commonwealth of Pennsylvania, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Doylestown, Pennsylvania including but not limited to training, assistance, support and the development of the System.  In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of Pennsylvania as set forth in this Section.

18.5    **Third Party Beneficiaries**. Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation provision set forth in this Section 18, each having authority to specifically enforce the right to mediate claims asserted against such person(s) by Franchisee.

18.6    **Prior Notice of Claims.**  As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

18.7    **No Right to Offset**.  Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

18.8    **Injunctive Relief**.  Nothing in this Agreement shall prevent Franchisor from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause Franchisor loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.  If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief.  If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

DocuSign Envelope ID: C121B2CD-89E8-4416-AD96-B4C8B45B6B60

18.9    **Limitation of Action**. Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

18.9.1    Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any mediation, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2    Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10    **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages. Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future royalties for the balance of the term of this Agreement.

18.11    **THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY GOODS OR SERVICES.**

**19    REPRESENTATIONS**

19.1    **Proprietary Software**. Any proprietary software provided by Franchisor or an affiliate is on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for any proprietary software, or covenant that the proprietary software will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the software or services provided thereby.

FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE PROPRIETARY SOFTWARE, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE PROPRIETARY SOFTWARE, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2 **No Authority.** NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3 **Receipt.** THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT. IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4 **Opportunity for Review by Franchisee's Advisors.** FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5 **Execution of Agreement.** EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE

PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

## 20   GUARANTEE OF PRINCIPALS AND THEIR SPOUSES

Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing personal guaranty in the form attached hereto as Exhibit A.

## 21   NOTICES

All notices and requests to be given under this Agreement are to be in writing, and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt, to the following addresses (which may be changed by written notice):

Franchisee Name/Address:      Michael Fitzpatrick
                              35 Lewis Ave.
                              Summit, New Jersey 07901

                              Ryan Fitzpatrick
                              1700 Park Avenue, Apt. 811
                              Weehawken, NJ 07086

Franchisor                    MDR United LLC
                              95 N. Broad Street
                              Doylestown, Pennsylvania 18901

With a copy to:               Fisher Zucker, LLC
                              21 S. 21st Street
                              Philadelphia, PA 19103
                              Attn: Lane Fisher

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Expressor a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

## 22   MISCELLANEOUS

22.1   **Entire Agreement.** This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be

modified except by a written document signed by both parties. Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee.

22.2    **Construction of Language.** The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party. All words in this Agreement refer to whatever number or gender the context requires. If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several. Headings are for reference purposes and do not control interpretation. Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings and Franchisee's spouse's parents, children, and siblings. Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members, and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement. In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement

22.3    **Severability.** If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other trade secrets, is declared invalid or unenforceable, then Franchisor at Franchisor's option may terminate this Agreement immediately upon written notice to Franchisee.

22.4    **State Law Applies.** If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

22.5    **Additional Documentation.** Franchisee must from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein. In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

22.6    **Force Majeure.** Neither Franchisee, Franchisor, or Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform its obligations is not the fault nor within the reasonable control of the person due to perform but results from, without limitation, fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics of other national health crisis or civil disorders. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

whole or in part, as Franchisor deems reasonable.

22.7    **Anti-Terrorist Activities.**    Franchisee certifies that neither Franchisee, nor Franchisee's owners, principals, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8    **Attorneys' Fees.**    If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

## 23    ACKNOWLEDGMENTS

23.1    **Independent Investigation.**    Franchisee acknowledges that Franchisee has conducted an independent investigation of the Franchised Business contemplated by this Agreement and recognizes that it involves business risks which make the success of the venture largely dependent upon Franchisee's business abilities and efforts. Franchisee acknowledges that Franchisee has been given the opportunity to clarify any provision of this Agreement that Franchisee may not have initially understood and that Franchisor has advised Franchisee to have this Agreement reviewed by an attorney.

23.2    **No Guarantee of Earnings.**  Franchisee understands that Franchisor and any of Franchisor's representatives and/or agents with whom Franchisee has met have not made and are not making any guarantees as to the extent of Franchisee's success in Franchisee's Franchised Business, and have not and are not in any way representing or promising any specific amounts of earnings or profits in association with Franchisee's Franchised Business.

23.3    **Receipt of Franchise Disclosure Document.**  Franchisee acknowledges that this Agreement and Franchisor's Franchise Disclosure Document have been in Franchisee's possession for at least fourteen (14) calendar days before Franchisee signed this Agreement or paid any monies to Franchisor or an affiliate and that any material changes to this Agreement were in writing in this Agreement for at least seven (7) calendar days before Franchisee signed this Agreement.

23.4    **No Personal Liability.**  Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason.  This is an important part of this Agreement.  Franchisee agrees that nothing that Franchisee believes Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement. This is an important part of this Agreement.  <u>Do not sign this Agreement if there is any question concerning its contents or any representations made</u>.

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**FRANCHISOR**

**MDR UNITED LLC**

By: _Josh Skolnick_____
9AD574030DF9458...
Josh Skolnick, Managing Member

By: _Zach Beutler_____
DAF25556D7454C7...
Zach Beutler, Managing Member

**FRANCHISEE**

_Michael Fitzpatrick_____
5F20519C805D417...
Michael Fitzpatrick, individually

_Ryan Fitzpatrick_____
79E11698D2F04FD...
Ryan Fitzpatrick, individually

**EXHIBIT A**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PERSONAL GUARANTY**

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS
AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF
FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL
PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING
UNDERTAKING. IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF
FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST
EXECUTE THE FOLLOWING UNDERTAKING.

**ARTICLE I**
**PERSONAL GUARANTY**

The undersigned persons (individually and collectively "you") hereby represent to MDR United LLC
("Franchisor"), or all of the members and managers, or the spouse of any such shareholder, general
partner, or member or manager of _____("Franchisee"), as the case may
be. In consideration of the grant by Franchisor to Franchisee as provided in the foregoing franchise
agreement (the "Franchise Agreement"), each you hereby agree, in consideration of benefits received
and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal
representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the
foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or
its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee
of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other
agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of
Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and
individually) will not permit or cause any change in the percentage of Franchisee owned, directly or
indirectly, by any person, without first obtaining the written consent of Franchisor prior to said
proposed transfer, which consent must not be unreasonably withheld, and without first paying or
causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if
applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise
Agreement. You further agree to be bound by the in-term and post-term non-competition and non-
solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other
covenants set forth in the Franchise Agreement, including but not limited to those concerning
confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the
Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by
the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

**ARTICLE II**
**CONFIDENTIALITY**

During the term of this Agreement, you will receive information which Franchisor considers a trade
secret and confidential information ("Confidential Information"). You shall not, during the term of
this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person,
partnership, association, corporation, or limited liability company any Confidential Information

© 2021 MDR United LLC
Franchise Agreement

DocuSign Envelope ID: C421B2CD-83E8-4416-AD96-B4C8B45B6B60

including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to Franchisor's integrated bookkeeping system, and other methods, techniques, and know-how concerning the operation of a Mighty Dog Roofing Business of which you may be appraised by virtue of your role as a Guarantor of Franchisee.

## ARTICLE III
## NON-COMPETITION

1) **During the Term of the Franchise Agreement.** During the term of the Franchise Agreement, neither your, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2) **After the Term of the Franchise Agreement.** For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (i) within the Protected Territory, (ii) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (iii) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

3) **Intent and Enforcement**.  It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law.  Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable.  In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach.  You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm.  You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living.  You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV
## DISPUTE RESOLUTION

1) **Acknowledgment**.  You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's proprietary marks or its system.

2) **Governing Law.**  This Guaranty shall be deemed to have been made in and governed by the laws of the Commonwealth of Pennsylvania, without any reference to Pennsylvania conflict of laws principles.

3) **Internal Dispute Resolution.**  You must first bring any claim or dispute arising out of or relating to the Franchise Agreement or this Guaranty to Franchisor's management.  You agree to exhaust this internal dispute resolution procedure before bringing any dispute before a third party. This agreement to engage in internal dispute resolution first shall survive the termination or expiration of this Agreement.

4) **Mediation.**  At Franchisor's option, all claims or disputes between you and Franchisor arising out of, or in any way relating to, this Guaranty or the Franchise Agreement or any other agreement by and between you and the Franchisor, or any of the parties' respective rights and obligations arising from such agreements, must be submitted first to mediation, in Bucks County, Pennsylvania, under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect.  Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, you must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify you as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.  You may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written

DocuSign Envelope ID: C121B2CD-83E8-4416-AD96-B4C8B45B6B60

declaration by Franchisor.  Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor.  Each party shall bear its own cost of mediation and the parties shall share the cost of mediator.  This agreement to mediate at Franchisor's option shall survive the termination or expiration of the Franchise Agreement.

The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 4 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

    i.    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

    ii.    Any claims arising out of or pertaining to any warranty issued;

    iii.    Any of the restrictive covenants contained in this agreement;

    iv.    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

    v.    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency.

5) **Third Party Beneficiaries.**  Franchisor's officers, directors, shareholders, agents and/or employees are express third party beneficiaries of the Franchise Agreement and this Guaranty, and the mediation provisions contained herein, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you.

6) **Injunctive Relief.**  Nothing contained in this Guaranty shall prevent Franchisor from applying to or obtaining from any court having jurisdiction, without bond, a writ of attachment, temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interest prior to the filing of any mediation proceeding or pending the trial or handing down of a decision or award pursuant to any mediation or judicial proceeding conducted hereunder.

7) **Jurisdiction and Venue.**  Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests.  The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Bucks County, Pennsylvania and the jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania.  The parties acknowledge and agree that this Agreement has been entered into in the Commonwealth of Pennsylvania, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Bucks County, Pennsylvania, including but not limited to training, assistance, support and the development of the System.  In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Pennsylvania as set forth herein.

8) **Jury Trial Waiver. THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY GOODS OR SERVICES.**

9) **Waiver of Punitive Damages.** You waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, your recovery shall be limited to actual damages. If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

10) **Limitation on Action.** You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide basis, and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

11) **Attorneys' Fees.** If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

12) **Nonwaiver.** Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Guaranty shall be cumulative. Franchisor' election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

13) **Severability.** The parties agree that if any provisions of this Guaranty may be construed in two

© 2021 MDR United LLC
Franchise Agreement

DocuSign Envelope ID: C121B2CD-83F8-4416-AD96-B4C8B45B6B60

ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party. The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable. If any material provision of this Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions. In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

14) **Construction of Language.** Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement. The language of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party. All words in this Guaranty refer to whatever number or gender the context requires. If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

15) **Successors**. References to "Franchisor" or "the undersigned, or "you" include the respective parties' successors or permitted assigns or transferees.

16) **No Personal Liability**. You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

*THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK.*
*SIGNATURES APPEAR ON FOLLOWING PAGE*

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**PERSONAL GUARANTORS**

**SPOUSES**

By: _____

By: _____

Print Name: _____

Print Name: _____

Address: _____

Address: _____

_____

_____

Telephone: _____

Telephone: _____

By: _____

By: _____

Print Name: _____

Print Name: _____

Address: _____

Address: _____

_____

_____

Telephone: _____

Telephone: _____

© 2021 MDR United LLC
Franchise Agreement

**EXHIBIT B**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS,**
**FACSIMILE NUMBERS AND DOMAIN NAMES**

1.  _____, doing business as a Mighty Dog Roofing franchisee, ("Assignor"), in exchange for valuable consideration provided by MDR United LLC ("Assignee"), receipt of which is hereby acknowledged hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____
Facsimile Number(s): _____
Domain Name(s) (as permitted by Franchisor under the Franchise Agreement): _____

2.  The conditional agreement will become effective automatically upon termination, expiration of Assignor's franchise. Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3.  Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment, and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR**:

By: _____        Date: _____

Name: _____

Title: _____

**ASSIGNEE**:

**MDR UNITED LLC**

By: _____        Date: _____

Name: _____

Title: _____

**EXHIBIT C**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors,*
*general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from MDR United LLC (the "Company") to establish and operate a Mighty Dog Roofing business (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Mighty Dog Roofing Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ (the "Franchised Business Premises").

1.      The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's  Manuals; price lists and standards and specifications for the  Approved Products and Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be appraised by virtue of my employment with Franchisee ("Confidential Information").

2.      Any and all  information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

3.      In my position with  the  Franchisee, the  Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual") and other general assistance during the term of this Agreement.

4.      I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.      The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all  Confidential Information and all  other information designated by the  Company as confidential.  Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

© 2021 MDR United LLC
Franchise Agreement

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing businesses, except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.     This Agreement shall be construed under the laws of the Commonwealth of Pennsylvania. The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

By: _____

Name: _____

Title: _____

Date: _____

**ACKNOWLEDGED BY FRANCHISEE**

By: _____

Name: _____

**EXHIBIT D**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name:    _____

ABA#  :    _____

Acct. No.:    _____

Acct. Name:    _____

1.    Effective as of the date of the signature below, _____ ("Franchisee") hereby authorizes MDR United LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise    Agreement    for    the    Franchised    Business    located    at: _____: (1) all Royalty fees; (2) Technology and Software Fees; (3) Call Center Fees; (4) Local Brand Optimization Fees; (5) Creative Media Fund Fees; (6) Monthly Digital Management Fees; (7) all Brand Fund Contributions; (9) all recurring fees or other fees due and owing to the Company, or to which the Company has rights to, under the Franchise Agreement, electronically or otherwise. Franchisee acknowledges that Royalty and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement.  Such withdrawals shall occur on a weekly and/or monthly basis, or on such other schedule as Company shall specify in writing.  If necessary, Company is also authorized to deposit the Gross Revenues of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur as needed or on such other schedule as Company shall specify in writing.   This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISOR**                          **FRANCHISEE**

**MDR UNITED LLC**                       _____

By: _____         By: _____

Name: _____         Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

DocuSign Envelope ID: C121B2CD-9858-441C-AD96-B4C8B45B6B60

**EXHIBIT E**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**SITE SELECTION ADDENDUM**

MDR United LLC, a Pennsylvania limited liability company with a principal business address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee"), have this 11th day of March, 2022, entered into the foregoing Franchise Agreement(s) for the operation of a Mighty Dog Roofing franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.      Within ninety (90) days after Franchisee receives notice of approval of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Protected Territory granted under the Franchise Agreement.

2.      Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum. Time is of the essence.

3.      Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within forty five (45) days after execution of this Site Selection Addendum. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.      Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct up to one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's reasonable expenses including, without limitation, the costs of travel, lodging, and meals.

5.      If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

6.      After Franchisor has approved a site for the Franchised Business in writing and Franchisee has acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.      Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty or any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose.  Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation.  Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.      This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and terms of this Site Selection Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISEE**

Michael Fitzpatrick, individually

Ryan Fitzpatrick, individually

**FRANCHISOR**

**MDR UNITED LLC**

Zach Beutler, Managing Member

# EXHIBIT F
## to
## MDR UNITED LLC
## FRANCHISE AGREEMENT

### COLLATERAL ASSIGNMENT OF LEASE

**FOR VALUE RECEIVED**, the undersigned ("Assignor") hereby assigns and transfers to MDR United LLC, a Pennsylvania limited liability company, with its principal place of business address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto as <u>Exhibit 1</u> (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee has no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of its interest in the Lease or the premises demised thereby.

Upon a default by Assignor under the Lease or under the franchise agreement for a Franchised Business between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, or upon expiration or termination of the Franchise Agreement or this Agreement, Assignee has the right and is hereby empowered to take possession of the premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor will have no further right, title or interest in the Lease. Assignor hereby authorizes the Lessor to disclose to Assignee, upon its request, sales and other information furnished to the Lessor by Assignor.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereto, Assignor agrees that it must elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing.

If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and instead of Assignor for the purpose of effecting such extension or renewal.

**ASSIGNOR:**

Dated:_____

_____

SIGNED AND SEALED this
day of _____, 20

_____

Notary Public

## CONSENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the aforedescribed Lease hereby:

      (a)      Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

      (b)      Agrees that Assignee has the right, but must not be obligated, to cure any default by Assignor under the Lease within thirty (30) days (or such longer period of time as reasonably necessary to cure the default, so long as Assignee commences the cure within 30 days and thereafter diligently pursues the cure to completion) after delivery by Lessor of notice thereof in accordance with paragraph (a) above;

      (c)      Consents to the foregoing Collateral Assignment and agrees that if Assignee takes possession of the premises demised by the Lease and confirms to Lessor the assumption of the Lease by Assignee as tenant thereunder, Lessor must recognize Assignee as tenant under the Lease, provided that Assignee cures within the time period set forth above the defaults, if any, of Assignor under the Lease;

      (d)      Agrees that Assignee may further assign the Lease to a person, firm or corporation who must agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Lessor and upon such assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise.

DATED:_____

_____

_____

**Exhibit "1" to Collateral Assignment of Lease**

**LEASE**

**Lease Agreement attached**

**EXHIBIT G**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**TERRITORY MAP**

**Territory 1 Map Attached**

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60



## Territory : PENDING - Fitzpatrick - 1



Territories

ZIP Codes

Territory Demographics for PENDING - Fitzpatrick

| ZIP Code | ZIP Code Name | Owner Occupied Homes |
|---|---|---|
| 07054 | PARSIPPANY | 6,485 |
| 07869 | RANDOLPH | 6,759 |
| 07927 | CEDAR KNOLLS | 1,220 |
| 07928 | CHATHAM | 5,498 |
| 07935 | GREEN VILLAGE | 200 |
| 07940 | MADISON | 3,748 |
| 07945 | MENDHAM | 3,102 |
| 07950 | MORRIS PLAINS | 6,016 |
| 07960 | MORRISTOWN | 10,917 |
| 07974 | NEW PROVIDENCE | 3,646 |
| 07976 | NEW VERNON | 199 |
| 07981 | WHIPPANY | 3,017 |
| Totals | | 50,807 |

**EXHIBIT I**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**
**MULTI-UNIT ADDENDUM**

THIS MULTI-UNIT ADDENDUM (the "Addendum") is made and entered into this 11th day of March, 2022 by and between MDR United LLC, a Pennsylvania limited liability company with an address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee").

**BACKGROUND**

A.    Contemporaneous with the execution of this Addendum, Franchisee and Franchisor entered into those certain three (3) franchise agreements (collectively, the "Applicable Franchise Agreements") pursuant to which Franchisee obtained the right and undertook the obligation to operate Mighty Dog Roofing franchised businesses within the territories defined therein (each a "Franchised Business").

B.    Each Franchised Business has its own designated protected territory wherein Franchisee is required to actively promote and operate the Franchised Businesses (collectively, the territories granted under the Applicable Franchise Agreements will be referred to as the "Protected Territories").

C.    Franchisor expects that Franchisee will operate the Franchised Business from a single Approved Location using the same vehicles, supplies, equipment and inventory as required by Franchisor.

D.    The parties now wish to amend certain provisions of the Applicable Franchise Agreements pursuant to the terms and conditions set forth in this Addendum.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Multi-Unit Initial Franchise Fees**. Notwithstanding anything contained in Section 3.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor an Initial Franchise Fee under any Applicable Franchise Agreement. Instead, Franchisee shall pay Franchisor lump-sum multi-unit Initial Franchisee Fee as follows (the "Multi-Unit Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | | Cumulative Number Owner Occupied Homes |
|---|---|---|---|---|
| #1 | $59,500 | $59,500 | | 50,000 |
| #2 | $99,500 | $40,000 | | 100,000 |
| #3 | $129,500 | $30,000 | | 150,000 |
| #4 | $159,500 | $30,000 | | 200,000 |
| #5 | $189,500 | $30,000 | | 250,000 |

The entire Multi-Unit Initial Franchise Fee must be paid upon execution of the Applicable Franchise Agreements and this Addendum, and this fee is deemed fully earned upon payment and non-refundable under any circumstances.

2. **Initial Training Program**. Franchisee shall only be required to attend and complete Franchisor's Initial Training Program described more fully in Section 8.1 of the Applicable Franchise Agreements, respectively, once in connection with the Franchised Businesses governed by this Addendum. All other provisions regarding Franchisee's training obligations in the Applicable Franchise Agreements are hereby ratified and confirmed.

3. **Minimum Royalty Fee and Minimum Annual Revenue Requirement**.

a. <u>Minimum Royalty Fee</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor a separate Minimum Royalty Fee under each Applicable Franchise Agreement. Instead, Franchise shall pay Franchisor the following Minimum Royalty Fees depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation:

| Minimum Royalty Fees Per Week | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

The parties further acknowledge and agree that Franchisee is subject to the Minimum Royalty Fees set forth herein in the event the Franchisee's Royalty based on the Gross Revenues Collected is less than the

Minimum Royalty Fee obligation for any given week.

b.    <u>Minimum Annual Revenue Requirement</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee shall meet and maintain the following minimum annual Gross Revenue requirements depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation, as follows (the "Minimum Annual Revenue Requirements"):

| Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

All other provisions regarding Franchisee's payment obligations, including those related to Franchisee's Royalty or other fees, of the Franchise Agreements are hereby confirmed and ratified. Franchisor reserves the right, but not the obligation, to offer a royalty incentive programs for the benefit of qualifying franchisees. To qualify for such programs, Franchisee must satisfy Franchisor's then-current specifications and standards as provided in the Operations Manual or otherwise in writing by Franchisor. Franchisor reserves the right to modify, supplement, or terminate any royalty incentive programs upon notice to Franchisee. If Franchisee fails to meet the Minimum Annual Revenue Requirements in any period, Franchisor may terminate the Franchisee's Protected Territories or otherwise terminate the Franchise Agreements.

4.    **Opening Package.**  Notwithstanding anything contained in Section 3.5 of the Applicable Franchise Agreements, Franchisee will not be required to purchase a separate Opening Package under each Applicable Franchise Agreement.

5.    **Local Brand Optimization Fee**. Notwithstanding anything contained in Section 3.6 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Local Brand Optimization Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Local Brand Optimization Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 1 | $12,000 |
| 2-3 | $12,000 |

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 4-5 | $24,000 |

6.      **Technology and Software Fees**.  Notwithstanding anything contained in Section 3.8 of the Applicable Franchise Agreements, Franchisee will not be required to pay separate Technology Fees and Software Fees under each Applicable Franchise Agreement.

7.      **Call Center Fee**.  Notwithstanding anything contained in Section 3.9 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Call Center Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Call Center Fee regardless of the number of Applicable Franchise Agreements executed.

8.      **Creative Media Fund Fee**.  Notwithstanding anything contained in Section 3.10 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Creative Media Fund Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Creative Media Fund Fee regardless of the number of Applicable Franchise Agreements executed.

9.      **Monthly Digital Management Fee**.  Notwithstanding anything contained in Section 3.11 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Monthly Digital Management Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Monthly Digital Management Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Monthly Digital Management Fee |
|---|---|
| 1 | $500 |
| 2-3 | $1,000 |
| 4-5 | $1,500 |

10.      **Equipment and Inventory**.  Notwithstanding anything contained in Section 7.6.7 of the Applicable Franchise Agreements, if Franchisee purchases four or more Territories, Franchisee must add an additional crew, an additional salesperson, and an additional separate vehicle by the end of the second year of operations.

11.      **Approved Location**.  Notwithstanding anything contained in Section 1.3 of the Applicable Franchise Agreements, Franchisee shall only be required to have one physical location that satisfies Franchisee's Approved Location requirement, if, and only if, Franchisee's Territories are contiguous.

12.      **Default of Addendum Constitutes Default Under All Applicable Franchise Agreements**. In the event Franchisee breaches any of the provisions of this Addendum, such breach will constitute a material default of all Applicable Franchise Agreements and must be cured within 30 days from Franchisee's receipt of Franchisor's written notice of such breach as set forth in Section 15.4 of the

Applicable Franchise Agreements. If Franchisee fails to cure such breaches within the prescribed period, Franchisor may, at its option, terminate one or more of the Applicable Franchise Agreements immediately upon providing written notice, or otherwise terminate Franchisee's Protected Territories.

13.     **Ratification and Confirmation of the Applicable Franchise Agreements**. Except as amended by this Addendum, any and all other terms and conditions set forth in the Applicable Franchise Agreements are hereby ratified and confirmed as if fully restated herein, including without limitation, those provisions regarding dispute resolution and venue, which will also apply to any claims or disputes arising out of or related to this Addendum. All capitalized terms not specifically defined in this Addendum will be afforded the definition given to them in the Applicable Franchise Agreements.

14.     **Entire Agreement**. The Applicable Franchise Agreements and this Addendum constitute the entire, full, and complete agreement between the parties concerning the subject matter set forth herein and supersede any and all prior agreements. In the event of a conflict between the terms of any Applicable Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. This Addendum constitutes an amendment to all Applicable Franchise Agreements.

*Signatures appear on the following page.*

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Addendum the date and year first written above.

**FRANCHISOR:**

**MDR United LLC**

By: _Josh Skolnick_     Date: 3/11/2022
9AD574030DF9458...

Josh Skolnick, Managing Member

By: _Zach Beutler_     Date: 3/11/2022
DAF25556D7154C7...

Zach Beutler, Managing Member

**FRANCHISEE:**

_Michael Fitzpatrick_     Date: 3/11/2022
5F20519C80ED417...

Michael Fitzpatrick, individually

_Ryan Fitzpatrick_     Date: 3/11/2022
79E11698D2F04FD...

Ryan Fitzpatrick, individually

DocuSign Envelope ID: C121B2CD-9858-441C-AD96-B4C8B45B6B60

**MDR UNITED LLC**



**FRANCHISE AGREEMENT**

# TABLE OF CONTENTS

**SECTION**                                                                          **PAGE**

DATA SHEET ...................................................................................................................... IV

FRANCHISEE AFFIRMATIONS AND ACKNOWLEDGEMENTS……………………………………V

1   GRANT OF FRANCHISE ...................................................................................... 2

2   TERM AND RENEWAL ......................................................................................... 5

3   FEES ........................................................................................................................ 7

4   PROPRIETARY MARKS ...................................................................................... 12

5   CONFIDENTIAL INFORMATION ...................................................................... 14

6   FRANCHISOR'S OBLIGATIONS ....................................................................... 16

7   FRANCHISEE'S OBLIGATIONS ........................................................................ 18

8   TRAINING ............................................................................................................ 26

9   INSURANCE ......................................................................................................... 28

10  FINANCIAL RECORDS AND REPORTS ........................................................... 30

11  BOOKS AND RECORDS ...................................................................................... 31

12  ADVERTISING ..................................................................................................... 32

13  INDEPENDENT CONTRACTOR; INDEMNIFICATION ................................... 37

14  SALE OR TRANSFER .......................................................................................... 38

15  BREACH AND TERMINATION .......................................................................... 42

16  RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION .................. 46

17  COVENANTS ........................................................................................................ 48

18  DISPUTE RESOLUTION ..................................................................................... 50

19  REPRESENTATIONS ........................................................................................... 52

20  GUARANTEE OF PRINCIPALS THEIR AND SPOUSES ................................. 54

21  NOTICES ............................................................................................................... 54

22  MISCELLANEOUS .............................................................................................. 54

23  ACKNOWLEDGMENTS ...................................................................................... 56

© 2021 MDR United LLC
Franchise Agreement

## EXHIBITS

Exhibit A – Personal Guaranty and Guaranty of Spouses
Exhibit B – Conditional Assignment of Franchisee's Telephone Numbers, Facsimile
                Numbers and Domain Names
Exhibit C – Confidentiality and Restrictive Covenant Agreement for Employees
Exhibit D – Electronic Funds Withdrawal Authorization
Exhibit E – Site Selection Addendum
Exhibit F – Collateral Assignment of Lease
Exhibit G – Territory Map
Exhibit H – Multi Unit Addendum

**DATA SHEET**

| | |
|---|---|
| Franchisee: | Michael Fitzpatrick<br>35 Lewis Ave.<br>Summit, New Jersey 07901 |
| | Ryan Fitzpatrick<br>1700 Park Avenue, Apt. 811<br>Weehawken, NJ 07086 |
| Guarantors: | Michael Fitzpatrick<br>35 Lewis Ave.<br>Summit, New Jersey 07901 |
| | Ryan Fitzpatrick<br>1700 Park Avenue, APT 811<br>Weehawken, NJ 07086 |
| Effective Date: | March 11, 2022 |
| Approved Location: | _____<br><br>_____ |
| Protected Territory: | See "Territory 2" set forth on the Map attached as Exhibit "G" to Franchise Agreement |
| Telephone Number: | Michael Fitzpatrick:  (718) 772-4989<br>Ryan Fitzpatrick:     (646) 210-7218 |
| E-Mail Address: | Michael Fitzpatrick:  mfitzpat23@yahoo.com<br>Ryan Fitzpatrick:     fitzpatrick.ryan11@gmail.com |
| Initial Franchise Fee: | $40,000.00 |

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

# MDR UNITED LLC
# FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective this 11th day of March, 2022, by and between MDR United LLC, a Pennsylvania limited liability company, with its principal place of business at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee").

## RECITALS

A.      Through the expenditure of a considerable amount of time, effort, and money, Franchisor has developed a system for the operation of Mighty Dog Roofing businesses (each, a "Franchised Business") that offer, sell and perform roofing services in residential and commercial properties, including: (i) new and replacement roofing services; (ii) emergency tarping services; (iii) gutter replacement; (iv) attic insulation; and (v) other products, services and events that Franchisor may approve and modify from time to time (collectively, the "Approved Products and Services").

B.      Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which include: (i) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Services to customers; (ii) certain proprietary products developed by Franchisor; (iii) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (iv) Franchisor's centralized System-wide call center (the "Call Center"); (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential operations manual (the "Operations Manual") that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.      The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin and intellectual property, including, without limitation, the MIGHTY DOG ROOFING word mark pending registration on the Principal Register of the United States Patent and Trademark (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.      Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Protected Territory").

E.      Franchisee desires to establish and operate a Franchised Business within the

DocuSign Envelope ID: C121B2CD-9858-441C-AD96-B4C8B45B6B60

Protected Territory hereinafter designated, to use in connection therewith the Franchisor's System and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.    Franchisor wishes to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.    Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

# 1    GRANT OF FRANCHISE

1.1    **Grant and Acceptance**.  Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business.  Except as otherwise provided in this Agreement, Franchisee may offer, sell and perform Franchisor's Approved Products and Services within the Protected Territory set forth in Section 1.2 herein. Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional protected territories.

1.2    **Protected Territory**.  Except as otherwise provided in this Agreement and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third-party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Protected Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including without limitation, those rights set forth in Sections 1.4 through Section 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Protected Territory provided that (a) Franchisee will not be operating within another franchisee's Protected Territory, and (b) Franchisee received Franchisor's prior written consent, which may be withheld for any reason. Other than these operations, Franchisee is not permitted to operate the Franchised Business outside of the Protected Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Protected Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and specifications as set forth in the Operations Manual (as defined in Section 6.1). If more than 5% of Franchisee's Gross Revenues are derived from approved operations from or within a specific location or area that is outside of the Protected

Territory, to continue to operate in that area, Franchisee must either purchase an additional franchise and execute a separate franchise agreement for that operation or purchase an additional territory covering such territory.

1.3    **Approved Location**.  Franchisee must operate the Franchised Business only at the approved location identified in the Data Sheet (the "Approved Location").  Franchisee shall operate the Franchised Business from an approved office/warehouse or flex space located in the Protected Territory that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee will need to lease approximately 1,500 to 2,000 square feet of commercial real estate for the office/warehouse or flex space and to securely store equipment/inventory. Franchisor may, but is not required to, allow Franchisee to utilize a home office or cooperative space of 1,500 to 2,000 square feet as an Approved Location during the first six (6) months of operations. Franchisee may not utilize a home office or cooperative space at any time without Franchisor's prior written consent. The office may be located in the warehouse or flex space, provided that it meets Franchisor's standards and specifications. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. Franchisee must secure its Approved Location within ninety (90) days of executing this Agreement in the event the parties have not agreed on an Approved Location prior to executing this Agreement. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (attached hereto as Exhibit E), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

1.4    **National and Regional Accounts**. Franchisor has the exclusive right to create National and Regional Account ("NORA") programs for a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations, Chain Customers (as defined below) and other similar organizations for the benefit of the System. Franchisor or any party Franchisor may designate has the exclusive right to solicit and service NORA customers within or outside of the Protected Territory, including, the right to offer and sell Approved Products and Services. Franchisee may not solicit, service or otherwise pursue any NORA relationships, whether the contacts for these relationships are in the Protected Territory or not, without Franchisor's prior written consent. Franchisee may not service, solicit or otherwise pursue a relationship with a NORA or potential NORA or any of its members or associates, without notice to Franchisor and Franchisor's prior written consent. Any dispute as to whether a particular customer is considered a NORA customer will be determined by Franchisor, and its determination will be final and binding. A Chain Customer´ is a non-residential customer, a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations whose presence is not confined within any one particular territory. Following the execution of a contract with or the acceptance of a bid by a NORA customer which contemplates the provision of services to one or more NORA locations within the Protected Territory, Franchisor may, at its sole option, provide Franchisee the option to perform such services pursuant to the terms and conditions of the NORA contract or on such terms and conditions as Franchisor determines in its sole discretion. In order to service any NORA customers, Franchisee must enter into Franchisor's then-current form of NORA participation agreement, the terms of which

will govern all NORA work. Franchisee is not entitled to any right to compensation or consideration for work performed by others in the Protected Territory for National Accounts.

1.4.1    Franchisor also shall have the right, exercisable in its sole discretion, to:

A.    provide, directly or through any other licensee or franchisee utilizing the Proprietary Marks, services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract; and/or

B.    contract with another party to provide such services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract between Franchisor and the NORA customer, utilizing the Proprietary Marks or any other trademarks, service marks or trade names.

Neither the direct provision by Franchisor (or a System franchisee, licensee, or Franchisor's agent or designee) of services to NORA customers, nor Franchisor's contracting with another party to provide such services shall constitute a violation of Franchisee's rights in the Protected Territory. Franchisee disclaims any compensation or consideration for work performed by others in the Protected Territory on account of NORA customers within the Protected Territory.

1.5    **Reservation of Rights**. Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Services, and otherwise use the Proprietary Marks and System, within the Protected Territory is non-exclusive and Franchisor and its affiliates expressly reserve the right to: (i) establish and operate, and license third parties the right to establish and operate, Franchised Businesses using the Proprietary Marks and System at any location outside of the Protected Territory; (ii) acquire, merge with, engage in joint ventures with, or otherwise affiliate with, and thereafter own and operate and franchise others the right to own and operate, any business of any kind regardless of location, except for businesses that offer roof repair and roof replacement within the Protected Territory; (iii) establish and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark, other than the Proprietary Marks, at any location, within or outside the Protected Territory; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service NORAs within and outside the Protected Territory as set forth more fully in Section 1.4; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center in accordance with Section 1.8 of this Agreement; (vii) sell and distribute, directly or indirectly, or license others to sell and distribute within or outside the Protected Territory, directly or indirectly, any products, services or merchandise, including Approved Products and Services, from any location or to any purchaser or through any alternative channel or method of distribution including, but not limited to, via retail and wholesale distribution, in supermarkets, hardware stores, club stores and other retail facilities, via mail order and e-commerce channels; and (viii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

1.6    **Events of Catastrophe**. Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliates and/or other System franchisees may be permitted to provide support to

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

Franchisee and/or perform work in the Protected Territory, including the provision of labor, materials, equipment, and project management on projects in the Protected Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Protected Territory.

1.7 **Alternate Channels of Distribution.**  Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Protected Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine.  Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Services as described in this Section 1.7; or (ii) to share in any of the proceeds received by any such party therefrom.

1.8 **Right to Service Customers in Protected Territory; Use of Call Center.**

1.8.1 Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Protected Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and (a) Franchisee does not respond to the assignment within a time period Franchisor deems in its sole discretion appropriate under the circumstances, or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems appropriate in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that the Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Protected Territory has been subjected to a disaster or catastrophe.

1.8.2 Franchisee agrees and acknowledges that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Protected Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

# 2    TERM AND RENEWAL

2.1 **Term**.  The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

2.2    **Renewal**.  Franchisee has the right to renew this Agreement for one successive, additional ten (10) year period, provided Franchisee has met the following conditions:

2.2.1    Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

2.2.2    Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Protected Territory acceptable to Franchisor;

2.2.3    Franchisee has completed, to Franchisor's satisfaction, ninety (90) days prior to the expiration of the then-current term, any updates to all required equipment, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications and, Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

2.2.4    Franchisee is not in breach of any provision of this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

2.2.5    Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

2.2.6    Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without limitation, increased royalty and other fees and insurance requirements);

2.2.7    Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to providing the Approved Products and Services at any location within the Protected Territory;

2.2.8    Franchisee and its principals execute a general release in the form Franchisor prescribes; and

2.2.9    Franchisee pays a renewal fee in the amount of twenty percent (20%) of the then-current initial franchise fee.

## 3     FEES AND MANNER OF PAYMENT

3.1    **Initial Franchise Fee**.  In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee, calculated as follows (the "Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | | Individual Franchise Fee | | Cumulative Number Owner Occupied Homes |
|---|---|---|---|---|---|
| #1 | $59,500 | | $59,500 | | 50,000 |
| #2 | $99,500 | | $40,000 | | 100,000 |
| #3 | $129,500 | | $30,000 | | 150,000 |
| #4 | $159,500 | | $30,000 | | 200,000 |
| #5 | $189,500 | | $30,000 | | 250,000 |

The Initial Franchise Fee is due at the signing of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise others.

3.2    **Royalty Fee**.  Franchisee must pay Franchisor a weekly royalty fee (the "Royalty") in an amount equal to the greater of: (i) six- and one-half percent (6.5%) of Gross Revenues Collected during the immediately preceding week; or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.1.

3.2.1    *Minimum Royalty Fee and Annual Gross Revenue Requirements*.

Franchisee must meet and maintain the following weekly Minimum Royalty Fees per Territory throughout the Term. Franchisee's weekly Minimum Royalty Fees are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Mighty Dog Roofing Business(es) have been open and operating.

Franchisee's Minimum Royalty Fees are as follows:

| Months of Operation | Minimum Royalties Per Week Per Territory | | | | |
|---|---|---|---|---|---|
| | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |

| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

In addition, Franchisee must meet and maintain the following minimum annual Gross Revenue requirements ("Minimum Annual Revenue Requirements") per Territory throughout the Term. Franchisee's Minimum Annual Revenue Requirements are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Mighty Dog Roofing Business(es) have been open and operating.

Franchisee's Minimum Annual Revenue Requirements are as follows:

| Minimum Annual Revenue Requirement Per Territory | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

The parties will true-up all Royalty payments, whether actual or Minimum Royalty Fee payments for each applicable 12-month period, at the period's end by evaluating each period's obligations on an annualized basis. In the event Franchisee's fails to meet the above Minimum Royalty Fees or Minimum Annual Revenue Requirements, Franchisor may terminate the Protected Territory or otherwise terminate this Agreement.

However, Franchisee will not be subject to a Minimum Royalty Fee during the first twelve (12) months of operations on the condition that Franchisee strictly complies with all its obligations during the first twelve (12) months of operations and Franchisee shall pay the Royalty fee equal to six- and one-half percent (6.5%) of Gross Revenues Collected by the Franchised Business during the first twelve (12) months of operations.

"Gross Revenues Collected" means any and all revenue or other compensation actually collected by Franchisee from customers of the Franchised Business.

"Gross Revenues" are defined in the Franchise Agreement to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by or on account of the operation of the Franchised Business at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including but not limited to cash, services, in kind from barter and/or exchange, on credit or otherwise as well as business interruption insurance proceeds. Gross Revenues shall also include the total amount of all sales for labor, material, equipment and/or services performed or rendered by: (a) Franchisee, or (b) any third-party subcontractors or agents of Franchisee who perform services for Franchisee's customers or clients as part of Franchisee's services. Gross Sales shall also include all commissions, finder's fees, referral fees, construction management fees or other compensation received by Franchisee on the value of any work performed. Franchisee agrees that all Royalty Fees, including any Minimum Royalty Fee, are non-refundable. However, the definition of Gross Revenues does not include sales tax that is collected from customers and transmitted to the appropriate taxing authorities.

    3.2.2 *Special Programs*. Franchisor reserves the right, but not the obligation, to

establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

3.3  **Gross Revenue Reporting**.  Franchisee agrees to report Gross Revenue in such form or format as Franchisor may specify from time to time.  Franchisor may, at any time, and from time to time, modify the required form or format. Franchisor reserves the right to require Franchisee to provide Franchisor with verified Gross Revenue Reports in the event Franchisor is unable to process electronic funds transfer based upon information Franchisee inputs into the POS System. Each Gross Revenue Report must set forth: (i) Gross Revenues Collected generated during the previous week; (ii) calculation of the Royalty and Brand Fund Contribution (as defined below); and (iii) any other information Franchisor may require.  If a Gross Revenue Report is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the electronic funds transfer, then Franchisor may withdraw additional funds through an electronic funds transfer from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the electronic funds transfer, then Franchisor will credit the excess amount to the payment of Franchisee's future obligations.

3.4  **Method of Payment**.  With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement, or any other agreement between Franchisee and Franchisor or its affiliates, from the bank account Franchisee provides to Franchisor for use in connection with EFT Program (the "EFT Account"). Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks, and credit card receipts.  At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Authorization Form attached as Exhibit D to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer. Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account.  Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement by such other means as Franchisor may specify from time to time.

3.5  **Opening Package**. Prior to opening its Franchised Business, Franchisee must purchase from Franchisor, or an affiliate or designated vendor, the required opening package at its then-current cost, which includes items such as tarp, catch all system, and small promotional materials such as yard signs, clothing, printed items, pitch books, a vehicle wrap and other equipment, tools, and supplies related to the operation of your franchise (the "Opening Package").

3.6  **First Year Local Brand Optimization**. Prior to opening the Franchised Business, Franchisee must pay to Franchisor and/or Franchisor's designated vendor a local brand optimization fee (the "Local Brand Optimization Fee") in the amount of $12,000, in connection with the costs of local SEO optimization.  After the initial year of operations, Franchisor reserves the right to require Franchisee to expend Franchisor's then-current Local Brand Optimization each year.

DocuSign Envelope ID: G121B2CD-9858-4416-AD96-B4C8B45B6B60

3.7 **Brand Fund Contribution**. As set forth more fully in Section 12.3 of this Agreement, Franchisor has established a national brand fund for advertising and brand promotion (the "Brand Fund"). Franchisee shall make weekly contributions of two percent (2%) of Gross Revenues Collected by the Franchised Business for sales made during the immediately preceding week (the "Brand Fund Contribution"). Presently, Brand Fund Contributions are to be paid as directed by Franchisor via the EFT Program, or as otherwise required by the Operations Manual or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenues Collected during the Term of this Agreement.

3.8 **Technology Fee and Software Fee**. Prior to opening, Franchisee must pay Franchisor a technology fee (the "Technology Fee") of $3,500 and a software fee (the "Software Fee") of $6,000 for the first year of operations, which Franchisor will collect on Franchisee's behalf and remit to its designated vendors. The Software Fee covers the costs of various software programs Franchisee must utilize in connection with the operation of the Franchised Business and the Technology Fee covers the costs associated with system network functions, updating microsites, and call center interfacing software. Thereafter, Franchisee must pay Franchisor or its designated vendors, on a monthly basis, its then-current Technology Fee and Software Fee associated with using and maintaining the required computer hardware and software, hosting services and solutions, and any other technology used in the operation of the Franchised Business, and such payment shall be made in the manner prescribed by Franchisor or the designated vendor(s), as applicable, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer requirements or as required by the third-party service provider(s) or by any regulatory agency.

3.9 **Call-Center Fee**. Franchisor, or its affiliate, has established and will operate a Call Center which will field all calls and manage prospective and existing customers and route/assign work/inquiries as Franchisor deems necessary in its discretion, and as further described in Section 6.6. Franchisee must pay Franchisor, or its affiliate, all associated start-up fee(s), monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call-Center Fee"), which are subject to change at any time. Franchisee shall pay the first year Call-Center Fee of $3,600 prior to commencing operations of the Franchised Business. After the first year of operations, Franchisee will be billed $300 monthly. Lead fees and surcharges will be paid as incurred or as Franchisor requires. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the Call Center or as required by any third-party service provider(s) or by any regulatory agency, at any time upon providing reasonable notice to Franchisee. Franchisor may require Franchisee to pay the Call Center Fees to Franchisor directly for its operation of the Call Center, or for Franchisor to make payment on Franchisee's behalf to its affiliate or another third-party provider it designates. Franchisor may require Franchisee to make payment directly to such affiliate or third-party provider in its sole discretion.

3.10 **Creative Media Fund Fee.** Prior to attending training, Franchisee must pay Franchisor a Creative Media Fee of $5,000 to cover costs associated with video production, actors and actresses' compensation, video editing of videos. These videos are designed for national use on social media, YouTube, and other digital platforms. This is a one-time fee.

3.11    **Monthly Digital Management Fee.**  Franchisee must pay Franchisor's designee, currently, Franchisor's affiliate, Franchise Rocket, a monthly Digital Management Fee (the "Digital Management Fee"), currently $500 per month for 1 Territory, $1,000 for 2 or 3 Territories; and $1,500 for 4 or 5 Territories. As of the Effective Date, the Digital Management Fee covers the following items: (i) Management and SEO optimization of one micro site and GMB page; (ii) management and optimization of one digital campaign; (iii) two (2) hours of graphic design support; (iv) site directory management; and (v) basic reputation management. The Digital Management Fee is paid on a per territory basis. Franchisor reserves the right to modify the Digital Management Fee as Franchisor modifies the digital marketing and advertising requirements that Franchisee must use for the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Digital Management Fee, including the party to whom payment is made, at any time upon providing reasonable notice. Franchisee must comply with all such modifications.

3.12    **Late and/or Under Payments and Interest**. All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company, and other amounts which Franchisee owes to the Franchisor and/or its affiliated company, not received on or before the due date, shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to the Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one and one half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement.

3.13    **No Right to Off Set**. Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.14    **Non-Exclusive Remedies**. Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waive, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

3.15    **Taxes on Payments**.  In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.16    **Administrative Fee**.  Franchisee must pay Franchisor its then-current administrative fee (the "Administrative Fee") in the event Franchisor makes and processes any amendments, modifications, or otherwise supplements this Agreement at the request of Franchisee or is otherwise required due to Franchisee's actions.

3.17    **Outstanding A/R Collection Fee**. Franchisor has the right to assist Franchisee in collecting outstanding balances from Franchisee's customers for amounts more than 60 days past due.  If Franchisor assists in collecting such outstanding amounts, Franchisee must pay Franchisor a fee in the amount of 15% of the amount collected.

3.18    **Insurance Claims Assistance Fee**. Prior to opening, Franchisee must pay

Franchisor a fee of $1,000 to cover Franchisor's costs in providing Franchisee insurance claim assistance services, in which Franchisor will investigate the building requirements on a state, county and at local level in Franchisee's market in order to assist Franchisee in preparing insurance claims. Such costs may be used to cover market visits and third-party vendors costs are non-refundable upon payment.

3.19 **Memberships and Subscriptions**. Franchisee must participate in all membership and subscription services that franchisor requires. Currently, Franchisee must participate in the Owens Corning Platinum Preferred Contractor program immediately upon launching the Franchised Business and pay all dues associated with the program, currently $2,500 per year, which are subject to increases from time to time. Franchisees must continue this annual membership, or any similar membership that Franchisor may require from time to time.

3.20 **Franchise Resources Fee**. Franchisee must pay to Franchisor's designated vendor a monthly Franchise Resources Fee in the amount designated by Franchisor. As of January 1, 2022, the Franchise Resources Fee is $399 per month. This fee may cover, among other designated resources, designated vendor fees for bookkeeping services. Franchisor reserves the right to increase the Franchise Resource Fee up to 0.5% of Franchisee's total Gross Revenues Collected. Franchisor also reserves the right to modify the Franchise Resources Fee, to modify the franchise resource requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Franchise Resources Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee. Franchisor reserves the right to require Franchisee to use Franchisor's designated vendors for payroll, sales tax filing, and other related services.

3.21 **Annual Conference Fee**. Franchisee must pay to Franchisor an annual fee for Franchisee's registration and attendance to Franchisor's annual conference for the System (the "Annual Conference"), if held by Franchisor, and as further described in Section 6.8. Franchisee and Franchisee management (if applicable) must register for and attend the Annual Conference and pay Franchisor the then-current registration and attendance fee (the "Annual Conference Fee"), which shall not exceed $1,000 per attendee. If Franchisee does not register for the Annual Conference, Franchisee must pay Franchisor a fee of $1,000.

3.22 **Drone Kit Fee**. Franchisee must pay to Franchisor's designated vendor a Drone Kit Fee for the first year of operations. As of January 1, 2022, the Drone Kit Fee is $6,900. After the first year of operations, Franchisee must pay Franchisor's designated vendors, on a monthly basis. As of January 1, 2022, the monthly Drone Kit Fee is $269. Franchisor also reserves the right to modify the Drone Kit Fee, to modify the franchise resource requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Drone Kit Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee

# 4    PROPRIETARY MARKS

4.1     **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**.

4.1.1     Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

4.1.2    Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Protected Territory and in sales and marketing for the Franchised Business.

4.1.3    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable.  Franchisee may not use the Proprietary Marks in connection with the offer or sale of any services or products which Franchisor has not authorized for use in connection with the System.  Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name.  Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use.  Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (collectively the "Proprietary Material").  Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof.  Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material.  Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement.  In the event of any litigation relating to Franchisee's use of the Proprietary Material,

Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution including, without limitation, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

   4.1.9  Franchisee expressly understands and acknowledges that:

     4.1.9.1 Franchisor or its affiliates or licensors own all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

     4.1.9.2 The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

     4.1.9.3 During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

     4.1.9.4 Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

     4.1.9.5 Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

     4.1.9.6 Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

     4.1.9.7 Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder. Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within ten (10) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

# 5  CONFIDENTIAL INFORMATION

   5.1  **Nondisclosure**. During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information. Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any Confidential Information, as defined in Section 5.2. Upon

termination or expiration of this Agreement, regardless of reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately and Franchisee may not use the Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2  **Confidential Information**. Confidential Information hereby includes, without limitation, any and all confidential, proprietary, and trade secret information relating to the operation of a Franchised Business, such as: all financial, operational, technical and marketing information; the Operations Manual and Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; cost data; pricing information; business plans; financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; photographs, devices, samples, models, and illustrations; software developed by or for Franchisor; customer lists and any information relating to Franchisor's customers or the customers of other System franchisees; patent, trademark, service mark, and copyright applications; information relating to inventions, discoveries, software and any other research and development information; methods of conducting the Business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; any information of a customer not generally known or available to the public; any Trade Secrets (as defined in Section 5.3 of this Agreement), or of a customer of Franchisor, or of any other franchisee; and any information about or originating from any Franchisee which, if it was information of Franchisor, are expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3  **Trade Secrets**. Notwithstanding Section 5.2, trade secret means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4  **Employees and Subcontractors**. All of Franchisee's employees and subcontractors must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Franchised Business.  Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement attached as Exhibit C to this Agreement.  Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5  **New Concepts.**  If Franchisee, or Franchisee's employees, principals or subcontractors, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6560

necessary related information, without compensation. Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent applications, trademarks, copyrights and other intellectual property rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentations for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

5.6 **Customer Privacy**. Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop. Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

## 6    FRANCHISOR'S OBLIGATIONS

6.1 **Operations Manual**. Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual and intranet system, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre-opening procedures, systems and procedures, personnel policies, specifications for vehicles, supplies, equipment and inventory, marketing, accounting and bookkeeping and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of the Franchisor, constituting a trade secret of Franchisor, and may not be, shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System.

6.2 **Opening Package; Initial Equipment and Supplies**. Franchisor, or its affiliates will provide Franchisee with an Opening Package upon Franchisee's payment of the required fees. Franchisor will also provide a list of all items, equipment, and supplies needed to open and operate the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), which may include Franchisor and its affiliates, with which Franchisee must comply.

6.3     **Ongoing Assistance**.  Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means.  If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current training fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion.  Franchisor may also use the Operations Manual, as defined in Section 6.6, to provide some self-serve training materials.

6.4     **Additional Training**.  As set forth more fully in Section 8.2, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee and Franchisee's personnel to attend such additional training at a location to be selected by Franchisor. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility.  If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.5     **Remedial Training**. In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to remedial training (in addition to any required training under Section 6.4). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current tuition training fee to provide such remedial training.

6.6     **Call Center**.  Franchisor has established and maintains a centralized call center for the purpose of accepting telephone, internet and other inquiries from potential customers and forwarding such customer information to the appropriate franchisee (the "Call Center"). Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay in connection with administering and maintaining this service. Franchisor has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls as it deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Protected Territory. All Mighty Dog Roofing related phone numbers and internet lead sources are required to be ported to or directed to Franchisor.

6.7     **Pricing**. Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. Franchisee may charge whatever prices it deems appropriate without regard to Franchisor's suggested pricing.

6.8    **Annual Conference**. Franchisor may, in Franchisor's discretion, hold an annual conference at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if it chooses to charge a registration fee in its sole discretion. Franchisor reserves the right to charge Franchisee a fee to cover convention expenses in the event the Franchisee chooses not to attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals, and salaries during the Annual Conference, are Franchisee's sole responsibility. Franchisor may use National Fund Contributions for purposes related to the Annual Conference, including costs related to productions, programs, and materials.

# 7    FRANCHISEE'S OBLIGATIONS

7.1    **Site Location and Lease Approval.**  Franchisee shall operate the Franchised Business from an approved commercial office/warehouse or flex space that meets Franchisor's then-current standards and specifications for an Approved Location and located within the Protected Territory. Franchisee will need to lease approximately 1,500 to 2,000 square feet of separate commercial office/warehouse or flex space for Franchisee's office and storage space to securely store all equipment, supplies and inventory.  Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location for Franchisee to operate the Franchised Business as of the date Franchisee signs this Agreement, the parties shall enter into Franchisor's prescribed form of Site Selection Addendum, the terms of which shall govern the parties' site selection obligations. Franchisor has the right to review, evaluate and approve Franchisee's proposed lease for the Approved Location ("Lease") prior to execution.  Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form attached hereto as Exhibit F.

7.1.1    *Relocation*. If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Protected Territory to complete the unexpired portion of the term of this Agreement.  Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within forty-five (45) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its reasonable costs and expenses associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation.

7.1.2    *Franchised Business Appearance and Approved Location Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout, and design of a Franchised Business.  Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete

DocuSign Envelope ID: C121B2CD-9858-441E-AD96-B4C8B45B6B60

construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permits requirements, and any other applicable local, state, or federal law.

       7.1.3 *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

      7.2    **Training**.  Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program as set forth more fully in Section 8 of this Agreement. Franchisor has the right to require up to two (2) individuals to attend in addition to Franchisee.

      7.3    **Opening Requirements**.  Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. In addition to any other pre-opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Protected Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, supplies, and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers, that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program as described defined in this Agreement, as well as any other pre-opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement.

      7.4    **Purchasing Requirements**.

      7.4.1   *Compliance with Standards*.  Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System.  Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same.  Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion.  Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

      7.4.2   *Designated and Approved Suppliers*.  Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "Approved Supplier"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliate and/or a third

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

party may be one of several, or the only, Approved Supplier of any item. Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue on any products or services that Franchisor, Franchisor's affiliates or Franchisor's Approved Suppliers supply and/or provide to Franchisee. Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

       7.4.3  *Supplier Approval.*  In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known. At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier. Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency, and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information. Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate. Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

       7.4.3.1 Franchisee, or the proposed supplier, must pay Franchisor in advance for Franchisor's reasonable costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

       7.4.3.2 Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

       7.4.3.3 Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third-party to supply, provided that third-party executes Franchisor's prescribed form of non-disclosure agreement.

       7.4.3.4 Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor

approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

        7.4.3.5 Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

        7.4.4 *System Suppliers.* Franchisor may establish business relationships, from time to time, with suppliers, including affiliates of Franchisor, who may produce and/or provide certain goods or services that Franchisee is required to purchase from only that supplier (each a "System Supplier"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software, and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally. Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product or ability to obtain product only on less favorable credit terms. Accordingly, Franchisee agrees to pay System Suppliers as and when due. Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

    7.5    **Authorized Products and Services.** Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization. Franchisee shall at all times maintain sufficient levels of inventory, as specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees. In the event Franchisee wishes to offer any Approved Products or Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Services.

    7.6    **Operations**.

        7.6.1 *Hours of Operation.* Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

        7.6.2 *Maintenance of Premises and Project Sites.* Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual. Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

        7.6.3 *Personnel/Staffing.* Franchisee must employ a sufficient number of qualified, competent personnel, offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain

and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

7.6.4    *Compliance with Operations Manual and Training of Employees.* Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual and shall continue such training and instruction as long as each employee is employed. Franchisee shall cause any third-party subcontractor engaged by Franchisee to perform work on behalf of Franchisee with respect to the Franchised Business to comply with all applicable requirements of this Agreement, including, but not limited to, Franchisor's quality and performance standards. The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

7.6.5    *Management Participation.* Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote his or her personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon Franchisee's written request, Franchisor shall permit Franchisee to employ a manager to manage the day-to-day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program before assuming any managerial responsibility. The Franchised Business must, at all times, be staffed with at least one (1) individual who has successfully completed Franchisor's initial training program as set forth in Section 8.1. In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business. In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly.

7.6.6    *Working Capital.* Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7    *Equipment and Inventory.* Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with representative vehicles, supplies, equipment and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by the Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand. In the event that Franchisee's accounts receivable grows in excess of 40% of Franchisee's overall Gross Revenues Collected or Franchisee's backlog of jobs reaches 12 weeks, Franchisee must, at Franchisor's request, invest in additional infrastructure and/or equipment and employees to adequately service customers and the Protected Territory efficiently.

7.6.8    *Products with Proprietary Marks*. Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor.

7.6.9    *Market Research*. Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.7    **Franchised Business Inspection.**  Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

7.8    **Computer Software and Hardware**.

7.8.1    *Computer System*. Franchisor shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, applications, and hardware be used by Franchisee, including without limitation: (a) a compatible computer system that complies with Franchisor's standards and specifications and is capable of operating financial and other business software; (b) printers and other peripheral hardware or devices; (c) archival back-up systems; and (d) Internet access mode and bandwidth (collectively, the "Computer System").

7.8.2    *Required Software*. Franchisor shall have the right, but not the obligation, to develop or designate: (a) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's proprietary software (collectively, the "Required Software"), which Franchisee must license from Franchisor; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee must install at its expense; (c) the tangible media upon which Franchisee records data; and (d) the database file structure of the Computer System.

7.8.3    *Compliance with Requirements*.  At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section 7.8.3 shall be at Franchisee's sole cost and expense.

7.8.4    *Franchisor's Access.* Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section 7.8 within thirty (30) days of opening the Franchised Business.

7.8.5    *Proprietary Software.* Franchisor has a proprietary interest in all databases, lists, templates, programs and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create programs that conduct, among other things, scheduling, accounting, inventory, and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's confidential information.

7.8.6    *Computer Network.* Franchisee is required to participate in any System-wide computer network, intranet system, or extranet system that Franchisor implements and may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor on-line; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) to complete any initial or ongoing training, in the event Franchisor makes such training accessible through this medium. Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

7.9    **Personal Conduct**.    Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

7.10    **Best Efforts**.    Franchisee (or Franchisee's principals or designated manager) must devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Protected Territory. Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and System. Franchisee acknowledges that Franchisee's (or Franchisee's principals' or designated manager) violation of the terms in this Section 7.10 will be a material breach of this Agreement, and Franchisor may terminate

this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

7.11    **Telephone and Email Access.**  Franchisor reserves the right to procure and supply dedicated telephone numbers and email accounts associated with the Franchised Business.

7.12    **Payment of Debts**.  Franchisee is solely responsible for: selecting, retaining and paying Franchisee's employees; the payment of all invoices for the purchase of goods and services used in connection with operating the Franchised Business; and determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business.  Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors, and creditors on a timely basis.  Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System suppliers and System franchisees.  Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, personal property and real estate taxes arising from Franchisee's operation of the Franchised Business.  Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13    **Compliance with Applicable Laws.**  Franchisee must comply with all applicable federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to occupational hazards and health, trademark and copyright infringement, fair marketing laws, consumer protection, trade regulation, workers' compensation, unemployment insurance, withholding and payment of Federal and State income taxes and social security taxes and sales, use and property taxes, and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the operation of the Franchised Business).  Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors.  Franchisee agrees to be solely responsible for all employment decisions and to comply with all state, federal, and local hiring laws and functions of the Franchised Business, including without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part-time.  At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates.

7.14    **Trade Secrets and Confidential Information**.  Franchisee and all employees and subcontractors must maintain the confidentiality of all Confidential Information as set forth in Section 5 of this Agreement.

7.15    **Image**.  Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other roofing service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service.  Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System.  Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity and increase the demand for the products sold and services rendered by System franchisees.  Franchisee agrees to comply with the standards, specifications and requirements

Franchisor set forth in order to uniformly convey the distinctive image of a Mighty Dog Roofing franchised business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16 **Pending Actions.** Franchisee shall notify Franchisor, in writing, within five (5) days of the commencement of any action, suit or proceeding and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17 **Standard Maintenance and System Conformity.** Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s), equipment, tools and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

7.18 **Customer Service.** Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, warranties on any Approved Products or Services offered or sold by the Franchised Business, refund policies and other standards and specifications.

7.19 **Warranty.** Franchisee agrees to offer and honor such warranty on all materials and workmanship sold by Franchisee as Franchisor may designate from time to time in the Operations Manual or otherwise in writing. Franchisee shall cooperate with Franchisor warranty claims and shall make no statements or admissions as to liability. Franchisee shall promptly report all warranty claims to Franchisor and shall undertake all warranty work under the Proprietary Marks. All costs associated with administering and honoring the warranty service shall be borne by Franchisee. Franchisee agrees that it shall remain liable during the Term or upon the termination or expiration of this Agreement for all warranties issued by Franchisee. If Franchisee does not remedy, in full, any warranty claim made by a customer within a reasonable amount of time after receiving notice of such claim, as determined by Franchisor in its sole discretion, Franchisee and its principals acknowledge and agree that Franchisor may thereafter address such warranty claim, and Franchisee and principals are required to promptly reimburse Franchisor for all warranty costs or customer reimbursements incurred by Franchisor plus Franchisor's then current administration charge.

# 8 TRAINING

8.1 **Initial Training Program.** Franchisor will provide Franchisee (or one of Franchisee's principal owners if Franchisee is a business entity) and up to two (2) additional

individuals that Franchisee designates with Franchisor's then-current initial training program (the "Initial Training Program") tuition-free, subject to the availability and schedule of Franchisor's training personnel, for a total of three (3) individual attendees. Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's facility in Omaha, Nebraska, or other location that Franchisor may designate, prior to commencing operations of the Franchised Business. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. The Initial Training Program lasts up to twenty (20) days, and Franchisee will be solely responsible for costs and expenses Franchisee and its representative(s) incur in connection with attending the Initial Training Program, including travel, lodging, meals or any wages incurred for Franchisee's employees. In the event Franchisor permits Franchisee to employ a Designated Manager (as defined in this Agreement), such Designated Manager must attend and complete the Initial Training Program to Franchisor's satisfaction prior to commencing any managerial duties of the Franchised Business. Franchisor reserves the right to substitute any in-person training for virtual training at its discretion.

8.1.1 *Timing for Completion.* Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction prior to opening the Franchised Business and within one hundred eighty (180) days from the date this Agreement is fully executed. In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction, then Franchisor may terminate this Agreement.

8.1.2 *Additional Employees.* In the event Franchisee wishes for more than two (2) additional persons to participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee. All training related expenses for Franchisee's additional personnel, including transportation to and from the training site, lodging, meals, and salaries during training, are Franchisee's sole responsibility.

8.1.3 *Replacement Personnel.* In the event Franchisee or Franchisee's employee or attendee fails to complete the Initial Training Program to Franchisor's satisfaction, the respective person may repeat the course, or, in the case of an employee or attendee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Failure by Franchisee, an employee or any Replacement Personnel to complete the initial training program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

8.1.4 *Employee Training.* Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their respective duties in connection with the Franchised Business prior to such employee(s) undertaking these duties.

8.1.5 *Training Materials.* Franchisor may provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel. Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel. Updated training materials may be available to Franchisee in the Operations Manual or by other means in Franchisor's sole discretion. All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates'

title or rights in or to the training materials. Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

8.2    **Additional and Remedial Training.** Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable), estimators, installers, and other employees to attend additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then-current tuition fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals, and employee wages incurred). Additional and/or refresher training may take place at Franchisor's facility in Omaha, Nebraska, or any other location that Franchisor may designate. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

8.3    **Reasonable Training and Assistance Requests**. Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then-current tuition fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Franchisor's facility in Omaha, Nebraska, or on-site at Franchisee's Approved Location or within the Protected Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

## 9    INSURANCE

9.1    **General**. Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual or otherwise in writing.  In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such insurance and minimum policy limits that are reasonable and customary in the roofing services industry. The insurance policy or policies must be in effect upon the earlier of: (a) thirty (30) days prior to opening the Franchised Business; or (b) upon signing a lease agreement for the premises of the Franchised Business. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's respective, past, present, and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys, and agents against any loss, liability, personal injury, death, property damage or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use, or occupancy of the Franchised Business. Franchisee shall have MDR United LLC, and its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds as an additional insured under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. The employment practices liability policy is required to: (a) have an endorsement as listed on Form CG 20 29 or its equivalent; and (b) name Franchisor as Co-Defendant. Franchisor reserves the right to amend, modify, and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice through the Operations Manual or otherwise in writing by Franchisor.  Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Franchisee must provide Franchisor with certificates of insurance evidencing the required coverage

at least 30 days prior to opening. Franchisee shall continue to provide Franchisor with certificates of insurance evidencing the required coverage and any other documentation in connection therewith on an annual basis or as otherwise specified in the Operations Manual.

9.2 **Designation of Carrier; Insurance Rating, Approval, and Certification.** Franchisor has the sole right, exercisable at any time and upon notice to Franchisee, to designate a vendor or supplier, which may include an affiliate of Franchisor, from whom Franchisee must purchase all insurance policies required by Franchisor to operate the Franchised Business. All insurance carriers must be approved by Franchisor in advance and in writing. All insurance policies must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance Report. Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy. Franchisee agrees to carry such insurance as may be required by the lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law. Franchisee must deliver a certificate of insurance to Franchisor at least thirty (30) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary and non-contributory to any policy or policies held by Franchisor or its affiliates.

9.3 **Designees.** All policies will list Franchisor, its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds and contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's agreement based on changes in risk factors for which Franchisee will comply with upon written notice from Franchisor.

9.4 **Claims Cancellation.** Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations. Franchisee has a twenty-four (24) hour opportunity to cure any lapses in insurance coverage. No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certification of insurance which demonstrates compliance with this Section 9.

9.5 **Failure to Maintain Insurance.** If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a reasonable administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6 **Modification of Requirements.** Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

9.7 **Third Party Subcontractors - Insurance.** Franchisee agrees not to permit any third party subcontractor to perform any work or offer any services on behalf of Franchisee in respect of the Franchised Business unless such subcontractor maintains insurance coverage in such amounts

and types as Franchisee is required to maintain under the provisions of this Section 9, with the specific addition that subcontractors cannot exclude principals from its Workers' Compensation coverage and that liability policies name Franchisor as an additional insured. Franchisee agrees to maintain evidence that such insurance by its subcontractors is in effect and to provide such proof of insurance as Franchisor may require, in its sole discretion, from time to time.

## 10    FINANCIAL RECORDS AND REPORTS

10.1    **Reporting.** Franchisee must maintain, for at least five (5) fiscal years from their preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section 10.1 in accordance with generally accepted accounting principles.

10.1.1  Franchisee will, at its expense, submit to the Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2  Each financial statement shall be signed by Franchisee or by an individual authorized by the Franchisee, attesting that the statement is true and correct and prepared in accordance with the Franchisor's requirements.

10.1.3  Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider.

10.1.4  Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including all reports set forth in the Operations Manual.

10.2    **Tax Returns.**  In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns.

10.3    **Right to Disclose Information.** Franchisor has the right to disclose data derived from the reports Franchisee furnishes.

10.4    **Bookkeeping/Accounting Service**. To ensure Franchisee is properly reporting to Franchisor financial records and reports, Franchisee must use the services of one of Franchisor's designated and preferred bookkeeping service providers.  Franchisee is required to pay the bookkeeping service its then current fee which is subject to future increases.

10.5    **Monthly Profit and Loss Statements**. Franchisee must send Franchisor finalized profit and loss statements by the 21st of the following month. Failure to do so upon 15 days' written notice is grounds for termination of the Franchise Agreement under Section 15.3.8.

# 11    BOOKS AND RECORDS

11.1    **Records and Audits**. Franchisee must maintain accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business, including a complete listing of all work performed by any subcontractors. Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours, to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider(s). If any audit reveals that Franchisee has understated Franchisee's financial information, including but not limited to Royalty or National Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12) month period, Franchisee must pay the reasonable cost of such audit and/or inspection, including the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for royalty and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

11.2    **Corporate or Limited Liability Company Franchisee Records**. If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

11.2.1    Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by-laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

11.2.2    Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

11.2.3    All members with or shareholders of Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by the Franchisor (see Exhibit "A" to this Agreement). All members and/or shareholders shall also be individually subject to the non-disclosure and confidentiality provisions as set forth in this Agreement, as well as any and all in-term and post-term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "Publicly Held Corporation").

11.2.4  The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to-day operations of the business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

11.2.5 All issued and outstanding stock certificates of such corporation shall bear the following legend:

> *EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between _____ and MDR United LLC, dated _____."*

## 12    ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1    **Generally**.  With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing.  If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received.  If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing.  Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2    **Internet Website**. Franchisee must have and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section 12.2 from time to time in its sole discretion.

12.2.1  Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by franchised businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2  Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

12.2.3   Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s).

12.2.4   Franchisor may use a portion of the National Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

12.2.5   Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.mightydogroofing.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

12.3   **Brand Fund**.  Franchisor has established a Brand Fund for the common benefit of System franchisees. Franchisor requires Franchisee to participate in and contribute weekly two percent (2%) of the Franchised Business's Gross Revenues Collected to the Brand Fund. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenues Collected during the term of this Agreement. Franchisee must pay the Brand Fund Contribution directly to the Brand Fund via EFT on a weekly basis on the same basis as the Royalties.  Franchisor reserves the right to modify the frequency, manner, or method of payment upon providing reasonable notice to Franchisee.

12.3.1   Franchisor may use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis. Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: the cost of preparing and producing internet, television, radio, magazine and newspaper advertising campaigns; the cost of direct mail and outdoor billboard advertising; the cost of soliciting National Accounts; the cost of public relations activities and advertising agencies; the cost of developing and maintaining an Internet website; personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit

directly or on a pro rata basis from such expenditures. The Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available". Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the Mighty Dog Roofing brand.

12.3.2 Franchisor may periodically assist franchises to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys"). The cost of such programs will be borne by the Brand Fund. The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System established minimum standards for such Surveys.

12.3.3 Franchisor has the right to reimburse itself from the Brand Fund for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4 In Franchisor's sole discretion, units owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit Franchisor and its units, even though the units operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5 Franchisor will prepare on an annual basis and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund. The statement will be presented to Franchisee upon Franchisee's written request. The Brand Fund is not required to be independently audited.

12.3.6 Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7 Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8 Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9 Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

12.4    **Regional Advertising and Promotional Cooperative**. Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited

towards the Local Marketing Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1  Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2  Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local marketing;

12.4.3  No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4  Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Marketing Requirement;

12.4.5  Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6  Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7  Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

**12.5**    **Grand Opening and Local Marketing.**

12.5.1 *Grand Opening Advertising Requirement*.  In connection with the grand opening campaign of the Franchised Business ("Grand Opening Campaign"), Franchisee shall spend a minimum amount of ten thousand dollars ($10,000) prior to opening the Franchised Business to satisfy Franchisee's advertising requirements for the Grand Opening Campaign ("Grand Opening Advertising Requirement"). Any Grand Opening Advertising Requirement expense must be conducted in accordance with Franchisor's standards and specification, as described in the Operations Manual or this Agreement. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Grand Opening Advertising Requirement expenditures.

12.5.2 *Local Advertising Expenditures*.  In addition to the Brand Fund Contributions described above in Section 12.3, during the first three (3) months of operations of the Franchised Business, Franchisee must spend $6,000 each month on local marketing and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Expenditures") through approved online vendors and/or in telephone directories distributed within Franchisee's Protected Territory, as well as direct mail and other forms of media advertising Franchisor may

DocuSign Envelope ID: C121B2CD-9858-441E-AD96-B4C8B45B6B60

specify. Thereafter, Franchisee must spend at least five percent (5%) of Gross Revenues Collected during the immediately preceding calendar month on Local Advertising Expenditures. Franchisee must spend the Local Advertising Expenditures as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Expenditures must be expended within Franchisee's Protected Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Expenditures must be expended regardless of the amount(s) spent by other System franchisees on local marketing. Franchisee may spend any additional sums Franchisee wishes on local marketing. Franchisee must submit, for Franchisor's approval, all proposed advertising and promotional materials prior to Franchisee's use or distribution. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Local Advertising Expenditures. Franchisor shall have the right to review Franchisee's books and records to determine these expenditures. If Franchisee does not meet the minimum Local Advertising Expenditures requirement, Franchisor shall have the right to require Franchisee to pay to Franchisor any such deficiency amount (the "Local Advertising Expenditure Deficiency"). Franchisor shall have the right to spend the Local Advertising Expenditure Deficiency on local advertising for the Franchised Business, or require that the Local Advertising Expenditure Deficiency be paid to the Brand Fund as an additional contribution. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center. If Franchisee desires to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit the materials Franchisee desires to use to Franchisor for prior written approval at least 30 days prior to Franchisee's intended use or publication. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of Franchisee's proposed materials within 15 days of the date Franchisor received the proposed materials from Franchisee. If Franchisee does not receive Franchisor's written approval during that period, the proposed materials shall be deemed disapproved. Once approved, Franchisee may use the materials unless Franchisor withdraws or revokes approval, which Franchisor may do at any time upon written notice. All advertising must prominently display the Proprietary Marks and must comply with any standards Franchisor establishes, as specified in the Operations Manual or in any other writing. Franchisor may require Franchisee to discontinue using any advertising or marketing material within a specified time frame, and at Franchisee's own cost and expense.

       12.5.3 *Local Brand Optimization Fee*. Prior to opening, Franchisee must pay to Franchisor a Local Brand Optimization Fee of $12,000 for the first year of operations, which Franchisor collects and remits to its designated vendors.

       12.5.4 *Creative Media Fund Fee*. Prior to opening, Franchisee must pay to Franchisor a Creative Media Fund Fee of $5,000 to cover costs associated with video production, actors' and actresses' compensation and video editing to create videos for national use on social media, YouTube, and other digital platforms.

       12.6    **Advisory Council**. Franchisor reserves the right to establish a Mighty Dog Roofing Advisory Council for the purpose of exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts ("Advisory Council"). If established, elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the

Advisory Council from time to time, in its sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to, exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change, or dissolve any Advisory Council at any time in its sole discretion.

## 13    INDEPENDENT CONTRACTOR; INDEMNIFICATION

13.1    **Independent Contractor Status**.    Franchisee is an independent contractor responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated Mighty Dog Roofing business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors.  It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2    **Indemnification**.    Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for all claims, obligations, liabilities and damages ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising, and the sale and installation of all Approved Products by Franchisee, its employees or subcontractors and all warranty claims; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals.  For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive and other damages, and costs reasonably incurred in the defense of any action, including attorneys', attorney assistants' and expert

witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable in Franchisor's sole discretion. Such an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 14    SALE OR TRANSFER

14.1    **Transfer**. Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchise Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein.

14.2    **Death or Disability**.

14.2.1 *Representative's Right to Continue as Franchisee*. In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative, or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180 Day Period"), such person (a) meets Franchisor then-current standards to become a franchisee, as described in Section 14.3.2.5, and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporate or limited liability company franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

14.2.2 *Franchised Business Operation During and After 180 Day Period*. Franchisor is under no obligation to operate the Franchised Business or incur any obligation on behalf of any incapacitated franchisee, during or after the 180 Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180 Day Period. In the event of Franchisee's death, disability, absence or otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and

under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time-to-time in Franchisor's sole and absolute discretion. Franchisor may pay itself a reasonable amount to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3    **Ownership Changes**.  A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership, (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer or any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement. A transfer pursuant to (i) and (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1 *Right of First Refusal.*  If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth in Section 14.4 hereof), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party. Franchisee shall obtain from the third party and provide Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent"). If Franchisor elects not to accept the offer within a thirty (30) day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent subject to the conditions for approval set forth in Section 14.3.2 hereof. Franchisee shall affect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section 14.3.1. Any material change in the terms of the offer shall be deemed a new proposal subject to Franchisor's right of first refusal. So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder, or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner, in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2 *Conditions for Approval*.  Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business, at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or

transfer of the Franchise Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1  All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors, are satisfied;

14.3.2.2   Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's designated/approved suppliers and vendors, within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3   Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the release shall not be inconsistent with any applicable state statute regulating franchising;

14.3.2.4 That the transferor and transferee have executed a mutual general release, relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5  Franchisee or transferee shall provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6  The transferee shall demonstrate to Franchisor's satisfaction that he or she meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business to be transferred; and has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7  That, at Franchisor's option, the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8  Franchisee shall pay Franchisor a transfer fee equal to twenty percent (20%) of Franchisor's then-current Initial Franchise Fee per Protected Territory that is being transferred to transferee. In the event Franchisee transfers multiple Protected Territories at once,

Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Protected Territories being transferred, by any amount;

14.3.2.9  The transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

14.3.2.10 Franchisee (and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company), and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11 The transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits, and licenses required for the operation of the Franchised Business;

14.3.2.12 To the extent required by the terms of any leases or other agreements, the lessors or other parties must have consented to the proposed transfer;

14.3.2.13 The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14 Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15 The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under the transferee's franchise agreement;

14.3.2.16 Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of disclosure document and Franchisor shall not be liable for any representations not included in the disclosure document;

14.3.2.17 Franchisor's approval of the transfer shall not constitute a waiver of any claims Franchisor may have against the transferring party;

14.3.2.18 Franchisor shall have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder; and

14.3.2.19 In any event, Franchisor may withhold or condition Franchisor's consent to any transfer as Franchisor deems appropriate based on the circumstances of the transfer or otherwise.

14.4    **Transfer to a Corporation or Limited Liability Company**.  If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fee set forth in Sections 14.3.2.7, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

14.4.1  The corporation or limited liability company is newly organized, and its activities are confined to operating the Franchised Business;

14.4.2  Franchisee is, and at all times remains, the owner of at least fifty-one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3  The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4  All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty; and

14.4.5  At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations, and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.5    **Franchisor's Right to Transfer**.  Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement in Franchisor's sole discretion.

## 15    BREACH AND TERMINATION

15.1    **Automatic Termination**.  This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

15.1.1  *Voluntary Bankruptcy*.  If Franchisee or any principal makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2  *Involuntary Bankruptcy*.  If proceedings are commenced to have Franchisee or any of its principals adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within 60 days.

15.1.4  *Loss of Premises*. If Franchisee loses the right to occupy the premises or operate the Franchised Business from the Approved Location.

15.2    **With Notice and Without Opportunity to Cure**.  Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1  *Criminal Acts*.  If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised

Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2  *Fraud.*  If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3  *Other Actions.* If Franchisee or Franchisee's principals, including any shareholder, member, guarantors or agents, engage in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4  *Misrepresentation.*  If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation.

15.2.5  *Failure to Complete Training.*  If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6  *Repeated Breaches.*  If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any 12-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7  *Breach of Other Agreements.*  If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8  *Misuse of the Proprietary Marks or Confidential Information*. If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9  *Discloses Confidential Information or Trade Secrets*. If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual, or any other Confidential Information or Trade Secret provided to Franchisee by the Franchisor or any of its affiliates to any third party;

15.2.10 *Violation of Law.*  If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the public.

15.2.11 *Violation of In-term Restrictive Covenant.*  If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

15.2.12 *Liens*. If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13 *Insolvency*. If Franchisee or any of Franchisee's principals become insolvent.

15.2.14 *Abandonment*. If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue operations of the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15 *Unauthorized Transfer*. If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof;

15.2.16 *Unauthorized Products or Services*. If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17 *Unapproved Purchases*. If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18 *Proprietary Software*. If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19 *Insurance*. If Franchisee fails to maintain insurance, purchase insurance from designated vendors, or to repay Franchisor for insurance paid for by it, or otherwise fail to adhere to the requirements of Section 9.

15.2.20 *Government Regulations*. If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21 *Government Actions*. If any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22 *Anti-Terrorist Activities*. If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23 *Personal Use of Franchised Business Property*. If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24 *Insufficient Funds*. If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12) month period.

15.2.25 *Failure to Open.* If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26 *Operating Outside of Protected Territory*. If Franchisee operates the Franchised Business outside of the Protected Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27 *Violation of Best Efforts.* If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.2.28 *Failure to Meet Minimum Annual Revenue Requirements or Minimum Royalty Fees.* If Franchisee fails to meet the Minimum Annual Revenue Requirements or Minimum Royalty Fee for any territory granted hereunder in any period.

15.3.  **Upon 15 Days' Notice to Cure.** Franchisor has the right to terminate this Agreement if any of the following defaults remains uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1 *Nonpayment.* If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's system suppliers or vendors.

15.3.2 *Endorsement of Checks.* If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3 *Failure to Maintain Sufficient Marketing Materials and Supplies.* If Franchisee fails to maintain sufficient levels marketing materials and other supplies necessary to adequately develop the Protected Territory and meet consumer demand.

15.3.4 *Interruption of Service.* If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5 *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.* If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel, as Franchisor requires from time to time.

15.3.6 *Quality Control.* If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

15.3.7 *Licenses and Permits.* If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.3.8 *Profit and Loss Statements*. If Franchisee fails to submit finalized Profit & Loss statements by the twenty-first (21st) of each month (or other date Franchisor may require).

15.4  **Upon 30 Days' Notice to Cure.** Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement, or any

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5     **Step in Rights**.  In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right, or any other rights, Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured, and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all reasonable costs and overhead, if any, incurred in connection with its operation of the Franchised Business including, without limitations, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business.

15.6     **Nonwaiver**.  Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

## 16     RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1     **Franchisee's Obligations**.  Upon termination of this Agreement, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost and expense:

16.1.1   Immediately cease all operations under this Agreement;

16.1.2   Immediately pay Franchisor all unpaid fees, and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3   Discontinue immediately the use of the Proprietary Marks;

16.1.4   Immediately cease using the proprietary software and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days and immediately and permanently cease use of such information and materials;

16.1.5   Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or Social Media Pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name attached hereto as Exhibit B, and transfer all usernames and passwords for all Social Media Pages to Franchisor;

16.1.6  Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease attached as Exhibit F, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7  Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks as Franchisor directs and all items which are a part of the trade dress of the System-immediately, no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8  Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9  Immediately cease to communicate with all Mighty Dog Roofing customers;

16.1.10 Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11 Permit Franchisor to make final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration, or transfer;

16.1.12 Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13 Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System; and

16.1.14 Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15 Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16.

16.2    **Option to Purchase Personal Property.** Upon the termination or expiration of this Agreement, Franchisor, or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice.  For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10) year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes).   Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property that is subject to a lease or finance agreement, the purchase price of such personal property shall

equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable. Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

   16.3 **Exclusions.** Franchisor may exclude from the personal property purchased under Section 16.2 cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

   16.4 **Damages, Costs, and Expenses.** In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 17  COVENANTS

   Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

   17.1 **During the Term of This Agreement.** During the term of this Agreement, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

     17.1.1 Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

     17.1.2 Directly or indirectly induce or seek to induce anyone employed by

Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

            17.1.3  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

     17.2   **After the Term of This Agreement.**  For a period of two (2) years after the expiration, transfer or termination of this Agreement, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers, directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

            17.2.1  Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (a) within the Protected Territory, (b) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (c) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or  (ii) such person's ownership of  a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

            17.2.2  Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

            17.2.3  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

     17.3   **Intent and Enforcement**.  It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law.  Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable.  In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach.  Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other Mighty Dog Roofing franchisees, and the System.  Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement.  Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm.  Franchisee acknowledges and agrees on Franchisee's own behalf and on behalf of the persons who are liable under this Section 17 that each has previously worked or been gainfully employed in other careers and that the provisions of this Section 17 in no way prevent any such person from earning a living.  Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during any default under this Section.

     17.4   **Employees.**  Franchisee shall ensure that Franchisee's principals, managers,

employees, and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit C to the Franchise Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

17.5    **No Defense**.  Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

## 18    DISPUTE RESOLUTION

18.1    **Choice of Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws principals.

18.2    **Internal Dispute Resolution.**  Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management, after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party.  This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

18.3    **Mediation; Arbitration**.  At Franchisor's option, all claims or disputes between Franchisee and Franchisor or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisee and Franchisor or its affiliates, or any of the parties' respective rights and obligations arising from such agreement, which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above, must be submitted first to mediation, in Bucks County, Pennsylvania under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Franchisee as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.  Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor.  Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and Franchisor and Franchisee shall share mediation costs equally.  This agreement to mediate shall survive any termination or expiration of this Agreement.

18.3.1    The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 18.3 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

18.3.1.1    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

18.3.1.2    Any claims pertaining to or arising out of any warranty issue;

18.3.1.3    Any of the restrictive covenants contained in this Agreement.

18.3.1.4    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

18.3.1.5    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency

18.4    **Selection of Venue**.  Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests.  The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Bucks County, Pennsylvania and the jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania.  Franchisee acknowledges that this Agreement has been entered into in the Commonwealth of Pennsylvania, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Doylestown, Pennsylvania including but not limited to training, assistance, support and the development of the System.  In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of Pennsylvania as set forth in this Section.

18.5    **Third Party Beneficiaries**. Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation provision set forth in this Section 18, each having authority to specifically enforce the right to mediate claims asserted against such person(s) by Franchisee.

18.6    **Prior Notice of Claims.**  As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

18.7    **No Right to Offset**.  Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

18.8    **Injunctive Relief**.  Nothing in this Agreement shall prevent Franchisor from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause Franchisor loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.  If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief.  If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

DocuSign Envelope ID: 6121B2CD-9858-441C-AD96-B4C8B45B6B60

18.9 **Limitation of Action**.  Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

18.9.1 Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any mediation, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2 Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10 **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages.  If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.  Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future royalties for the balance of the term of this Agreement.

**18.11 THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT.  THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY GOODS OR SERVICES.**

# 19 REPRESENTATIONS

19.1 **Proprietary Software**. Any proprietary software provided by Franchisor or an affiliate is on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for any proprietary software, or covenant that the proprietary software will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the software or services provided thereby.

FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE PROPRIETARY SOFTWARE, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE PROPRIETARY SOFTWARE, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2   **No Authority.** NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3   **Receipt.** THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT. IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4   **Opportunity for Review by Franchisee's Advisors.** FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5   **Execution of Agreement.** EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE

PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

## 20    GUARANTEE OF PRINCIPALS AND THEIR SPOUSES

Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing personal guaranty in the form attached hereto as Exhibit A.

## 21    NOTICES

All notices and requests to be given under this Agreement are to be in writing, and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt, to the following addresses (which may be changed by written notice):

Franchisee Name/Address:    Michael Fitzpatrick
                            35 Lewis Ave.
                            Summit, New Jersey 07901

                            Ryan Fitzpatrick
                            1700 Park Avenue, Apt. 811
                            Weehawken, NJ 07086

Franchisor                  MDR United LLC
                            95 N. Broad Street
                            Doylestown, Pennsylvania 18901

With a copy to:             Fisher Zucker, LLC
                            21 S. 21st Street
                            Philadelphia, PA 19103
                            Attn: Lane Fisher

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Expressor a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

## 22    MISCELLANEOUS

22.1    **Entire Agreement.**  This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be

modified except by a written document signed by both parties. Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee.

22.2    **Construction of Language.**  The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party. All words in this Agreement refer to whatever number or gender the context requires. If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several. Headings are for reference purposes and do not control interpretation. Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings and Franchisee's spouse's parents, children, and siblings. Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members, and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement. In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement

22.3    **Severability.**  If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other trade secrets, is declared invalid or unenforceable, then Franchisor at Franchisor's option may terminate this Agreement immediately upon written notice to Franchisee.

22.4    **State Law Applies.**  If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

22.5    **Additional Documentation.**  Franchisee must from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein. In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

22.6    **Force Majeure.**  Neither Franchisee, Franchisor, or Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform its obligations is not the fault nor within the reasonable control of the person due to perform but results from, without limitation, fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics of other national health crisis or civil disorders. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in

whole or in part, as Franchisor deems reasonable.

22.7    **Anti-Terrorist Activities.**    Franchisee certifies that neither Franchisee, nor Franchisee's owners, principals, employees or any one associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8    **Attorneys' Fees.**    If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

## 23    ACKNOWLEDGMENTS

23.1    **Independent Investigation.**    Franchisee acknowledges that Franchisee has conducted an independent investigation of the Franchised Business contemplated by this Agreement and recognizes that it involves business risks which make the success of the venture largely dependent upon Franchisee's business abilities and efforts. Franchisee acknowledges that Franchisee has been given the opportunity to clarify any provision of this Agreement that Franchisee may not have initially understood and that Franchisor has advised Franchisee to have this Agreement reviewed by an attorney.

23.2    **No Guarantee of Earnings.**    Franchisee understands that Franchisor and any of Franchisor's representatives and/or agents with whom Franchisee has met have not made and are not making any guarantees as to the extent of Franchisee's success in Franchisee's Franchised Business, and have not and are not in any way representing or promising any specific amounts of earnings or profits in association with Franchisee's Franchised Business.

23.3    **Receipt of Franchise Disclosure Document.**    Franchisee acknowledges that this Agreement and Franchisor's Franchise Disclosure Document have been in Franchisee's possession for at least fourteen (14) calendar days before Franchisee signed this Agreement or paid any monies to Franchisor or an affiliate and that any material changes to this Agreement were in writing in this Agreement for at least seven (7) calendar days before Franchisee signed this Agreement.

23.4    **No Personal Liability.**    Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason.  This is an important part of this Agreement.  Franchisee agrees that nothing that Franchisee believes Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement. This is an important part of this Agreement.  <u>Do not sign this Agreement if there is any question concerning its contents or any representations made.</u>

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**FRANCHISOR**

**MDR UNITED LLC**

By: _Josh Skolnick_____
Josh Skolnick, Managing Member

By: _Zach Beutler_____
Zach Beutler, Managing Member

**FRANCHISEE**

_Michael Fitzpatrick_____
Michael Fitzpatrick, individually

_Ryan Fitzpatrick_____
Ryan Fitzpatrick, individually

**EXHIBIT A**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PERSONAL GUARANTY**

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.

**ARTICLE I**
**PERSONAL GUARANTY**

The undersigned persons (individually and collectively "you") hereby represent to MDR United LLC ("Franchisor"), or all of the members and managers, or the spouse of any such shareholder, general partner, or member or manager of _____("Franchisee"), as the case may be. In consideration of the grant by Franchisor to Franchisee as provided in the foregoing franchise agreement (the "Franchise Agreement"), each you hereby agree, in consideration of benefits received and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and individually) will not permit or cause any change in the percentage of Franchisee owned, directly or indirectly, by any person, without first obtaining the written consent of Franchisor prior to said proposed transfer, which consent must not be unreasonably withheld, and without first paying or causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise Agreement. You further agree to be bound by the in-term and post-term non-competition and non-solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other covenants set forth in the Franchise Agreement, including but not limited to those concerning confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

**ARTICLE II**
**CONFIDENTIALITY**

During the term of this Agreement, you will receive information which Franchisor considers a trade secret and confidential information ("Confidential Information"). You shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation, or limited liability company any Confidential Information

DocuSign Envelope ID: G121B2CD-9858-441C-AD96-B4C8B45B6B60

including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to Franchisor's integrated bookkeeping system, and other methods, techniques, and know-how concerning the operation of a Mighty Dog Roofing Business of which you may be appraised by virtue of your role as a Guarantor of Franchisee.

## ARTICLE III
## NON-COMPETITION

1) **During the Term of the Franchise Agreement.** During the term of the Franchise Agreement, neither your, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2) **After the Term of the Franchise Agreement.** For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (i) within the Protected Territory, (ii) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (iii) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

© 2021 MDR United LLC
Franchise Agreement

DocuSign Envelope ID: G121B2CD-9858-441C-AD96-B4C8B45B6B60

c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

3) **Intent and Enforcement**. It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm. You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living. You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV
## DISPUTE RESOLUTION

1) **Acknowledgment**. You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's proprietary marks or its system.

2) **Governing Law.** This Guaranty shall be deemed to have been made in and governed by the laws of the Commonwealth of Pennsylvania, without any reference to Pennsylvania conflict of laws principles.

3) **Internal Dispute Resolution.** You must first bring any claim or dispute arising out of or relating to the Franchise Agreement or this Guaranty to Franchisor's management. You agree to exhaust this internal dispute resolution procedure before bringing any dispute before a third party. This agreement to engage in internal dispute resolution first shall survive the termination or expiration of this Agreement.

4) **Mediation.** At Franchisor's option, all claims or disputes between you and Franchisor arising out of, or in any way relating to, this Guaranty or the Franchise Agreement or any other agreement by and between you and the Franchisor, or any of the parties' respective rights and obligations arising from such agreements, must be submitted first to mediation, in Bucks County, Pennsylvania, under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, you must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute. Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify you as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation. You may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written

DocuSign Envelope ID: C121B2CD-9858-441C-AD96-B4C8B45B6B60

declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and the parties shall share the cost of mediator. This agreement to mediate at Franchisor's option shall survive the termination or expiration of the Franchise Agreement.

The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 4 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

    i.    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

    ii.    Any claims arising out of or pertaining to any warranty issued;

    iii.    Any of the restrictive covenants contained in this agreement;

    iv.    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

    v.    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency.

5) **Third Party Beneficiaries.** Franchisor's officers, directors, shareholders, agents and/or employees are express third party beneficiaries of the Franchise Agreement and this Guaranty, and the mediation provisions contained herein, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you.

6) **Injunctive Relief.** Nothing contained in this Guaranty shall prevent Franchisor from applying to or obtaining from any court having jurisdiction, without bond, a writ of attachment, temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interest prior to the filing of any mediation proceeding or pending the trial or handing down of a decision or award pursuant to any mediation or judicial proceeding conducted hereunder.

7) **Jurisdiction and Venue.** Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Bucks County, Pennsylvania and the jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania. The parties acknowledge and agree that this Agreement has been entered into in the Commonwealth of Pennsylvania, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Bucks County, Pennsylvania, including but not limited to training, assistance, support and the development of the System. In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Pennsylvania as set forth herein.

8) **Jury Trial Waiver.  THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT.  THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY GOODS OR SERVICES.**

9) **Waiver of Punitive Damages.**  You waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, your recovery shall be limited to actual damages.  If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

10) **Limitation on Action.**  You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide basis, and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

11) **Attorneys' Fees**.  If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs.  If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

12) **Nonwaiver.**  Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding.  Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults.  All rights and remedies granted in this Guaranty shall be cumulative.  Franchisor' election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

13) **Severability.**  The parties agree that if any provisions of this Guaranty may be construed in two

© 2021 MDR United LLC
Franchise Agreement

ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party. The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable. If any material provision of this Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions. In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

14) **Construction of Language.** Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement. The language of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party. All words in this Guaranty refer to whatever number or gender the context requires. If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

15) **Successors**. References to "Franchisor" or "the undersigned, or "you" include the respective parties' successors or permitted assigns or transferees.

16) **No Personal Liability**. You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

***THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK.***
***SIGNATURES APPEAR ON FOLLOWING PAGE***

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**PERSONAL GUARANTORS**                    **SPOUSES**

By: _____            By: _____

Print Name: _____            Print Name: _____

Address: _____            Address: _____

_____            _____

Telephone: _____            Telephone: _____


By: _____            By: _____

Print Name: _____            Print Name: _____

Address: _____            Address: _____

_____            _____

Telephone: _____            Telephone: _____

**EXHIBIT B**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS,**
**FACSIMILE NUMBERS AND DOMAIN NAMES**

1. _____, doing business as a Mighty Dog Roofing franchisee, ("Assignor"), in exchange for valuable consideration provided by MDR United LLC ("Assignee"), receipt of which is hereby acknowledged hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____
Facsimile Number(s): _____
Domain Name(s) (as permitted by Franchisor under the Franchise Agreement): _____

2. The conditional agreement will become effective automatically upon termination, expiration of Assignor's franchise. Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3. Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment, and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR**:

By: _____         Date: _____

Name: _____

Title: _____

**ASSIGNEE**:

**MDR UNITED LLC**

By: _____         Date: _____

Name: _____

Title: _____

DocuSign Envelope ID: C121B2CD-98E8-4416-AD96-B4C8B45B6B60

**EXHIBIT C**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors,*
*general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from MDR United LLC (the "Company") to establish and operate a Mighty Dog Roofing business (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Mighty Dog Roofing Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ (the "Franchised Business Premises").

1.       The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's Manuals; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be appraised by virtue of my employment with Franchisee ("Confidential Information").

2.       Any and all information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

3.       In my position with the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual") and other general assistance during the term of this Agreement.

4.       I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.       The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential.  Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing businesses, except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.      This Agreement shall be construed under the laws of the Commonwealth of Pennsylvania. The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

By: _____

Name: _____

Title: _____

Date: _____

**ACKNOWLEDGED BY FRANCHISEE**

By:_____

Name: _____

**EXHIBIT D**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name:    _____

ABA#  :       _____

Acct. No.:    _____

Acct. Name:   _____

1.      Effective as of the date of the signature below, _____ ("Franchisee") hereby authorizes MDR United LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise       Agreement       for       the       Franchised       Business       located       at: _____: (1) all Royalty fees; (2) Technology and Software Fees; (3) Call Center Fees; (4) Local Brand Optimization Fees; (5) Creative Media Fund Fees; (6) Monthly Digital Management Fees; (7) all Brand Fund Contributions; (9) all recurring fees or other fees due and owing to the Company, or to which the Company has rights to, under the Franchise Agreement, electronically or otherwise. Franchisee acknowledges that Royalty and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement.  Such withdrawals shall occur on a weekly and/or monthly basis, or on such other schedule as Company shall specify in writing.  If necessary, Company is also authorized to deposit the Gross Revenues of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur as needed or on such other schedule as Company shall specify in writing.   This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISOR**                              **FRANCHISEE**

**MDR UNITED LLC**                          _____

By: _____        By: _____

Name: _____         Name: _____

Title: _____        Title: _____

Date: _____         Date: _____

© 2021 MDR United LLC
Franchise Agreement

DocuSign Envelope ID: C121B2CD-98E8-441E-AD96-B4C8B45B6B60

**EXHIBIT E**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**SITE SELECTION ADDENDUM**

MDR United LLC, a Pennsylvania limited liability company with a principal business address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee"), have this 11th day of March, 2022, entered into the foregoing Franchise Agreement(s) for the operation of a Mighty Dog Roofing franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.    Within ninety (90) days after Franchisee receives notice of approval of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Protected Territory granted under the Franchise Agreement.

2.    Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum. Time is of the essence.

3.    Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within forty five (45) days after execution of this Site Selection Addendum. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.    Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct up to one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's reasonable expenses including, without limitation, the costs of travel, lodging, and meals.

5.    If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

6.      After Franchisor has approved a site for the Franchised Business in writing and Franchisee has acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.      Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty or any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose.  Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation.  Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.      This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and terms of this Site Selection Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISEE**

Michael Fitzpatrick, individually

Ryan Fitzpatrick, individually

**FRANCHISOR**

**MDR UNITED LLC**

Zach Beutler, Managing Member

DocuSign Envelope ID: 9121B2CD-9858-4416-AD96-B4C8B45B6B60

**EXHIBIT F**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**COLLATERAL ASSIGNMENT OF LEASE**

  **FOR VALUE RECEIVED**, the undersigned ("Assignor") hereby assigns and transfers to MDR United LLC, a Pennsylvania limited liability company, with its principal place of business address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto as <u>Exhibit 1</u> (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee has no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

  Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of its interest in the Lease or the premises demised thereby.

  Upon a default by Assignor under the Lease or under the franchise agreement for a Franchised Business between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, or upon expiration or termination of the Franchise Agreement or this Agreement, Assignee has the right and is hereby empowered to take possession of the premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor will have no further right, title or interest in the Lease. Assignor hereby authorizes the Lessor to disclose to Assignee, upon its request, sales and other information furnished to the Lessor by Assignor.

  Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereto, Assignor agrees that it must elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing.

  If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and instead of Assignor for the purpose of effecting such extension or renewal.

             **ASSIGNOR**:

Dated:_____

             _____

SIGNED AND SEALED this
day of _____, 20      _____

Notary Public

## CONSENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the aforedescribed Lease hereby:

     (a)     Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

     (b)     Agrees that Assignee has the right, but must not be obligated, to cure any default by Assignor under the Lease within thirty (30) days (or such longer period of time as reasonably necessary to cure the default, so long as Assignee commences the cure within 30 days and thereafter diligently pursues the cure to completion) after delivery by Lessor of notice thereof in accordance with paragraph (a) above;

     (c)     Consents to the foregoing Collateral Assignment and agrees that if Assignee takes possession of the premises demised by the Lease and confirms to Lessor the assumption of the Lease by Assignee as tenant thereunder, Lessor must recognize Assignee as tenant under the Lease, provided that Assignee cures within the time period set forth above the defaults, if any, of Assignor under the Lease;

     (d)     Agrees that Assignee may further assign the Lease to a person, firm or corporation who must agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Lessor and upon such assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise.

DATED:_____

_____

_____

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

**Exhibit "1" to Collateral Assignment of Lease**

**LEASE**

**Lease Agreement attached**

**EXHIBIT G**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**TERRITORY MAP**

**Territory 2 Map Attached**



Territory : PENDING - Fitzpatrick - 2



Territories

ZIP Codes

## Territory Demographics for PENDING - Fitzpatrick

| ZIP Code | ZIP Code Name | Owner Occupied Homes |
|----------|---------------|----------------------|
| 07039 | LIVINGSTON | 9,844 |
| 07041 | MILLBURN | 1,860 |
| 07078 | SHORT HILLS | 4,092 |
| 07083 | UNION | 15,032 |
| 07088 | VAUXHALL | 819 |
| 07201 | ELIZABETH | 2,330 |
| 07205 | HILLSIDE | 5,086 |
| 07206 | ELIZABETHPORT | 2,087 |
| 07208 | ELIZABETH | 3,668 |
| 07932 | FLORHAM PARK | 2,944 |
| 07936 | EAST HANOVER | 3,697 |
| Totals | | 51,459 |

**EXHIBIT H**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**
**MULTI-UNIT ADDENDUM**

THIS MULTI-UNIT ADDENDUM (the "Addendum") is made and entered into this 11th day of March, 2022 by and between MDR United LLC, a Pennsylvania limited liability company with an address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee").

**BACKGROUND**

A.  Contemporaneous with the execution of this Addendum, Franchisee and Franchisor entered into those certain three (3) franchise agreements (collectively, the "Applicable Franchise Agreements") pursuant to which Franchisee obtained the right and undertook the obligation to operate Mighty Dog Roofing franchised businesses within the territories defined therein (each a "Franchised Business").

B.  Each Franchised Business has its own designated protected territory wherein Franchisee is required to actively promote and operate the Franchised Businesses (collectively, the territories granted under the Applicable Franchise Agreements will be referred to as the "Protected Territories").

C.  Franchisor expects that Franchisee will operate the Franchised Business from a single Approved Location using the same vehicles, supplies, equipment and inventory as required by Franchisor.

D.  The parties now wish to amend certain provisions of the Applicable Franchise Agreements pursuant to the terms and conditions set forth in this Addendum.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  **Multi-Unit Initial Franchise Fees**. Notwithstanding anything contained in Section 3.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor an Initial Franchise Fee under any Applicable Franchise Agreement. Instead, Franchisee shall pay Franchisor lump-sum multi-unit Initial Franchisee Fee as follows (the "Multi-Unit Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | | Cumulative Number Owner Occupied Homes |
|---|---|---|---|---|
| #1 | $59,500 | $59,500 | | 50,000 |
| #2 | $99,500 | $40,000 | | 100,000 |
| #3 | $129,500 | $30,000 | | 150,000 |
| #4 | $159,500 | $30,000 | | 200,000 |
| #5 | $189,500 | $30,000 | | 250,000 |

The entire Multi-Unit Initial Franchise Fee must be paid upon execution of the Applicable Franchise Agreements and this Addendum, and this fee is deemed fully earned upon payment and non-refundable under any circumstances.

2.        **Initial Training Program**. Franchisee shall only be required to attend and complete Franchisor's Initial Training Program described more fully in Section 8.1 of the Applicable Franchise Agreements, respectively, once in connection with the Franchised Businesses governed by this Addendum. All other provisions regarding Franchisee's training obligations in the Applicable Franchise Agreements are hereby ratified and confirmed.

3.        **Minimum Royalty Fee and Minimum Annual Revenue Requirement**.

a.        <u>Minimum Royalty Fee</u>.  Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor a separate Minimum Royalty Fee under each Applicable Franchise Agreement. Instead, Franchise shall pay Franchisor the following Minimum Royalty Fees depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation:

| Minimum Royalty Fees Per Week | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

The parties further acknowledge and agree that Franchisee is subject to the Minimum Royalty Fees set forth herein in the event the Franchisee's Royalty based on the Gross Revenues Collected is less than the

Minimum Royalty Fee obligation for any given week.

b.    <u>Minimum Annual Revenue Requirement</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee shall meet and maintain the following minimum annual Gross Revenue requirements depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation, as follows (the "Minimum Annual Revenue Requirements"):

| Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| **Months of Operation** | **1 Territory** | **2 Territories** | **3 Territories** | **4 Territories** | **5 Territories** |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

All other provisions regarding Franchisee's payment obligations, including those related to Franchisee's Royalty or other fees, of the Franchise Agreements are hereby confirmed and ratified. Franchisor reserves the right, but not the obligation, to offer a royalty incentive programs for the benefit of qualifying franchisees. To qualify for such programs, Franchisee must satisfy Franchisor's then-current specifications and standards as provided in the Operations Manual or otherwise in writing by Franchisor. Franchisor reserves the right to modify, supplement, or terminate any royalty incentive programs upon notice to Franchisee.  If Franchisee fails to meet the Minimum Annual Revenue Requirements in any period, Franchisor may terminate the Franchisee's Protected Territories or otherwise terminate the Franchise Agreements.

4.    **Opening Package.**  Notwithstanding anything contained in Section 3.5 of the Applicable Franchise Agreements, Franchisee will not be required to purchase a separate Opening Package under each Applicable Franchise Agreement.

5.    **Local Brand Optimization Fee**. Notwithstanding anything contained in Section 3.6 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Local Brand Optimization Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Local Brand Optimization Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 1 | $12,000 |
| 2-3 | $12,000 |

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 4-5 | $24,000 |

6.    **Technology and Software Fees**.  Notwithstanding anything contained in Section 3.8 of the Applicable Franchise Agreements, Franchisee will not be required to pay separate Technology Fees and Software Fees under each Applicable Franchise Agreement.

7.    **Call Center Fee**.  Notwithstanding anything contained in Section 3.9 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Call Center Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Call Center Fee regardless of the number of Applicable Franchise Agreements executed.

8.    **Creative Media Fund Fee**.  Notwithstanding anything contained in Section 3.10 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Creative Media Fund Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Creative Media Fund Fee regardless of the number of Applicable Franchise Agreements executed.

9.    **Monthly Digital Management Fee**.  Notwithstanding anything contained in Section 3.11 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Monthly Digital Management Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Monthly Digital Management Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Monthly Digital Management Fee |
|---|---|
| 1 | $500 |
| 2-3 | $1,000 |
| 4-5 | $1,500 |

10.    **Equipment and Inventory**.  Notwithstanding anything contained in Section 7.6.7 of the Applicable Franchise Agreements, if Franchisee purchases four or more Territories, Franchisee must add an additional crew, an additional salesperson, and an additional separate vehicle by the end of the second year of operations.

11.    **Approved Location**.  Notwithstanding anything contained in Section 1.3 of the Applicable Franchise Agreements, Franchisee shall only be required to have one physical location that satisfies Franchisee's Approved Location requirement, if, and only if, Franchisee's Territories are contiguous.

12.    **Default of Addendum Constitutes Default Under All Applicable Franchise Agreements**. In the event Franchisee breaches any of the provisions of this Addendum, such breach will constitute a material default of all Applicable Franchise Agreements and must be cured within 30 days from Franchisee's receipt of Franchisor's written notice of such breach as set forth in Section 15.4 of the

Applicable Franchise Agreements. If Franchisee fails to cure such breaches within the prescribed period, Franchisor may, at its option, terminate one or more of the Applicable Franchise Agreements immediately upon providing written notice, or otherwise terminate Franchisee's Protected Territories.

13.    **Ratification and Confirmation of the Applicable Franchise Agreements**. Except as amended by this Addendum, any and all other terms and conditions set forth in the Applicable Franchise Agreements are hereby ratified and confirmed as if fully restated herein, including without limitation, those provisions regarding dispute resolution and venue, which will also apply to any claims or disputes arising out of or related to this Addendum. All capitalized terms not specifically defined in this Addendum will be afforded the definition given to them in the Applicable Franchise Agreements.

14.    **Entire Agreement**. The Applicable Franchise Agreements and this Addendum constitute the entire, full, and complete agreement between the parties concerning the subject matter set forth herein and supersede any and all prior agreements. In the event of a conflict between the terms of any Applicable Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. This Addendum constitutes an amendment to all Applicable Franchise Agreements.

*Signatures appear on the following page.*

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Addendum the date and year first written above.

**FRANCHISOR:**

**MDR United LLC**

By: _Josh Skolnick_                        Date: 3/11/2022
     9AD574030DE9458...

Josh Skolnick, Managing Member

By: _Zach Beutler_                        Date: 3/11/2022
     DAF25556D7154C7...

Zach Beutler, Managing Member

**FRANCHISEE:**

_Michael Fitzpatrick_
5F20519C80ED417...                        Date: 3/11/2022

Michael Fitzpatrick, individually

_Ryan Fitzpatrick_
79E11698D2F04FD...                        Date: 3/11/2022

Ryan Fitzpatrick, individually

# MDR UNITED LLC



# FRANCHISE AGREEMENT

# TABLE OF CONTENTS

**SECTION**                                                                  **PAGE**

DATA SHEET ...................................................................................................... IV

FRANCHISEE AFFIRMATIONS AND ACKNOWLEDGEMENTS ………………………………… V

1   GRANT OF FRANCHISE ................................................................................ 2

2   TERM AND RENEWAL ................................................................................. 5

3   FEES ............................................................................................................ 7

4   PROPRIETARY MARKS .............................................................................. 12

5   CONFIDENTIAL INFORMATION ................................................................. 14

6   FRANCHISOR'S OBLIGATIONS ................................................................... 16

7   FRANCHISEE'S OBLIGATIONS ................................................................... 18

8   TRAINING .................................................................................................. 26

9   INSURANCE ................................................................................................ 28

10  FINANCIAL RECORDS AND REPORTS ......................................................... 30

11  BOOKS AND RECORDS ............................................................................... 31

12  ADVERTISING ............................................................................................. 32

13  INDEPENDENT CONTRACTOR; INDEMNIFICATION .................................... 37

14  SALE OR TRANSFER ................................................................................... 38

15  BREACH AND TERMINATION ..................................................................... 42

16  RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION ..................... 46

17  COVENANTS ............................................................................................... 48

18  DISPUTE RESOLUTION .............................................................................. 50

19  REPRESENTATIONS ................................................................................... 52

20  GUARANTEE OF PRINCIPALS THEIR AND SPOUSES ................................... 54

21  NOTICES .................................................................................................... 54

22  MISCELLANEOUS ...................................................................................... 54

23  ACKNOWLEDGMENTS ............................................................................... 56

# EXHIBITS

Exhibit A – Personal Guaranty and Guaranty of Spouses
Exhibit B – Conditional Assignment of Franchisee's Telephone Numbers, Facsimile
          Numbers and Domain Names
Exhibit C – Confidentiality and Restrictive Covenant Agreement for Employees
Exhibit D – Electronic Funds Withdrawal Authorization
Exhibit E – Site Selection Addendum
Exhibit F – Collateral Assignment of Lease
Exhibit G – Territory Map
Exhibit H – Multi Unit Addendum

## DATA SHEET

Franchisee:           Michael Fitzpatrick
35 Lewis Ave.
Summit, New Jersey 07901

Ryan Fitzpatrick
1700 Park Avenue, Apt. 811
Weehawken, NJ 07086

Guarantors:          Michael Fitzpatrick
35 Lewis Ave.
Summit, New Jersey 07901

Ryan Fitzpatrick
1700 Park Avenue, APT 811
Weehawken, NJ 07086

Effective Date:       March 11, 2022

Approved Location:   _____

_____

Protected Territory:   See "Territory 3" set forth on the Map attached as Exhibit "G" to Franchise Agreement

Telephone Number:   Michael Fitzpatrick:  (718) 772-4989
Ryan Fitzpatrick:     (646) 210-7218

E-Mail Address:      Michael Fitzpatrick:  mfitzpat23@yahoo.com
Ryan Fitzpatrick:     fitzpatrick.ryan11@gmail.com

Initial Franchise Fee:   $30,000.00

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

© 2021 MDR United LLC
Franchise Agreement

**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**FRANCHISEE AFFIRMATIONS AND ACKNOWLEDGEMENTS**

As you know, MDR United LLC ("we", "us" or "Mighty Dog Roofing"), and you are preparing to enter into a Franchise Agreement for the operation of a Mighty Dog Roofing franchise (a "Franchised Business"). The purposes of this Questionnaire are to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes_____ No _____  1.   Have you received and personally reviewed the Franchise Agreement, as well as each exhibit or schedule attached to this agreement, you intend to enter into with us?

Yes_____ No _____  2.   Do you understand that this Questionnaire pertains and relates to each and all of the Franchise Agreements, if more than one (1) Franchise Agreement, you intend to enter into with us?

Yes_____ No _____  3.   Have you received and personally reviewed the Franchise Disclosure Document we provided?

Yes_____ No _____  4.   Did you sign a receipt for the Disclosure Document indicating the date you received it?

Yes_____ No _____  5.   Do you understand all the information contained in the Disclosure Document and the Franchise Agreement you intend to enter into with us?

Yes_____ No _____  6.   Have you reviewed the Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor and discussed the benefits and risks of operating a Franchised Business with these professional advisor(s)?

Yes_____ No _____  7.   Do you understand the success or failure of your Franchised Business will depend in large part upon your skills, abilities and efforts and those of the persons you employ, as well as many factors beyond your control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace?

Yes_____ No _____  8.   Do you understand we have only granted you certain protected territorial rights under the Franchise Agreement and that we have reserved certain rights under the Franchise Agreement?

© 2021 MDR United LLC
Franchise Agreement

Yes____ No ____   9.   Do you understand we and our affiliates retain the exclusive unrestricted right to engage, directly or through others, in the providing of services under the Franchisor's Proprietary Marks or other marks, at any location outside your Protected Territory, without regard to the proximity of these activities to the premises of your Franchised Business?

Yes____ No ____   10.   Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be mediated, at our option, in Bucks County, Pennsylvania?

Yes____ No ____   11.   Do you understand the Franchise Agreement provides you can only collect compensatory damages on any claim under or relating to the Franchise Agreement and you are not entitled to any punitive, consequential or other special damages?

Yes____ No ____   12.   Do you understand the sole entity or person against whom you may bring a claim under the Franchise Agreement is MDR United LLC?

Yes____ No ____   13.   Do you understand all persons whose names appear on the Franchise Agreement must successfully complete the appropriate initial training program(s) before we will allow the Franchised Business to open or consent to a transfer of that Franchised Business?

Yes____ No ____   14.   Do you understand that we require you to successfully complete certain initial training program(s) and if you do not successfully complete the applicable training program(s) to our satisfaction, we may terminate your Franchise Agreement?

Yes____ No ____   15.   Do you understand we do not have to sell you a franchise or additional franchises or consent to your purchase of existing franchises?

Yes____ No ____   16.   Do you understand that we will send written notices, as required by your Franchise Agreement, to either your Franchised Business or home address until you designate a different address by sending written notice to us?

Yes____ No ____   17.   Do you understand that we will not approve your purchase of a Franchised Business, or we may immediately terminate your Franchise Agreement, if we are prohibited from doing business with you under any anti-terrorism law enacted by the United States Government?

Yes____ No ____   18.   Is it true that no broker, employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Franchised Business that is not contained in the Disclosure Document or that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____   19.   Is it true that no broker, employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a Franchised Business will generate, that is not

contained in the Disclosure Document or that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____  20.  Is it true that no broker, employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____  21.  Is it true that no broker, employee or other person providing services to you on our behalf has solicited or accepted any loan, gratuity, bribe, gift or any other payment in money, property or services from you in connection with a Franchised Business purchase with exception of those payments or loans provided in the Disclosure Document?

Yes____ No ____  22.  Did you receive the Franchise Disclosure Document at least fourteen (14) days before you completed and signed this Questionnaire?

Yes____ No ____  23.  Did you receive the Franchise Agreement at least seven (7) days before you completed and signed this Questionnaire?

**YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.**

_____
Michael Fitzpatrick, individually

Dated: _____

_____
Ryan Fitzpatrick, individually

Dated: _____

# MDR UNITED LLC
# FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective this 11th day of March, 2022, by and between MDR United LLC, a Pennsylvania limited liability company, with its principal place of business at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee").

## RECITALS

A.      Through the expenditure of a considerable amount of time, effort, and money, Franchisor has developed a system for the operation of Mighty Dog Roofing businesses (each, a "Franchised Business") that offer, sell and perform roofing services in residential and commercial properties, including: (i) new and replacement roofing services; (ii) emergency tarping services; (iii) gutter replacement; (iv) attic insulation; and (v) other products, services and events that Franchisor may approve and modify from time to time (collectively, the "Approved Products and Services").

B.      Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which include: (i) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Services to customers; (ii) certain proprietary products developed by Franchisor; (iii) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (iv) Franchisor's centralized System-wide call center (the "Call Center"); (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential operations manual (the "Operations Manual") that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.      The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin and intellectual property, including, without limitation, the MIGHTY DOG ROOFING word mark pending registration on the Principal Register of the United States Patent and Trademark (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.      Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Protected Territory").

E.      Franchisee desires to establish and operate a Franchised Business within the

Protected Territory hereinafter designated, to use in connection therewith the Franchisor's System and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.    Franchisor wishes to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.    Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

# 1    GRANT OF FRANCHISE

1.1    **Grant and Acceptance**. Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisee may offer, sell and perform Franchisor's Approved Products and Services within the Protected Territory set forth in Section 1.2 herein. Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional protected territories.

1.2    **Protected Territory**. Except as otherwise provided in this Agreement and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third-party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Protected Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including without limitation, those rights set forth in Sections 1.4 through Section 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Protected Territory provided that (a) Franchisee will not be operating within another franchisee's Protected Territory, and (b) Franchisee received Franchisor's prior written consent, which may be withheld for any reason. Other than these operations, Franchisee is not permitted to operate the Franchised Business outside of the Protected Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Protected Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and specifications as set forth in the Operations Manual (as defined in Section 6.1). If more than 5% of Franchisee's Gross Revenues are derived from approved operations from or within a specific location or area that is outside of the Protected

Territory, to continue to operate in that area, Franchisee must either purchase an additional franchise and execute a separate franchise agreement for that operation or purchase an additional territory covering such territory.

      1.3    **Approved Location**.  Franchisee must operate the Franchised Business only at the approved location identified in the Data Sheet (the "Approved Location").  Franchisee shall operate the Franchised Business from an approved office/warehouse or flex space located in the Protected Territory that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee will need to lease approximately 1,500 to 2,000 square feet of commercial real estate for the office/warehouse or flex space and to securely store equipment/inventory. Franchisor may, but is not required to, allow Franchisee to utilize a home office or cooperative space of 1,500 to 2,000 square feet as an Approved Location during the first six (6) months of operations. Franchisee may not utilize a home office or cooperative space at any time without Franchisor's prior written consent. The office may be located in the warehouse or flex space, provided that it meets Franchisor's standards and specifications. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. Franchisee must secure its Approved Location within ninety (90) days of executing this Agreement in the event the parties have not agreed on an Approved Location prior to executing this Agreement. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (attached hereto as Exhibit E), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

      1.4    **National and Regional Accounts**. Franchisor has the exclusive right to create National and Regional Account ("NORA") programs for a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations, Chain Customers (as defined below) and other similar organizations for the benefit of the System. Franchisor or any party Franchisor may designate has the exclusive right to solicit and service NORA customers within or outside of the Protected Territory, including, the right to offer and sell Approved Products and Services. Franchisee may not solicit, service or otherwise pursue any NORA relationships, whether the contacts for these relationships are in the Protected Territory or not, without Franchisor's prior written consent. Franchisee may not service, solicit or otherwise pursue a relationship with a NORA or potential NORA or any of its members or associates, without notice to Franchisor and Franchisor's prior written consent. Any dispute as to whether a particular customer is considered a NORA customer will be determined by Franchisor, and its determination will be final and binding. A Chain Customer´ is a non-residential customer, a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations whose presence is not confined within any one particular territory. Following the execution of a contract with or the acceptance of a bid by a NORA customer which contemplates the provision of services to one or more NORA locations within the Protected Territory, Franchisor may, at its sole option, provide Franchisee the option to perform such services pursuant to the terms and conditions of the NORA contract or on such terms and conditions as Franchisor determines in its sole discretion. In order to service any NORA customers, Franchisee must enter into Franchisor's then-current form of NORA participation agreement, the terms of which

DocuSign Envelope ID: C121B2CD-9858-441C-AD96-B4C8B45B6B60

will govern all NORA work. Franchisee is not entitled to any right to compensation or consideration for work performed by others in the Protected Territory for National Accounts.

      1.4.1    Franchisor also shall have the right, exercisable in its sole discretion, to:

      A.  provide, directly or through any other licensee or franchisee utilizing the Proprietary Marks, services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract; and/or

      B.  contract with another party to provide such services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract between Franchisor and the NORA customer, utilizing the Proprietary Marks or any other trademarks, service marks or trade names.

Neither the direct provision by Franchisor (or a System franchisee, licensee, or Franchisor's agent or designee) of services to NORA customers, nor Franchisor's contracting with another party to provide such services shall constitute a violation of Franchisee's rights in the Protected Territory. Franchisee disclaims any compensation or consideration for work performed by others in the Protected Territory on account of NORA customers within the Protected Territory.

      1.5    **Reservation of Rights**. Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Services, and otherwise use the Proprietary Marks and System, within the Protected Territory is non-exclusive and Franchisor and its affiliates expressly reserve the right to: (i) establish and operate, and license third parties the right to establish and operate, Franchised Businesses using the Proprietary Marks and System at any location outside of the Protected Territory; (ii) acquire, merge with, engage in joint ventures with, or otherwise affiliate with, and thereafter own and operate and franchise others the right to own and operate, any business of any kind regardless of location, except for businesses that offer roof repair and roof replacement within the Protected Territory; (iii) establish and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark, other than the Proprietary Marks, at any location, within or outside the Protected Territory; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service NORAs within and outside the Protected Territory as set forth more fully in Section 1.4; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center in accordance with Section 1.8 of this Agreement; (vii) sell and distribute, directly or indirectly, or license others to sell and distribute within or outside the Protected Territory, directly or indirectly, any products, services or merchandise, including Approved Products and Services, from any location or to any purchaser or through any alternative channel or method of distribution including, but not limited to, via retail and wholesale distribution, in supermarkets, hardware stores, club stores and other retail facilities, via mail order and e-commerce channels; and (viii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

      1.6    **Events of Catastrophe**. Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliates and/or other System franchisees may be permitted to provide support to

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

Franchisee and/or perform work in the Protected Territory, including the provision of labor, materials, equipment, and project management on projects in the Protected Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Protected Territory.

      1.7    **Alternate Channels of Distribution.**  Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Protected Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine.  Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Services as described in this Section 1.7; or (ii) to share in any of the proceeds received by any such party therefrom.

      1.8    **Right to Service Customers in Protected Territory; Use of Call Center.**

      1.8.1    Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Protected Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and (a) Franchisee does not respond to the assignment within a time period Franchisor deems in its sole discretion appropriate under the circumstances, or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems appropriate in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that the Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Protected Territory has been subjected to a disaster or catastrophe.

      1.8.2    Franchisee agrees and acknowledges that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Protected Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

## 2    TERM AND RENEWAL

      2.1    **Term**.  The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

2.2     **Renewal**.  Franchisee has the right to renew this Agreement for one successive, additional ten (10) year period, provided Franchisee has met the following conditions:

2.2.1     Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

2.2.2     Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Protected Territory acceptable to Franchisor;

2.2.3     Franchisee has completed, to Franchisor's satisfaction, ninety (90) days prior to the expiration of the then-current term, any updates to all required equipment, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications and, Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

2.2.4     Franchisee is not in breach of any provision of this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

2.2.5     Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

2.2.6     Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without limitation, increased royalty and other fees and insurance requirements);

2.2.7     Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to providing the Approved Products and Services at any location within the Protected Territory;

2.2.8     Franchisee and its principals execute a general release in the form Franchisor prescribes; and

2.2.9     Franchisee pays a renewal fee in the amount of twenty percent (20%) of the then-current initial franchise fee.

## 3    FEES AND MANNER OF PAYMENT

3.1    **Initial Franchise Fee**.  In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee, calculated as follows (the "Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | Cumulative Number Owner Occupied Homes |
|---|---|---|---|
| #1 | $59,500 | $59,500 | 50,000 |
| #2 | $99,500 | $40,000 | 100,000 |
| #3 | $129,500 | $30,000 | 150,000 |
| #4 | $159,500 | $30,000 | 200,000 |
| #5 | $189,500 | $30,000 | 250,000 |

The Initial Franchise Fee is due at the signing of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise others.

3.2    **Royalty Fee**.  Franchisee must pay Franchisor a weekly royalty fee (the "Royalty") in an amount equal to the greater of: (i) six- and one-half percent (6.5%) of Gross Revenues Collected during the immediately preceding week; or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.1.

3.2.1    *Minimum Royalty Fee and Annual Gross Revenue Requirements*.

Franchisee must meet and maintain the following weekly Minimum Royalty Fees per Territory throughout the Term. Franchisee's weekly Minimum Royalty Fees are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Mighty Dog Roofing Business(es) have been open and operating.

Franchisee's Minimum Royalty Fees are as follows:

| Months of Operation | Minimum Royalties Per Week Per Territory | | | | |
|---|---|---|---|---|---|
| | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |

| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

In addition, Franchisee must meet and maintain the following minimum annual Gross Revenue requirements ("Minimum Annual Revenue Requirements") per Territory throughout the Term. Franchisee's Minimum Annual Revenue Requirements are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Mighty Dog Roofing Business(es) have been open and operating.

Franchisee's Minimum Annual Revenue Requirements are as follows:

| Minimum Annual Revenue Requirement Per Territory | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

The parties will true-up all Royalty payments, whether actual or Minimum Royalty Fee payments for each applicable 12-month period, at the period's end by evaluating each period's obligations on an annualized basis. In the event Franchisee's fails to meet the above Minimum Royalty Fees or Minimum Annual Revenue Requirements, Franchisor may terminate the Protected Territory or otherwise terminate this Agreement.

However, Franchisee will not be subject to a Minimum Royalty Fee during the first twelve (12) months of operations on the condition that Franchisee strictly complies with all its obligations during the first twelve (12) months of operations and Franchisee shall pay the Royalty fee equal to six- and one-half percent (6.5%) of Gross Revenues Collected by the Franchised Business during the first twelve (12) months of operations.

"Gross Revenues Collected" means any and all revenue or other compensation actually collected by Franchisee from customers of the Franchised Business.

"Gross Revenues" are defined in the Franchise Agreement to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by or on account of the operation of the Franchised Business at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including but not limited to cash, services, in kind from barter and/or exchange, on credit or otherwise as well as business interruption insurance proceeds. Gross Revenues shall also include the total amount of all sales for labor, material, equipment and/or services performed or rendered by: (a) Franchisee, or (b) any third-party subcontractors or agents of Franchisee who perform services for Franchisee's customers or clients as part of Franchisee's services. Gross Sales shall also include all commissions, finder's fees, referral fees, construction management fees or other compensation received by Franchisee on the value of any work performed. Franchisee agrees that all Royalty Fees, including any Minimum Royalty Fee, are non-refundable. However, the definition of Gross Revenues does not include sales tax that is collected from customers and transmitted to the appropriate taxing authorities.

3.2.2 *Special Programs.* Franchisor reserves the right, but not the obligation, to

establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

3.3    **Gross Revenue Reporting**. Franchisee agrees to report Gross Revenue in such form or format as Franchisor may specify from time to time. Franchisor may, at any time, and from time to time, modify the required form or format. Franchisor reserves the right to require Franchisee to provide Franchisor with verified Gross Revenue Reports in the event Franchisor is unable to process electronic funds transfer based upon information Franchisee inputs into the POS System. Each Gross Revenue Report must set forth: (i) Gross Revenues Collected generated during the previous week; (ii) calculation of the Royalty and Brand Fund Contribution (as defined below); and (iii) any other information Franchisor may require. If a Gross Revenue Report is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the electronic funds transfer, then Franchisor may withdraw additional funds through an electronic funds transfer from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the electronic funds transfer, then Franchisor will credit the excess amount to the payment of Franchisee's future obligations.

3.4    **Method of Payment**. With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement, or any other agreement between Franchisee and Franchisor or its affiliates, from the bank account Franchisee provides to Franchisor for use in connection with EFT Program (the "EFT Account"). Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks, and credit card receipts. At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Authorization Form attached as Exhibit D to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer. Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account. Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement by such other means as Franchisor may specify from time to time.

3.5    **Opening Package**. Prior to opening its Franchised Business, Franchisee must purchase from Franchisor, or an affiliate or designated vendor, the required opening package at its then-current cost, which includes items such as tarp, catch all system, and small promotional materials such as yard signs, clothing, printed items, pitch books, a vehicle wrap and other equipment, tools, and supplies related to the operation of your franchise (the "Opening Package").

3.6    **First Year Local Brand Optimization**. Prior to opening the Franchised Business, Franchisee must pay to Franchisor and/or Franchisor's designated vendor a local brand optimization fee (the "Local Brand Optimization Fee") in the amount of $12,000, in connection with the costs of local SEO optimization. After the initial year of operations, Franchisor reserves the right to require Franchisee to expend Franchisor's then-current Local Brand Optimization each year.

3.7    **Brand Fund Contribution**. As set forth more fully in Section 12.3 of this Agreement, Franchisor has established a national brand fund for advertising and brand promotion (the "Brand Fund").  Franchisee shall make weekly contributions of two percent (2%) of Gross Revenues Collected by the Franchised Business for sales made during the immediately preceding week (the "Brand Fund Contribution"). Presently, Brand Fund Contributions are to be paid as directed by Franchisor via the EFT Program, or as otherwise required by the Operations Manual or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenues Collected during the Term of this Agreement.

3.8    **Technology Fee and Software Fee**. Prior to opening, Franchisee must pay Franchisor a technology fee (the "Technology Fee") of $3,500 and a software fee (the "Software Fee") of $6,000 for the first year of operations, which Franchisor will collect on Franchisee's behalf and remit to its designated vendors. The Software Fee covers the costs of various software programs Franchisee must utilize in connection with the operation of the Franchised Business and the Technology Fee covers the costs associated with system network functions, updating microsites, and call center interfacing software. Thereafter, Franchisee must pay Franchisor or its designated vendors, on a monthly basis, its then-current Technology Fee and Software Fee associated with using and maintaining the required computer hardware and software, hosting services and solutions, and any other technology used in the operation of the Franchised Business, and such payment shall be made in the manner prescribed by Franchisor or the designated vendor(s), as applicable, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer requirements or as required by the third-party service provider(s) or by any regulatory agency.

3.9    **Call-Center Fee**. Franchisor, or its affiliate, has established and will operate a Call Center which will field all calls and manage prospective and existing customers and route/assign work/inquiries as Franchisor deems necessary in its discretion, and as further described in Section 6.6. Franchisee must pay Franchisor, or its affiliate, all associated start-up fee(s), monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call-Center Fee"), which are subject to change at any time. Franchisee shall pay the first year Call-Center Fee of $3,600 prior to commencing operations of the Franchised Business. After the first year of operations, Franchisee will be billed $300 monthly. Lead fees and surcharges will be paid as incurred or as Franchisor requires.  Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the Call Center or as required by any third-party service provider(s) or by any regulatory agency, at any time upon providing reasonable notice to Franchisee. Franchisor may require Franchisee to pay the Call Center Fees to Franchisor directly for its operation of the Call Center, or for Franchisor to make payment on Franchisee's behalf to its affiliate or another third-party provider it designates. Franchisor may require Franchisee to make payment directly to such affiliate or third-party provider in its sole discretion.

3.10    **Creative Media Fund Fee.** Prior to attending training, Franchisee must pay Franchisor a Creative Media Fee of $5,000 to cover costs associated with video production, actors and actresses' compensation, video editing of videos. These videos are designed for national use on social media, YouTube, and other digital platforms. This is a one-time fee.

© 2021 MDR United LLC

3.11    **Monthly Digital Management Fee.**  Franchisee must pay Franchisor's designee, currently, Franchisor's affiliate, Franchise Rocket, a monthly Digital Management Fee (the "Digital Management Fee"), currently $500 per month for 1 Territory, $1,000 for 2 or 3 Territories; and $1,500 for 4 or 5 Territories. As of the Effective Date, the Digital Management Fee covers the following items: (i) Management and SEO optimization of one micro site and GMB page; (ii) management and optimization of one digital campaign; (iii) two (2) hours of graphic design support; (iv) site directory management; and (v) basic reputation management. The Digital Management Fee is paid on a per territory basis. Franchisor reserves the right to modify the Digital Management Fee as Franchisor modifies the digital marketing and advertising requirements that Franchisee must use for the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Digital Management Fee, including the party to whom payment is made, at any time upon providing reasonable notice. Franchisee must comply with all such modifications.

3.12    **Late and/or Under Payments and Interest.** All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company, and other amounts which Franchisee owes to the Franchisor and/or its affiliated company, not received on or before the due date, shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to the Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one and one half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement.

3.13    **No Right to Off Set**. Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.14    **Non-Exclusive Remedies**. Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waive, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

3.15    **Taxes on Payments**.  In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.16    **Administrative Fee**.  Franchisee must pay Franchisor its then-current administrative fee (the "Administrative Fee") in the event Franchisor makes and processes any amendments, modifications, or otherwise supplements this Agreement at the request of Franchisee or is otherwise required due to Franchisee's actions.

3.17    **Outstanding A/R Collection Fee**. Franchisor has the right to assist Franchisee in collecting outstanding balances from Franchisee's customers for amounts more than 60 days past due.  If Franchisor assists in collecting such outstanding amounts, Franchisee must pay Franchisor a fee in the amount of 15% of the amount collected.

3.18    **Insurance Claims Assistance Fee**. Prior to opening, Franchisee must pay

Franchisor a fee of $1,000 to cover Franchisor's costs in providing Franchisee insurance claim assistance services, in which Franchisor will investigate the building requirements on a state, county and at local level in Franchisee's market in order to assist Franchisee in preparing insurance claims. Such costs may be used to cover market visits and third-party vendors costs are non-refundable upon payment.

3.19    **Memberships and Subscriptions**. Franchisee must participate in all membership and subscription services that franchisor requires. Currently, Franchisee must participate in the Owens Corning Platinum Preferred Contractor program immediately upon launching the Franchised Business and pay all dues associated with the program, currently $2,500 per year, which are subject to increases from time to time. Franchisees must continue this annual membership, or any similar membership that Franchisor may require from time to time.

3.20    **Franchise Resources Fee**. Franchisee must pay to Franchisor's designated vendor a monthly Franchise Resources Fee in the amount designated by Franchisor. As of January 1, 2022, the Franchise Resources Fee is $399 per month. This fee may cover, among other designated resources, designated vendor fees for bookkeeping services. Franchisor reserves the right to increase the Franchise Resource Fee up to 0.5% of Franchisee's total Gross Revenues Collected. Franchisor also reserves the right to modify the Franchise Resources Fee, to modify the franchise resource requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Franchise Resources Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee. Franchisor reserves the right to require Franchisee to use Franchisor's designated vendors for payroll, sales tax filing, and other related services.

3.21    **Annual Conference Fee**. Franchisee must pay to Franchisor an annual fee for Franchisee's registration and attendance to Franchisor's annual conference for the System (the "Annual Conference"), if held by Franchisor, and as further described in Section 6.8. Franchisee and Franchisee management (if applicable) must register for and attend the Annual Conference and pay Franchisor the then-current registration and attendance fee (the "Annual Conference Fee"), which shall not exceed $1,000 per attendee. If Franchisee does not register for the Annual Conference, Franchisee must pay Franchisor a fee of $1,000.

3.22    **Drone Kit Fee**. Franchisee must pay to Franchisor's designated vendor a Drone Kit Fee for the first year of operations. As of January 1, 2022, the Drone Kit Fee is $6,900. After the first year of operations, Franchisee must pay Franchisor's designated vendors, on a monthly basis. As of January 1, 2022, the monthly Drone Kit Fee is $269. Franchisor also reserves the right to modify the Drone Kit Fee, to modify the franchise resource requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Drone Kit Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee

# 4    PROPRIETARY MARKS

4.1    **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**.

4.1.1    Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

4.1.2    Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Protected Territory and in sales and marketing for the Franchised Business.

4.1.3    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable. Franchisee may not use the Proprietary Marks in connection with the offer or sale of any services or products which Franchisor has not authorized for use in connection with the System. Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name. Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use. Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (collectively the "Proprietary Material"). Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material. Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material. If Franchisor, in Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement. If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement. In the event of any litigation relating to Franchisee's use of the Proprietary Material,

Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution including, without limitation, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

4.1.9    Franchisee expressly understands and acknowledges that:

4.1.9.1 Franchisor or its affiliates or licensors own all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

4.1.9.2 The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

4.1.9.3 During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

4.1.9.4 Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

4.1.9.5 Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

4.1.9.6 Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

4.1.9.7 Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder. Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within ten (10) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

## 5    CONFIDENTIAL INFORMATION

5.1    **Nondisclosure**. During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information. Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any Confidential Information, as defined in Section 5.2. Upon

termination or expiration of this Agreement, regardless of reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately and Franchisee may not use the Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2    **Confidential Information**. Confidential Information hereby includes, without limitation, any and all confidential, proprietary, and trade secret information relating to the operation of a Franchised Business, such as: all financial, operational, technical and marketing information; the Operations Manual and Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; cost data; pricing information; business plans; financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; photographs, devices, samples, models, and illustrations; software developed by or for Franchisor; customer lists and any information relating to Franchisor's customers or the customers of other System franchisees; patent, trademark, service mark, and copyright applications; information relating to inventions, discoveries, software and any other research and development information; methods of conducting the Business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; any information of a customer not generally known or available to the public; any Trade Secrets (as defined in Section 5.3 of this Agreement), or of a customer of Franchisor, or of any other franchisee; and any information about or originating from any Franchisee which, if it was information of Franchisor, are expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3    **Trade Secrets**. Notwithstanding Section 5.2, trade secret means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4    **Employees and Subcontractors**. All of Franchisee's employees and subcontractors must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Franchised Business.  Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement attached as Exhibit C to this Agreement.  Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5    **New Concepts.**    If Franchisee, or Franchisee's employees, principals or subcontractors, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

necessary related information, without compensation. Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent applications, trademarks, copyrights and other intellectual property rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentations for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

      5.6    **Customer Privacy**. Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop. Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

## 6    FRANCHISOR'S OBLIGATIONS

      6.1    **Operations Manual**. Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual and intranet system, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre-opening procedures, systems and procedures, personnel policies, specifications for vehicles, supplies, equipment and inventory, marketing, accounting and bookkeeping and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of the Franchisor, constituting a trade secret of Franchisor, and may not be, shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System.

      6.2    **Opening Package; Initial Equipment and Supplies**. Franchisor, or its affiliates will provide Franchisee with an Opening Package upon Franchisee's payment of the required fees. Franchisor will also provide a list of all items, equipment, and supplies needed to open and operate the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), which may include Franchisor and its affiliates, with which Franchisee must comply.

6.3 **Ongoing Assistance**. Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means. If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current training fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion. Franchisor may also use the Operations Manual, as defined in Section 6.6, to provide some self-serve training materials.

6.4 **Additional Training**. As set forth more fully in Section 8.2, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee and Franchisee's personnel to attend such additional training at a location to be selected by Franchisor. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.5 **Remedial Training**. In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to remedial training (in addition to any required training under Section 6.4). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current tuition training fee to provide such remedial training.

6.6 **Call Center**. Franchisor has established and maintains a centralized call center for the purpose of accepting telephone, internet and other inquiries from potential customers and forwarding such customer information to the appropriate franchisee (the "Call Center"). Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay in connection with administering and maintaining this service. Franchisor has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls as it deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Protected Territory. All Mighty Dog Roofing related phone numbers and internet lead sources are required to be ported to or directed to Franchisor.

6.7 **Pricing**. Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. Franchisee may charge whatever prices it deems appropriate without regard to Franchisor's suggested pricing.

6.8    **Annual Conference**. Franchisor may, in Franchisor's discretion, hold an annual conference at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if it chooses to charge a registration fee in its sole discretion. Franchisor reserves the right to charge Franchisee a fee to cover convention expenses in the event the Franchisee chooses not to attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals, and salaries during the Annual Conference, are Franchisee's sole responsibility. Franchisor may use National Fund Contributions for purposes related to the Annual Conference, including costs related to productions, programs, and materials.

# 7    FRANCHISEE'S OBLIGATIONS

7.1    **Site Location and Lease Approval**.    Franchisee shall operate the Franchised Business from an approved commercial office/warehouse or flex space that meets Franchisor's then-current standards and specifications for an Approved Location and located within the Protected Territory. Franchisee will need to lease approximately 1,500 to 2,000 square feet of separate commercial office/warehouse or flex space for Franchisee's office and storage space to securely store all equipment, supplies and inventory.  Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location for Franchisee to operate the Franchised Business as of the date Franchisee signs this Agreement, the parties shall enter into Franchisor's prescribed form of Site Selection Addendum, the terms of which shall govern the parties' site selection obligations. Franchisor has the right to review, evaluate and approve Franchisee's proposed lease for the Approved Location ("Lease") prior to execution.  Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form attached hereto as Exhibit F.

7.1.1    *Relocation*. If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Protected Territory to complete the unexpired portion of the term of this Agreement.  Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within forty-five (45) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its reasonable costs and expenses associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation.

7.1.2    *Franchised Business Appearance and Approved Location Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout, and design of a Franchised Business.  Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete

construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permits requirements, and any other applicable local, state, or federal law.

      7.1.3 *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

    7.2    **Training**.  Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program as set forth more fully in Section 8 of this Agreement. Franchisor has the right to require up to two (2) individuals to attend in addition to Franchisee.

    7.3    **Opening Requirements**.  Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. In addition to any other pre-opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Protected Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, supplies, and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers, that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program as described defined in this Agreement, as well as any other pre-opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement.

    7.4    **Purchasing Requirements**.

      7.4.1   *Compliance with Standards*.  Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System.  Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same.  Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion.  Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

      7.4.2   *Designated and Approved Suppliers*.  Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "Approved Supplier"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliate and/or a third

DocuSign Envelope ID: 6121B2CD-9858-441E-AD96-B4C8B45B6B60

party may be one of several, or the only, Approved Supplier of any item. Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue on any products or services that Franchisor, Franchisor's affiliates or Franchisor's Approved Suppliers supply and/or provide to Franchisee. Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

   7.4.3 *Supplier Approval.* In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known. At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier. Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency, and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information. Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate. Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

   7.4.3.1 Franchisee, or the proposed supplier, must pay Franchisor in advance for Franchisor's reasonable costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

   7.4.3.2 Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

   7.4.3.3 Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third-party to supply, provided that third-party executes Franchisor's prescribed form of non-disclosure agreement.

   7.4.3.4 Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

7.4.3.5 Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

7.4.4 *System Suppliers.* Franchisor may establish business relationships, from time to time, with suppliers, including affiliates of Franchisor, who may produce and/or provide certain goods or services that Franchisee is required to purchase from only that supplier (each a "System Supplier"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software, and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally. Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product or ability to obtain product only on less favorable credit terms. Accordingly, Franchisee agrees to pay System Suppliers as and when due. Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

7.5 **Authorized Products and Services**. Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization. Franchisee shall at all times maintain sufficient levels of inventory, as specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees. In the event Franchisee wishes to offer any Approved Products or Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Services.

7.6 **Operations**.

7.6.1 *Hours of Operation*. Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

7.6.2 *Maintenance of Premises and Project Sites*. Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual. Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

7.6.3 *Personnel/Staffing*. Franchisee must employ a sufficient number of qualified, competent personnel, offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain

and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

7.6.4    *Compliance with Operations Manual and Training of Employees.* Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual and shall continue such training and instruction as long as each employee is employed. Franchisee shall cause any third-party subcontractor engaged by Franchisee to perform work on behalf of Franchisee with respect to the Franchised Business to comply with all applicable requirements of this Agreement, including, but not limited to, Franchisor's quality and performance standards. The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

7.6.5    *Management Participation.* Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote his or her personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon Franchisee's written request, Franchisor shall permit Franchisee to employ a manager to manage the day-to-day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program before assuming any managerial responsibility. The Franchised Business must, at all times, be staffed with at least one (1) individual who has successfully completed Franchisor's initial training program as set forth in Section 8.1. In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business. In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly.

7.6.6    *Working Capital.* Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7    *Equipment and Inventory.* Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with representative vehicles, supplies, equipment and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by the Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand. In the event that Franchisee's accounts receivable grows in excess of 40% of Franchisee's overall Gross Revenues Collected or Franchisee's backlog of jobs reaches 12 weeks, Franchisee must, at Franchisor's request, invest in additional infrastructure and/or equipment and employees to adequately service customers and the Protected Territory efficiently.

7.6.8    *Products with Proprietary Marks*. Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor.

7.6.9    *Market Research*. Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.7    **Franchised Business Inspection.**    Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

7.8    **Computer Software and Hardware**.

7.8.1    *Computer System*. Franchisor shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, applications, and hardware be used by Franchisee, including without limitation: (a) a compatible computer system that complies with Franchisor's standards and specifications and is capable of operating financial and other business software; (b) printers and other peripheral hardware or devices; (c) archival back-up systems; and (d) Internet access mode and bandwidth (collectively, the "Computer System").

7.8.2    *Required Software*. Franchisor shall have the right, but not the obligation, to develop or designate: (a) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's proprietary software (collectively, the "Required Software"), which Franchisee must license from Franchisor; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee must install at its expense; (c) the tangible media upon which Franchisee records data; and (d) the database file structure of the Computer System.

7.8.3    *Compliance with Requirements*. At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section 7.8.3 shall be at Franchisee's sole cost and expense.

7.8.4    *Franchisor's Access.* Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section 7.8 within thirty (30) days of opening the Franchised Business.

7.8.5    *Proprietary Software.* Franchisor has a proprietary interest in all databases, lists, templates, programs and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create programs that conduct, among other things, scheduling, accounting, inventory, and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's confidential information.

7.8.6    *Computer Network.* Franchisee is required to participate in any System-wide computer network, intranet system, or extranet system that Franchisor implements and may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor on-line; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) to complete any initial or ongoing training, in the event Franchisor makes such training accessible through this medium. Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

7.9    **Personal Conduct**.  Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

7.10    **Best Efforts**.  Franchisee (or Franchisee's principals or designated manager) must devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Protected Territory.  Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and System. Franchisee acknowledges that Franchisee's (or Franchisee's principals' or designated manager) violation of the terms in this Section 7.10 will be a material breach of this Agreement, and Franchisor may terminate

this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

7.11     **Telephone and Email Access.**  Franchisor reserves the right to procure and supply dedicated telephone numbers and email accounts associated with the Franchised Business.

7.12     **Payment of Debts**.  Franchisee is solely responsible for: selecting, retaining and paying Franchisee's employees; the payment of all invoices for the purchase of goods and services used in connection with operating the Franchised Business; and determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business. Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors, and creditors on a timely basis. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System suppliers and System franchisees. Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, personal property and real estate taxes arising from Franchisee's operation of the Franchised Business. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13     **Compliance with Applicable Laws.**  Franchisee must comply with all applicable federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to occupational hazards and health, trademark and copyright infringement, fair marketing laws, consumer protection, trade regulation, workers' compensation, unemployment insurance, withholding and payment of Federal and State income taxes and social security taxes and sales, use and property taxes, and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the operation of the Franchised Business). Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors. Franchisee agrees to be solely responsible for all employment decisions and to comply with all state, federal, and local hiring laws and functions of the Franchised Business, including without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part-time. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates.

7.14     **Trade Secrets and Confidential Information**.  Franchisee and all employees and subcontractors must maintain the confidentiality of all Confidential Information as set forth in Section 5 of this Agreement.

7.15     **Image**.  Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other roofing service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service. Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System. Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity and increase the demand for the products sold and services rendered by System franchisees. Franchisee agrees to comply with the standards, specifications and requirements

Franchisor set forth in order to uniformly convey the distinctive image of a Mighty Dog Roofing franchised business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16    **Pending Actions.** Franchisee shall notify Franchisor, in writing, within five (5) days of the commencement of any action, suit or proceeding and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17    **Standard Maintenance and System Conformity.** Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s), equipment, tools and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

7.18    **Customer Service.** Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, warranties on any Approved Products or Services offered or sold by the Franchised Business, refund policies and other standards and specifications.

7.19    **Warranty.** Franchisee agrees to offer and honor such warranty on all materials and workmanship sold by Franchisee as Franchisor may designate from time to time in the Operations Manual or otherwise in writing. Franchisee shall cooperate with Franchisor warranty claims and shall make no statements or admissions as to liability. Franchisee shall promptly report all warranty claims to Franchisor and shall undertake all warranty work under the Proprietary Marks. All costs associated with administering and honoring the warranty service shall be borne by Franchisee. Franchisee agrees that it shall remain liable during the Term or upon the termination or expiration of this Agreement for all warranties issued by Franchisee. If Franchisee does not remedy, in full, any warranty claim made by a customer within a reasonable amount of time after receiving notice of such claim, as determined by Franchisor in its sole discretion, Franchisee and its principals acknowledge and agree that Franchisor may thereafter address such warranty claim, and Franchisee and principals are required to promptly reimburse Franchisor for all warranty costs or customer reimbursements incurred by Franchisor plus Franchisor's then current administration charge.

## 8    TRAINING

8.1    **Initial Training Program.** Franchisor will provide Franchisee (or one of Franchisee's principal owners if Franchisee is a business entity) and up to two (2) additional

individuals that Franchisee designates with Franchisor's then-current initial training program (the "Initial Training Program") tuition-free, subject to the availability and schedule of Franchisor's training personnel, for a total of three (3) individual attendees. Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's facility in Omaha, Nebraska, or other location that Franchisor may designate, prior to commencing operations of the Franchised Business. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. The Initial Training Program lasts up to twenty (20) days, and Franchisee will be solely responsible for costs and expenses Franchisee and its representative(s) incur in connection with attending the Initial Training Program, including travel, lodging, meals or any wages incurred for Franchisee's employees. In the event Franchisor permits Franchisee to employ a Designated Manager (as defined in this Agreement), such Designated Manager must attend and complete the Initial Training Program to Franchisor's satisfaction prior to commencing any managerial duties of the Franchised Business. Franchisor reserves the right to substitute any in-person training for virtual training at its discretion.

8.1.1    *Timing for Completion*. Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction prior to opening the Franchised Business and within one hundred eighty (180) days from the date this Agreement is fully executed. In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction, then Franchisor may terminate this Agreement.

8.1.2    *Additional Employees*. In the event Franchisee wishes for more than two (2) additional persons to participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee. All training related expenses for Franchisee's additional personnel, including transportation to and from the training site, lodging, meals, and salaries during training, are Franchisee's sole responsibility.

8.1.3    *Replacement Personnel*. In the event Franchisee or Franchisee's employee or attendee fails to complete the Initial Training Program to Franchisor's satisfaction, the respective person may repeat the course, or, in the case of an employee or attendee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Failure by Franchisee, an employee or any Replacement Personnel to complete the initial training program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

8.1.4    *Employee Training*. Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their respective duties in connection with the Franchised Business prior to such employee(s) undertaking these duties.

8.1.5    *Training Materials*. Franchisor may provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel. Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel. Updated training materials may be available to Franchisee in the Operations Manual or by other means in Franchisor's sole discretion. All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates'

title or rights in or to the training materials. Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

8.2 **Additional and Remedial Training.** Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable), estimators, installers, and other employees to attend additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then-current tuition fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals, and employee wages incurred). Additional and/or refresher training may take place at Franchisor's facility in Omaha, Nebraska, or any other location that Franchisor may designate. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

8.3 **Reasonable Training and Assistance Requests**. Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then-current tuition fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Franchisor's facility in Omaha, Nebraska, or on-site at Franchisee's Approved Location or within the Protected Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

# 9   INSURANCE

9.1 **General**. Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual or otherwise in writing.  In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such insurance and minimum policy limits that are reasonable and customary in the roofing services industry. The insurance policy or policies must be in effect upon the earlier of: (a) thirty (30) days prior to opening the Franchised Business; or (b) upon signing a lease agreement for the premises of the Franchised Business. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's respective, past, present, and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys, and agents against any loss, liability, personal injury, death, property damage or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use, or occupancy of the Franchised Business. Franchisee shall have MDR United LLC, and its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds as an additional insured under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. The employment practices liability policy is required to: (a) have an endorsement as listed on Form CG 20 29 or its equivalent; and (b) name Franchisor as Co-Defendant. Franchisor reserves the right to amend, modify, and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice through the Operations Manual or otherwise in writing by Franchisor.  Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Franchisee must provide Franchisor with certificates of insurance evidencing the required coverage

at least 30 days prior to opening. Franchisee shall continue to provide Franchisor with certificates of insurance evidencing the required coverage and any other documentation in connection therewith on an annual basis or as otherwise specified in the Operations Manual.

9.2    **Designation of Carrier; Insurance Rating, Approval, and Certification.** Franchisor has the sole right, exercisable at any time and upon notice to Franchisee, to designate a vendor or supplier, which may include an affiliate of Franchisor, from whom Franchisee must purchase all insurance policies required by Franchisor to operate the Franchised Business. All insurance carriers must be approved by Franchisor in advance and in writing. All insurance policies must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance Report. Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy. Franchisee agrees to carry such insurance as may be required by the lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law. Franchisee must deliver a certificate of insurance to Franchisor at least thirty (30) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary and non-contributory to any policy or policies held by Franchisor or its affiliates.

9.3    **Designees.** All policies will list Franchisor, its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds and contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's agreement based on changes in risk factors for which Franchisee will comply with upon written notice from Franchisor.

9.4    **Claims Cancellation.** Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations. Franchisee has a twenty-four (24) hour opportunity to cure any lapses in insurance coverage. No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certification of insurance which demonstrates compliance with this Section 9.

9.5    **Failure to Maintain Insurance.** If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a reasonable administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6    **Modification of Requirements.** Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

9.7    **Third Party Subcontractors - Insurance.** Franchisee agrees not to permit any third party subcontractor to perform any work or offer any services on behalf of Franchisee in respect of the Franchised Business unless such subcontractor maintains insurance coverage in such amounts

and types as Franchisee is required to maintain under the provisions of this Section 9, with the specific addition that subcontractors cannot exclude principals from its Workers' Compensation coverage and that liability policies name Franchisor as an additional insured. Franchisee agrees to maintain evidence that such insurance by its subcontractors is in effect and to provide such proof of insurance as Franchisor may require, in its sole discretion, from time to time.

## 10      FINANCIAL RECORDS AND REPORTS

10.1      **Reporting.** Franchisee must maintain, for at least five (5) fiscal years from their preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section 10.1 in accordance with generally accepted accounting principles.

10.1.1  Franchisee will, at its expense, submit to the Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2  Each financial statement shall be signed by Franchisee or by an individual authorized by the Franchisee, attesting that the statement is true and correct and prepared in accordance with the Franchisor's requirements.

10.1.3  Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider.

10.1.4  Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including all reports set forth in the Operations Manual.

10.2      **Tax Returns.**   In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns.

10.3      **Right to Disclose Information.** Franchisor has the right to disclose data derived from the reports Franchisee furnishes.

10.4      **Bookkeeping/Accounting Service**. To ensure Franchisee is properly reporting to Franchisor financial records and reports, Franchisee must use the services of one of Franchisor's designated and preferred bookkeeping service providers.  Franchisee is required to pay the bookkeeping service its then current fee which is subject to future increases.

10.5 **Monthly Profit and Loss Statements**. Franchisee must send Franchisor finalized profit and loss statements by the 21st of the following month. Failure to do so upon 15 days' written notice is grounds for termination of the Franchise Agreement under Section 15.3.8.

# 11   BOOKS AND RECORDS

11.1 **Records and Audits**. Franchisee must maintain accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business, including a complete listing of all work performed by any subcontractors. Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours, to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider(s). If any audit reveals that Franchisee has understated Franchisee's financial information, including but not limited to Royalty or National Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12) month period, Franchisee must pay the reasonable cost of such audit and/or inspection, including the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for royalty and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

11.2 **Corporate or Limited Liability Company Franchisee Records**. If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

11.2.1 Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by-laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

11.2.2 Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

11.2.3 All members with or shareholders of Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by the Franchisor (see Exhibit "A" to this Agreement). All members and/or shareholders shall also be individually subject to the non-disclosure and confidentiality provisions as set forth in this Agreement, as well as any and all in-term and post-term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "Publicly Held Corporation").

11.2.4   The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to-day operations of the business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

11.2.5 All issued and outstanding stock certificates of such corporation shall bear the following legend:

*EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between _____ and MDR United LLC, dated _____.*

## 12    ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1    **Generally**.  With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing.  If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received.  If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing.  Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2    **Internet Website**.  Franchisee must have and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section 12.2 from time to time in its sole discretion.

12.2.1   Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by franchised businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2   Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

12.2.3    Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s).

12.2.4    Franchisor may use a portion of the National Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

12.2.5    Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.mightydogroofing.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

12.3    **Brand Fund**.  Franchisor has established a Brand Fund for the common benefit of System franchisees. Franchisor requires Franchisee to participate in and contribute weekly two percent (2%) of the Franchised Business's Gross Revenues Collected to the Brand Fund. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenues Collected during the term of this Agreement. Franchisee must pay the Brand Fund Contribution directly to the Brand Fund via EFT on a weekly basis on the same basis as the Royalties.  Franchisor reserves the right to modify the frequency, manner, or method of payment upon providing reasonable notice to Franchisee.

12.3.1    Franchisor may use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis.  Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: the cost of preparing and producing internet, television, radio, magazine and newspaper advertising campaigns; the cost of direct mail and outdoor billboard advertising; the cost of soliciting National Accounts; the cost of public relations activities and advertising agencies; the cost of developing and maintaining an Internet website; personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit

directly or on a pro rata basis from such expenditures. The Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available". Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the Mighty Dog Roofing brand.

12.3.2 Franchisor may periodically assist franchises to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys"). The cost of such programs will be borne by the Brand Fund. The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System established minimum standards for such Surveys.

12.3.3 Franchisor has the right to reimburse itself from the Brand Fund for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4 In Franchisor's sole discretion, units owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit Franchisor and its units, even though the units operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5 Franchisor will prepare on an annual basis and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund. The statement will be presented to Franchisee upon Franchisee's written request. The Brand Fund is not required to be independently audited.

12.3.6 Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7 Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8 Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9 Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

12.4 **Regional Advertising and Promotional Cooperative**. Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited

towards the Local Marketing Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1   Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2   Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local marketing;

12.4.3   No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4   Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Marketing Requirement;

12.4.5   Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6   Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7   Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

**12.5    Grand Opening and Local Marketing.**

12.5.1   *Grand Opening Advertising Requirement*.   In connection with the grand opening campaign of the Franchised Business ("Grand Opening Campaign"), Franchisee shall spend a minimum amount of ten thousand dollars ($10,000) prior to opening the Franchised Business to satisfy Franchisee's advertising requirements for the Grand Opening Campaign ("Grand Opening Advertising Requirement"). Any Grand Opening Advertising Requirement expense must be conducted in accordance with Franchisor's standards and specification, as described in the Operations Manual or this Agreement. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Grand Opening Advertising Requirement expenditures.

12.5.2   *Local Advertising Expenditures*.   In addition to the Brand Fund Contributions described above in Section 12.3, during the first three (3) months of operations of the Franchised Business, Franchisee must spend $6,000 each month on local marketing and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Expenditures") through approved online vendors and/or in telephone directories distributed within Franchisee's Protected Territory, as well as direct mail and other forms of media advertising Franchisor may

DocuSign Envelope ID: C121B2CD-9858-441B-AD96-B4C8B45B6B60

specify. Thereafter, Franchisee must spend at least five percent (5%) of Gross Revenues Collected during the immediately preceding calendar month on Local Advertising Expenditures. Franchisee must spend the Local Advertising Expenditures as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Expenditures must be expended within Franchisee's Protected Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Expenditures must be expended regardless of the amount(s) spent by other System franchisees on local marketing. Franchisee may spend any additional sums Franchisee wishes on local marketing. Franchisee must submit, for Franchisor's approval, all proposed advertising and promotional materials prior to Franchisee's use or distribution. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Local Advertising Expenditures. Franchisor shall have the right to review Franchisee's books and records to determine these expenditures. If Franchisee does not meet the minimum Local Advertising Expenditures requirement, Franchisor shall have the right to require Franchisee to pay to Franchisor any such deficiency amount (the "Local Advertising Expenditure Deficiency"). Franchisor shall have the right to spend the Local Advertising Expenditure Deficiency on local advertising for the Franchised Business, or require that the Local Advertising Expenditure Deficiency be paid to the Brand Fund as an additional contribution. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center. If Franchisee desires to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit the materials Franchisee desires to use to Franchisor for prior written approval at least 30 days prior to Franchisee's intended use or publication. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of Franchisee's proposed materials within 15 days of the date Franchisor received the proposed materials from Franchisee. If Franchisee does not receive Franchisor's written approval during that period, the proposed materials shall be deemed disapproved. Once approved, Franchisee may use the materials unless Franchisor withdraws or revokes approval, which Franchisor may do at any time upon written notice. All advertising must prominently display the Proprietary Marks and must comply with any standards Franchisor establishes, as specified in the Operations Manual or in any other writing. Franchisor may require Franchisee to discontinue using any advertising or marketing material within a specified time frame, and at Franchisee's own cost and expense.

        12.5.3 *Local Brand Optimization Fee*. Prior to opening, Franchisee must pay to Franchisor a Local Brand Optimization Fee of $12,000 for the first year of operations, which Franchisor collects and remits to its designated vendors.

        12.5.4 *Creative Media Fund Fee*. Prior to opening, Franchisee must pay to Franchisor a Creative Media Fund Fee of $5,000 to cover costs associated with video production, actors' and actresses' compensation and video editing to create videos for national use on social media, YouTube, and other digital platforms.

        12.6 **Advisory Council**. Franchisor reserves the right to establish a Mighty Dog Roofing Advisory Council for the purpose of exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts ("Advisory Council"). If established, elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the

Advisory Council from time to time, in its sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to, exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change, or dissolve any Advisory Council at any time in its sole discretion.

## 13    INDEPENDENT CONTRACTOR; INDEMNIFICATION

13.1    **Independent Contractor Status**.    Franchisee is an independent contractor responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated Mighty Dog Roofing business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors. It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2    **Indemnification**.    Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for all claims, obligations, liabilities and damages ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising, and the sale and installation of all Approved Products by Franchisee, its employees or subcontractors and all warranty claims; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals. For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive and other damages, and costs reasonably incurred in the defense of any action, including attorneys', attorney assistants' and expert

witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable in Franchisor's sole discretion. Such an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

**14      SALE OR TRANSFER**

       14.1    **Transfer**. Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchise Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein.

       14.2    **Death or Disability**.

              14.2.1  *Representative's Right to Continue as Franchisee*. In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative, or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180 Day Period"), such person (a) meets Franchisor then-current standards to become a franchisee, as described in Section 14.3.2.5, and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporate or limited liability company franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

              14.2.2  *Franchised Business Operation During and After 180 Day Period*. Franchisor is under no obligation to operate the Franchised Business or incur any obligation on behalf of any incapacitated franchisee, during or after the 180 Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180 Day Period. In the event of Franchisee's death, disability, absence or otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and

under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time-to-time in Franchisor's sole and absolute discretion. Franchisor may pay itself a reasonable amount to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3  **Ownership Changes**. A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership, (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer or any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement. A transfer pursuant to (i) and (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1  *Right of First Refusal.* If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth in Section 14.4 hereof), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party. Franchisee shall obtain from the third party and provide Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent"). If Franchisor elects not to accept the offer within a thirty (30) day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent subject to the conditions for approval set forth in Section 14.3.2 hereof. Franchisee shall affect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section 14.3.1. Any material change in the terms of the offer shall be deemed a new proposal subject to Franchisor's right of first refusal. So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder, or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner, in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2  *Conditions for Approval.* Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business, at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or

transfer of the Franchise Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1   All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors, are satisfied;

14.3.2.2   Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's designated/approved suppliers and vendors, within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3   Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the release shall not be inconsistent with any applicable state statute regulating franchising;

14.3.2.4 That the transferor and transferee have executed a mutual general release, relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5   Franchisee or transferee shall provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6   The transferee shall demonstrate to Franchisor's satisfaction that he or she meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business to be transferred; and has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7   That, at Franchisor's option, the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8   Franchisee shall pay Franchisor a transfer fee equal to twenty percent (20%) of Franchisor's then-current Initial Franchise Fee per Protected Territory that is being transferred to transferee. In the event Franchisee transfers multiple Protected Territories at once,

Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Protected Territories being transferred, by any amount;

14.3.2.9  The transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

14.3.2.10 Franchisee (and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company), and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11 The transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits, and licenses required for the operation of the Franchised Business;

14.3.2.12 To the extent required by the terms of any leases or other agreements, the lessors or other parties must have consented to the proposed transfer;

14.3.2.13 The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14 Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15 The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under the transferee's franchise agreement;

14.3.2.16 Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of disclosure document and Franchisor shall not be liable for any representations not included in the disclosure document;

14.3.2.17 Franchisor's approval of the transfer shall not constitute a waiver of any claims Franchisor may have against the transferring party;

14.3.2.18 Franchisor shall have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder; and

14.3.2.19 In any event, Franchisor may withhold or condition Franchisor's consent to any transfer as Franchisor deems appropriate based on the circumstances of the transfer or otherwise.

14.4    **Transfer to a Corporation or Limited Liability Company**.  If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fee set forth in Sections 14.3.2.7, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

DocuSign Envelope ID: G121B2CD-9858-4416-AD96-B4C8B45B6B60

14.4.1  The corporation or limited liability company is newly organized, and its activities are confined to operating the Franchised Business;

14.4.2  Franchisee is, and at all times remains, the owner of at least fifty-one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3  The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4  All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty; and

14.4.5  At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations, and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.5    **Franchisor's Right to Transfer**.  Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement in Franchisor's sole discretion.

## 15    BREACH AND TERMINATION

15.1    **Automatic Termination**.  This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

15.1.1  *Voluntary Bankruptcy*.  If Franchisee or any principal makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2  *Involuntary Bankruptcy*.  If proceedings are commenced to have Franchisee or any of its principals adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within 60 days.

15.1.4  *Loss of Premises*. If Franchisee loses the right to occupy the premises or operate the Franchised Business from the Approved Location.

15.2    **With Notice and Without Opportunity to Cure**.  Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1  *Criminal Acts.*  If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised

Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2 *Fraud.* If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3 *Other Actions.* If Franchisee or Franchisee's principals, including any shareholder, member, guarantors or agents, engage in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4 *Misrepresentation.* If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation.

15.2.5 *Failure to Complete Training.* If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6 *Repeated Breaches.* If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any 12-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7 *Breach of Other Agreements.* If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8 *Misuse of the Proprietary Marks or Confidential Information.* If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9 *Discloses Confidential Information or Trade Secrets.* If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual, or any other Confidential Information or Trade Secret provided to Franchisee by the Franchisor or any of its affiliates to any third party;

15.2.10 *Violation of Law.* If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the public.

15.2.11 *Violation of In-term Restrictive Covenant.* If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

DocuSign Envelope ID: 9121B2CD-9858-4416-AD96-B4C8B45B6B60

15.2.12 *Liens*. If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13 *Insolvency*. If Franchisee or any of Franchisee's principals become insolvent.

15.2.14 *Abandonment*. If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue operations of the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15 *Unauthorized Transfer*. If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof;

15.2.16 *Unauthorized Products or Services*. If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17 *Unapproved Purchases*. If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18 *Proprietary Software*. If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19 *Insurance*. If Franchisee fails to maintain insurance, purchase insurance from designated vendors, or to repay Franchisor for insurance paid for by it, or otherwise fail to adhere to the requirements of Section 9.

15.2.20 *Government Regulations*. If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21 *Government Actions*. If any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22 *Anti-Terrorist Activities*. If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23 *Personal Use of Franchised Business Property*. If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24 *Insufficient Funds*. If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12) month period.

15.2.25 *Failure to Open.*  If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26 *Operating Outside of Protected Territory*. If Franchisee operates the Franchised Business outside of the Protected Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27 *Violation of Best Efforts.* If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.2.28 *Failure to Meet Minimum Annual Revenue Requirements or Minimum Royalty Fees.*  If Franchisee fails to meet the Minimum Annual Revenue Requirements or Minimum Royalty Fee for any territory granted hereunder in any period.

15.3.    **Upon 15 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if any of the following defaults remains uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1 *Nonpayment.*  If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's system suppliers or vendors.

15.3.2 *Endorsement of Checks.*  If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3 *Failure to Maintain Sufficient Marketing Materials and Supplies*.  If Franchisee fails to maintain sufficient levels marketing materials and other supplies necessary to adequately develop the Protected Territory and meet consumer demand.

15.3.4 *Interruption of Service.*  If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5 *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.*  If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel, as Franchisor requires from time to time.

15.3.6 *Quality Control.*  If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

15.3.7 *Licenses and Permits.*  If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.3.8 *Profit and Loss Statements.* If Franchisee fails to submit finalized Profit & Loss statements by the twenty-first (21st) of each month (or other date Franchisor may require).

15.4    **Upon 30 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement, or any

ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5    **Step in Rights**.  In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right, or any other rights, Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured, and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all reasonable costs and overhead, if any, incurred in connection with its operation of the Franchised Business including, without limitations, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business.

15.6    **Nonwaiver**.  Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

## 16    RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1    **Franchisee's Obligations**.  Upon termination of this Agreement, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost and expense:

16.1.1   Immediately cease all operations under this Agreement;

16.1.2   Immediately pay Franchisor all unpaid fees, and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3   Discontinue immediately the use of the Proprietary Marks;

16.1.4   Immediately cease using the proprietary software and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days and immediately and permanently cease use of such information and materials;

16.1.5   Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or Social Media Pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name attached hereto as Exhibit B, and transfer all usernames and passwords for all Social Media Pages to Franchisor;

16.1.6  Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease attached as Exhibit F, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7  Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks as Franchisor directs and all items which are a part of the trade dress of the System-immediately, no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8  Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9  Immediately cease to communicate with all Mighty Dog Roofing customers;

16.1.10 Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11 Permit Franchisor to make final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration, or transfer;

16.1.12 Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13 Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System; and

16.1.14 Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15 Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16.

16.2    **Option to Purchase Personal Property.** Upon the termination or expiration of this Agreement, Franchisor, or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice.  For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10) year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes).  Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property that is subject to a lease or finance agreement, the purchase price of such personal property shall

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable. Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

      16.3    **Exclusions.** Franchisor may exclude from the personal property purchased under Section 16.2 cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

      16.4    **Damages, Costs, and Expenses.**   In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisee as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 17     COVENANTS

      Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

      17.1    **During the Term of This Agreement.** During the term of this Agreement, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

          17.1.1  Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

          17.1.2  Directly or indirectly induce or seek to induce anyone employed by

Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.1.3 Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.2 **After the Term of This Agreement.** For a period of two (2) years after the expiration, transfer or termination of this Agreement, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers, directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.2.1 Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (a) within the Protected Territory, (b) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (c) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

17.2.2 Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.2.3 Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.3 **Intent and Enforcement**. It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other Mighty Dog Roofing franchisees, and the System. Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement. Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm. Franchisee acknowledges and agrees on Franchisee's own behalf and on behalf of the persons who are liable under this Section 17 that each has previously worked or been gainfully employed in other careers and that the provisions of this Section 17 in no way prevent any such person from earning a living. Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during any default under this Section.

17.4 **Employees.** Franchisee shall ensure that Franchisee's principals, managers,

DocuSign Envelope ID: 6121B2CD-9858-4416-AD96-B4C8B45B6B60

employees, and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit C to the Franchise Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

17.5     **No Defense**.  Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

## 18     DISPUTE RESOLUTION

18.1     **Choice of Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws principals.

18.2     **Internal Dispute Resolution.**  Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management, after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party.  This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

18.3     **Mediation; Arbitration**.  At Franchisor's option, all claims or disputes between Franchisee and Franchisor or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisee and Franchisor or its affiliates, or any of the parties' respective rights and obligations arising from such agreement, which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above, must be submitted first to mediation, in Bucks County, Pennsylvania under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Franchisee as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.  Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor.  Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and Franchisor and Franchisee shall share mediation costs equally.  This agreement to mediate shall survive any termination or expiration of this Agreement.

18.3.1   The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 18.3 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

        18.3.1.1     Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

        18.3.1.2     Any claims pertaining to or arising out of any warranty issue;

        18.3.1.3     Any of the restrictive covenants contained in this Agreement.

        18.3.1.4     Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

        18.3.1.5     Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency

        **18.4**    **Selection of Venue**. Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Bucks County, Pennsylvania and the jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania. Franchisee acknowledges that this Agreement has been entered into in the Commonwealth of Pennsylvania, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Doylestown, Pennsylvania including but not limited to training, assistance, support and the development of the System. In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of Pennsylvania as set forth in this Section.

        **18.5**    **Third Party Beneficiaries**. Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation provision set forth in this Section 18, each having authority to specifically enforce the right to mediate claims asserted against such person(s) by Franchisee.

        **18.6**    **Prior Notice of Claims.** As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

        **18.7**    **No Right to Offset**. Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

        **18.8**    **Injunctive Relief**. Nothing in this Agreement shall prevent Franchisor from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause Franchisor loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions. If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

18.9    **Limitation of Action**.  Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

18.9.1  Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any mediation, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2  Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10  **Waiver of Punitive Damages**.  Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages.  If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.  Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future royalties for the balance of the term of this Agreement.

18.11   **THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT.  THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY GOODS OR SERVICES.**

**19    REPRESENTATIONS**

19.1    **Proprietary Software**.  Any proprietary software provided by Franchisor or an affiliate is on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for any proprietary software, or covenant that the proprietary software will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the software or services provided thereby.

FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE PROPRIETARY SOFTWARE, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE PROPRIETARY SOFTWARE, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2    **No Authority.** NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT.  FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3    **Receipt.**  THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT.  IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4    **Opportunity for Review by Franchisee's Advisors.**    FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5    **Execution of Agreement.**    EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT.  IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE

PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

## 20    GUARANTEE OF PRINCIPALS AND THEIR SPOUSES

Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing personal guaranty in the form attached hereto as Exhibit A.

## 21    NOTICES

All notices and requests to be given under this Agreement are to be in writing, and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt, to the following addresses (which may be changed by written notice):

| | |
|---|---|
| Franchisee Name/Address: | Michael Fitzpatrick<br>35 Lewis Ave.<br>Summit, New Jersey 07901 |
| | Ryan Fitzpatrick<br>1700 Park Avenue, Apt. 811<br>Weehawken, NJ 07086 |
| Franchisor | MDR United LLC<br>95 N. Broad Street<br>Doylestown, Pennsylvania 18901 |
| With a copy to: | Fisher Zucker, LLC<br>21 S. 21st Street<br>Philadelphia, PA 19103<br>Attn: Lane Fisher |

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Expressor a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

## 22    MISCELLANEOUS

22.1    **Entire Agreement.**  This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be

modified except by a written document signed by both parties. Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee.

22.2 **Construction of Language.** The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party. All words in this Agreement refer to whatever number or gender the context requires. If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several. Headings are for reference purposes and do not control interpretation. Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings and Franchisee's spouse's parents, children, and siblings. Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members, and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement. In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement

22.3 **Severability.** If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other trade secrets, is declared invalid or unenforceable, then Franchisor at Franchisor's option may terminate this Agreement immediately upon written notice to Franchisee.

22.4 **State Law Applies.** If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

22.5 **Additional Documentation.** Franchisee must from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein. In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

22.6 **Force Majeure.** Neither Franchisee, Franchisor, or Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform its obligations is not the fault nor within the reasonable control of the person due to perform but results from, without limitation, fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics of other national health crisis or civil disorders. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in

whole or in part, as Franchisor deems reasonable.

22.7  **Anti-Terrorist Activities.**  Franchisee certifies that neither Franchisee, nor Franchisee's owners, principals, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8  **Attorneys' Fees.**  If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

# 23    ACKNOWLEDGMENTS

23.1  **Independent Investigation.**  Franchisee acknowledges that Franchisee has conducted an independent investigation of the Franchised Business contemplated by this Agreement and recognizes that it involves business risks which make the success of the venture largely dependent upon Franchisee's business abilities and efforts. Franchisee acknowledges that Franchisee has been given the opportunity to clarify any provision of this Agreement that Franchisee may not have initially understood and that Franchisor has advised Franchisee to have this Agreement reviewed by an attorney.

23.2    **No Guarantee of Earnings.**    Franchisee understands that Franchisor and any of Franchisor's representatives and/or agents with whom Franchisee has met have not made and are not making any guarantees as to the extent of Franchisee's success in Franchisee's Franchised Business, and have not and are not in any way representing or promising any specific amounts of earnings or profits in association with Franchisee's Franchised Business.

23.3    **Receipt of Franchise Disclosure Document.**    Franchisee acknowledges that this Agreement and Franchisor's Franchise Disclosure Document have been in Franchisee's possession for at least fourteen (14) calendar days before Franchisee signed this Agreement or paid any monies to Franchisor or an affiliate and that any material changes to this Agreement were in writing in this Agreement for at least seven (7) calendar days before Franchisee signed this Agreement.

23.4    **No Personal Liability.**    Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason.    This is an important part of this Agreement.    Franchisee agrees that nothing that Franchisee believes Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement. This is an important part of this Agreement.    <u>Do not sign this Agreement if there is any question concerning its contents or any representations made</u>.

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**FRANCHISOR**

**MDR UNITED LLC**

By: _Josh Skolnick_____
9AD674030DF9458
Josh Skolnick, Managing Member

By: _Zach Beutler_____
DAF25556D7154C7
Zach Beutler, Managing Member

**FRANCHISEE**

_Michael Fitzpatrick_____
5F20519C80ED417
Michael Fitzpatrick, individually

_Ryan Fitzpatrick_____
79E11698D2E04ED
Ryan Fitzpatrick, individually

**EXHIBIT A**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PERSONAL GUARANTY**

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.

**ARTICLE I**
**PERSONAL GUARANTY**

The undersigned persons (individually and collectively "you") hereby represent to MDR United LLC ("Franchisor"), or all of the members and managers, or the spouse of any such shareholder, general partner, or member or manager of _____("Franchisee"), as the case may be. In consideration of the grant by Franchisor to Franchisee as provided in the foregoing franchise agreement (the "Franchise Agreement"), each you hereby agree, in consideration of benefits received and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and individually) will not permit or cause any change in the percentage of Franchisee owned, directly or indirectly, by any person, without first obtaining the written consent of Franchisor prior to said proposed transfer, which consent must not be unreasonably withheld, and without first paying or causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise Agreement. You further agree to be bound by the in-term and post-term non-competition and non-solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other covenants set forth in the Franchise Agreement, including but not limited to those concerning confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

**ARTICLE II**
**CONFIDENTIALITY**

During the term of this Agreement, you will receive information which Franchisor considers a trade secret and confidential information ("Confidential Information"). You shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation, or limited liability company any Confidential Information

including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to Franchisor's integrated bookkeeping system, and other methods, techniques, and know-how concerning the operation of a Mighty Dog Roofing Business of which you may be appraised by virtue of your role as a Guarantor of Franchisee.

**ARTICLE III**
**NON-COMPETITION**

1) **During the Term of the Franchise Agreement.**  During the term of the Franchise Agreement, neither your, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2) **After the Term of the Franchise Agreement.**  For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (i) within the Protected Territory, (ii) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (iii) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c)  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

3)  **Intent and Enforcement**.  It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law.  Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable.  In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach.  You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm.  You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living.  You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV
## DISPUTE RESOLUTION

1)  **Acknowledgment**.  You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's proprietary marks or its system.

2)  **Governing Law.**  This Guaranty shall be deemed to have been made in and governed by the laws of the Commonwealth of Pennsylvania, without any reference to Pennsylvania conflict of laws principles.

3)  **Internal Dispute Resolution.**  You must first bring any claim or dispute arising out of or relating to the Franchise Agreement or this Guaranty to Franchisor's management.  You agree to exhaust this internal dispute resolution procedure before bringing any dispute before a third party. This agreement to engage in internal dispute resolution first shall survive the termination or expiration of this Agreement.

4)  **Mediation.**  At Franchisor's option, all claims or disputes between you and Franchisor arising out of, or in any way relating to, this Guaranty or the Franchise Agreement or any other agreement by and between you and the Franchisor, or any of the parties' respective rights and obligations arising from such agreements, must be submitted first to mediation, in Bucks County, Pennsylvania, under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect.  Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, you must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify you as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.  You may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written

DocuSign Envelope ID: G121B2CD-9858-4416-AD96-B4C8B45B6B60

declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and the parties shall share the cost of mediator. This agreement to mediate at Franchisor's option shall survive the termination or expiration of the Franchise Agreement.

The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 4 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

    i.    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

    ii.    Any claims arising out of or pertaining to any warranty issued;

    iii.    Any of the restrictive covenants contained in this agreement;

    iv.    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

    v.    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency.

5) **Third Party Beneficiaries.** Franchisor's officers, directors, shareholders, agents and/or employees are express third party beneficiaries of the Franchise Agreement and this Guaranty, and the mediation provisions contained herein, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you.

6) **Injunctive Relief.** Nothing contained in this Guaranty shall prevent Franchisor from applying to or obtaining from any court having jurisdiction, without bond, a writ of attachment, temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interest prior to the filing of any mediation proceeding or pending the trial or handing down of a decision or award pursuant to any mediation or judicial proceeding conducted hereunder.

7) **Jurisdiction and Venue.** Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Bucks County, Pennsylvania and the jurisdiction and venue of the United States District Court for the Eastern District of Pennsylvania. The parties acknowledge and agree that this Agreement has been entered into in the Commonwealth of Pennsylvania, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Bucks County, Pennsylvania, including but not limited to training, assistance, support and the development of the System. In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Pennsylvania as set forth herein.

© 2021 MDR United LLC
Franchise Agreement

DocuSign Envelope ID: C121B2CD-9858-441C-AD96-B4C8B45B6B60

8) **Jury Trial Waiver. THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY GOODS OR SERVICES.**

9) **Waiver of Punitive Damages.** You waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, your recovery shall be limited to actual damages. If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

10) **Limitation on Action.** You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide basis, and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

11) **Attorneys' Fees.** If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

12) **Nonwaiver.** Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Guaranty shall be cumulative. Franchisor' election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

13) **Severability.** The parties agree that if any provisions of this Guaranty may be construed in two

ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party. The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable. If any material provision of this Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions. In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

14) **Construction of Language.** Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement. The language of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party. All words in this Guaranty refer to whatever number or gender the context requires. If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

15) **Successors**. References to "Franchisor" or "the undersigned, or "you" include the respective parties' successors or permitted assigns or transferees.

16) **No Personal Liability**. You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

***THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK.
SIGNATURES APPEAR ON FOLLOWING PAGE***

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**PERSONAL GUARANTORS**                      **SPOUSES**

By: _____        By: _____

Print Name: _____        Print Name: _____

Address: _____         Address: _____

_____            _____

Telephone: _____         Telephone: _____


By: _____        By: _____

Print Name: _____        Print Name: _____

Address: _____         Address: _____

_____            _____

Telephone: _____         Telephone: _____

© 2021 MDR United LLC
Franchise Agreement

**EXHIBIT B**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS,**
**FACSIMILE NUMBERS AND DOMAIN NAMES**

1.    _____, doing business as a Mighty Dog Roofing franchisee, ("Assignor"), in exchange for valuable consideration provided by MDR United LLC ("Assignee"), receipt of which is hereby acknowledged hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____
Facsimile Number(s): _____
Domain Name(s) (as permitted by Franchisor under the Franchise Agreement): _____

2.    The conditional agreement will become effective automatically upon termination, expiration of Assignor's franchise.  Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3.    Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment, and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR**:

By: _____      Date: _____

Name: _____

Title: _____

**ASSIGNEE**:

**MDR UNITED LLC**

By: _____      Date: _____

Name: _____

Title: _____

DocuSign Envelope ID: C121B2CD-9858-441C-AD96-B4C8B45B6B60

**EXHIBIT C**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors,*
*general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from MDR United LLC (the "Company") to establish and operate a Mighty Dog Roofing business (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Mighty Dog Roofing Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ (the "Franchised Business Premises").

1.       The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's  Manuals; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be appraised by virtue of my employment with Franchisee ("Confidential Information").

2.       Any and all information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

3.       In my position with the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual") and other general assistance during the term of this Agreement.

4.       I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.       The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential.  Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing businesses, except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee. I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me. Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.     This Agreement shall be construed under the laws of the Commonwealth of Pennsylvania. The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

By: _____

Name: _____

Title: _____

Date: _____

**ACKNOWLEDGED BY FRANCHISEE**

By: _____

Name: _____

DocuSign Envelope ID: 6121B2CD-9858-4416-AD96-B4C8B45B6B60

**EXHIBIT D**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name: _____

ABA# : _____

Acct. No.: _____

Acct. Name: _____

1.      Effective as of the date of the signature below, _____ ("Franchisee") hereby authorizes MDR United LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise    Agreement    for    the    Franchised    Business    located    at: _____: (1) all Royalty fees; (2) Technology and Software Fees; (3) Call Center Fees; (4) Local Brand Optimization Fees; (5) Creative Media Fund Fees; (6) Monthly Digital Management Fees; (7) all Brand Fund Contributions; (9) all recurring fees or other fees due and owing to the Company, or to which the Company has rights to, under the Franchise Agreement, electronically or otherwise. Franchisee acknowledges that Royalty and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement.  Such withdrawals shall occur on a weekly and/or monthly basis, or on such other schedule as Company shall specify in writing.  If necessary, Company is also authorized to deposit the Gross Revenues of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur as needed or on such other schedule as Company shall specify in writing.   This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISOR**                              **FRANCHISEE**

**MDR UNITED LLC**                          _____

By: _____         By: _____

Name: _____         Name: _____

Title: _____        Title: _____

Date: _____         Date: _____

**EXHIBIT E**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**SITE SELECTION ADDENDUM**

MDR United LLC, a Pennsylvania limited liability company with a principal business address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee"), have this 11th day of March, 2022, entered into the foregoing Franchise Agreement(s) for the operation of a Mighty Dog Roofing franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.      Within ninety (90) days after Franchisee receives notice of approval of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Protected Territory granted under the Franchise Agreement.

2.      Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum. Time is of the essence.

3.      Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within forty five (45) days after execution of this Site Selection Addendum. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.      Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct up to one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's reasonable expenses including, without limitation, the costs of travel, lodging, and meals.

5.      If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

6.      After Franchisor has approved a site for the Franchised Business in writing and Franchisee has acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.      Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty or any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose. Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation. Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.      This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and terms of this Site Selection Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISEE**

*Michael Fitzpatrick*
5F20519C80ED417...
Michael Fitzpatrick, individually

*Ryan Fitzpatrick*
79E11698D2E04FD...
Ryan Fitzpatrick, individually

**FRANCHISOR**

**MDR UNITED LLC**

*Zach Beutler*
DAF25556D7154C7...
Zach Beutler, Managing Member

# EXHIBIT F
## to
## MDR UNITED LLC
## FRANCHISE AGREEMENT

## COLLATERAL ASSIGNMENT OF LEASE

**FOR VALUE RECEIVED**, the undersigned ("Assignor") hereby assigns and transfers to MDR United LLC, a Pennsylvania limited liability company, with its principal place of business address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto as <u>Exhibit 1</u> (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee has no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of its interest in the Lease or the premises demised thereby.

Upon a default by Assignor under the Lease or under the franchise agreement for a Franchised Business between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, or upon expiration or termination of the Franchise Agreement or this Agreement, Assignee has the right and is hereby empowered to take possession of the premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor will have no further right, title or interest in the Lease. Assignor hereby authorizes the Lessor to disclose to Assignee, upon its request, sales and other information furnished to the Lessor by Assignor.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereto, Assignor agrees that it must elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing.

If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and instead of Assignor for the purpose of effecting such extension or renewal.

**ASSIGNOR**:

Dated:_____

SIGNED AND SEALED this                          _____
day of _____, 20
                                                 _____
Notary Public

## CONSENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the aforedescribed Lease hereby:

(a)    Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

(b)    Agrees that Assignee has the right, but must not be obligated, to cure any default by Assignor under the Lease within thirty (30) days (or such longer period of time as reasonably necessary to cure the default, so long as Assignee commences the cure within 30 days and thereafter diligently pursues the cure to completion) after delivery by Lessor of notice thereof in accordance with paragraph (a) above;

(c)    Consents to the foregoing Collateral Assignment and agrees that if Assignee takes possession of the premises demised by the Lease and confirms to Lessor the assumption of the Lease by Assignee as tenant thereunder, Lessor must recognize Assignee as tenant under the Lease, provided that Assignee cures within the time period set forth above the defaults, if any, of Assignor under the Lease;

(d)    Agrees that Assignee may further assign the Lease to a person, firm or corporation who must agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Lessor and upon such assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise.

DATED: _____

_____

_____

DocuSign Envelope ID: C121B2CD-98E8-4416-AD96-B4C8B45B6B60

**Exhibit "1" to Collateral Assignment of Lease**

**LEASE**

**Lease Agreement attached**

**EXHIBIT G**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**TERRITORY MAP**

**Territory 3 Map Attached**

DocuSign Envelope ID: C121B2CD-9858-4416-AD96-B4C8B45B6B60

## Territory : PENDING - Fitzpatrick - 3



Territories

ZIP Codes

Territory Demographics for PENDING - Fitzpatrick - 3



| ZIP Code | ZIP Code Name | Owner Occupied Homes |
|----------|---------------|---------------------:|
| 07016 | CRANFORD | 7,100 |
| 07027 | GARWOOD | 1,212 |
| 07033 | KENILWORTH | 2,225 |
| 07036 | LINDEN | 9,104 |
| 07081 | SPRINGFIELD | 4,763 |
| 07090 | WESTFIELD | 8,710 |
| 07092 | MOUNTAINSIDE | 2,359 |
| 07202 | ELIZABETH | 3,729 |
| 07203 | ROSELLE | 4,881 |
| 07204 | ROSELLE PARK | 3,098 |
| 07901 | SUMMIT | 5,869 |
| Totals | | 53,050 |

DocuSign Envelope ID: G121B2CD-9858-441C-AD96-B4C8B45B6B60

**EXHIBIT H**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**
**MULTI-UNIT ADDENDUM**

THIS MULTI-UNIT ADDENDUM (the "Addendum") is made and entered into this 11th day of March, 2022 by and between MDR United LLC, a Pennsylvania limited liability company with an address at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor"), and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet (collectively, "Franchisee").

**BACKGROUND**

A.  Contemporaneous with the execution of this Addendum, Franchisee and Franchisor entered into those certain three (3) franchise agreements (collectively, the "Applicable Franchise Agreements") pursuant to which Franchisee obtained the right and undertook the obligation to operate Mighty Dog Roofing franchised businesses within the territories defined therein (each a "Franchised Business").

B.  Each Franchised Business has its own designated protected territory wherein Franchisee is required to actively promote and operate the Franchised Businesses (collectively, the territories granted under the Applicable Franchise Agreements will be referred to as the "Protected Territories").

C.  Franchisor expects that Franchisee will operate the Franchised Business from a single Approved Location using the same vehicles, supplies, equipment and inventory as required by Franchisor.

D.  The parties now wish to amend certain provisions of the Applicable Franchise Agreements pursuant to the terms and conditions set forth in this Addendum.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  **Multi-Unit Initial Franchise Fees**. Notwithstanding anything contained in Section 3.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor an Initial Franchise Fee under any Applicable Franchise Agreement. Instead, Franchisee shall pay Franchisor lump-sum multi-unit Initial Franchisee Fee as follows (the "Multi-Unit Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | Cumulative Number Owner Occupied Homes |
|---|---|---|---|
| #1 | $59,500 | $59,500 | 50,000 |
| #2 | $99,500 | $40,000 | 100,000 |
| #3 | $129,500 | $30,000 | 150,000 |
| #4 | $159,500 | $30,000 | 200,000 |
| #5 | $189,500 | $30,000 | 250,000 |

The entire Multi-Unit Initial Franchise Fee must be paid upon execution of the Applicable Franchise Agreements and this Addendum, and this fee is deemed fully earned upon payment and non-refundable under any circumstances.

2.　　**Initial Training Program**. Franchisee shall only be required to attend and complete Franchisor's Initial Training Program described more fully in Section 8.1 of the Applicable Franchise Agreements, respectively, once in connection with the Franchised Businesses governed by this Addendum. All other provisions regarding Franchisee's training obligations in the Applicable Franchise Agreements are hereby ratified and confirmed.

3.　　**Minimum Royalty Fee and Minimum Annual Revenue Requirement**.

a.　　<u>Minimum Royalty Fee</u>.  Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor a separate Minimum Royalty Fee under each Applicable Franchise Agreement. Instead, Franchise shall pay Franchisor the following Minimum Royalty Fees depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation:

| Minimum Royalty Fees Per Week | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

The parties further acknowledge and agree that Franchisee is subject to the Minimum Royalty Fees set forth herein in the event the Franchisee's Royalty based on the Gross Revenues Collected is less than the

Minimum Royalty Fee obligation for any given week.

b.  <u>Minimum Annual Revenue Requirement</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee shall meet and maintain the following minimum annual Gross Revenue requirements depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation, as follows (the "Minimum Annual Revenue Requirements"):

| Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| **Months of Operation** | **1 Territory** | **2 Territories** | **3 Territories** | **4 Territories** | **5 Territories** |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

All other provisions regarding Franchisee's payment obligations, including those related to Franchisee's Royalty or other fees, of the Franchise Agreements are hereby confirmed and ratified. Franchisor reserves the right, but not the obligation, to offer a royalty incentive programs for the benefit of qualifying franchisees. To qualify for such programs, Franchisee must satisfy Franchisor's then-current specifications and standards as provided in the Operations Manual or otherwise in writing by Franchisor. Franchisor reserves the right to modify, supplement, or terminate any royalty incentive programs upon notice to Franchisee.  If Franchisee fails to meet the Minimum Annual Revenue Requirements in any period, Franchisor may terminate the Franchisee's Protected Territories or otherwise terminate the Franchise Agreements.

4.  **Opening Package.**  Notwithstanding anything contained in Section 3.5 of the Applicable Franchise Agreements, Franchisee will not be required to purchase a separate Opening Package under each Applicable Franchise Agreement.

5.  **Local Brand Optimization Fee**. Notwithstanding anything contained in Section 3.6 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Local Brand Optimization Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Local Brand Optimization Fee:

| **Number of Applicable Franchise Agreements/ Territories Purchased** | **Local Brand Optimization Fee** |
|---|---|
| 1 | $12,000 |
| 2-3 | $12,000 |

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 4-5 | $24,000 |

6.      **Technology and Software Fees**.  Notwithstanding anything contained in Section 3.8 of the Applicable Franchise Agreements, Franchisee will not be required to pay separate Technology Fees and Software Fees under each Applicable Franchise Agreement.

7.      **Call Center Fee**.  Notwithstanding anything contained in Section 3.9 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Call Center Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Call Center Fee regardless of the number of Applicable Franchise Agreements executed.

8.      **Creative Media Fund Fee**.  Notwithstanding anything contained in Section 3.10 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Creative Media Fund Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Creative Media Fund Fee regardless of the number of Applicable Franchise Agreements executed.

9.      **Monthly Digital Management Fee**.  Notwithstanding anything contained in Section 3.11 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Monthly Digital Management Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Monthly Digital Management Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Monthly Digital Management Fee |
|---|---|
| 1 | $500 |
| 2-3 | $1,000 |
| 4-5 | $1,500 |

10.     **Equipment and Inventory**.  Notwithstanding anything contained in Section 7.6.7 of the Applicable Franchise Agreements, if Franchisee purchases four or more Territories, Franchisee must add an additional crew, an additional salesperson, and an additional separate vehicle by the end of the second year of operations.

11.     **Approved Location**.  Notwithstanding anything contained in Section 1.3 of the Applicable Franchise Agreements, Franchisee shall only be required to have one physical location that satisfies Franchisee's Approved Location requirement, if, and only if, Franchisee's Territories are contiguous.

12.     **Default of Addendum Constitutes Default Under All Applicable Franchise Agreements**. In the event Franchisee breaches any of the provisions of this Addendum, such breach will constitute a material default of all Applicable Franchise Agreements and must be cured within 30 days from Franchisee's receipt of Franchisor's written notice of such breach as set forth in Section 15.4 of the

Applicable Franchise Agreements. If Franchisee fails to cure such breaches within the prescribed period, Franchisor may, at its option, terminate one or more of the Applicable Franchise Agreements immediately upon providing written notice, or otherwise terminate Franchisee's Protected Territories.

13.        **Ratification and Confirmation of the Applicable Franchise Agreements**. Except as amended by this Addendum, any and all other terms and conditions set forth in the Applicable Franchise Agreements are hereby ratified and confirmed as if fully restated herein, including without limitation, those provisions regarding dispute resolution and venue, which will also apply to any claims or disputes arising out of or related to this Addendum. All capitalized terms not specifically defined in this Addendum will be afforded the definition given to them in the Applicable Franchise Agreements.

14.        **Entire Agreement**. The Applicable Franchise Agreements and this Addendum constitute the entire, full, and complete agreement between the parties concerning the subject matter set forth herein and supersede any and all prior agreements. In the event of a conflict between the terms of any Applicable Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. This Addendum constitutes an amendment to all Applicable Franchise Agreements.

*Signatures appear on the following page.*

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Addendum the date and year first written above.

**FRANCHISOR:**

**MDR United LLC**

By: _____     Date: _____    3/11/2022

*Josh Skolnick*
9AD574D30DE9458

Josh Skolnick, Managing Member

By: _____     Date: _____    3/11/2022

*Zach Beutler*
DAF25556D7154C7...

Zach Beutler, Managing Member

**FRANCHISEE:**

*Michael Fitzpatrick*
5E20519C80ED417

Michael Fitzpatrick, individually     Date: _____    3/11/2022

*Ryan Fitzpatrick*
79E11698D2F04FD...

Ryan Fitzpatrick, individually     Date: _____    3/11/2022

# ADDENDUM TO FRANCHISE AGREEMENT

This Addendum to the MDR United LLC Franchise Agreement (the "Addendum") is made this 11th day of March, 2022 (the "Effective Date"), by and between: MDR United LLC, a Pennsylvania limited liability company, with its principal place of business at 95 N. Broad Street, Doylestown, Pennsylvania 18901 ("Franchisor") and Michael Fitzpatrick, an individual with an address at 35 Lewis Ave., Summit, New Jersey 07901, which is identified more fully in the attached Data Sheet, and Ryan Fitzpatrick, an individual with an address at 1700 Park Avenue, Apt. 811, Weehawken, New Jersey 07086, which is identified more fully in the attached Data Sheet ("Franchisees").

## BACKGROUND

A.      Contemporaneous with the execution of this Addendum, Franchisor and Franchisees have entered into franchise agreements (the "Franchise Agreements"), under which Franchisees obtained the right and undertook the obligation to open and operate three (3) Mighty Dog Roofing franchises (the "Franchised Businesses") in designated territories as set forth and more fully described in Exhibit H to each of the Franchise Agreements (the "Territories").

B.      The parties now wish to amend the Franchise Agreements, pursuant to the terms of this Addendum.

NOW THEREFORE, in consideration of the mutual agreements, covenants and promises contained in this Addendum and for mutual consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.      **Background; Definitions**.

        a.      The parties agree and acknowledge that the Background portion of this Addendum, including all definitions and provisions set forth therein, is hereby incorporated by reference as if fully set forth in this Section.

        b.      For purposes of this Addendum, if a capitalized term in this Addendum is not specifically defined herein, that term will be given the same definition that the term is afforded in the Franchise Agreement.

2.      **Amendment**.

        a.      Section 3.1 "Initial Franchise Fee" of the Franchise Agreements, is hereby amended to provide that the Initial Franchise Fee is not payable in full upon the execution of the Franchise Agreements; rather, Franchisees shall pay Franchisor a nonrefundable deposit in the amount of Nineteen Thousand Four Hundred Twenty-Five dollars ($19,425.00) (the "Deposit") upon the execution of this Addendum. The remaining Initial Franchise Fee balance of One Hundred Ten Thousand Seventy-Five dollars ($110,075.00) is due in full within four (4) weeks of the date hereof. In the event that Franchisees are unable to pay the requisite payment, Franchisor will have the absolute right to rescind the Franchise Agreements and Franchisees will execute a mutual rescission agreement (the "Rescission Agreement") with Franchisor pursuant to which Franchisees will release Franchisor from any and all claims, agree to keep Franchisor's

proprietary information confidential and comply with the post term non-competition provisions of the Franchise Agreements.

b.  Section 3.1 "Initial Franchise Fee" of the Franchise Agreements and Section 1 "Multi-Unit Initial Franchise Fees" of the Exhibit I Multi-Unit Addendum to the Franchise Agreements, are hereby amended to provide that Franchisee shall have the right to pay Franchisor the discounted "Initial Franchise Fees" set forth in Section 1 of the Exhibit I Multi-Unit Addendum to the Franchise Agreements, in the amount of Thirty Thousand Dollars ($30,000.00) for each additional "Protected Territory" (as defined in the Franchise Agreements), if, and only if, Franchisee purchases each such additional Protected Territory from Franchisor and executes additional franchise agreements with Franchisor, within eighteen (18) months after the date of execution of the Franchise Agreements. Notwithstanding the above, Franchisee shall be obligated to pay the Initial Franchise Fee as set forth in Section 2(a) of this Addendum, regardless of whether Franchisee exercises the right to pay the discounted "Initial Franchise Fees" under this Section 2(b) of this Addendum.

c.  Section 7.3 "Opening Requirements" of the Franchise Agreements, is hereby amended to provide that the franchisee shall open and commence operating the Franchised Business within two hundred ten (210) days of executing this Agreement.

d.  Section 11.2.3 "Corporate or Limited Liability Company Franchisee Records" of the Franchise Agreements, is hereby amended to read as follows:

> "All members with or shareholders of Franchisee with fifteen percent (15%) or more equity shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by the Franchisor (see Exhibit "A" to this Agreement). All members and/or shareholders with fifteen percent (15%) or more equity shall also be individually subject to the non-disclosure and confidentiality provisions as set forth in this Agreement, as well as any and all in-term and post-term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "Publicly Held Corporation")."

e.  Section 14.4.4 "Transfer to a Corporation or Limited Liability Company" of the Franchise Agreements, is hereby amended to read as follows:

> " All stockholders of the corporation, or members and managers of the limited liability company, as applicable, with fifteen percent (15%) or more equity must execute Franchisor's prescribed form of personal guaranty."

f.  Section 15.1.4 "*Loss of Premises*" of the Franchise Agreements, is hereby amended to provide that Section 22.6 "Force Majeure" of the Franchise

Agreements, is hereby incorporated herein by reference as if set forth verbatim herein.

g.  Section 20 "Guarantee of Principals and Their Spouses" of the Franchise Agreements, is hereby amended to read as follows:

> "Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses with fifteen percent (15%) or more equity hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing personal guaranty in the form attached hereto as Exhibit A."

3.  **Confidentiality**. Franchisees and Guarantors agree that they shall maintain the confidentiality of this Addendum and will not disclose the terms of this Addendum to any person or persons, except as Franchisor approves or as otherwise as required by law.

4.  **Construction of Language**. The language of this Addendum will be construed according to its fair meaning, and not strictly for or against either party. The parties have had a reasonable opportunity to review this Addendum. In the event of an ambiguity or if a question of intent or interpretation arises, this Addendum shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Addendum. Headings are for reference purposes and do not control interpretation.

5.  **Binding Effect; Assignment**. This Addendum shall be binding and inure to the benefit of the parties and their respective heirs, successors and assigns. Franchisees may transfer or assign this Addendum in connection with the sale or assignment of the Franchised Businesses provided Franchisees receives Franchisor's prior written consent, which shall not be unreasonably withheld.

6.  **Entire Agreement**. The Franchise Agreements and this Addendum constitute the entire, full, and complete agreement between the parties concerning the subject matter of this Addendum and supersede any and all prior agreements. In the event of a conflict between the terms of the Franchise Agreement and this Addendum, the terms of this Addendum shall control. Except as amended by this Addendum, all the other terms and conditions of the Franchise Agreement are hereby ratified and confirmed, including the provisions related to governing law, venue, dispute resolution, attorneys' fees and other enforcement provisions, all of which shall also apply to any claims or disputes arising out of or related to this Addendum.

*Signatures appear on the following page.*

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have duly executed and delivered this Addendum on the date first written above.

**FRANCHISOR**

**MDR UNITED LLC**

By: _Josh Skolnick_
    9AD57403DF9468...
Josh Skolnick, Managing Member

By: _Zach Beutler_
    DAF25556D7154C7...
Zach Beutler, Managing Member

**FRANCHISEES**

_Michael Fitzpatrick_
5F20519C80ED417...
Michael Fitzpatrick

_Ryan Fitzpatrick_
79E11698D2F04FD...
Ryan Fitzpatrick

4

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: C121B2CD08E84416AD96B4C8B45B6B60 | | Status: Completed |
| Subject: Please DocuSign: MDR_FA_Fitzpatrick_T1-T3 & Addendum | | |
| Source Envelope: | | |
| Document Pages: 268 | Signatures: 40 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | HorsePower Brands Legal |
| AutoNav: Enabled | | 10820 Harney St. |
| EnvelopeId Stamping: Enabled | | Omaha, NE  68154 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | legal@horsepowerbrands.com |
| | | IP Address: 70.184.221.239 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: HorsePower Brands Legal | Location: DocuSign |
| 3/10/2022 1:48:01 PM | legal@horsepowerbrands.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Michael Fitzpatrick<br>mfitzpat23@yahoo.com<br>Security Level: Email, Account Authentication (None) | *Michael Fitzpatrick*<br>DocuSigned by:<br>5F20519C80ED417...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 100.8.112.124 | Sent: 3/11/2022 5:19:53 AM<br>Viewed: 3/11/2022 7:04:34 AM<br>Signed: 3/11/2022 7:15:31 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 3/11/2022 7:04:34 AM<br>ID: 7ad562f9-79e8-4f75-b55a-35cb387b34e5 | | |
| Ryan Fitzpatrick<br>fitzpatrick.ryan11@gmail.com<br>Security Level: Email, Account Authentication (None) | *Ryan Fitzpatrick*<br>DocuSigned by:<br>79E11698D2F04FD...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 173.63.231.96 | Sent: 3/11/2022 5:19:54 AM<br>Viewed: 3/11/2022 7:51:24 AM<br>Signed: 3/11/2022 7:54:36 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 3/11/2022 7:51:24 AM<br>ID: 5af596f5-e57d-4427-859c-3cb22488dfff | | |
| Josh Skolnick<br>jskolnick@horsepowerbrands.com<br>Security Level: Email, Account Authentication (None) | *Josh Skolnick*<br>DocuSigned by:<br>9AD574030DF9458...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 73.81.224.215 | Sent: 3/11/2022 7:54:51 AM<br>Viewed: 3/11/2022 7:55:30 AM<br>Signed: 3/11/2022 7:55:53 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 3/11/2022 7:55:30 AM<br>ID: a86ada02-c7a0-49c5-98e6-23aa673e868f | | |
| Zach Beutler<br>zbeutler@horsepowerbrands.com<br>Security Level: Email, Account Authentication (None) | *Zach Beutler*<br>DocuSigned by:<br>DAF25556D7154C7...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 70.184.221.239 | Sent: 3/11/2022 7:56:12 AM<br>Viewed: 3/11/2022 7:56:44 AM<br>Signed: 3/11/2022 7:57:05 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 3/11/2022 7:56:44 AM<br>ID: 5c02a6d1-0fad-4cab-9eeb-748538aa079d | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| David Lloyd<br>dlloyd@horsepowerbrands.com<br>Horsepower Brands<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | **COPIED** | Sent: 3/11/2022 7:57:21 AM |
| HorsePower Brands Legal<br>legal@horsepowerbrands.com<br>Legal<br>HorsePower Brands<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | **COPIED** | Sent: 3/11/2022 7:57:21 AM<br>Resent: 3/11/2022 7:57:29 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/11/2022 5:19:54 AM |
| Certified Delivered | Security Checked | 3/11/2022 7:56:44 AM |
| Signing Complete | Security Checked | 3/11/2022 7:57:05 AM |
| Completed | Security Checked | 3/11/2022 7:57:21 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure | | |
|---|---|---|

Electronic Record and Signature Disclosure created on: 12/22/2021 12:35:00 PM
Parties agreed to: Michael Fitzpatrick, Ryan Fitzpatrick, Josh Skolnick, Zach Beyer

Case 2:25-cv-18583-JKS-MAH    Document 1    Filed 12/12/25    Page 295 of 581 PageID: 295

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, HorsePower Brands (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact HorsePower Brands:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: legal@horsepowerbrands.com

**To advise HorsePower Brands of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at legal@horsepowerbrands.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from HorsePower Brands**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to legal@horsepowerbrands.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with HorsePower Brands**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to legal@horsepowerbrands.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify HorsePower Brands as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by HorsePower Brands during the course of your relationship with HorsePower Brands.

# Exhibit B

## FRANCHISEE AFFIRMATIONS AND ACKNOWLEDGEMENTS

As you know, MDR United LLC ("we", "us" or "Mighty Dog Roofing"), and you are preparing to enter into a Franchise Agreement for the operation of a Mighty Dog Roofing franchise (a "Franchised Business"). The purposes of this Questionnaire are to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

X X
Yes____ No ____    1.    Have you received and personally reviewed the Franchise Agreement, as well as each exhibit or schedule attached to this agreement, you intend to enter into with us?

X X
Yes____ No ____    2.    Do you understand that this Questionnaire pertains and relates to each and all of the Franchise Agreements, if more than one (1) Franchise Agreement, you intend to enter into with us?

X X
Yes____ No ____    3.    Have you received and personally reviewed the Franchise Disclosure Document we provided?

X X
Yes____ No ____    4.    Did you sign a receipt for the Disclosure Document indicating the date you received it?

X X
Yes____ No ____    5.    Do you understand all the information contained in the Disclosure Document and the Franchise Agreement you intend to enter into with us?

X X
Yes____ No ____    6.    Have you reviewed the Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor and discussed the benefits and risks of operating a Franchised Business with these professional advisor(s)?

X X
Yes____ No ____    7.    Do you understand the success or failure of your Franchised Business will depend in large part upon your skills, abilities and efforts and those of the persons you employ, as well as many factors beyond your control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace?

X X
Yes____ No ____    8.    Do you understand we have only granted you certain protected territorial rights under the Franchise Agreement and that we have reserved certain rights under the Franchise Agreement?

X X
Yes____ No ____    9.    Do you understand we and our affiliates retain the exclusive unrestricted right to engage, directly or through others, in the providing of services under the Franchisor's mark or other marks, at any location outside your Protected Territory, without regard to the proximity of these activities to the premises of your Franchised Business?

X X
Yes____ No ____    10.    Do you understand all disputes or claims you may have arising out of or relating

to the Franchise Agreement must be mediated, at our option, in Douglas County, Nebraska?

Yes____ No ____   11.   Do you understand the Franchise Agreement provides you can only collect compensatory damages on any claim under or relating to the Franchise Agreement and you are not entitled to any punitive, consequential or other special damages?

Yes____ No ____   12.   Do you understand the sole entity or person against whom you may bring a claim under the Franchise Agreement is MDR United LLC?

Yes____ No ____   13.   Do you understand all persons whose names appear on the Franchise Agreement must successfully complete the appropriate initial training program(s) before we will allow the Franchised Business to open or consent to a transfer of that Franchised Business?

Yes____ No ____   14.   Do you understand that we require you to successfully complete certain initial training program(s) and if you do not successfully complete the applicable training program(s) to our satisfaction, we may terminate your Franchise Agreement?

Yes____ No ____   15.   Do you understand we do not have to sell you a franchise or additional franchises or consent to your purchase of existing franchises?

Yes____ No ____   16.   Do you understand that we will send written notices, as required by your Franchise Agreement, to either your Franchised Business or home address until you designate a different address by sending written notice to us?

Yes____ No ____   17.   Do you understand that we will not approve your purchase of a Franchised Business, or we may immediately terminate your Franchise Agreement, if we are prohibited from doing business with you under any anti-terrorism law enacted by the United States Government?

Yes____ No ____   18.   Is it true that no broker, employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Franchised Business that is not contained in the Disclosure Document or that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____   19.   Is it true that no broker, employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a Franchised Business will generate, that is not contained in the Disclosure Document or that is contrary to, or different from, the information contained in the Disclosure Document?

Yes____ No ____   20.   Is it true that no broker, employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary

© 2022 MDR United LLC
Franchise Agreement

to, or different from, the information contained in the Disclosure Document?

Yes____ No ____  21.  Is it true that no broker, employee or other person providing services to you on our behalf has solicited or accepted any loan, gratuity, bribe, gift or any other payment in money, property or services from you in connection with a Franchised Business purchase with exception of those payments or loans provided in the Disclosure Document?

X X

Yes____ No ____  22.  Do you understand that the Item 19 financial performance disclosure contained in Item 19 of the Disclosure Document is not a representation of what you can expect to achieve in connection with the operation of a Franchised Business?

X X

Yes____ No ____  23.  Do you understand that you are entirely responsible for all employment related matters in connection with the operation of your Franchised Business and that we are not responsible for, and do not control, directly or indirectly, your employees?

X X

Yes____ No ____  24.  Did you receive the Franchise Disclosure Document at least fourteen (14) days before you completed and signed this Questionnaire?

X X

Yes____ No ____  25.  Did you receive the Franchise Agreement at least seven (7) days before you completed and signed this Questionnaire?

X X

**YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.**

DocuSign by:

_____
E0734D564F4A44E...
Anthony Traficante, individually

Dated: 7/28/2022 _____

DocuSign by:

_Jose Beras_
_____
FAA88A63F7714EE...
Jose Beras, individually

Dated: 7/28/2022 _____

**MDR UNITED LLC**

© 2022 MDR United LLC
Franchise Agreement



# FRANCHISE AGREEMENT

© 2022 MDR United LLC
Franchise Agreement

# TABLE OF CONTENTS

| SECTION | | PAGE |
|---|---|---|
| | DATA SHEET | VII |
| 1 | GRANT OF FRANCHISE | 2 |
| 2 | TERM AND RENEWAL | 6 |
| 3 | FEES | 7 |
| 4 | PROPRIETARY MARKS | 13 |
| 5 | CONFIDENTIAL INFORMATION | 15 |
| 6 | FRANCHISOR'S OBLIGATIONS | 17 |
| 7 | FRANCHISEE'S OBLIGATIONS | 19 |
| 8 | TRAINING | 28 |
| 9 | INSURANCE | 30 |
| 10 | FINANCIAL RECORDS AND REPORTS | 31 |
| 11 | BOOKS AND RECORDS | 32 |
| 12 | ADVERTISING | 34 |
| 13 | INDEPENDENT CONTRACTOR; INDEMNIFICATION | 39 |
| 14 | SALE OR TRANSFER | 40 |
| 15 | BREACH AND TERMINATION | 44 |
| 16 | RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION | 48 |
| 17 | COVENANTS | 50 |
| 18 | DISPUTE RESOLUTION | 52 |
| 19 | REPRESENTATIONS | 54 |
| 20 | GUARANTEE OF PRINCIPALS THEIR AND SPOUSES | 56 |
| 21 | NOTICES | 56 |
| 22 | MISCELLANEOUS | 56 |
| 23 | ACKNOWLEDGMENTS | 58 |

**EXHIBITS**

Exhibit A – Personal Guaranty and Guaranty of Spouses
Exhibit B – Conditional Assignment of Franchisee's Telephone Numbers, Facsimile
                  Numbers and Domain Names
Exhibit C – Confidentiality and Restrictive Covenant Agreement for Employees
Exhibit D – Electronic Funds Withdrawal Authorization
Exhibit E – Site Selection Addendum
Exhibit F – Collateral Assignment of Lease
Exhibit G – Territory Map
Exhibit H – Multi Unit Addendum

**DATA SHEET**

Franchisee:                    Anthony Traficante
                               119 Garibaldi Ave
                               Lodi, NJ 07644

                               Jose Beras
                               222 N Queen St.
                               Bergenfield, NJ 07621

Guarantors:                    Anthony Traficante
                               119 Garibaldi Ave
                               Lodi, NJ 07644

                               Jose Beras
                               222 N Queen St.
                               Bergenfield, NJ 07621

Effective Date:                July 28th, 2022

Approved Location:             _____

                               _____

Protected Territory:           See "Territory 1" set forth on the Map attached as Exhibit "G" to
                               Franchise Agreement

Telephone Number:              Anthony Traficante: (201) 241-2764
                               Jose Beras: (201) 660-3045

E-Mail Address:                Anthony Traficante: traficante.anthony@gmail.com
                               Jose Beras: beras4@aol.com

Initial Franchise Fee:         $59,500.00

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

© 2022 MDR United LLC
Franchise Agreement

# MDR UNITED LLC
# FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective this 28th day of July, 2022, by and between MDR United LLC, a Pennsylvania limited liability company, with its principal place of business at 10820 Harney Street, Omaha, Nebraska 68154 ("Franchisor"), and Anthony Traficante, an individual with an address at 119 Garibaldi Ave., Lodi, New Jersey 07644, which is identified more fully in the attached Data Sheet, and Jose Beras, an individual with an address at 222 N. Queen Street, Bergenfield, New Jersey 07621, which is identified more fully in the attached Data Sheet ("Franchisee").

## RECITALS

A.      Through the expenditure of a considerable amount of time, effort, and money, Franchisor has developed a system for the operation of Mighty Dog Roofing businesses (each, a "Franchised Business") that offer, sell and perform roofing services in residential and commercial properties, including: (i) new and replacement roofing services; (ii) emergency tarping services; (iii) gutter replacement; (iv) attic insulation; and (v) other products, services and events that Franchisor may approve and modify from time to time (collectively, the "Approved Products and Services").

B.      Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which currently include: (i) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Services to customers; (ii) certain proprietary products developed by Franchisor; (iii) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (iv) Franchisor's centralized System-wide call center (the "Call Center"); (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential operations manual (the "Operations Manual") that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.      The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin and intellectual property, including, without limitation, the "Mighty Dog Roofing" word mark and the "Mighty Dog Roofing" design mark(s) pending registration on the Principal Register of the United States Patent and Trademark Office (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.      Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Protected Territory").

E.      Franchisee desires to establish and operate a Franchised Business within the

Protected Territory hereinafter designated, to use in connection therewith the Franchisor's System and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.      Franchisor wishes to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.      Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

# 1      GRANT OF FRANCHISE

1.1      **Grant and Acceptance**.  Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business.  Except as otherwise provided in this Agreement, Franchisee may offer, sell and perform Franchisor's Approved Products and Services within the Protected Territory set forth in Section 1.2 herein. Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional Protected Territories.

1.2      **Protected Territory**.  Except as otherwise provided in this Agreement and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third-party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Protected Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including without limitation, those rights set forth in Sections 1.4 through Section 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Protected Territory provided that (a) Franchisee will not be operating within another franchisee's Protected Territory, and (b) Franchisee received Franchisor's prior written consent, which may be withheld for any reason. Other than these operations, Franchisee is not permitted to operate the Franchised Business outside of the Protected Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Protected Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and specifications as set forth in the Operations Manual (as defined in Section 6.1 herein). If, at any time during the term of this Agreement, more than 5% of Franchisee's Gross Revenues are derived from or within specific locations or areas that

are outside of the Protected Territory, Franchisor may, among other conditions, require Franchisee to purchase an additional franchise, enter into Franchisor's then-current franchise agreement and pay to Franchisor its then-current initial franchise fee. Franchisor is not required to offer Franchisee the opportunity to enter into a franchise agreement to continue operations in any area outside of the Protected Territory and may revoke any prior granted approval allowing Franchisee permission to operate outside of the Protected Territory at any time, effective on notice to Franchisee.

      1.3    **Approved Location**.  Franchisee must operate the Franchised Business only at the approved location identified in the Data Sheet (the "Approved Location").  Franchisee shall operate the Franchised Business from an approved office/warehouse or flex space located in the Protected Territory that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee will need to lease approximately 1,500 to 2,000 square feet of commercial real estate for the office/warehouse or flex space and to securely store equipment, tools, supplies, and inventory. Franchisor may, but is not required to, allow Franchisee to utilize a home office or cooperative space of 1,500 to 2,000 square feet as an Approved Location during the first six (6) months of operations. Franchisee may not utilize a home office or cooperative space at any time without Franchisor's prior written consent. The office may be located in the warehouse or flex space, provided that it meets Franchisor's standards and specifications. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. Franchisee must secure its Approved Location within ninety (90) days of executing this Agreement in the event the parties have not agreed on an Approved Location prior to executing this Agreement. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (attached hereto as Exhibit E), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

      1.4    **National and Regional Accounts**. Franchisor has the exclusive right to create National and Regional Account ("NORA") programs for a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations, Chain Customers (as defined below) and other similar organizations for the benefit of the System. Franchisor or any party Franchisor may designate has the exclusive right to solicit and service NORA customers within or outside of the Protected Territory, including, the right to offer and sell Approved Products and Services. Franchisee may not solicit, service or otherwise pursue any NORA relationships, whether the contacts for these relationships are in the Protected Territory or not, without Franchisor's prior written consent. Franchisee may not service, solicit or otherwise pursue a relationship with a NORA or potential NORA or any of its members or associates, without notice to Franchisor and Franchisor's prior written consent. Any dispute as to whether a particular customer is considered a NORA customer will be determined by Franchisor, and its determination will be final and binding. A Chain Customer´ is a non-residential customer, a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations whose presence is not confined within any one particular territory. Following the execution of a contract with or the acceptance of a bid by a NORA customer which contemplates the provision of services to one or more NORA locations within the Protected Territory, Franchisor may, at its sole option, provide Franchisee the option to perform such

DocuSign Envelope ID: FABE4732-2D5C-42BE-8420-9BCA37C2584C

services pursuant to the terms and conditions of the NORA contract or on such terms and conditions as Franchisor determines in its sole discretion. In order to service any NORA customers, Franchisee must enter into Franchisor's then-current form of NORA participation agreement, the terms of which will govern all NORA work. Franchisee is not entitled to any right to compensation or consideration for work performed by others in the Protected Territory for NORAs.

    1.4.1    Franchisor also shall have the right, exercisable in its sole discretion, to:

A.    provide, directly or through any other licensee or franchisee utilizing the Proprietary Marks, services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract; and/or

B.    contract with another party to provide such services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract between Franchisor and the NORA customer, utilizing the Proprietary Marks or any other trademarks, service marks or trade names.

Neither the direct provision by Franchisor (or a System franchisee, licensee, or Franchisor's agent or designee) of services to NORA customers, nor Franchisor's contracting with another party to provide such services shall constitute a violation of Franchisee's rights in the Protected Territory. Franchisee disclaims any compensation or consideration for work performed by others in the Protected Territory on account of NORA customers within the Protected Territory.

    1.5    **Reservation of Rights**. Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Services, and otherwise use the Proprietary Marks and System, within the Protected Territory is non-exclusive and Franchisor and its affiliates expressly reserve the right to: (i) establish and operate, and license third parties the right to establish and operate, Franchised Businesses using the Proprietary Marks and System at any location outside of the Protected Territory; (ii) acquire, merge with, engage in joint ventures with, or otherwise affiliate with, and thereafter own and operate and franchise others the right to own and operate, any business of any kind regardless of location, except for businesses that offer roof repair and roof replacement within the Protected Territory; (iii) establish and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark, other than the Proprietary Marks, at any location, within or outside the Protected Territory; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service NORAs within and outside the Protected Territory as set forth more fully in Section 1.4; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center in accordance with Section 1.8 of this Agreement; (vii) sell and distribute, directly or indirectly, or license others to sell and distribute within or outside the Protected Territory, directly or indirectly, any products, services or merchandise, including Approved Products and Services, from any location or to any purchaser or through any alternative channel or method of distribution including, but not limited to, via retail and wholesale distribution, in supermarkets, hardware stores, club stores and other retail facilities, via mail order and e-commerce channels; and (viii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

1.6     **Events of Catastrophe**.  Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliates and/or other System franchisees may be permitted to provide support to Franchisee and/or perform work in the Protected Territory, including the provision of labor, materials, equipment, and project management on projects in the Protected Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Protected Territory.

1.7     **Alternate Channels of Distribution.**  Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Protected Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine.  Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Services as described in this Section 1.7; or (ii) to share in any of the proceeds received by any such party therefrom.

1.8     **Right to Service Customers in Protected Territory; Use of Call Center.**

1.8.1     Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor (or its designee) will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Protected Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and (a) Franchisee does not respond to the assignment within a time period Franchisor deems in its sole discretion appropriate under the circumstances, or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems appropriate in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that the Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Protected Territory has been subjected to a disaster or catastrophe.

1.8.2     Franchisee agrees and acknowledges that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Protected Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

## 2   TERM AND RENEWAL

2.1   **Term**. The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

2.2   **Renewal**. Franchisee has the right to renew this Agreement for one successive, additional ten (10) year period, provided Franchisee has met the following conditions:

2.2.1   Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

2.2.2   Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location and within the Protected Territory for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Protected Territory acceptable to Franchisor;

2.2.3   Franchisee has completed, to Franchisor's satisfaction, ninety (90) days prior to the expiration of the then-current term, any updates to all required equipment, tools, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications and, Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

2.2.4   Franchisee is not in breach of any provision of this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

2.2.5   Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

2.2.6   Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without limitation, increased royalty and other fees and insurance requirements);

2.2.7   Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to operating the Franchised Business or providing the Approved Products and Services at any location within the Protected Territory;

2.2.8   Franchisee and its principals execute a general release in the form Franchisor prescribes; and

2.2.9   Franchisee pays a renewal fee in the amount of twenty percent (20%) of the then-current initial franchise fee.

DocuSign Envelope ID: FABE4732-2D5C-42BE-8430-9BCA37C2584C

## 3      FEES AND MANNER OF PAYMENT

3.1      **Initial Franchise Fee**.  In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee, calculated as follows (the "Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | Cumulative Number Owner Occupied Homes |
|:---:|:---:|:---:|:---:|
| #1 | $59,500 | $59,500 | 50,000 |
| #2 | $99,500 | $40,000 | 100,000 |
| #3 | $134,500 | $35,000 | 150,000 |
| #4 | $164,500 | $30,000 | 200,000 |
| #5 | $194,500 | $30,000 | 250,000 |

The Initial Franchise Fee is due at the signing of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise others.

3.2      **Royalty Fee**.  Franchisee must pay Franchisor a weekly royalty fee (the "Royalty") in an amount equal to the greater of: (i) eight- and one-half percent (8.5%) of Gross Revenues Collected during the immediately preceding week; or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.1.

3.2.1      *Minimum Royalty Fee and Annual Gross Revenue Requirements*.

Franchisee must meet and maintain the following weekly Minimum Royalty Fees per Protected Territory throughout the Term. Franchisee's weekly Minimum Royalty Fees are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Franchised Business(es) have been open and operating.

Franchisee's Minimum Royalty Fees are as follows:

| | Mighty Dog Roofing Minimum Royalty Fees Per Week | | | | |
|:---:|:---:|:---:|:---:|:---:|:---:|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |

| | | | | | |
|---|---|---|---|---|---|
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

In addition, Franchisee must meet and maintain the following minimum annual Gross Revenue requirements ("Minimum Annual Revenue Requirements") per Protected Territory throughout the Term. Franchisee's Minimum Annual Revenue Requirements are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Franchised Business(es) have been open and operating.

Franchisee's Minimum Annual Revenue Requirements are as follows:

| Mighty Dog Roofing Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

The parties will true-up all Royalty payments, whether actual or Minimum Royalty Fee payments for each applicable 12-month period, at the period's end by evaluating each period's obligations on an annualized basis. In the event Franchisee's fails to meet the above Minimum Royalty Fees or Minimum Annual Revenue Requirements, Franchisor may terminate the Protected Territory or otherwise terminate this Agreement.

However, Franchisee will not be subject to a Minimum Royalty Fee during the first twelve (12) months of operations on the condition that Franchisee strictly complies with all its obligations during the first twelve (12) months of operations and Franchisee shall pay the Royalty fee equal to eight-and one-half percent (8.5%) of Gross Revenues Collected by the Franchised Business during the first twelve (12) months of operations.

"Gross Revenues Collected" means any and all revenue or other compensation actually collected by Franchisee from customers of the Franchised Business.

"Gross Revenues" are defined in the Franchise Agreement to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by or on account of the operation of the Franchised Business at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including but not limited to cash, services, in kind from barter and/or exchange, on credit or otherwise as well as business interruption insurance proceeds. Gross Revenues shall also include the total amount of all sales for labor, material, equipment and/or services performed or rendered by: (a) Franchisee, or (b) any third-party subcontractors or agents of Franchisee who perform services for Franchisee's customers or clients as part of Franchisee's services. Gross Sales shall also include all commissions, finder's fees, referral fees, construction management fees or other compensation received by Franchisee on the value of any work performed. Franchisee agrees that all Royalty Fees, including any Minimum Royalty Fee,

DocuSign Envelope ID: FABF4732-3D5C-42BF-8430-9BCA37C2584C

are non-refundable. However, the definition of Gross Revenues does not include sales tax that is collected from customers and transmitted to the appropriate taxing authorities.

3.2.2 *Special Programs*. Franchisor reserves the right, but not the obligation, to establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

3.3 **Gross Revenue Reporting**. Franchisee agrees to report Gross Revenue in such form or format as Franchisor may specify from time to time. Franchisor may, at any time, and from time to time, modify the required form or format. Franchisor reserves the right to require Franchisee to provide Franchisor with verified Gross Revenue Reports in the event Franchisor is unable to process electronic funds transfer based upon information Franchisee inputs into the POS System. Each Gross Revenue Report must set forth: (i) Gross Revenues Collected generated during the previous week; (ii) calculation of the Royalty; and (iii) any other information Franchisor may require. If a Gross Revenue Report is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the electronic funds transfer, then Franchisor may withdraw additional funds through an electronic funds transfer from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the electronic funds transfer, then Franchisor will credit the excess amount to the payment of Franchisee's future obligations.

3.4 **Method of Payment**. With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement, or any other agreement between Franchisee and Franchisor or its affiliates, from the bank account Franchisee provides to Franchisor for use in connection with EFT Program (the "EFT Account"). Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks, and credit card receipts. At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Authorization Form attached as Exhibit D to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer. Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account. Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement by such other means as Franchisor may specify from time to time.

3.5 **Opening Package**. Prior to opening its Franchised Business, Franchisee must purchase from Franchisor the required opening package at its then-current cost, which includes items such as tarp, catch all system promotional materials, including printed items, pitch books, yard signs, clothing, vehicle wraps, and other equipment, tools, and supplies related to the operation of your franchise (the "Opening Package"). The current cost of the Opening Package is $22,000 to $31,000. Franchisor reserves the right to modify the components, standards and/or specifications of the Opening Package, which may modify the total costs associated with the Opening Package. The Opening Package includes the cost of Franchisor's insurance claims assistance fee ("Insurance

Claims Assistance Fee"), that covers market visits, third-party vendor costs, and other expenses associated with insurance claim assistance services provided to Franchisee by Franchisor or its affiliate or designated vendor, including investigating the building requirements in Franchisee's market on a state, county and at local level, and assisting Franchisee in the preparation of insurance claims.  If Franchisee purchases more than one (1) Protected Territory, Franchisee may, but shall not be required to, purchase additional Opening Packages.

3.6     **Local Brand Optimization Fee (First Year)**.  Prior to opening its Franchised Business, Franchisee must pay to Franchisor or its affiliate a local brand optimization fee in the amount of $12,000 (the "Local Brand Optimization Fee"), in connection with the costs of local SEO optimization for Franchisee's first year of operations.  After Franchisee's first year of operations, Franchisor recommends, but does not require, that Franchisee spend a minimum of $1,000 annually for SEO initiatives within Franchisee's Protected Territory through Franchisor or Franchisor's affiliate.

3.7     **Brand Fund Contribution**.   As set forth more fully in Section 12.3 of this Agreement, Franchisor reserves the right to establish a national brand fund for advertising and brand promotion (the "Brand Fund"). If established, Franchisee shall be required to make weekly contributions of up to three percent (3%) of Gross Revenues Collected by the Franchised Business for sales made during the immediately preceding week (the "Brand Fund Contribution"). However, the total sum of the Brand Fund Contribution and the Royalty fee shall not exceed the then-current Royalty fee, as a percentage of weekly Gross Revenues Collected. Franchisor may require Brand Fund Contributions to be paid as directed by Franchisor via the EFT Program, or as otherwise required by the Operations Manual or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Franchisor reserves the right to modify the Brand Fund Contribution and/or modify the digital marketing and advertising requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Brand Fund Contribution, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee (which need not exceed 30 days).

3.8     **Technology Fee**. Prior to opening its Franchised Business, Franchisee must pay Franchisor a technology fee (the "Technology Fee") of $9,500 for the first year of operations, which Franchisor will collect on Franchisee's behalf and remit to its designated vendors. Thereafter, Franchisee must pay Franchisor or its designated vendors, on a monthly basis, its then-current Technology Fee. The Technology Fee covers the costs associated with using and maintaining the required computer hardware and software, hosting services and solutions, system network functions, updating microsites, data reporting, various software programs, and any other technology Franchisee must utilize in connection with the operation of, or otherwise used in the operation of, the Franchised Business, including software to assist in measuring, training, business efficiencies, dashboard and KPIs. Franchisee shall pay the Technology Fee to Franchisor in the manner prescribed by Franchisor or the designated vendor, as applicable, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer or technology requirements or as required by the third-party service provider(s) or by any regulatory agency. If Franchisee purchases more than one Protected Territory, Franchisee shall only be required to pay one Technology Fee.

3.9     **Call-Center Fee**. Franchisor, or its affiliate or designated vendor, has established and will operate a Call Center which will field all calls and manage prospective and existing customers and route/assign work/inquiries as Franchisor deems necessary in its discretion, and as further described in Section 6.6. Franchisee must pay Franchisor, or its affiliate or designated vendor, all associated then-current start-up fee(s), monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call Center Fee"), which are subject to change at any time. As of April 2022, the current annual Call Center Fee is $3,600. Franchisee shall pay Franchisor, or its affiliate or designated vendor, prior to attending training. After the first year of operations, Franchisee shall pay the Call Center Fee on a monthly basis. As of April 2022, the current monthly Call Center Fee is $300. In addition to the Call Center Fee, Franchisee must pay Franchisor or its affiliate, $15 per scheduled lead. All scheduled lead fees will be paid as incurred or as Franchisor requires. All Call Center Fees and scheduled lead fees are subject to change at any time. Franchisor reserves the right to modify the call center or digital sales requirements that Franchisee must use in the operation of the Franchised Business, and designate and/or modify the amount, scope, structure, or manner of payment of the Call Center and Digital Sales Fee at any time upon providing reasonable notice (which need not exceed 30 days). Franchisor may require Franchisee to pay the Call Center Fees to Franchisor directly, or for Franchisor to make payment on Franchisee's behalf to Franchisor's affiliate or designated vendor, or directly to such affiliate or designated vendor, in Franchisor's sole discretion.

3.10     **Creative Media Fund Fee.** Prior to attending training, Franchisee must pay Franchisor a creative media fund fee ("Creative Media Fund Fee") of $5,000 to cover costs associated with video production, actors and actresses' compensation, and video editing. These videos are designed for national use on social media, YouTube, and other digital platforms. This is a one-time fee. If Franchisee purchases more than one (1) Protected Territory, Franchisee shall only be required to pay one Creative Media Fund Fee.

3.11     **Digital Management Fee.** Franchisee must pay Franchisor's affiliate, Franchise Rocket, a monthly digital management fee (the "Digital Management Fee"), currently $500 per month for 1 Protected Territory, $1,000 for 2 or 3 Protected Territories, and $1,500 for 4 or 5 Protected Territories. The Digital Management Fee covers the costs of digital marketing and website management. The Digital Management Fee shall be paid on a per Protected Territory basis. Franchisor reserves the right to modify the Digital Management Fee as Franchisor modifies the digital marketing and advertising requirements that Franchisee must use for the Franchised Business, and to designate and/or change the amount, scope, structure, or manner of payment of the Digital Management Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

3.12     **Late and/or Under Payments and Interest**. All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company, and other amounts which Franchisee owes to the Franchisor and/or its affiliated company, not received on or before the due date, shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to the Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one and one half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement.

DocuSign Envelope ID: FABE4732-2D5C-42BF-8430-9BCA37C2584C

3.13 **No Right to Off Set**. Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.14 **Non-Exclusive Remedies**. Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waive, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

3.15 **Taxes on Payments**. In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.16 **Administrative Fee**. Franchisee must pay Franchisor its then-current administrative fee (the "Administrative Fee") in the event Franchisor makes and processes any amendments, modifications, or otherwise supplements this Agreement at the request of Franchisee or is otherwise required due to Franchisee's actions.

3.17 **Outstanding A/R Collection Fee**. Franchisor has the right to assist Franchisee in collecting outstanding balances from Franchisee's customers for amounts more than 60 days past due. If Franchisor assists in collecting such outstanding amounts, Franchisee must pay Franchisor a fee in the amount of 15% of the amount collected.

3.18 **Insurance Claims Assistance Fee**. Prior to opening, Franchisee must pay Franchisor a fee of $1,000 to cover Franchisor's costs in providing Franchisee insurance claim assistance services, in which Franchisor will investigate the building requirements on a state, county and at local level in Franchisee's market in order to assist Franchisee in preparing insurance claims. Such costs may be used to cover market visits and third-party vendors costs are non-refundable upon payment. This Insurance Claims Assistance Fee is included in the cost of the Opening Package.

3.19 **Memberships and Subscriptions**. Franchisee must participate in all membership and subscription services that Franchisor requires. Currently, Franchisee must participate in the Owens Corning Platinum Preferred Contractor program immediately upon launching the Franchised Business and pay all dues associated with the program, currently $2,500 per year, which are subject to increases from time to time. Franchisees must continue this annual membership, or any similar membership that Franchisor may require from time to time.

3.20 **Accounting Services Fee**. Franchisee must pay Franchisor, or its affiliate or designated vendor (as designated by Franchisor), a then-current monthly accounting services fee for all bookkeeping services ("Accounting Services Fee"). The current monthly Accounting Services Fee is $399 per month. Franchisor reserves the right to increase the Accounting Services Fee up to 0.5% of Franchisee's total Gross Revenues Collected. The Accounting Services Fee does not include the cost of your required subscription to Quickbooks accounting software or other required software, which is currently $60 per month per user, and subject to change at any time. Franchisor reserves the right to modify the Accounting Services Fee, to modify the accounting services requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, structure, or manner of payment of the Accounting Services Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee (which need not exceed 30 days). Franchisor also reserves the right to require Franchisee to use Franchisor's

affiliate or designated vendors for payroll, sales tax filing, and other related services.

3.21    **Annual Conference Fee**.  Franchisee must pay to Franchisor an annual fee for Franchisee's registration and attendance to Franchisor's annual conference for the System (the "Annual Conference"), if held by Franchisor, and as further described in Section 6.8. Franchisee and Franchisee management (if applicable) must register for and attend the Annual Conference and pay Franchisor the then-current registration and attendance fee (the "Annual Conference Fee"), which shall not exceed $1,000 per attendee. If Franchisee does not register for the Annual Conference, Franchisee must pay Franchisor a fee of $1,000.

3.22    **Drone Kit Fee**.  Franchisee must pay to Franchisor's designated vendor a Drone Kit Fee for the first year of operations. As of April 2022, the Drone Kit Fee is $7,900. After the first year of operations, Franchisee must pay Franchisor's designated vendors, on a monthly basis. As of April 2022, the monthly Drone Kit Fee is $350. Franchisor also reserves the right to modify the Drone Kit Fee, to modify the drone kit requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Drone Kit Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee.

3.23    **National Permit Database Fee**. Franchisee must pay to Franchisor a then current monthly National Permit Database Fee in the amount designated by Franchisor. This budget is directed towards access, training, and use of certain real property permit databases in Franchisee's local market. As of April 2022, the National Permit Database Fee is $99 per month. Franchisor reserves the right to modify the National Permit Database Fee as new permit database resources and technology becomes available or changes, and/or modify the new permit database requirements that Franchisee must use for the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the National Permit Database Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

3.24    **Recruiting Fee**.  Franchisor offers optional recruiting services to Franchisee to assist Franchisee in recruiting key employees and subcontractors. Franchise may, but is not required to, elect this service, and if so elected, Franchisee must pay Franchisor, or its affiliate, a then-current one-time recruiting fee ("Recruiting Fee"). As of April 2022, the current Recruiting Fee is $1,999. Franchisor reserves the right to modify the optional Recruiting Fee, and to designate and/or modify the amount, scope, or manner of payment of the Recruiting Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

# 4    PROPRIETARY MARKS

4.1    **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**.

4.1.1    Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

4.1.2    Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Protected Territory and in sales and marketing for the Franchised Business.

4.1.3    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable.  Franchisee may not use the Proprietary Marks in connection with the offer or sale of any services or products which Franchisor has not authorized for use in connection with the System.  Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name.  Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use.  Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (collectively the "Proprietary Material"). Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material.  Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement.  In the event of any litigation relating to Franchisee's use of the Proprietary Material, Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution including, without limitation, becoming a nominal party to any legal action.  Except to the extent that such litigation is the result of Franchisee's use of

the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

4.1.9   Franchisee expressly understands and acknowledges that:

4.1.9.1 Franchisor or its affiliates or licensors own all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

4.1.9.2 The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

4.1.9.3 During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

4.1.9.4 Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

4.1.9.5 Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

4.1.9.6 Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

4.1.9.7 Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder.  Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within ten (10) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

## 5      CONFIDENTIAL INFORMATION

5.1      **Nondisclosure**.  During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information.  Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any Confidential Information, as defined in Section 5.2. Upon termination or expiration of this Agreement, regardless of reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately and Franchisee may not use the

Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2 **Confidential Information**. Confidential Information hereby includes, without limitation, any and all confidential, proprietary, and trade secret information relating to the operation of a Franchised Business, such as: all financial, operational, technical and marketing information; the Operations Manual and Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; cost data; pricing information; business plans; financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; photographs, devices, samples, models, and illustrations; software developed by or for Franchisor; customer lists and any information relating to Franchisor's customers or the customers of other System franchisees; patent, trademark, service mark, and copyright applications; information relating to inventions, discoveries, software and any other research and development information; methods of conducting the Franchised Business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; any information of a customer not generally known or available to the public; any Trade Secrets (as defined in Section 5.3 of this Agreement), or of a customer of Franchisor, or of any other franchisee; and any information about or originating from any Franchisee which, if it was information of Franchisor, are expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3 **Trade Secrets**. Notwithstanding Section 5.2, trade secret means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4 **Employees and Subcontractors**. All of Franchisee's employees and subcontractors must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment or engagement by Franchisee at the Franchised Business. Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement attached as Exhibit C to this Agreement. Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5 **New Concepts.** If Franchisee, or Franchisee's employees, principals or subcontractors, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation. Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent

applications, trademarks, copyrights and other intellectual property rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentations for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

5.6     **Customer Privacy**.   Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop. Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

# 6     FRANCHISOR'S OBLIGATIONS

6.1     **Operations Manual**. Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual and intranet system, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre-opening procedures, systems and procedures, personnel policies, specifications for vehicles and vehicle wraps, supplies, equipment and inventory, marketing, accounting and bookkeeping and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of the Franchisor, constituting a trade secret of Franchisor, and may not be, shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System.

6.2     **Opening Package; Initial Equipment, Tools and Supplies**.   Franchisor, or its affiliates or designated vendors, as determined by Franchisor in its sole discretion, will provide Franchisee with an Opening Package upon Franchisee's payment of the required fees. Franchisor will also provide a list of all items, equipment, tools, and supplies required to open and operate the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), which may include Franchisor its affiliates, and designated third-party suppliers, with which Franchisee must comply.

DocuSign Envelope ID: FABE4732-2D5C-42BF-8420-9BCA37C2584C

6.3     **Ongoing Assistance**.  Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means.  If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current Assistance Training Fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion.  Franchisor may also use the Operations Manual, as defined in Section 6.6, to provide some self-serve training materials.

6.4     **Additional Training**.  As set forth more fully in Section 8.2, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee and Franchisee's personnel to attend such additional training at a location to be selected by Franchisor and pay Franchisor's then current additional assistance or refresher training fee ("Assistance Training Fee"). All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.5     **Remedial Training**. In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to remedial training (in addition to any required training under Section 6.4). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current Assistance Training Fee to provide such remedial training. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.6     **Call Center**.  Franchisor and/or its affiliate or designated vendor has established and currently maintains the Call Center. Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay to Franchisor or its designee (which may include one or more of Franchisor's affiliates and/or designees) in connection with administering and maintaining Call Center services. Franchisor and/or its designee has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls, as well as provide digital sales services, including an online sales platform, as Franchisor deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Protected Territory. All Franchised Business-related phone numbers and internet lead sources are required to be ported to or directed to Franchisor or its affiliates or designated vendor. Franchisor reserves the right to discontinue the Call Center and the Call Center services at any time.

6.7 **Pricing**. Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. Franchisee may charge whatever prices it deems appropriate without regard to Franchisor's suggested pricing.

6.8 **Annual Conference**. Franchisor may, in Franchisor's discretion, hold an annual conference at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if it chooses to charge a registration fee in its sole discretion. Franchisor reserves the right to charge Franchisee a fee to cover convention expenses in the event the Franchisee chooses not to attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals, and salaries during the Annual Conference, are Franchisee's sole responsibility. Franchisor may use Brand Fund Contributions for purposes related to the Annual Conference, including costs related to productions, programs, and materials.

## 7    FRANCHISEE'S OBLIGATIONS

7.1 **Site Location and Lease Approval**.  Franchisee shall operate the Franchised Business from an approved commercial office/warehouse or flex space that meets Franchisor's then-current standards and specifications for an Approved Location and located within the Protected Territory. Franchisee will need to lease approximately 1,500 to 2,000 square feet of separate commercial office/warehouse or flex space for Franchisee's office and storage space to securely store all equipment, tools, supplies and inventory.  Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location for Franchisee to operate the Franchised Business as of the date Franchisee signs this Agreement, the parties shall enter into Franchisor's prescribed form of Site Selection Addendum, the terms of which shall govern the parties' site selection obligations. Franchisor has the right to review, evaluate and approve Franchisee's proposed lease for the Approved Location ("Lease") prior to execution.  Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form attached hereto as Exhibit F.

7.1.1 *Relocation*.  If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Protected Territory to complete the unexpired portion of the term of this Agreement.  Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within forty-five (45) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its reasonable costs and expenses

DocuSign Envelope ID: FABE4732-2D5C-42BF-8430-9BCA37C2584C

associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation.

7.1.2 *Franchised Business Appearance and Approved Location Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout, and design of a Franchised Business. Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permits requirements, and any other applicable local, state, or federal law.

7.1.3 *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

7.2 **Training**. Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program as set forth more fully in Section 8 of this Agreement. Franchisor has the right to require up to two (2) individuals to attend in addition to Franchisee, one of which must be Franchisee's general manager or Designated Manager.

7.3 **Opening Requirements**. Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. In addition to any other pre-opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Protected Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, tools, supplies, and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers, that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program as described defined in this Agreement, as well as any other pre-opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement.

7.4 **Purchasing Requirements**.

7.4.1 *Compliance with Standards*. Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System. Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same. Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion. Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

7.4.2  *Designated and Approved Suppliers.*  Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "Approved Supplier"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliates and/or a third party may be one of several, or the only, Approved Supplier of any item.  Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue and other material consideration on any products and/or services that Franchisor, Franchisor's affiliates and/or Franchisor's Approved Suppliers supply and/or provide to Franchisee.  Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

7.4.3  *Supplier Approval.*  In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known.  At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase.  Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier.  Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency, and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information.  Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate.  Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

7.4.3.1  Franchisee, or the proposed supplier, must pay Franchisor in advance for Franchisor's reasonable costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

7.4.3.2 Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing

associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

        7.4.3.3 Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third-party to supply, provided that third-party executes Franchisor's prescribed form of non-disclosure agreement.

        7.4.3.4 Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

        7.4.3.5 Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards.  Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

        7.4.4    *System Suppliers.*  Franchisor may establish business relationships, from time to time, with suppliers, including affiliates of Franchisor, who may produce and/or provide certain goods or services that Franchisee is required to purchase from only that supplier (each a "System Supplier"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software, and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally.  Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product or ability to obtain product only on less favorable credit terms.  Accordingly, Franchisee agrees to pay System Suppliers as and when due.  Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

        7.4.5    *Rebate Program.*  Franchisor and/or its affiliates and/or designated suppliers reserve the right to establish one or more rebate programs for qualifying purchases of certain products and/or services, and/or use of Franchisor's approved suppliers or designated vendors (the "Rebate Program") which may include discounted pricing, special terms, rebates, or other incentives or benefits (individually and collectively, the "Rebate"). Franchisor and/or its affiliates and/or third party suppliers reserve the right to (but are not contractually required to) establish and offer Franchisee an opportunity to participate in one or more Rebate Programs and to condition Franchisee's participation in any such Rebate Program on, among other conditions Franchisor may designate, Franchisee: (i) meeting certain eligibility requirements; (ii) executing Franchisor's designated form of Rebate Program participation agreement or amendment, which may include, among other terms, a general release of any and all claims in favor of Franchisor and its owners, officers, directors, affiliates, parents, subsidiaries, predecessors, successors and assigns; and (iii) compliance with purchasing requirements. Franchisor, its affiliates and third-party suppliers are not required to establish or offer Rebate Programs, but may do so at any time. Additionally, if established, Franchisor, its affiliates and third-party suppliers reserve the right to discontinue or terminate any Rebate Program at any time effective on notice to Franchisee. Franchisee

DocuSign Envelope ID: FABE4732-2B5C-42BF-8430-9BCA37C2584C

acknowledges, understands, and agrees that Franchisor, and/or its affiliates, may derive revenue or receive a commission or fee from the Rebate Program and hereby consents thereto.

       7.5    **Authorized Products and Services**.  Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization.  Franchisee shall at all times maintain sufficient levels of inventory, as specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees.  In the event Franchisee wishes to offer any Approved Products or Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Services.

       7.6    **Operations**.

       7.6.1   *Hours of Operation.* Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

       7.6.2   *Maintenance of Premises and Project Sites.* Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual.  Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

       7.6.3   *Personnel/Staffing.* Franchisee must employ a sufficient number of qualified, competent personnel, offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

       7.6.4   *Compliance with Operations Manual and Training of Employees.* Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual and shall continue such training and instruction as long as each employee is employed.  Franchisee shall cause any third-party subcontractor engaged by Franchisee to perform work on behalf of Franchisee with respect to the Franchised Business to comply with all applicable requirements of this Agreement, including, but not limited to, Franchisor's quality and performance standards.  The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

       7.6.5   *Management Participation.* Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote his or her personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon

DocuSign Envelope ID: FABE4732-2D5C-42BF-8430-9BCA37C2584C

Franchisee's written request, Franchisor shall permit Franchisee to employ a manager to manage the day-to-day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program before assuming any managerial responsibility. The Franchised Business must, at all times, be staffed with at least one (1) individual who has successfully completed Franchisor's initial training program as set forth in Section 8.1.  In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business.  In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly.

7.6.6    *Working Capital.* Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7    *Equipment and Inventory.* Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with representative vehicles (each wrapped in accordance with Franchisor's specifications), equipment, tools, supplies, and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by the Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand. Franchisor reserves the right to require Franchisee to invest in additional infrastructure and/or equipment and staffing requirements, as may be set forth more specifically in the Manual or otherwise in writing, to ensure adequate brand servicing in the Protected Territories, including in the event Franchisee's accounts receivable grows in excess of 40% (or such other percentage as Franchisor may designate) of Franchisee's overall Gross Revenues Collected or Franchisee's backlog of jobs reaches 12 weeks (or such other time period as Franchisor may designate).

7.6.8    *Products with Proprietary Marks.* Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor. Franchisee must wrap each vehicle used in connection with the operation of the Franchised Business in accordance with Franchisor's specifications.

7.6.9    *Market Research.* Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.7    **Franchised Business Inspection.**  Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform

any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

      7.8      **Computer Software and Hardware**.

      7.8.1    *Computer System.* Franchisor shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, applications, and hardware be used by Franchisee, including without limitation: (a) a compatible computer system that complies with Franchisor's standards and specifications and is capable of operating financial and other business software; (b) printers and other peripheral hardware or devices; (c) archival back-up systems; and (d) Internet access mode and bandwidth (collectively, the "Computer System").

      7.8.2    *Required Software.* Franchisor shall have the right, but not the obligation, to develop or designate: (a) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's proprietary software (collectively, the "Required Software"), which Franchisee must license from Franchisor; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee must install at its expense; (c) the tangible media upon which Franchisee records data; and (d) the database file structure of the Computer System.

      7.8.3    *Compliance with Requirements.* At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section 7.8.3 shall be at Franchisee's sole cost and expense.

      7.8.4    *Franchisor's Access.* Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section 7.8 within thirty (30) days of opening the Franchised Business.

      7.8.5    *Proprietary Software.* Franchisor has a proprietary interest in all databases, lists, templates, programs and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create

programs that conduct, among other things, scheduling, accounting, inventory, and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's confidential information.

    7.8.6 *Computer Network*. Franchisee is required to participate in any System-wide computer network, intranet system, or extranet system that Franchisor implements and may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor on-line; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) to complete any initial or ongoing training, in the event Franchisor makes such training accessible through this medium.  Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

    7.9 **Personal Conduct**.  Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

    7.10 **Best Efforts**.  Franchisee (or Franchisee's principals or designated manager) must devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Protected Territory.  Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and System. Franchisee acknowledges that Franchisee's (or Franchisee's principals' or designated manager) violation of the terms in this Section 7.10 will be a material breach of this Agreement, and Franchisor may terminate this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

    7.11 **Telephone and Email Access.**  Franchisor reserves the right to procure and supply dedicated telephone numbers and email accounts associated with the Franchised Business.

    7.12 **Payment of Debts**.  Franchisee is solely responsible for: selecting, retaining and paying Franchisee's employees; the payment of all invoices for the purchase of goods and services used in connection with operating the Franchised Business; and determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business.  Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors, and creditors on a timely basis.  Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System suppliers and System franchisees. Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes,

employee withholding taxes, FICA taxes, personal property and real estate taxes arising from Franchisee's operation of the Franchised Business. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13    **Compliance with Applicable Laws.** Franchisee must comply with all applicable federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to occupational hazards and health, trademark and copyright infringement, fair marketing laws, consumer protection, trade regulation, workers' compensation, unemployment insurance, withholding and payment of Federal and State income taxes and social security taxes and sales, use and property taxes, and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the operation of the Franchised Business). Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors. Franchisee agrees to be solely responsible for all employment decisions and to comply with all state, federal, and local hiring laws and functions of the Franchised Business, including without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part-time. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates.

7.14    **Trade Secrets and Confidential Information**. Franchisee and all employees and subcontractors must maintain the confidentiality of all Confidential Information as set forth in Section 5 of this Agreement.

7.15    **Image**. Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other roofing service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service. Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System. Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity and increase the demand for the products sold and services rendered by System franchisees. Franchisee agrees to comply with the standards, specifications and requirements Franchisor set forth in order to uniformly convey the distinctive image of a Mighty Dog Roofing franchised business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16    **Pending Actions.** Franchisee shall notify Franchisor, in writing, within five (5) days of the commencement of any action, suit or proceeding and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17    **Standard Maintenance and System Conformity.** Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s), equipment, tools and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the

© 2022 MDR United LLC
2022 Franchise Agreement                                    27

right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

7.18    **Customer Service**. Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, warranties on any Approved Products or Services offered or sold by the Franchised Business, refund policies and other standards and specifications.

7.19    **Warranty**.  Franchisee agrees to offer and honor such warranty on all materials and workmanship sold by Franchisee as Franchisor may designate from time to time in the Operations Manual or otherwise in writing. Franchisee shall cooperate with Franchisor warranty claims and shall make no statements or admissions as to liability. Franchisee shall promptly report all warranty claims to Franchisor and shall undertake all warranty work under the Proprietary Marks. All costs associated with administering and honoring the warranty service shall be borne by Franchisee.  Franchisee agrees that it shall remain liable during the Term or upon the termination or expiration of this Agreement for all warranties issued by Franchisee. If Franchisee does not remedy, in full, any warranty claim made by a customer within a reasonable amount of time after receiving notice of such claim, as determined by Franchisor in its sole discretion, Franchisee and its principals acknowledge and agree that Franchisor may thereafter address such warranty claim, and Franchisee and principals are required to promptly reimburse Franchisor for all warranty costs or customer reimbursements incurred by Franchisor plus Franchisor's then current administration charge.

# 8    TRAINING

8.1    **Initial Training Program**.  Franchisee and up to two (2) additional attendees that Franchisee designates, one of which must be Franchisee's Designated Manager, must attend Franchisor's then-current initial training program (the "Initial Training Program"). Prior to attending training, Franchisee must pay Franchisor its then-current initial training tuition fee for the Initial Training Program. As of April 2022, the current training tuition fee for the Initial Training Program is $4,995. The training tuition fee covers the costs of training, lodging, and meals during the Initial Training Program, however, the training tuition fee does not include travel expenses, meals outside of the Initial Training Program hours, and other living or miscellaneous expenses Franchisee or Franchisee's attendees may incur during the time of training. Any additional personnel, replacement personnel, or otherwise attendees Franchisee wishes to attend Initial Training Program must pay an additional $2,500 per attendee to attend the Initial Training Program (subject to class availability and the schedule/availability of Franchisor personnel). Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's facility in Omaha, Nebraska, or other location that Franchisor may designate, prior to commencing operations of the Franchised Business. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. The Initial Training Program lasts up to twenty (20) days, and except as expressly set forth above or herein, Franchisee will be solely responsible for all out-of-pocket expenses (including travel costs, if any) Franchisee and its attendees incur in

DocuSign Envelope ID: FABE4732-2D5C-42BF-8430-9BCA37C2584C

connection with attending the Initial Training Program. Franchisor reserves the right to substitute any in-person training for virtual training at its discretion.

8.1.1 *Timing for Completion.* Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction prior to opening the Franchised Business and within one hundred eighty (180) days from the date this Agreement is fully executed. In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction, then Franchisor may terminate this Agreement.

8.1.2 *Additional Employees.* In the event Franchisee wishes for more than two (2) additional persons to participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee.

8.1.3 *Replacement Personnel.* In the event Franchisee or Franchisee's employee(s) or attendee(s) fail to complete the Initial Training Program to Franchisor's satisfaction, the respective persons may repeat the course, or, in the case of an employee or attendee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Failure by Franchisee, an employee, attendee, or any Replacement Personnel to complete the Initial Training Program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

8.1.4 *Employee Training.* Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their respective duties in connection with the Franchised Business prior to such employee(s) undertaking these duties.

8.1.5 *Training Materials.* Franchisor may provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel. Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel. Updated training materials may be available to Franchisee in the Operations Manual or by other means in Franchisor's sole discretion. All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates' title or rights in or to the training materials. Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

8.2 **Additional and Remedial Training.** Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable), estimators, installers, and other employees to attend additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then-current Assistance Training Fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals, and employee wages incurred). Additional and/or refresher training may take place at Franchisor's facility in Omaha, Nebraska, or any other location that Franchisor may designate. Franchisor will provide Franchisee

with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

8.3     **Reasonable Training and Assistance Requests**. Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then-current Assistance Training Fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Franchisor's facility in Omaha, Nebraska, or on-site at Franchisee's Approved Location or within the Protected Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

## 9     INSURANCE

9.1     **General**.  Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual or otherwise in writing.  In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such insurance and minimum policy limits that are reasonable and customary in the roofing services industry. Franchisee must obtain the required insurance from Franchisor's designated vendor. The insurance policy or policies must be in effect upon the earlier of: (a) thirty (30) days prior to opening the Franchised Business; or (b) upon signing a lease agreement for the premises of the Franchised Business. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's respective, past, present, and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys, and agents against any loss, liability, personal injury, death, property damage or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use, or occupancy of the Franchised Business. Franchisee shall have MDR United LLC, and its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds as an additional insured under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. The employment practices liability policy is required to: (a) have an endorsement as listed on Form CG 20 29 or its equivalent; and (b) name Franchisor as Co-Defendant. Franchisor reserves the right to amend, modify, and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice (which need not exceed 30 days) through the Operations Manual or otherwise in writing by Franchisor.  Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Franchisee must provide Franchisor with certificates of insurance evidencing the required coverage at least 30 days prior to opening. Franchisee shall continue to provide Franchisor with certificates of insurance evidencing the required coverage and any other documentation in connection therewith on an annual basis or as otherwise specified in the Operations Manual.

9.2     **Designation of Carrier; Insurance Rating, Approval, and Certification.** Franchisor has the sole right, exercisable at any time and upon notice to Franchisee, to designate a vendor or supplier, which may include an affiliate of Franchisor, from whom Franchisee must purchase all insurance policies required by Franchisor to operate the Franchised Business. All insurance carriers must be approved by Franchisor in advance and in writing.  All insurance policies

must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance Report. Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy. Franchisee agrees to carry such insurance as may be required by the lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law. Franchisee must deliver a certificate of insurance to Franchisor at least thirty (30) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary and non-contributory to any policy or policies held by Franchisor or its affiliates.

9.3    **Designees.** All policies will list Franchisor, its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds and contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's agreement based on changes in risk factors for which Franchisee must comply with upon written notice from Franchisor.

9.4    **Claims Cancellation.** Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations. Franchisee has a twenty-four (24) hour opportunity to cure any lapses in insurance coverage. No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certification of insurance which demonstrates compliance with this Section 9.

9.5    **Failure to Maintain Insurance.** If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a reasonable administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6    **Modification of Requirements.** Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

9.7    **Third Party Subcontractors - Insurance**. Franchisee agrees not to permit any third party subcontractor to perform any work or offer any services on behalf of Franchisee in respect of the Franchised Business unless such subcontractor maintains insurance coverage in such amounts and types as Franchisee is required to maintain under the provisions of this Section 9, with the specific addition that subcontractors cannot exclude principals from its Workers' Compensation coverage and that liability policies name Franchisor as an additional insured. Franchisee agrees to maintain evidence that such insurance by its subcontractors is in effect and to provide such proof of insurance as Franchisor may require, in its sole discretion, from time to time.

## 10    FINANCIAL RECORDS AND REPORTS

10.1    **Reporting.** Franchisee must maintain, for at least five (5) fiscal years from their preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section 10.1 in accordance with generally accepted accounting principles.

10.1.1    Franchisee will, at its expense, submit to the Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2    Each financial statement shall be signed by Franchisee or by an individual authorized by the Franchisee, attesting that the statement is true and correct and prepared in accordance with the Franchisor's requirements.

10.1.3    Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider.

10.1.4    Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including all reports set forth in the Operations Manual.

10.2    **Tax Returns.**    In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns.

10.3    **Right to Disclose Information.** Franchisor has the right to disclose data derived from the reports Franchisee furnishes.

10.4    **Bookkeeping/Accounting Service**. To ensure Franchisee is properly reporting to Franchisor financial records and reports, Franchisee must use the services of Franchisor, its affiliate, or designated and preferred bookkeeping service providers.  Franchisee is required to pay the bookkeeping service its then current fee which is subject to future increases.

10.5    **Monthly Profit and Loss Statements**. Franchisee must send Franchisor finalized profit and loss statements by the 21st of the following month. Failure to do so upon 15 days' written notice is grounds for termination of the Franchise Agreement under Section 15.3.8.

## 11    BOOKS AND RECORDS

11.1    **Records and Audits**. Franchisee must maintain accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business, including a complete

listing of all work performed by any subcontractors. Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours, to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider(s). If any audit reveals that Franchisee has understated Franchisee's financial information, including but not limited to Royalty or Brand Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12) month period, Franchisee must pay the reasonable cost of such audit and/or inspection, including the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for Royalty and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

11.2    **Corporate or Limited Liability Company Franchisee Records**. If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

11.2.1   Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by-laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

11.2.2 Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

11.2.3  All members with or shareholders of Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by the Franchisor (see Exhibit "A" to this Agreement). All members and/or shareholders shall also be individually subject to the non-disclosure and confidentiality provisions as set forth in this Agreement, as well as any and all in-term and post-term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "Publicly Held Corporation").

11.2.4  The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to-day operations of the business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

11.2.5 All issued and outstanding stock certificates of such corporation shall bear the following legend:

*EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between _____ and MDR United LLC, dated _____."*

## 12    ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1    **Generally**.  With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing.  If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received.  If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing.  Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2    **Internet Website**. Franchisee must have and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section 12.2 from time to time in its sole discretion.

12.2.1    Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by franchised businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2    Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

12.2.3    Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in

writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s).

12.2.4  Franchisor may use a portion of the Brand Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

12.2.5  Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.mightydogroofing.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

12.3  **Brand Fund**.  Franchisor reserves the right to establish and administer a Brand Fund for the common benefit of System franchisees. If established, Franchisee will be required to participate in and contribute weekly (or on such other recurring basis as Franchisor may designate) up to three percent (3%) of the Franchised Business's Gross Revenues Collected to the Brand Fund. However, the total sum of the Brand Fund Contribution and the Royalty fee shall not exceed the then-current Royalty fee, as a percentage of weekly Gross Revenues Collected. If established, Franchisee will be required to pay the Brand Fund Contribution directly to the Brand Fund via EFT on a weekly basis on the same basis as the Royalties. Franchisor reserves the right to modify the frequency, manner, or method of payment upon providing reasonable notice to Franchisee (which need not exceed 30 days).

12.3.1  If established, Franchisor may use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis. Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: the cost of preparing and producing internet, television, radio, magazine and newspaper advertising campaigns; the cost of direct mail and outdoor billboard advertising; the cost of NORAs; the cost of public relations activities and advertising agencies; the cost of developing and maintaining an Internet website; personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit directly or on a pro rata basis from such expenditures.  If established, the Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available". Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the Mighty Dog Roofing brand.

12.3.2  Franchisor may periodically assist franchises to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys").

The cost of such programs will be borne by the Brand Fund. The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System established minimum standards for such Surveys.

12.3.3   Franchisor has the right to reimburse itself from the Brand Fund for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4   In Franchisor's sole discretion, businesses owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit Franchisor and its businesses, even though the businesses operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5   Franchisor will prepare on an annual basis and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund. The statement will be presented to Franchisee upon Franchisee's written request. The Brand Fund is not required to be independently audited.

12.3.6   Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7   Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8   Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9   Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

12.4   **Regional Advertising and Promotional Cooperative**. Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited towards the Local Marketing Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1   Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2  Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local marketing;

12.4.3  No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4  Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Marketing Requirement;

12.4.5  Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6  Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7  Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

12.5  **Grand Opening Advertising Requirement and Local Advertising Expenditures**.

12.5.1  *Grand Opening Advertising Requirement*.  In connection with the grand opening campaign of the Franchised Business ("Grand Opening Campaign"), Franchisee shall spend a minimum amount of ten thousand dollars ($10,000) prior to opening the Franchised Business to satisfy Franchisee's advertising requirements for the Grand Opening Campaign ("Grand Opening Advertising Requirement"). Any Grand Opening Advertising Requirement expense must be conducted in accordance with Franchisor's standards and specification, as described in the Operations Manual or this Agreement. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Grand Opening Advertising Requirement expenditures.

12.5.2  *Local Advertising Expenditures*.  In addition to the Brand Fund Contributions (if any) described above in Section 12.3, during the first three (3) months of operations of the Franchised Business, Franchisee shall spend $6,000 each month on local advertising and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Expenditures") through approved online vendors and/or in telephone directories distributed within Franchisee's Protected Territory, as well as direct mail and other forms of media advertising Franchisor may specify. Thereafter, for each month during the Term, Franchisee shall spend at least five percent (5%) of Gross Revenues Collected during the immediately preceding calendar month on Local Advertising Expenditures. Franchisee must spend the Local Advertising Expenditures as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or

engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Expenditures must be expended within Franchisee's Protected Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Expenditures must be expended regardless of the amount(s) spent by other System franchisees on local marketing. Franchisee may spend any additional sums Franchisee wishes on local marketing. Franchisee must submit, for Franchisor's approval, all proposed advertising and promotional materials prior to Franchisee's use or distribution. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Local Advertising Expenditures. Franchisor shall have the right to review Franchisee's books and records to determine these expenditures.  If Franchisee does not meet the minimum Local Advertising Expenditures requirement, Franchisor shall have the right to require Franchisee to pay to Franchisor any such deficiency amount (the "Local Advertising Expenditure Deficiency"). Franchisor shall have the right to spend the Local Advertising Expenditure Deficiency on local advertising for the Franchised Business, or require that the Local Advertising Expenditure Deficiency be paid to the Brand Fund as an additional contribution. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center. If Franchisee desires to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit the materials Franchisee desires to use to Franchisor for prior written approval at least 30 days prior to Franchisee's intended use or publication. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of Franchisee's proposed materials within 15 days of the date Franchisor received the proposed materials from Franchisee. If Franchisee does not receive Franchisor's written approval during that period, the proposed materials shall be deemed disapproved. Once approved, Franchisee may use the materials unless Franchisor withdraws or revokes approval, which Franchisor may do at any time upon written notice. All advertising must prominently display the Proprietary Marks and must comply with any standards Franchisor establishes, as specified in the Operations Manual or in any other writing.  Franchisor may require Franchisee to discontinue using any advertising or marketing material within a specified time frame, and at Franchisee's own cost and expense.

12.5.3  *Local Brand Optimization Fee*.  Prior to opening, Franchisee must pay to Franchisor a Local Brand Optimization Fee of $12,000 for the first year of operations, which Franchisor collects and remits to its designated vendors.

12.5.4  *Creative Media Fund Fee*. Prior to opening, Franchisee must pay to Franchisor a Creative Media Fund Fee of $5,000 to cover costs associated with video production, actors' and actresses' compensation and video editing to create videos for national use on social media, YouTube, and other digital platforms.

12.6  **Advisory Council**. Franchisor reserves the right to establish a Mighty Dog Roofing Advisory Council for the purpose of exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts ("Advisory Council"). If established, elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the Advisory Council from time to time, in its sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to, exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating

franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change, or dissolve any Advisory Council at any time in its sole discretion.

## 13    INDEPENDENT CONTRACTOR; INDEMNIFICATION

13.1    **Independent Contractor Status**.    Franchisee is an independent contractor responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated Mighty Dog Roofing business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors. It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2    **Indemnification**.    Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for all claims, obligations, liabilities and damages ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising, and the sale and installation of all Approved Products by Franchisee, its employees or subcontractors and all warranty claims; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals. For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive and other damages, and costs reasonably incurred in the defense of any action, including attorneys', attorney assistants' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable in Franchisor's sole discretion. Such

an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 14    SALE OR TRANSFER

14.1    **Transfer**. Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchise Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein.

14.2    **Death or Disability**.

14.2.1 *Representative's Right to Continue as Franchisee*. In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative, or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180 Day Period"), such person (a) meets Franchisor then-current standards to become a franchisee, as described in Section 14.3.2.5, and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporate or limited liability company franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

14.2.2 *Franchised Business Operation During and After 180 Day Period.* Franchisor is under no obligation to operate the Franchised Business or incur any obligation on behalf of any incapacitated franchisee, during or after the 180 Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180 Day Period. In the event of Franchisee's death, disability, absence or otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time-to-time in Franchisor's sole and absolute discretion.

Franchisor may pay itself a reasonable amount to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3    **Ownership Changes**. A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership, (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer or any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement. A transfer pursuant to (i) and (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1 *Right of First Refusal*. If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth in Section 14.4 hereof), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party. Franchisee shall obtain from the third party and provide Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent"). If Franchisor elects not to accept the offer within a thirty (30) day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent subject to the conditions for approval set forth in Section 14.3.2 hereof. Franchisee shall affect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section 14.3.1. Any material change in the terms of the offer shall be deemed a new proposal subject to Franchisor's right of first refusal. So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder, or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner, in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2 *Conditions for Approval*. Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business, at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or transfer of the Franchise Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1   All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors, are satisfied;

14.3.2.2   Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's designated/approved suppliers and vendors, within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3   Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the release shall not be inconsistent with any applicable state statute regulating franchising;

14.3.2.4 That the transferor and transferee have executed a mutual general release, relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5   Franchisee or transferee shall provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6   The transferee shall demonstrate to Franchisor's satisfaction that he or she meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business to be transferred; and has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7   That, at Franchisor's option, the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8   Franchisee shall pay Franchisor a transfer fee equal to twenty percent (20%) of Franchisor's then-current Initial Franchise Fee per Protected Territory that is being transferred to transferee. In the event Franchisee transfers multiple Protected Territories at once, Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Protected Territories being transferred, by any amount;

14.3.2.9  The transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

14.3.2.10  Franchisee (and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company), and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11  The transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits, and licenses required for the operation of the Franchised Business;

14.3.2.12  To the extent required by the terms of any leases or other agreements, the lessors or other parties must have consented to the proposed transfer;

14.3.2.13  The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14  Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15  The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under the transferee's franchise agreement;

14.3.2.16  Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of disclosure document and Franchisor shall not be liable for any representations not included in the disclosure document;

14.3.2.17  Franchisor's approval of the transfer shall not constitute a waiver of any claims Franchisor may have against the transferring party;

14.3.2.18  Franchisor shall have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder; and

14.3.2.19  In any event, Franchisor may withhold or condition Franchisor's consent to any transfer as Franchisor deems appropriate based on the circumstances of the transfer or otherwise.

14.4  **Transfer to a Corporation or Limited Liability Company**.  If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fee set forth in Sections 14.3.2.7, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

14.4.1  The corporation or limited liability company is newly organized, and its activities are confined to operating the Franchised Business;

14.4.2   Franchisee is, and at all times remains, the owner of at least fifty-one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3   The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4   All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty; and

14.4.5 At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations, and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.5    **Franchisor's Right to Transfer**.  Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement in Franchisor's sole discretion.

## 15    BREACH AND TERMINATION

15.1    **Automatic Termination**.  This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

15.1.1   *Voluntary Bankruptcy*.  If Franchisee or any principal makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2   *Involuntary Bankruptcy*.  If proceedings are commenced to have Franchisee or any of its principals adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within 60 days.

15.1.4   *Loss of Premises*. If Franchisee loses the right to occupy the premises or operate the Franchised Business from the Approved Location, unless such loss of right is not the fault nor within the reasonable control of Franchisee and results from fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics or other national health crisis or civil disorders. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in whole or in part, as Franchisor deems reasonable.

15.2    **With Notice and Without Opportunity to Cure**.  Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1   *Criminal Acts.*  If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2   *Fraud.*  If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3   *Other Actions.* If Franchisee or Franchisee's principals, including any shareholder, member, guarantors or agents, engage in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4   *Misrepresentation.*  If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation.

15.2.5   *Failure to Complete Training.*  If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6   *Repeated Breaches.*  If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any 12-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7   *Breach of Other Agreements.*  If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8   *Misuse of the Proprietary Marks or Confidential Information*.  If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9   *Discloses Confidential Information or Trade Secrets*. If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual, or any other Confidential Information or Trade Secret provided to Franchisee by the Franchisor or any of its affiliates to any third party;

15.2.10 *Violation of Law.*  If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the public.

15.2.11 *Violation of In-term Restrictive Covenant.*  If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

DocuSign Envelope ID: FABE4732-2D5C-42BF-8430-9BCA37C2584C

15.2.12 *Liens.*  If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13 *Insolvency.*  If Franchisee or any of Franchisee's principals become insolvent.

15.2.14 *Abandonment.*  If Franchisee voluntarily or otherwise abandons the Franchised Business.  The term "abandon" includes any conduct which indicates a desire or intent to discontinue operations of the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15 *Unauthorized Transfer*. If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof;

15.2.16 *Unauthorized Products or Services.*  If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17 *Unapproved Purchases.*  If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18 *Proprietary Software.*  If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19 *Insurance.*  If Franchisee fails to maintain insurance, purchase insurance from designated vendors, or to repay Franchisor for insurance paid for by it, or otherwise fail to adhere to the requirements of Section 9.

15.2.20 *Government Regulations.*  If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21 *Government Actions.*  If any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22 *Anti-Terrorist Activities.*  If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23 *Personal Use of Franchised Business Property*.  If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24 *Insufficient Funds.*  If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12) month period.

15.2.25 *Failure to Open.*  If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26 *Operating Outside of Protected Territory*. If Franchisee operates the Franchised Business outside of the Protected Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27 *Violation of Best Efforts.* If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.2.28 *Failure to Meet Minimum Annual Revenue Requirements or Minimum Royalty Fees.*  If Franchisee fails to meet the Minimum Annual Revenue Requirements or Minimum Royalty Fee for any Territory granted hereunder in any period.

15.3.    **Upon 15 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if any of the following defaults remains uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1 *Nonpayment.*  If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's system suppliers or vendors, including but not limited to Royalties, Call Center Fees, Technology Fees, Brand Optimization Fees and Digital Management Fees.

15.3.2 *Endorsement of Checks.*  If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3  *Failure to Maintain Sufficient Marketing Materials and Supplies*.  If Franchisee fails to maintain sufficient levels marketing materials and other supplies necessary to adequately develop the Protected Territory and meet consumer demand.

15.3.4 *Interruption of Service.*  If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5 *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.*  If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel, as Franchisor requires from time to time.

15.3.6  *Quality Control.*  If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

15.3.7  *Licenses and Permits.*  If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.3.8  *Profit and Loss Statements*. If Franchisee fails to submit finalized Profit & Loss statements by the twenty-first (21st) of each month (or other date Franchisor may require).

15.4    **Upon 30 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement, or any ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5    **Step in Rights**.  In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right, or any other rights, Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured, and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all reasonable costs and overhead, if any, incurred in connection with its operation of the Franchised Business including, without limitations, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business.

15.6    **Nonwaiver**.  Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

## 16    RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1    **Franchisee's Obligations**.  Upon termination of this Agreement, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost and expense:

16.1.1    Immediately cease all operations under this Agreement;

16.1.2    Immediately pay Franchisor all unpaid fees, and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3    Discontinue immediately the use of the Proprietary Marks;

16.1.4    Immediately cease using the proprietary software and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days and immediately and permanently cease use of such information and materials;

16.1.5    Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or Social Media Pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name attached hereto as Exhibit B, and transfer all usernames and passwords for all Social Media Pages to Franchisor;

16.1.6  Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease attached as Exhibit F, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7  Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks as Franchisor directs and all items which are a part of the trade dress of the System-immediately, no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8  Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9  Immediately cease to communicate with all Mighty Dog Roofing customers;

16.1.10 Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11 Permit Franchisor to make final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration, or transfer;

16.1.12 Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13 Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System; and

16.1.14 Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15 Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16.

16.2    **Option to Purchase Personal Property.** Upon the termination or expiration of this Agreement, Franchisor, or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice.  For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10) year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes).  Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property

that is subject to a lease or finance agreement, the purchase price of such personal property shall equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable. Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

      16.3    **Exclusions.** Franchisor may exclude from the personal property purchased under Section 16.2 cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

      16.4    **Damages, Costs, and Expenses.**   In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 17    COVENANTS

      Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

      17.1    **During the Term of This Agreement.**  During the term of this Agreement, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

        17.1.1  Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or  (ii) such person's ownership of  a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

17.1.2 Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.1.3 Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.2 **After the Term of This Agreement.** For a period of two (2) years after the expiration, transfer or termination of this Agreement, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers, directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.2.1 Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (a) within the Protected Territory, (b) within the Protected Territory of any other Franchised Business or any other Mighty Dog Roofing business, or within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (c) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or  (ii) such person's ownership of  a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

17.2.2 Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.2.3 Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.3 **Intent and Enforcement**. It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law.  Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable.  In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach.  Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other Mighty Dog Roofing franchisees, and the System.  Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement.  Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm.  Franchisee acknowledges and agrees on Franchisee's own behalf and on behalf of the persons who are liable under this Section 17 that each has previously worked or been gainfully employed in other careers and that the provisions of this Section 17 in no way prevent any such person from earning a living.  Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during

any default under this Section.

17.4    **Employees.**    Franchisee shall ensure that Franchisee's principals, managers, employees, and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit C to the Franchise Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

17.5    **No Defense**. Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

## 18    DISPUTE RESOLUTION

18.1    **Choice of Law.**    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws principals.

18.2    **Internal Dispute Resolution.**    Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management, after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

18.3    **Mediation; Arbitration**. At Franchisor's option, all claims or disputes between Franchisee and Franchisor or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisee and Franchisor or its affiliates, or any of the parties' respective rights and obligations arising from such agreement, which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above, must be submitted first to mediation, in Douglas County, Nebraska under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute. Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Franchisee as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation. Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and Franchisor and Franchisee shall share mediation costs equally. This agreement to mediate shall survive any termination or expiration of this Agreement.

18.3.1    The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 18.3 if such controversy, dispute, or

claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

        18.3.1.1    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

        18.3.1.2    Any claims pertaining to or arising out of any warranty issue;

        18.3.1.3    Any of the restrictive covenants contained in this Agreement.

        18.3.1.4    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

        18.3.1.5    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency

    18.4    **Selection of Venue**.  Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests.  The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Douglas County, Nebraska and the jurisdiction and venue of the United States District Court for the District of Nebraska.  Franchisee acknowledges that this Agreement has been entered into in the State of Nebraska, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Omaha, Nebraska including but not limited to training, assistance, support and the development of the System.  In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of Nebraska as set forth in this Section.

    18.5    **Third Party Beneficiaries**. Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation provision set forth in this Section 18, each having authority to specifically enforce the right to mediate claims asserted against such person(s) by Franchisee.

    18.6    **Prior Notice of Claims.**  As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

    18.7    **No Right to Offset**.  Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

    18.8    **Injunctive Relief**.  Nothing in this Agreement shall prevent Franchisor from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause Franchisor loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.  If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief.  If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

18.9    **Limitation of Action**.  Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

18.9.1    Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any mediation, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2    Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10    **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages.  If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.  Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future royalties for the balance of the term of this Agreement.

**18.11    THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT.  THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY GOODS OR SERVICES.**

# 19    REPRESENTATIONS

19.1    **Proprietary Software**. Any proprietary software provided by Franchisor or an affiliate is on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for any proprietary software, or covenant that the proprietary software will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the software or services provided thereby.

FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE PROPRIETARY SOFTWARE, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE PROPRIETARY SOFTWARE, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2    **No Authority.** NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3    **Receipt.** THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT. IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4    **Opportunity for Review by Franchisee's Advisors.** FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5    **Execution of Agreement.** EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE

PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

**20      GUARANTEE OF PRINCIPALS AND THEIR SPOUSES**

Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing personal guaranty in the form attached hereto as Exhibit A.

**21      NOTICES**

All notices and requests to be given under this Agreement are to be in writing, and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt, to the following addresses (which may be changed by written notice):

Franchisee Name/Address:       Anthony Traficante
                               119 Garibaldi Ave
                               Lodi, NJ 07644

                               Jose Beras
                               222 N Queen St.
                               Bergenfield, NJ 07621

Franchisor                     MDR United LLC
                               10820 Harney Street
                               Omaha, NE 68154

With a copy to:                Fisher Zucker, LLC
                               21 S. 21st Street
                               Philadelphia, PA 19103
                               Attn: Lane Fisher

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Express or a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

**22      MISCELLANEOUS**

22.1    **Entire Agreement.**  This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be

DocuSign Envelope ID: FABE4732-2D5C-42BF-8430-9BCA37C2584C

modified except by a written document signed by both parties.  Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee.

22.2 **Construction of Language.**  The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party.  All words in this Agreement refer to whatever number or gender the context requires.  If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several.  Headings are for reference purposes and do not control interpretation.  Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings and Franchisee's spouse's parents, children, and siblings.  Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members, and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement.  In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement

22.3 **Severability.**  If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other trade secrets, is declared invalid or unenforceable, then Franchisor at Franchisor's option may terminate this Agreement immediately upon written notice to Franchisee.

22.4 **State Law Applies.**  If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

22.5 **Additional Documentation**.  Franchisee must from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein.  In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

22.6 **Force Majeure.**  Neither Franchisee, Franchisor, or Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform its obligations is not the fault nor within the reasonable control of the person due to perform but results from, without limitation, fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics or other national health crisis or civil disorders.  Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in

DocuSign Envelope ID: FABE4732-2D5C-42BF-8420-9BCA37C2584C

whole or in part, as Franchisor deems reasonable.

22.7 **Anti-Terrorist Activities.** Franchisee certifies that neither Franchisee, nor Franchisee's owners, principals, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8 **Attorneys' Fees.** If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

## 23 ACKNOWLEDGMENTS

23.1 **Independent Investigation.** Franchisee acknowledges that Franchisee has conducted an independent investigation of the Franchised Business contemplated by this Agreement and recognizes that it involves business risks which make the success of the venture largely dependent upon Franchisee's business abilities and efforts. Franchisee acknowledges that Franchisee has been given the opportunity to clarify any provision of this Agreement that Franchisee may not have initially understood and that Franchisor has advised Franchisee to have this Agreement reviewed by an attorney.

23.2    **No Guarantee of Earnings.**  Franchisee understands that Franchisor and any of Franchisor's representatives and/or agents with whom Franchisee has met have not made and are not making any guarantees as to the extent of Franchisee's success in Franchisee's Franchised Business, and have not and are not in any way representing or promising any specific amounts of earnings or profits in association with Franchisee's Franchised Business.

23.3    **Receipt of Franchise Disclosure Document.**  Franchisee acknowledges that this Agreement and Franchisor's Franchise Disclosure Document have been in Franchisee's possession for at least fourteen (14) calendar days before Franchisee signed this Agreement or paid any monies to Franchisor or an affiliate and that any material changes to this Agreement were in writing in this Agreement for at least seven (7) calendar days before Franchisee signed this Agreement.

23.4    **No Personal Liability.**  Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason.  This is an important part of this Agreement.  Franchisee agrees that nothing that Franchisee believes Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement.  This is an important part of this Agreement.  Do not sign this Agreement if there is any question concerning its contents or any representations made.

*Signatures appear on following page*

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**FRANCHISOR**

**MDR UNITED LLC**

By: *Josh Skolnick*
    9AD574030DF9458...
Josh Skolnick, Managing Member

By: *Zach Beutler*
    8ACE8F5A4D3646F...
Zach Beutler, Managing Member

**FRANCHISEE**

E0734D504F4A44E...
Anthony Traficante, individually

*Jose Beras*
FAA88A63F7718EE...
Jose Beras, individually

**EXHIBIT A**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PERSONAL GUARANTY**

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.

**ARTICLE I**
**PERSONAL GUARANTY**

The undersigned persons (individually and collectively "you") hereby represent to MDR United LLC ("Franchisor"), or all of the members and managers, or the spouse of any such shareholder, general partner, or member or manager of _____("Franchisee"), as the case may be. In consideration of the grant by Franchisor to Franchisee as provided in the foregoing franchise agreement (the "Franchise Agreement"), each you hereby agree, in consideration of benefits received and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and individually) will not permit or cause any change in the percentage of Franchisee owned, directly or indirectly, by any person, without first obtaining the written consent of Franchisor prior to said proposed transfer, which consent must not be unreasonably withheld, and without first paying or causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise Agreement. You further agree to be bound by the in-term and post-term non-competition and non-solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other covenants set forth in the Franchise Agreement, including but not limited to those concerning confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

**ARTICLE II**
**CONFIDENTIALITY**

During the term of this Agreement, you will receive information which Franchisor considers a trade secret and confidential information ("Confidential Information"). You shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation, or limited liability company any Confidential Information

© 2022 MDR United LLC
Franchise Agreement

including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to Franchisor's integrated bookkeeping system, and other methods, techniques, and know-how concerning the operation of a Mighty Dog Roofing Business of which you may be appraised by virtue of your role as a Guarantor of Franchisee.

**ARTICLE III**
**NON-COMPETITION**

1) **During the Term of the Franchise Agreement.** During the term of the Franchise Agreement, neither your, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2) **After the Term of the Franchise Agreement.** For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (i) within the Protected Territory, (ii) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (iii) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

    c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

3) **Intent and Enforcement**. It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm. You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living. You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV
## DISPUTE RESOLUTION

1) **Acknowledgment**. You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's proprietary marks or its system.

2) **Governing Law.** This Guaranty shall be deemed to have been made in and governed by the laws of the Commonwealth of Pennsylvania, without any reference to Pennsylvania conflict of laws principles.

3) **Internal Dispute Resolution.** You must first bring any claim or dispute arising out of or relating to the Franchise Agreement or this Guaranty to Franchisor's management. You agree to exhaust this internal dispute resolution procedure before bringing any dispute before a third party. This agreement to engage in internal dispute resolution first shall survive the termination or expiration of this Agreement.

4) **Mediation.** At Franchisor's option, all claims or disputes between you and Franchisor arising out of, or in any way relating to, this Guaranty or the Franchise Agreement or any other agreement by and between you and the Franchisor, or any of the parties' respective rights and obligations arising from such agreements, must be submitted first to mediation, in Douglas County, Nebraska, under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, you must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute. Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify you as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation. You may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written

declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and the parties shall share the cost of mediator. This agreement to mediate at Franchisor's option shall survive the termination or expiration of the Franchise Agreement.

The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 4 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

   i.     Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

   ii.    Any claims arising out of or pertaining to any warranty issued;

   iii.   Any of the restrictive covenants contained in this agreement;

   iv.    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

   v.     Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency.

5) **Third Party Beneficiaries.** Franchisor's officers, directors, shareholders, agents and/or employees are express third party beneficiaries of the Franchise Agreement and this Guaranty, and the mediation provisions contained herein, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you.

6) **Injunctive Relief.** Nothing contained in this Guaranty shall prevent Franchisor from applying to or obtaining from any court having jurisdiction, without bond, a writ of attachment, temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interest prior to the filing of any mediation proceeding or pending the trial or handing down of a decision or award pursuant to any mediation or judicial proceeding conducted hereunder.

7) **Jurisdiction and Venue.** Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Douglas County, Nebraska and the jurisdiction and venue of the United States District Court for the District of Nebraska. The parties acknowledge and agree that this Agreement has been entered into in the State of Nebraska, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Douglas County, Nebraska, including but not limited to training, assistance, support and the development of the System. In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Nebraska as set forth herein.

8) **Jury Trial Waiver. THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN**

**ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY GOODS OR SERVICES.**

9) **Waiver of Punitive Damages.** You waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, your recovery shall be limited to actual damages. If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

10) **Limitation on Action.** You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide basis, and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

11) **Attorneys' Fees**. If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

12) **Nonwaiver.** Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Guaranty shall be cumulative. Franchisor' election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

13) **Severability.** The parties agree that if any provisions of this Guaranty may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable

DocuSign Envelope ID: FABE4732-2D5C-42BE-8430-9BCA37C2584C

and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party. The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable. If any material provision of this Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions. In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

14) **Construction of Language.**  Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement. The language of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party. All words in this Guaranty refer to whatever number or gender the context requires. If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

15) **Successors**.  References to "Franchisor" or "the undersigned, or "you" include the respective parties' successors or permitted assigns or transferees.

16) **No Personal Liability**.  You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

*THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK.*
*SIGNATURES APPEAR ON FOLLOWING PAGE*

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**PERSONAL GUARANTORS**                    **SPOUSES**

By: _____              By: _____

Print Name: _____              Print Name: _____

Address: _____               Address: _____

_____                  _____

Telephone: _____               Telephone: _____

By: _____              By: _____

Print Name: _____              Print Name: _____

Address: _____               Address: _____

_____                  _____

Telephone: _____               Telephone: _____

**EXHIBIT B**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS,**
**FACSIMILE NUMBERS AND DOMAIN NAMES**

1.    _____, doing business as a Mighty Dog Roofing franchisee, ("Assignor"), in exchange for valuable consideration provided by MDR United LLC ("Assignee"), receipt of which is hereby acknowledged hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____
Facsimile Number(s): _____
Domain Name(s) (as permitted by Franchisor under the Franchise Agreement):
_____

2.    The conditional agreement will become effective automatically upon termination, expiration of Assignor's franchise.  Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3.    Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment, and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR**:

By: _____        Date: _____

Name: _____

Title: _____

**ASSIGNEE**:

**MDR UNITED LLC**

By: _____        Date: _____

Name: _____

Title: _____

**EXHIBIT C**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors,*
*general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from MDR United LLC (the "Company") to establish and operate a Mighty Dog Roofing business (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Mighty Dog Roofing Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ (the "Franchised Business Premises").

1.    The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's Manuals; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be appraised by virtue of my employment with Franchisee ("Confidential Information").

2.    Any and all information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

3.    In my position with the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual") and other general assistance during the term of this Agreement.

4.    I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.    The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential.  Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

© 2022 MDR United LLC
Franchise Agreement

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing businesses, except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.     This Agreement shall be construed under the laws of the State of Nebraska.  The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

By: _____

Name: _____

Title: _____

Date: _____

**ACKNOWLEDGED BY FRANCHISEE**

By: _____

Name: _____

**EXHIBIT D**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name: _____

ABA#  : _____

Acct. No.: _____

Acct. Name: _____

1.      Effective as of the date of the signature below, _____ ("Franchisee") hereby authorizes MDR United LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise Agreement for the Franchised Business located at: _____: (all Royalty fees; and all other fees due and owing to the Company, or to which the Company has rights to, under the Franchise Agreement, electronically or otherwise. Franchisee acknowledges that Royalty and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement.  Such withdrawals shall occur on a weekly and/or monthly basis, or on such other schedule as Company shall specify in writing.  If necessary, Company is also authorized to deposit the Gross Revenues of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur as needed or on such other schedule as Company shall specify in writing.   This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISOR**                                  **FRANCHISEE**

**MDR UNITED LLC**                          _____

By: _____        By: _____

Name: _____        Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

**EXHIBIT E**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**SITE SELECTION ADDENDUM**

MDR United LLC, a Pennsylvania limited liability company with a principal business address at 10820 Harney Street, Omaha, Nebraska 68154 ("Franchisor"), and Anthony Traficante, an individual with an address at 119 Garibaldi Ave., Lodi, New Jersey 07644, which is identified more fully in the attached Data Sheet, and Jose Beras, an individual with an address at 222 N. Queen Street, Bergenfield, New Jersey 07621, which is identified more fully in the attached Data Sheet ("Franchisee"), have this 28th day of July, 2022, entered into the foregoing Franchise Agreement(s) for the operation of a Mighty Dog Roofing franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.    Within ninety (90) days after Franchisee receives notice of approval of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Protected Territory granted under the Franchise Agreement.

2.    Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum. Time is of the essence.

3.    Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within forty five (45) days after execution of this Site Selection Addendum. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.    Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct up to one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's reasonable expenses including, without limitation, the costs of travel, lodging, and meals.

5.    If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

© 2022 MDR United LLC
Franchise Agreement

DocuSign Envelope ID: FABE4732-2B5C-42BF-8420-9BCA37C2584C

6.      After Franchisor has approved a site for the Franchised Business in writing and Franchisee has acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.      Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty or any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose.  Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation.  Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.      This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and terms of this Site Selection Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISEE**

DocuSigned by:

_____
E0734D564F4A44E...
Anthony Traficante, individually

DocuSigned by:

_____
FAA88A63F77J4EE...
Jose Beras, individually

**FRANCHISOR**

**MDR UNITED LLC**

DocuSigned by:

_____
8ACE8F5A4D3645F...
Zach Beutler, Managing Member

© 2022 MDR United LLC
Franchise Agreement

**EXHIBIT F**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**COLLATERAL ASSIGNMENT OF LEASE**

    **FOR VALUE RECEIVED**, the undersigned ("Assignor") hereby assigns and transfers to MDR United LLC, a Pennsylvania limited liability company, with its principal place of business address at 10820 Harney Street, Omaha, Nebraska 68154 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto as <u>Exhibit 1</u> (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee has no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

    Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of its interest in the Lease or the premises demised thereby.

    Upon a default by Assignor under the Lease or under the franchise agreement for a Franchised Business between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, or upon expiration or termination of the Franchise Agreement or this Agreement, Assignee has the right and is hereby empowered to take possession of the premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor will have no further right, title or interest in the Lease.  Assignor hereby authorizes the Lessor to disclose to Assignee, upon its request, sales and other information furnished to the Lessor by Assignor.

    Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee.  Throughout the term of the Franchise Agreement and any renewals thereto, Assignor agrees that it must elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing.

    If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and instead of Assignor for the purpose of effecting such extension or renewal.

**ASSIGNOR**:

Dated:_____

SIGNED AND SEALED this
day of _____, 20

_____

_____

Notary Public

## CONSENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the aforedescribed Lease hereby:

(a)    Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

(b)    Agrees that Assignee has the right, but must not be obligated, to cure any default by Assignor under the Lease within thirty (30) days (or such longer period of time as reasonably necessary to cure the default, so long as Assignee commences the cure within 30 days and thereafter diligently pursues the cure to completion) after delivery by Lessor of notice thereof in accordance with paragraph (a) above;

(c)    Consents to the foregoing Collateral Assignment and agrees that if Assignee takes possession of the premises demised by the Lease and confirms to Lessor the assumption of the Lease by Assignee as tenant thereunder, Lessor must recognize Assignee as tenant under the Lease, provided that Assignee cures within the time period set forth above the defaults, if any, of Assignor under the Lease;

(d)    Agrees that Assignee may further assign the Lease to a person, firm or corporation who must agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Lessor and upon such assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise.

DATED:_____

_____

_____

DocuSign Envelope ID: FABE4732-2D5C-42BF-8420-9BCA37C2584C

**Exhibit "1" to Collateral Assignment of Lease**

**LEASE**

**Lease Agreement attached**

**EXHIBIT G**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PROTECTED TERRITORY MAP**

**Protected Territory 1 Map Attached**

Territory : APPROVEDPENDING-A.Traficante-1



Territories

ZIP Codes

# Territory Demographics for APPROVEDPENDING A.Traficante-1



| ZIP Code | ZIP Code Name | Owner Occupied Homes |
|---|---|---|
| 07401 | ALLENDALE | 2,046 |
| 07410 | FAIR LAWN | 9,703 |
| 07423 | HO HO KUS | 1,292 |
| 07432 | MIDLAND PARK | 1,945 |
| 07450 | RIDGEWOOD | 6,761 |
| 07452 | GLEN ROCK | 3,624 |
| 07458 | SADDLE RIVER | 3,524 |
| 07463 | WALDWICK | 3,063 |
| 07481 | WYCKOFF | 5,111 |
| 07652 | PARAMUS | 7,355 |
| 07662 | ROCHELLE PARK | 1,643 |
| 07663 | SADDLE BROOK | 3,629 |
| 07677 | WOODCLIFF LAKE | 1,857 |
| Totals |  | 51,553 |

**EXHIBIT H**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**
**MULTI-UNIT ADDENDUM**

THIS MULTI-UNIT ADDENDUM (the "Addendum") is made and entered into this 28th day of July, 2022 by and between MDR United LLC, a Pennsylvania limited liability company with an address at 10820 Harney Street, Omaha, Nebraska 68154 ("Franchisor"), and Anthony Traficante, an individual with an address at 119 Garibaldi Ave., Lodi, New Jersey 07644, which is identified more fully in the attached Data Sheet, and Jose Beras, an individual with an address at 222 N. Queen Street, Bergenfield, New Jersey 07621, which is identified more fully in the attached Data Sheet (collectively, "Franchisee").

**BACKGROUND**

A.   Contemporaneous with the execution of this Addendum, Franchisee and Franchisor entered into those certain three (3) franchise agreements (collectively, the "Applicable Franchise Agreements") pursuant to which Franchisee obtained the right and undertook the obligation to operate Mighty Dog Roofing franchised businesses within the territories defined therein (each a "Franchised Business").

B.   Each Franchised Business will operate within a designated protected territory wherein Franchisee is required to actively promote and operate the Franchised Businesses (collectively, the territories granted under the Applicable Franchise Agreements will be referred to as the "Protected Territories").

C.   Franchisor expects that Franchisee will operate the Franchised Business from a single Approved Location using the same vehicles, supplies, equipment and inventory as required by Franchisor.

D.   The parties now wish to amend certain provisions of the Applicable Franchise Agreements pursuant to the terms and conditions set forth in this Addendum.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   **Multi-Unit Initial Franchise Fees**. Notwithstanding anything contained in Section 3.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor an Initial Franchise Fee under any Applicable Franchise Agreement. Instead, Franchisee shall pay Franchisor lump-sum multi-unit Initial Franchisee Fee as follows (the "Multi-Unit Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | | Individual Franchise Fee | | Cumulative Number Owner Occupied Homes |
|---|---|---|---|---|---|
| #1 | $59,500 | | $59,500 | | 50,000 |
| #2 | $99,500 | | $40,000 | | 100,000 |
| #3 | $134,500 | | $35,000 | | 150,000 |
| #4 | $164,500 | | $30,000 | | 200,000 |
| #5 | $194,500 | | $30,000 | | 250,000 |

The entire Multi-Unit Initial Franchise Fee must be paid upon execution of the Applicable Franchise Agreements and this Addendum, and this fee is deemed fully earned upon payment and non-refundable under any circumstances.

2.       **Initial Training Program**. Franchisee is only required to attend and complete Franchisor's Initial Training Program described more fully in Section 8.1 of the Applicable Franchise Agreements, respectively, once in connection with the Franchised Businesses governed by this Addendum. All other provisions regarding Franchisee's training obligations in the Applicable Franchise Agreements are hereby ratified and confirmed.

3.       **Minimum Royalty Fee and Minimum Annual Revenue Requirement**.

a.       <u>Minimum Royalty Fee</u>.  Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor a separate Minimum Royalty Fee under each Applicable Franchise Agreement. Instead, Franchise shall pay Franchisor the following Minimum Royalty Fees depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation:

| Mighty Dog Roofing Minimum Royalty Fees Per Week | | | | | |
|---|---|---|---|---|---|
| **Months of Operation** | **1 Territory** | **2 Territories** | **3 Territories** | **4 Territories** | **5 Territories** |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

The parties further acknowledge and agree that Franchisee is subject to the Minimum Royalty Fees set forth herein in the event the Franchisee's Royalty based on the Gross Revenues Collected is less than the

Minimum Royalty Fee obligation for any given week.

b.        <u>Minimum Annual Revenue Requirement</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee shall meet and maintain the following minimum annual Gross Revenue requirements depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation, as follows (the "Minimum Annual Revenue Requirements"):

| Mighty Dog Roofing Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

All other provisions regarding Franchisee's payment obligations, including those related to Franchisee's Royalty or other fees, of the Franchise Agreements are hereby confirmed and ratified.  Franchisor reserves the right, but not the obligation, to offer a royalty incentive programs for the benefit of qualifying franchisees. To qualify for such programs, Franchisee must satisfy Franchisor's then-current specifications and standards as provided in the Operations Manual or otherwise in writing by Franchisor. Franchisor reserves the right to modify, supplement, or terminate any royalty incentive programs upon notice to Franchisee.  If Franchisee fails to meet the Minimum Annual Revenue Requirements in any period, Franchisor may terminate the Franchisee's Protected Territories or otherwise terminate the Franchise Agreements.

4.        **Opening Package.**  Notwithstanding anything contained in Section 3.5 of the Applicable Franchise Agreements, Franchisee will not be required to purchase a separate Opening Package under each Applicable Franchise Agreement. If Franchisee purchases four (4) or more Protected Territories, Franchisor recommends, but does not require, Franchisee to purchase an additional Opening Package.

5.        **Local Brand Optimization Fee (First Year)**. Notwithstanding anything contained in Section 3.6 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Local Brand Optimization Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Local Brand Optimization Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 1 | $12,000 |

DocuSign Envelope ID: FABE4732-2D5C-42BF-8420-9BCA37C2584C

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 2-3 | $12,000 |
| 4-5 | $24,000 |

6.  **Technology Fee**.  Notwithstanding anything contained in Section 3.8 of the Applicable Franchise Agreements, Franchisee will not be required to pay separate Technology Fees under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Technology Fee regardless of the number of Applicable Franchise Agreements executed.

7.  **Call Center Fee**.  Notwithstanding anything contained in Section 3.9 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Call Center Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Call Center Fee regardless of the number of Applicable Franchise Agreements executed.

8.  **Creative Media Fund Fee**.  Notwithstanding anything contained in Section 3.10 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Creative Media Fund Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Creative Media Fund Fee regardless of the number of Applicable Franchise Agreements executed.

9.  **Monthly Digital Management Fee**.  Notwithstanding anything contained in Section 3.11 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate monthly Digital Management Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following monthly Digital Management Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Monthly Digital Management Fee |
|---|---|
| 1 | $500 |
| 2-3 | $1,000 |
| 4-5 | $1,500 |

10.  **Vehicles, Equipment and Inventory**.  Notwithstanding anything contained in Section 7.6.7 of the Applicable Franchise Agreements, if Franchisee purchases four (4) or more Protected Territories, Franchisee must add an additional crew, an additional salesperson, and an additional separate sales vehicle by the end of the second (2nd) year of operations of the Franchised Business.

11.  **Approved Location**. Notwithstanding anything contained in Section 1.3 of the Applicable Franchise Agreements, Franchisee shall only be required to have one physical location that satisfies Franchisee's Approved Location requirement, if, and only if, Franchisee's Territories are contiguous.

12.  **Default of Addendum Constitutes Default Under All Applicable Franchise Agreements**. In the event Franchisee breaches any of the provisions of this Addendum, such breach will

DocuSign Envelope ID: FABE4732-2D5C-42BF-8420-9BCA37C2584C

constitute a material default of all Applicable Franchise Agreements and must be cured within 30 days from Franchisee's receipt of Franchisor's written notice of such breach as set forth in Section 15.4 of the Applicable Franchise Agreements. If Franchisee fails to cure such breaches within the prescribed period, Franchisor may, at its option, terminate one or more of the Applicable Franchise Agreements immediately upon providing written notice, or otherwise terminate Franchisee's Protected Territories.

13.      **Ratification and Confirmation of the Applicable Franchise Agreements**. Except as amended by this Addendum, any and all other terms and conditions set forth in the Applicable Franchise Agreements are hereby ratified and confirmed as if fully restated herein, including without limitation, those provisions regarding dispute resolution and venue, which will also apply to any claims or disputes arising out of or related to this Addendum. All capitalized terms not specifically defined in this Addendum will be afforded the definition given to them in the Applicable Franchise Agreements.

14.      **Entire Agreement**. The Applicable Franchise Agreements and this Addendum constitute the entire, full, and complete agreement between the parties concerning the subject matter set forth herein and supersede any and all prior agreements. In the event of a conflict between the terms of any Applicable Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. This Addendum constitutes an amendment to all Applicable Franchise Agreements.

*Signatures appear on the following page.*

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Addendum the date and year first written above.

**FRANCHISOR:**
**MDR United LLC**


By: _Josh Skolnick_                                          Date: 7/28/2022
Josh Skolnick, Managing Member


By: _Zach Beutler_                                          Date: 7/28/2022
Zach Beutler, Managing Member



**FRANCHISEE:**


_[signature]_                                          Date: 7/28/2022
Anthony Traficante, individually


_Jose Beras_                                          Date: 7/28/2022
Jose Beras, individually

# Exhibit C

## FRANCHISEE AFFIRMATIONS AND ACKNOWLEDGEMENTS

As you know, MDR United LLC ("we", "us" or "Mighty Dog Roofing"), and you are preparing to enter into a Franchise Agreement for the operation of a Mighty Dog Roofing franchise (a "Franchised Business"). The purposes of this Questionnaire are to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, to be certain that you have been properly represented in this transaction, and to be certain that you understand the limitations on claims you may make by reason of the purchase and operation of your franchise. **You cannot sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document but you must sign and date it the same day you sign the Franchise Agreement and pay your franchise fee.** Please review each of the following questions carefully and provide honest responses to each question. If you answer "No" to any of the questions below, please explain your answer on the back of this sheet.

Yes_____ No _____    1.    Have you received and personally reviewed the Franchise Agreement, as well as each exhibit or schedule attached to this agreement, you intend to enter into with us?
 Yes

Yes_____ No _____    2.    Do you understand that this Questionnaire pertains and relates to each and all of the Franchise Agreements, if more than one (1) Franchise Agreement, you intend to enter into with us?
 Yes

Yes_____ No _____    3.    Have you received and personally reviewed the Franchise Disclosure Document we provided?
 Yes

Yes_____ No _____    4.    Did you sign a receipt for the Disclosure Document indicating the date you received it?
 Yes

Yes_____ No _____    5.    Do you understand all the information contained in the Disclosure Document and the Franchise Agreement you intend to enter into with us?
 Yes

Yes_____ No _____    6.    Have you reviewed the Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor and discussed the benefits and risks of operating a Franchised Business with these professional advisor(s)?
 Yes

Yes_____ No _____    7.    Do you understand the success or failure of your Franchised Business will depend in large part upon your skills, abilities and efforts and those of the persons you employ, as well as many factors beyond your control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace?
 Yes

Yes_____ No _____    8.    Do you understand we have only granted you certain protected territorial rights under the Franchise Agreement and that we have reserved certain rights under the Franchise Agreement?
 Yes

Yes_____ No _____    9.    Do you understand we and our affiliates retain the exclusive unrestricted right to engage, directly or through others, in the providing of services under the Franchisor's mark or other marks, at any location outside your Protected Territory, without regard to the proximity of these activities to the premises of your Franchised Business?
 Yes

Yes_____ No _____    10.    Do you understand all disputes or claims you may have arising out of or relating
 Yes

to the Franchise Agreement must be mediated, at our option, in Douglas County, Nebraska?

Yes_____ No _____    11.    Do you understand the Franchise Agreement provides you can only collect
                             compensatory damages on any claim under or relating to the Franchise
    Yes                      Agreement and you are not entitled to any punitive, consequential or other
                             special damages?

Yes_____ No _____    12.    Do you understand the sole entity or person against whom you may bring a
                             claim under the Franchise Agreement is MDR United LLC?
    Yes

Yes_____ No _____    13.    Do you understand all persons whose names appear on the Franchise
                             Agreement must successfully complete the appropriate initial training
    Yes                      program(s) before we will allow the Franchised Business to open or consent to
                             a transfer of that Franchised Business?

Yes_____ No _____    14.    Do you understand that we require you to successfully complete certain initial
                             training program(s) and if you do not successfully complete the applicable
    Yes                      training program(s) to our satisfaction, we may terminate your Franchise
                             Agreement?

Yes_____ No _____    15.    Do you understand we do not have to sell you a franchise or additional
                             franchises or consent to your purchase of existing franchises?
    Yes

Yes_____ No _____    16.    Do you understand that we will send written notices, as required by your
                             Franchise Agreement, to either your Franchised Business or home address until
    Yes                      you designate a different address by sending written notice to us?

Yes_____ No _____    17.    Do you understand that we will not approve your purchase of a Franchised
                             Business, or we may immediately terminate your Franchise Agreement, if we
    Yes                      are prohibited from doing business with you under any anti-terrorism law
                             enacted by the United States Government?

Yes_____ No _____    18.    Is it true that no broker, employee or other person speaking on our behalf made
                             any statement or promise regarding the costs involved in operating a Franchised
    Yes                      Business that is not contained in the Disclosure Document or that is contrary
                             to, or different from, the information contained in the Disclosure Document?

Yes_____ No _____    19.    Is it true that no broker, employee or other person speaking on our behalf made
                             any statement or promise regarding the actual, average or projected profits or
    Yes                      earnings, the likelihood of success, the amount of money you may earn, or the
                             total amount of revenue a Franchised Business will generate, that is not
                             contained in the Disclosure Document or that is contrary to, or different from,
                             the information contained in the Disclosure Document?

Yes_____ No _____    20.    Is it true that no broker, employee or other person speaking on our behalf made
                             any statement or promise or agreement, other than those matters addressed in
    Yes                      your Franchise Agreement concerning advertising, marketing, media support,
                             marketing penetration, training, support service or assistance that is contrary

to, or different from, the information contained in the Disclosure Document?

Yes____ No ____    21.    Is it true that no broker, employee or other person providing services to you on
       Yes           our behalf has solicited or accepted any loan, gratuity, bribe, gift or any other
payment in money, property or services from you in connection with a
Franchised Business purchase with exception of those payments or loans
provided in the Disclosure Document?

Yes____ No ____    22.   Do you understand that the Item 19 financial performance disclosure contained
       Yes           in Item 19 of the Disclosure Document is not a representation of what you can
expect to achieve in connection with the operation of a Franchised Business?

Yes____ No ____    23.    Do you understand that you are entirely responsible for all employment related
       Yes           matters in connection with the operation of your Franchised Business and that
we are not responsible for, and do not control, directly or indirectly, your
employees?

Yes____ No ____    24.    Did you receive the Franchise Disclosure Document at least fourteen (14) days
       Yes           before you completed and signed this Questionnaire?

Yes____ No ____    25.    Did you receive the Franchise Agreement at least seven (7) days before you
       Yes           completed and signed this Questionnaire?

**YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.**

DocuSigned by:

_____
FEF8B4680DC34CD...
Michael Greenstein, individually

Dated: 9/9/2022  _____

**MDR UNITED LLC**

© 2022 MDR United LLC
Franchise Agreement



# FRANCHISE AGREEMENT

© 2022 MDR United LLC
Franchise Agreement

# TABLE OF CONTENTS

**SECTION**                                                                    **PAGE**

DATA SHEET ...................................................................................................................... VII

1    GRANT OF FRANCHISE .................................................................................. 2

2    TERM AND RENEWAL .................................................................................... 6

3    FEES .................................................................................................................. 7

4    PROPRIETARY MARKS .................................................................................. 13

5    CONFIDENTIAL INFORMATION .................................................................. 15

6    FRANCHISOR'S OBLIGATIONS .................................................................... 17

7    FRANCHISEE'S OBLIGATIONS ...................................................................... 19

8    TRAINING ........................................................................................................ 28

9    INSURANCE ...................................................................................................... 30

10   FINANCIAL RECORDS AND REPORTS ........................................................ 31

11   BOOKS AND RECORDS .................................................................................. 32

12   ADVERTISING .................................................................................................. 34

13   INDEPENDENT CONTRACTOR; INDEMNIFICATION ................................ 39

14   SALE OR TRANSFER ...................................................................................... 40

15   BREACH AND TERMINATION ...................................................................... 44

16   RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION ............... 48

17   COVENANTS .................................................................................................... 50

18   DISPUTE RESOLUTION .................................................................................. 52

19   REPRESENTATIONS ........................................................................................ 54

20   GUARANTEE OF PRINCIPALS THEIR AND SPOUSES .............................. 56

21   NOTICES .......................................................................................................... 56

22   MISCELLANEOUS ........................................................................................... 56

23   ACKNOWLEDGMENTS .................................................................................. 58

© 2022 MDR United LLC
Franchise Agreement

# EXHIBITS

Exhibit A – Personal Guaranty and Guaranty of Spouses
Exhibit B – Conditional Assignment of Franchisee's Telephone Numbers, Facsimile
    Numbers and Domain Names
Exhibit C – Confidentiality and Restrictive Covenant Agreement for Employees
Exhibit D – Electronic Funds Withdrawal Authorization
Exhibit E – Site Selection Addendum
Exhibit F – Collateral Assignment of Lease
Exhibit G – Territory Map
Exhibit H – Multi Unit Addendum

**DATA SHEET**

Franchisee:                    Michael Greenstein
                               164 Edgemont Rd.
                               Watchung, NJ 07069

Guarantors:                    Michael Greenstein
                               164 Edgemont Rd.
                               Watchung, NJ 07069

Effective Date:                September 9th, 2022

Approved Location:             _____

                               _____

Protected Territory:           See "Territory 1" set forth on the Map attached as Exhibit "G" to
                               Franchise Agreement

Telephone Number:              (908) 347-2940

E-Mail Address:                msgreenstein@gmail.com

Initial Franchise Fee:         $59,500.00

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

© 2022 MDR United LLC
Franchise Agreement

# MDR UNITED LLC
## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective this 9th day of September, 2022, by and between MDR United LLC, a Pennsylvania limited liability company, with its principal place of business at 10820 Harney Street, Omaha, Nebraska 68154 ("Franchisor"), and Michael Greenstein, an individual with an address at 164 Edgemont Road, Watchung, New Jersey 07069, which is identified more fully in the attached Data Sheet ("Franchisee").

## RECITALS

A.      Through the expenditure of a considerable amount of time, effort, and money, Franchisor has developed a system for the operation of Mighty Dog Roofing businesses (each, a "Franchised Business") that offer, sell and perform roofing services in residential and commercial properties, including: (i) new and replacement roofing services; (ii) emergency tarping services; (iii) gutter replacement; (iv) attic insulation; and (v) other products, services and events that Franchisor may approve and modify from time to time (collectively, the "Approved Products and Services").

B.      Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which currently include: (i) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Services to customers; (ii) certain proprietary products developed by Franchisor; (iii) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (iv) Franchisor's centralized System-wide call center (the "Call Center"); (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential operations manual (the "Operations Manual") that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.      The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin and intellectual property, including, without limitation, the "Mighty Dog Roofing" word mark and the "Mighty Dog Roofing" design mark(s) pending registration on the Principal Register of the United States Patent and Trademark Office (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.      Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Protected Territory").

E.      Franchisee desires to establish and operate a Franchised Business within the Protected Territory hereinafter designated, to use in connection therewith the Franchisor's System

and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.      Franchisor wishes to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.      Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

## 1      GRANT OF FRANCHISE

1.1      **Grant and Acceptance**.  Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business.  Except as otherwise provided in this Agreement, Franchisee may offer, sell and perform Franchisor's Approved Products and Services within the Protected Territory set forth in Section 1.2 herein. Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional Protected Territories.

1.2      **Protected Territory**.  Except as otherwise provided in this Agreement and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third-party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Protected Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including without limitation, those rights set forth in Sections 1.4 through Section 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Protected Territory provided that (a) Franchisee will not be operating within another franchisee's Protected Territory, and (b) Franchisee received Franchisor's prior written consent, which may be withheld for any reason. Other than these operations, Franchisee is not permitted to operate the Franchised Business outside of the Protected Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Protected Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and specifications as set forth in the Operations Manual (as defined in Section 6.1 herein). If, at any time during the term of this Agreement, more than 5% of Franchisee's Gross Revenues are derived from or within specific locations or areas that are outside of the Protected Territory, Franchisor may, among other conditions, require Franchisee

to purchase an additional franchise, enter into Franchisor's then-current franchise agreement and pay to Franchisor its then-current initial franchise fee. Franchisor is not required to offer Franchisee the opportunity to enter into a franchise agreement to continue operations in any area outside of the Protected Territory and may revoke any prior granted approval allowing Franchisee permission to operate outside of the Protected Territory at any time, effective on notice to Franchisee.

      1.3    **Approved Location**.  Franchisee must operate the Franchised Business only at the approved location identified in the Data Sheet (the "Approved Location"). Franchisee shall operate the Franchised Business from an approved office/warehouse or flex space located in the Protected Territory that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee will need to lease approximately 1,500 to 2,000 square feet of commercial real estate for the office/warehouse or flex space and to securely store equipment, tools, supplies, and inventory. Franchisor may, but is not required to, allow Franchisee to utilize a home office or cooperative space of 1,500 to 2,000 square feet as an Approved Location during the first six (6) months of operations. Franchisee may not utilize a home office or cooperative space at any time without Franchisor's prior written consent. The office may be located in the warehouse or flex space, provided that it meets Franchisor's standards and specifications. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. Franchisee must secure its Approved Location within ninety (90) days of executing this Agreement in the event the parties have not agreed on an Approved Location prior to executing this Agreement. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (attached hereto as Exhibit E), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

      1.4    **National and Regional Accounts**. Franchisor has the exclusive right to create National and Regional Account ("NORA") programs for a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations, Chain Customers (as defined below) and other similar organizations for the benefit of the System. Franchisor or any party Franchisor may designate has the exclusive right to solicit and service NORA customers within or outside of the Protected Territory, including, the right to offer and sell Approved Products and Services. Franchisee may not solicit, service or otherwise pursue any NORA relationships, whether the contacts for these relationships are in the Protected Territory or not, without Franchisor's prior written consent. Franchisee may not service, solicit or otherwise pursue a relationship with a NORA or potential NORA or any of its members or associates, without notice to Franchisor and Franchisor's prior written consent. Any dispute as to whether a particular customer is considered a NORA customer will be determined by Franchisor, and its determination will be final and binding. A Chain Customer´ is a non-residential customer, a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations whose presence is not confined within any one particular territory. Following the execution of a contract with or the acceptance of a bid by a NORA customer which contemplates the provision of services to one or more NORA locations within the Protected Territory, Franchisor may, at its sole option, provide Franchisee the option to perform such services pursuant to the terms and conditions of the NORA contract or on such terms and conditions

as Franchisor determines in its sole discretion. In order to service any NORA customers, Franchisee must enter into Franchisor's then-current form of NORA participation agreement, the terms of which will govern all NORA work. Franchisee is not entitled to any right to compensation or consideration for work performed by others in the Protected Territory for NORAs.

    1.4.1   Franchisor also shall have the right, exercisable in its sole discretion, to:

    A.  provide, directly or through any other licensee or franchisee utilizing the Proprietary Marks, services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract; and/or

    B.  contract with another party to provide such services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract between Franchisor and the NORA customer, utilizing the Proprietary Marks or any other trademarks, service marks or trade names.

Neither the direct provision by Franchisor (or a System franchisee, licensee, or Franchisor's agent or designee) of services to NORA customers, nor Franchisor's contracting with another party to provide such services shall constitute a violation of Franchisee's rights in the Protected Territory. Franchisee disclaims any compensation or consideration for work performed by others in the Protected Territory on account of NORA customers within the Protected Territory.

    1.5    **Reservation of Rights**. Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Services, and otherwise use the Proprietary Marks and System, within the Protected Territory is non-exclusive and Franchisor and its affiliates expressly reserve the right to: (i) establish and operate, and license third parties the right to establish and operate, Franchised Businesses using the Proprietary Marks and System at any location outside of the Protected Territory; (ii) acquire, merge with, engage in joint ventures with, or otherwise affiliate with, and thereafter own and operate and franchise others the right to own and operate, any business of any kind regardless of location, except for businesses that offer roof repair and roof replacement within the Protected Territory; (iii) establish and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark, other than the Proprietary Marks, at any location, within or outside the Protected Territory; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service NORAs within and outside the Protected Territory as set forth more fully in Section 1.4; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center in accordance with Section 1.8 of this Agreement; (vii) sell and distribute, directly or indirectly, or license others to sell and distribute within or outside the Protected Territory, directly or indirectly, any products, services or merchandise, including Approved Products and Services, from any location or to any purchaser or through any alternative channel or method of distribution including, but not limited to, via retail and wholesale distribution, in supermarkets, hardware stores, club stores and other retail facilities, via mail order and e-commerce channels; and (viii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

1.6    **Events of Catastrophe**. Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliates and/or other System franchisees may be permitted to provide support to Franchisee and/or perform work in the Protected Territory, including the provision of labor, materials, equipment, and project management on projects in the Protected Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Protected Territory.

1.7    **Alternate Channels of Distribution.** Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Protected Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine.  Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Services as described in this Section 1.7; or (ii) to share in any of the proceeds received by any such party therefrom.

1.8    **Right to Service Customers in Protected Territory; Use of Call Center.**

1.8.1    Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor (or its designee) will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Protected Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and (a) Franchisee does not respond to the assignment within a time period Franchisor deems in its sole discretion appropriate under the circumstances, or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems appropriate in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that the Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Protected Territory has been subjected to a disaster or catastrophe.

1.8.2    Franchisee agrees and acknowledges that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Protected Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

## 2    TERM AND RENEWAL

2.1    **Term**.  The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

2.2    **Renewal**.  Franchisee has the right to renew this Agreement for one successive, additional ten (10) year period, provided Franchisee has met the following conditions:

2.2.1    Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

2.2.2    Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location and within the Protected Territory for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Protected Territory acceptable to Franchisor;

2.2.3    Franchisee has completed, to Franchisor's satisfaction, ninety (90) days prior to the expiration of the then-current term, any updates to all required equipment, tools, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications and, Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

2.2.4    Franchisee is not in breach of any provision of this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

2.2.5    Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

2.2.6    Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without limitation, increased royalty and other fees and insurance requirements);

2.2.7    Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to operating the Franchised Business or providing the Approved Products and Services at any location within the Protected Territory;

2.2.8    Franchisee and its principals execute a general release in the form Franchisor prescribes; and

2.2.9    Franchisee pays a renewal fee in the amount of twenty percent (20%) of the then-current initial franchise fee.

## 3    FEES AND MANNER OF PAYMENT

3.1    **Initial Franchise Fee**.  In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee, calculated as follows (the "Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | Cumulative Number Owner Occupied Homes |
|---|---|---|---|
| #1 | $59,500 | $59,500 | 50,000 |
| #2 | $99,500 | $40,000 | 100,000 |
| #3 | $134,500 | $35,000 | 150,000 |
| #4 | $164,500 | $30,000 | 200,000 |
| #5 | $194,500 | $30,000 | 250,000 |

The Initial Franchise Fee is due at the signing of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise others.

3.2    **Royalty Fee**.  Franchisee must pay Franchisor a weekly royalty fee (the "Royalty") in an amount equal to the greater of: (i) eight- and one-half percent (8.5%) of Gross Revenues Collected during the immediately preceding week; or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.1.

3.2.1    *Minimum Royalty Fee and Annual Gross Revenue Requirements*.

Franchisee must meet and maintain the following weekly Minimum Royalty Fees per Protected Territory throughout the Term. Franchisee's weekly Minimum Royalty Fees are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Franchised Business(es) have been open and operating.

Franchisee's Minimum Royalty Fees are as follows:

| Mighty Dog Roofing Minimum Royalty Fees Per Week | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |

DocuSign Envelope ID: E7967120-1781-4B33-8C64-CC8B03F4B76E

| | | | | |
|---|---|---|---|---|
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

In addition, Franchisee must meet and maintain the following minimum annual Gross Revenue requirements ("Minimum Annual Revenue Requirements") per Protected Territory throughout the Term. Franchisee's Minimum Annual Revenue Requirements are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Franchised Business(es) have been open and operating.

Franchisee's Minimum Annual Revenue Requirements are as follows:

| Mighty Dog Roofing Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| **Months of Operation** | **1 Territory** | **2 Territories** | **3 Territories** | **4 Territories** | **5 Territories** |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

The parties will true-up all Royalty payments, whether actual or Minimum Royalty Fee payments for each applicable 12-month period, at the period's end by evaluating each period's obligations on an annualized basis. In the event Franchisee's fails to meet the above Minimum Royalty Fees or Minimum Annual Revenue Requirements, Franchisor may terminate the Protected Territory or otherwise terminate this Agreement.

However, Franchisee will not be subject to a Minimum Royalty Fee during the first twelve (12) months of operations on the condition that Franchisee strictly complies with all its obligations during the first twelve (12) months of operations and Franchisee shall pay the Royalty fee equal to eight-and one-half percent (8.5%) of Gross Revenues Collected by the Franchised Business during the first twelve (12) months of operations.

"Gross Revenues Collected" means any and all revenue or other compensation actually collected by Franchisee from customers of the Franchised Business.

"Gross Revenues" are defined in the Franchise Agreement to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by or on account of the operation of the Franchised Business at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including but not limited to cash, services, in kind from barter and/or exchange, on credit or otherwise as well as business interruption insurance proceeds. Gross Revenues shall also include the total amount of all sales for labor, material, equipment and/or services performed or rendered by: (a) Franchisee, or (b) any third-party subcontractors or agents of Franchisee who perform services for Franchisee's customers or clients as part of Franchisee's services. Gross Sales shall also include all commissions, finder's fees, referral fees, construction management fees or other compensation received by Franchisee on the value of any work performed. Franchisee agrees that all Royalty Fees, including any Minimum Royalty Fee,

are non-refundable. However, the definition of Gross Revenues does not include sales tax that is collected from customers and transmitted to the appropriate taxing authorities.

        3.2.2 *Special Programs*. Franchisor reserves the right, but not the obligation, to establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

      3.3    **Gross Revenue Reporting**. Franchisee agrees to report Gross Revenue in such form or format as Franchisor may specify from time to time. Franchisor may, at any time, and from time to time, modify the required form or format. Franchisor reserves the right to require Franchisee to provide Franchisor with verified Gross Revenue Reports in the event Franchisor is unable to process electronic funds transfer based upon information Franchisee inputs into the POS System. Each Gross Revenue Report must set forth: (i) Gross Revenues Collected generated during the previous week; (ii) calculation of the Royalty; and (iii) any other information Franchisor may require. If a Gross Revenue Report is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the electronic funds transfer, then Franchisor may withdraw additional funds through an electronic funds transfer from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the electronic funds transfer, then Franchisor will credit the excess amount to the payment of Franchisee's future obligations.

      3.4    **Method of Payment**. With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement, or any other agreement between Franchisee and Franchisor or its affiliates, from the bank account Franchisee provides to Franchisor for use in connection with EFT Program (the "EFT Account"). Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks, and credit card receipts. At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Authorization Form attached as Exhibit D to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer. Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account. Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement by such other means as Franchisor may specify from time to time.

      3.5    **Opening Package**. Prior to opening its Franchised Business, Franchisee must purchase from Franchisor the required opening package at its then-current cost, which includes items such as tarp, catch all system promotional materials, including printed items, pitch books, yard signs, clothing, vehicle wraps, and other equipment, tools, and supplies related to the operation of your franchise (the "Opening Package"). The current cost of the Opening Package is $22,000 to $31,000. Franchisor reserves the right to modify the components, standards and/or specifications of the Opening Package, which may modify the total costs associated with the Opening Package. The Opening Package includes the cost of Franchisor's insurance claims assistance fee ("Insurance

Claims Assistance Fee"), that covers market visits, third-party vendor costs, and other expenses associated with insurance claim assistance services provided to Franchisee by Franchisor or its affiliate or designated vendor, including investigating the building requirements in Franchisee's market on a state, county and at local level, and assisting Franchisee in the preparation of insurance claims. If Franchisee purchases more than one (1) Protected Territory, Franchisee may, but shall not be required to, purchase additional Opening Packages.

      3.6    **Local Brand Optimization Fee (First Year)**. Prior to opening its Franchised Business, Franchisee must pay to Franchisor or its affiliate a local brand optimization fee in the amount of $12,000 (the "Local Brand Optimization Fee"), in connection with the costs of local SEO optimization for Franchisee's first year of operations. After Franchisee's first year of operations, Franchisor recommends, but does not require, that Franchisee spend a minimum of $1,000 annually for SEO initiatives within Franchisee's Protected Territory through Franchisor or Franchisor's affiliate.

      3.7    **Brand Fund Contribution**.  As set forth more fully in Section 12.3 of this Agreement, Franchisor reserves the right to establish a national brand fund for advertising and brand promotion (the "Brand Fund"). If established, Franchisee shall be required to make weekly contributions of up to three percent (3%) of Gross Revenues Collected by the Franchised Business for sales made during the immediately preceding week (the "Brand Fund Contribution"). However, the total sum of the Brand Fund Contribution and the Royalty fee shall not exceed the then-current Royalty fee, as a percentage of weekly Gross Revenues Collected. Franchisor may require Brand Fund Contributions to be paid as directed by Franchisor via the EFT Program, or as otherwise required by the Operations Manual or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Franchisor reserves the right to modify the Brand Fund Contribution and/or modify the digital marketing and advertising requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Brand Fund Contribution, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee (which need not exceed 30 days).

      3.8    **Technology Fee**. Prior to opening its Franchised Business, Franchisee must pay Franchisor a technology fee (the "Technology Fee") of $9,500 for the first year of operations, which Franchisor will collect on Franchisee's behalf and remit to its designated vendors. Thereafter, Franchisee must pay Franchisor or its designated vendors, on a monthly basis, its then-current Technology Fee. The Technology Fee covers the costs associated with using and maintaining the required computer hardware and software, hosting services and solutions, system network functions, updating microsites, data reporting, various software programs, and any other technology Franchisee must utilize in connection with the operation of, or otherwise used in the operation of, the Franchised Business, including software to assist in measuring, training, business efficiencies, dashboard and KPIs. Franchisee shall pay the Technology Fee to Franchisor in the manner prescribed by Franchisor or the designated vendor, as applicable, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer or technology requirements or as required by the third-party service provider(s) or by any regulatory agency. If Franchisee purchases more than one Protected Territory, Franchisee shall only be required to pay one Technology Fee.

3.9 **Call-Center Fee**. Franchisor, or its affiliate or designated vendor, has established and will operate a Call Center which will field all calls and manage prospective and existing customers and route/assign work/inquiries as Franchisor deems necessary in its discretion, and as further described in Section 6.6. Franchisee must pay Franchisor, or its affiliate or designated vendor, all associated then-current start-up fee(s), monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call Center Fee"), which are subject to change at any time. As of April 2022, the current annual Call Center Fee is $3,600. Franchisee shall pay Franchisor, or its affiliate or designated vendor, prior to attending training. After the first year of operations, Franchisee shall pay the Call Center Fee on a monthly basis. As of April 2022, the current monthly Call Center Fee is $300. In addition to the Call Center Fee, Franchisee must pay Franchisor or its affiliate, $15 per scheduled lead. All scheduled lead fees will be paid as incurred or as Franchisor requires. All Call Center Fees and scheduled lead fees are subject to change at any time. Franchisor reserves the right to modify the call center or digital sales requirements that Franchisee must use in the operation of the Franchised Business, and designate and/or modify the amount, scope, structure, or manner of payment of the Call Center and Digital Sales Fee at any time upon providing reasonable notice (which need not exceed 30 days). Franchisor may require Franchisee to pay the Call Center Fees to Franchisor directly, or for Franchisor to make payment on Franchisee's behalf to Franchisor's affiliate or designated vendor, or directly to such affiliate or designated vendor, in Franchisor's sole discretion.

3.10 **Creative Media Fund Fee.** Prior to attending training, Franchisee must pay Franchisor a creative media fund fee ("Creative Media Fund Fee") of $5,000 to cover costs associated with video production, actors and actresses' compensation, and video editing. These videos are designed for national use on social media, YouTube, and other digital platforms. This is a one-time fee. If Franchisee purchases more than one (1) Protected Territory, Franchisee shall only be required to pay one Creative Media Fund Fee.

3.11 **Digital Management Fee.** Franchisee must pay Franchisor's affiliate, Franchise Rocket, a monthly digital management fee (the "Digital Management Fee"), currently $500 per month for 1 Protected Territory, $1,000 for 2 or 3 Protected Territories, and $1,500 for 4 or 5 Protected Territories. The Digital Management Fee covers the costs of digital marketing and website management. The Digital Management Fee shall be paid on a per Protected Territory basis. Franchisor reserves the right to modify the Digital Management Fee as Franchisor modifies the digital marketing and advertising requirements that Franchisee must use for the Franchised Business, and to designate and/or change the amount, scope, structure, or manner of payment of the Digital Management Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

3.12 **Late and/or Under Payments and Interest**. All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company, and other amounts which Franchisee owes to the Franchisor and/or its affiliated company, not received on or before the due date, shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to the Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one and one half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement.

© 2022 MDR United LLC
2022 Franchise Agreement                                                                 11

3.13    **No Right to Off Set**. Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.14    **Non-Exclusive Remedies**. Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waive, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

3.15    **Taxes on Payments**.  In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.16    **Administrative Fee**.  Franchisee must pay Franchisor its then-current administrative fee (the "Administrative Fee") in the event Franchisor makes and processes any amendments, modifications, or otherwise supplements this Agreement at the request of Franchisee or is otherwise required due to Franchisee's actions.

3.17    **Outstanding A/R Collection Fee**. Franchisor has the right to assist Franchisee in collecting outstanding balances from Franchisee's customers for amounts more than 60 days past due.  If Franchisor assists in collecting such outstanding amounts, Franchisee must pay Franchisor a fee in the amount of 15% of the amount collected.

3.18    **Insurance Claims Assistance Fee**. Prior to opening, Franchisee must pay Franchisor a fee of $1,000 to cover Franchisor's costs in providing Franchisee insurance claim assistance services, in which Franchisor will investigate the building requirements on a state, county and at local level in Franchisee's market in order to assist Franchisee in preparing insurance claims. Such costs may be used to cover market visits and third-party vendors costs are non-refundable upon payment. This Insurance Claims Assistance Fee is included in the cost of the Opening Package.

3.19    **Memberships and Subscriptions**. Franchisee must participate in all membership and subscription services that Franchisor requires. Currently, Franchisee must participate in the Owens Corning Platinum Preferred Contractor program immediately upon launching the Franchised Business and pay all dues associated with the program, currently $2,500 per year, which are subject to increases from time to time. Franchisees must continue this annual membership, or any similar membership that Franchisor may require from time to time.

3.20    **Accounting Services Fee**.  Franchisee must pay Franchisor, or its affiliate or designated vendor (as designated by Franchisor), a then-current monthly accounting services fee for all bookkeeping services ("Accounting Services Fee"). The current monthly Accounting Services Fee is $399 per month. Franchisor reserves the right to increase the Accounting Services Fee up to 0.5% of Franchisee's total Gross Revenues Collected. The Accounting Services Fee does not include the cost of your required subscription to Quickbooks accounting software or other required software, which is currently $60 per month per user, and subject to change at any time. Franchisor reserves the right to modify the Accounting Services Fee, to modify the accounting services requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, structure, or manner of payment of the Accounting Services Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee (which need not exceed 30 days). Franchisor also reserves the right to require Franchisee to use Franchisor's

affiliate or designated vendors for payroll, sales tax filing, and other related services.

3.21 **Annual Conference Fee**. Franchisee must pay to Franchisor an annual fee for Franchisee's registration and attendance to Franchisor's annual conference for the System (the "Annual Conference"), if held by Franchisor, and as further described in Section 6.8. Franchisee and Franchisee management (if applicable) must register for and attend the Annual Conference and pay Franchisor the then-current registration and attendance fee (the "Annual Conference Fee"), which shall not exceed $1,000 per attendee. If Franchisee does not register for the Annual Conference, Franchisee must pay Franchisor a fee of $1,000.

3.22 **Drone Kit Fee**. Franchisee must pay to Franchisor's designated vendor a Drone Kit Fee for the first year of operations. As of April 2022, the Drone Kit Fee is $7,900. After the first year of operations, Franchisee must pay Franchisor's designated vendors, on a monthly basis. As of April 2022, the monthly Drone Kit Fee is $350. Franchisor also reserves the right to modify the Drone Kit Fee, to modify the drone kit requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Drone Kit Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee.

3.23 **National Permit Database Fee**. Franchisee must pay to Franchisor a then current monthly National Permit Database Fee in the amount designated by Franchisor. This budget is directed towards access, training, and use of certain real property permit databases in Franchisee's local market. As of April 2022, the National Permit Database Fee is $99 per month. Franchisor reserves the right to modify the National Permit Database Fee as new permit database resources and technology becomes available or changes, and/or modify the new permit database requirements that Franchisee must use for the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the National Permit Database Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

3.24 **Recruiting Fee**. Franchisor offers optional recruiting services to Franchisee to assist Franchisee in recruiting key employees and subcontractors. Franchise may, but is not required to, elect this service, and if so elected, Franchisee must pay Franchisor, or its affiliate, a then-current one-time recruiting fee ("Recruiting Fee"). As of April 2022, the current Recruiting Fee is $1,999. Franchisor reserves the right to modify the optional Recruiting Fee, and to designate and/or modify the amount, scope, or manner of payment of the Recruiting Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

## 4    PROPRIETARY MARKS

### 4.1    **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**.

4.1.1 Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

4.1.2 Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Protected Territory and in sales and marketing for the Franchised Business.

4.1.3    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable.  Franchisee may not use the Proprietary Marks in connection with the offer or sale of any services or products which Franchisor has not authorized for use in connection with the System.  Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name.  Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use.  Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (collectively the "Proprietary Material"). Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material.  Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement.  If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement.  In the event of any litigation relating to Franchisee's use of the Proprietary Material, Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution including, without limitation, becoming a nominal party to any legal action.  Except to the extent that such litigation is the result of Franchisee's use of

the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

4.1.9    Franchisee expressly understands and acknowledges that:

4.1.9.1  Franchisor or its affiliates or licensors own all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

4.1.9.2  The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

4.1.9.3  During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

4.1.9.4  Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

4.1.9.5  Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

4.1.9.6  Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

4.1.9.7  Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder.  Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within ten (10) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

## 5    CONFIDENTIAL INFORMATION

5.1    **Nondisclosure**.  During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information.  Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any Confidential Information, as defined in Section 5.2. Upon termination or expiration of this Agreement, regardless of reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately and Franchisee may not use the

Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2    **Confidential Information**. Confidential Information hereby includes, without limitation, any and all confidential, proprietary, and trade secret information relating to the operation of a Franchised Business, such as: all financial, operational, technical and marketing information; the Operations Manual and Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; cost data; pricing information; business plans; financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; photographs, devices, samples, models, and illustrations; software developed by or for Franchisor; customer lists and any information relating to Franchisor's customers or the customers of other System franchisees; patent, trademark, service mark, and copyright applications; information relating to inventions, discoveries, software and any other research and development information; methods of conducting the Franchised Business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; any information of a customer not generally known or available to the public; any Trade Secrets (as defined in Section 5.3 of this Agreement), or of a customer of Franchisor, or of any other franchisee; and any information about or originating from any Franchisee which, if it was information of Franchisor, are expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3    **Trade Secrets**. Notwithstanding Section 5.2, trade secret means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4    **Employees and Subcontractors**. All of Franchisee's employees and subcontractors must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment or engagement by Franchisee at the Franchised Business. Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement attached as Exhibit C to this Agreement. Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5    **New Concepts.** If Franchisee, or Franchisee's employees, principals or subcontractors, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation. Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent

applications, trademarks, copyrights and other intellectual property rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentations for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

5.6    **Customer Privacy**.    Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop. Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

# 6    FRANCHISOR'S OBLIGATIONS

6.1    **Operations Manual**. Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual and intranet system, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre-opening procedures, systems and procedures, personnel policies, specifications for vehicles and vehicle wraps, supplies, equipment and inventory, marketing, accounting and bookkeeping and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of the Franchisor, constituting a trade secret of Franchisor, and may not be, shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System.

6.2    **Opening Package; Initial Equipment, Tools and Supplies**. Franchisor, or its affiliates or designated vendors, as determined by Franchisor in its sole discretion, will provide Franchisee with an Opening Package upon Franchisee's payment of the required fees. Franchisor will also provide a list of all items, equipment, tools, and supplies required to open and operate the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), which may include Franchisor its affiliates, and designated third-party suppliers, with which Franchisee must comply.

6.3 **Ongoing Assistance**. Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means. If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current Assistance Training Fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion. Franchisor may also use the Operations Manual, as defined in Section 6.6, to provide some self-serve training materials.

6.4 **Additional Training**. As set forth more fully in Section 8.2, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee and Franchisee's personnel to attend such additional training at a location to be selected by Franchisor and pay Franchisor's then current additional assistance or refresher training fee ("Assistance Training Fee"). All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.5 **Remedial Training**. In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to remedial training (in addition to any required training under Section 6.4). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current Assistance Training Fee to provide such remedial training. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.6 **Call Center**. Franchisor and/or its affiliate or designated vendor has established and currently maintains the Call Center. Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay to Franchisor or its designee (which may include one or more of Franchisor's affiliates and/or designees) in connection with administering and maintaining Call Center services. Franchisor and/or its designee has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls, as well as provide digital sales services, including an online sales platform, as Franchisor deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Protected Territory. All Franchised Business-related phone numbers and internet lead sources are required to be ported to or directed to Franchisor or its affiliates or designated vendor. Franchisor reserves the right to discontinue the Call Center and the Call Center services at any time.

6.7     **Pricing**. Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. Franchisee may charge whatever prices it deems appropriate without regard to Franchisor's suggested pricing.

6.8     **Annual Conference**. Franchisor may, in Franchisor's discretion, hold an annual conference at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if it chooses to charge a registration fee in its sole discretion. Franchisor reserves the right to charge Franchisee a fee to cover convention expenses in the event the Franchisee chooses not to attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals, and salaries during the Annual Conference, are Franchisee's sole responsibility. Franchisor may use Brand Fund Contributions for purposes related to the Annual Conference, including costs related to productions, programs, and materials.

## 7     FRANCHISEE'S OBLIGATIONS

7.1     **Site Location and Lease Approval**.  Franchisee shall operate the Franchised Business from an approved commercial office/warehouse or flex space that meets Franchisor's then-current standards and specifications for an Approved Location and located within the Protected Territory. Franchisee will need to lease approximately 1,500 to 2,000 square feet of separate commercial office/warehouse or flex space for Franchisee's office and storage space to securely store all equipment, tools, supplies and inventory.  Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location for Franchisee to operate the Franchised Business as of the date Franchisee signs this Agreement, the parties shall enter into Franchisor's prescribed form of Site Selection Addendum, the terms of which shall govern the parties' site selection obligations. Franchisor has the right to review, evaluate and approve Franchisee's proposed lease for the Approved Location ("Lease") prior to execution.  Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form attached hereto as Exhibit F.

7.1.1   *Relocation*.  If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Protected Territory to complete the unexpired portion of the term of this Agreement.  Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within forty-five (45) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its reasonable costs and expenses

associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation.

7.1.2    *Franchised Business Appearance and Approved Location Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout, and design of a Franchised Business. Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permits requirements, and any other applicable local, state, or federal law.

7.1.3 *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

7.2    **Training**.  Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program as set forth more fully in Section 8 of this Agreement. Franchisor has the right to require up to two (2) individuals to attend in addition to Franchisee, one of which must be Franchisee's general manager or Designated Manager.

7.3    **Opening Requirements**.  Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. In addition to any other pre-opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Protected Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, tools, supplies, and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers, that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program as described defined in this Agreement, as well as any other pre-opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement.

7.4    **Purchasing Requirements**.

7.4.1    *Compliance with Standards.*  Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System.  Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same.  Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion.  Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

7.4.2  *Designated and Approved Suppliers.*  Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "Approved Supplier"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliates and/or a third party may be one of several, or the only, Approved Supplier of any item.  Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue and other material consideration on any products and/or services that Franchisor, Franchisor's affiliates and/or Franchisor's Approved Suppliers supply and/or provide to Franchisee.  Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

7.4.3  *Supplier Approval.*  In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known.  At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase.  Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier.  Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency, and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information.  Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate.  Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

7.4.3.1  Franchisee, or the proposed supplier, must pay Franchisor in advance for Franchisor's reasonable costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

7.4.3.2 Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing

associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

7.4.3.3 Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third-party to supply, provided that third-party executes Franchisor's prescribed form of non-disclosure agreement.

7.4.3.4 Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

7.4.3.5 Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards.  Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

7.4.4    *System Suppliers.*  Franchisor may establish business relationships, from time to time, with suppliers, including affiliates of Franchisor, who may produce and/or provide certain goods or services that Franchisee is required to purchase from only that supplier (each a "System Supplier"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software, and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally.  Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product or ability to obtain product only on less favorable credit terms.  Accordingly, Franchisee agrees to pay System Suppliers as and when due.  Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

7.4.5    *Rebate Program.*  Franchisor and/or its affiliates and/or designated suppliers reserve the right to establish one or more rebate programs for qualifying purchases of certain products and/or services, and/or use of Franchisor's approved suppliers or designated vendors (the "Rebate Program") which may include discounted pricing, special terms, rebates, or other incentives or benefits (individually and collectively, the "Rebate"). Franchisor and/or its affiliates and/or third party suppliers reserve the right to (but are not contractually required to) establish and offer Franchisee an opportunity to participate in one or more Rebate Programs and to condition Franchisee's participation in any such Rebate Program on, among other conditions Franchisor may designate, Franchisee: (i) meeting certain eligibility requirements; (ii) executing Franchisor's designated form of Rebate Program participation agreement or amendment, which may include, among other terms, a general release of any and all claims in favor of Franchisor and its owners, officers, directors, affiliates, parents, subsidiaries, predecessors, successors and assigns; and (iii) compliance with purchasing requirements. Franchisor, its affiliates and third-party suppliers are not required to establish or offer Rebate Programs, but may do so at any time. Additionally, if established, Franchisor, its affiliates and third-party suppliers reserve the right to discontinue or terminate any Rebate Program at any time effective on notice to Franchisee. Franchisee

DocuSign Envelope ID: 57967120-1781-4B33-8C64-CC8B03F4876E

acknowledges, understands, and agrees that Franchisor, and/or its affiliates, may derive revenue or receive a commission or fee from the Rebate Program and hereby consents thereto.

7.5    **Authorized Products and Services**.  Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization.  Franchisee shall at all times maintain sufficient levels of inventory, as specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees.  In the event Franchisee wishes to offer any Approved Products or Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Services.

7.6    **Operations**.

7.6.1    *Hours of Operation.* Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

7.6.2    *Maintenance of Premises and Project Sites.* Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual.  Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

7.6.3    *Personnel/Staffing.* Franchisee must employ a sufficient number of qualified, competent personnel, offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

7.6.4    *Compliance with Operations Manual and Training of Employees.* Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual and shall continue such training and instruction as long as each employee is employed.  Franchisee shall cause any third-party subcontractor engaged by Franchisee to perform work on behalf of Franchisee with respect to the Franchised Business to comply with all applicable requirements of this Agreement, including, but not limited to, Franchisor's quality and performance standards. The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

7.6.5    *Management Participation.* Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote his or her personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon

Franchisee's written request, Franchisor shall permit Franchisee to employ a manager to manage the day-to-day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program before assuming any managerial responsibility. The Franchised Business must, at all times, be staffed with at least one (1) individual who has successfully completed Franchisor's initial training program as set forth in Section 8.1.  In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business.  In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly.

7.6.6    *Working Capital.* Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7    *Equipment and Inventory.* Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with representative vehicles (each wrapped in accordance with Franchisor's specifications), equipment, tools, supplies, and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by the Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand. Franchisor reserves the right to require Franchisee to invest in additional infrastructure and/or equipment and staffing requirements, as may be set forth more specifically in the Manual or otherwise in writing, to ensure adequate brand servicing in the Protected Territories, including in the event Franchisee's accounts receivable grows in excess of 40% (or such other percentage as Franchisor may designate) of Franchisee's overall Gross Revenues Collected or Franchisee's backlog of jobs reaches 12 weeks (or such other time period as Franchisor may designate).

7.6.8    *Products with Proprietary Marks.* Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor. Franchisee must wrap each vehicle used in connection with the operation of the Franchised Business in accordance with Franchisor's specifications.

7.6.9    *Market Research.* Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.7    **Franchised Business Inspection.**  Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform

DocuSign Envelope ID: 57967120-1781-4B33-8C64-CC8B03F4876E

any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

#### 7.8 **Computer Software and Hardware**.

7.8.1 *Computer System.* Franchisor shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, applications, and hardware be used by Franchisee, including without limitation: (a) a compatible computer system that complies with Franchisor's standards and specifications and is capable of operating financial and other business software; (b) printers and other peripheral hardware or devices; (c) archival back-up systems; and (d) Internet access mode and bandwidth (collectively, the "Computer System").

7.8.2 *Required Software.* Franchisor shall have the right, but not the obligation, to develop or designate: (a) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's proprietary software (collectively, the "Required Software"), which Franchisee must license from Franchisor; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee must install at its expense; (c) the tangible media upon which Franchisee records data; and (d) the database file structure of the Computer System.

7.8.3 *Compliance with Requirements.* At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section 7.8.3 shall be at Franchisee's sole cost and expense.

7.8.4 *Franchisor's Access.* Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section 7.8 within thirty (30) days of opening the Franchised Business.

7.8.5 *Proprietary Software.* Franchisor has a proprietary interest in all databases, lists, templates, programs and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create

programs that conduct, among other things, scheduling, accounting, inventory, and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's confidential information.

       7.8.6   *Computer Network*. Franchisee is required to participate in any System-wide computer network, intranet system, or extranet system that Franchisor implements and may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor on-line; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) to complete any initial or ongoing training, in the event Franchisor makes such training accessible through this medium. Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

       7.9   **Personal Conduct**. Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

       7.10   **Best Efforts**. Franchisee (or Franchisee's principals or designated manager) must devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Protected Territory. Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and System. Franchisee acknowledges that Franchisee's (or Franchisee's principals' or designated manager) violation of the terms in this Section 7.10 will be a material breach of this Agreement, and Franchisor may terminate this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

       7.11   **Telephone and Email Access.** Franchisor reserves the right to procure and supply dedicated telephone numbers and email accounts associated with the Franchised Business.

       7.12   **Payment of Debts**. Franchisee is solely responsible for: selecting, retaining and paying Franchisee's employees; the payment of all invoices for the purchase of goods and services used in connection with operating the Franchised Business; and determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business. Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors, and creditors on a timely basis. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System suppliers and System franchisees. Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes,

employee withholding taxes, FICA taxes, personal property and real estate taxes arising from Franchisee's operation of the Franchised Business. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13    **Compliance with Applicable Laws.** Franchisee must comply with all applicable federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to occupational hazards and health, trademark and copyright infringement, fair marketing laws, consumer protection, trade regulation, workers' compensation, unemployment insurance, withholding and payment of Federal and State income taxes and social security taxes and sales, use and property taxes, and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the operation of the Franchised Business). Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors. Franchisee agrees to be solely responsible for all employment decisions and to comply with all state, federal, and local hiring laws and functions of the Franchised Business, including without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part-time. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates.

7.14    **Trade Secrets and Confidential Information**. Franchisee and all employees and subcontractors must maintain the confidentiality of all Confidential Information as set forth in Section 5 of this Agreement.

7.15    **Image**. Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other roofing service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service. Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System. Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity and increase the demand for the products sold and services rendered by System franchisees. Franchisee agrees to comply with the standards, specifications and requirements Franchisor set forth in order to uniformly convey the distinctive image of a Mighty Dog Roofing franchised business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16    **Pending Actions.** Franchisee shall notify Franchisor, in writing, within five (5) days of the commencement of any action, suit or proceeding and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17    **Standard Maintenance and System Conformity.** Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s), equipment, tools and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the

right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

      7.18    **Customer Service**. Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, warranties on any Approved Products or Services offered or sold by the Franchised Business, refund policies and other standards and specifications.

      7.19    **Warranty**.  Franchisee agrees to offer and honor such warranty on all materials and workmanship sold by Franchisee as Franchisor may designate from time to time in the Operations Manual or otherwise in writing. Franchisee shall cooperate with Franchisor warranty claims and shall make no statements or admissions as to liability. Franchisee shall promptly report all warranty claims to Franchisor and shall undertake all warranty work under the Proprietary Marks. All costs associated with administering and honoring the warranty service shall be borne by Franchisee.  Franchisee agrees that it shall remain liable during the Term or upon the termination or expiration of this Agreement for all warranties issued by Franchisee. If Franchisee does not remedy, in full, any warranty claim made by a customer within a reasonable amount of time after receiving notice of such claim, as determined by Franchisor in its sole discretion, Franchisee and its principals acknowledge and agree that Franchisor may thereafter address such warranty claim, and Franchisee and principals are required to promptly reimburse Franchisor for all warranty costs or customer reimbursements incurred by Franchisor plus Franchisor's then current administration charge.

# 8    TRAINING

      8.1    **Initial Training Program**.  Franchisee and up to two (2) additional attendees that Franchisee designates, one of which must be Franchisee's Designated Manager, must attend Franchisor's then-current initial training program (the "Initial Training Program"). Prior to attending training, Franchisee must pay Franchisor its then-current initial training tuition fee for the Initial Training Program. As of April 2022, the current training tuition fee for the Initial Training Program is $4,995. The training tuition fee covers the costs of training, lodging, and meals during the Initial Training Program, however, the training tuition fee does not include travel expenses, meals outside of the Initial Training Program hours, and other living or miscellaneous expenses Franchisee or Franchisee's attendees may incur during the time of training. Any additional personnel, replacement personnel, or otherwise attendees Franchisee wishes to attend Initial Training Program must pay an additional $2,500 per attendee to attend the Initial Training Program (subject to class availability and the schedule/availability of Franchisor personnel). Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's facility in Omaha, Nebraska, or other location that Franchisor may designate, prior to commencing operations of the Franchised Business. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. The Initial Training Program lasts up to twenty (20) days, and except as expressly set forth above or herein, Franchisee will be solely responsible for all out-of-pocket expenses (including travel costs, if any) Franchisee and its attendees incur in

© 2022 MDR United LLC
2022 Franchise Agreement          28

DocuSign Envelope ID: 57967120-1781-4B33-8C64-CC8B03F4876E

connection with attending the Initial Training Program. Franchisor reserves the right to substitute any in-person training for virtual training at its discretion.

8.1.1    *Timing for Completion.* Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction prior to opening the Franchised Business and within one hundred eighty (180) days from the date this Agreement is fully executed. In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction, then Franchisor may terminate this Agreement.

8.1.2    *Additional Employees.* In the event Franchisee wishes for more than two (2) additional persons to participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee.

8.1.3    *Replacement Personnel*. In the event Franchisee or Franchisee's employee(s) or attendee(s) fail to complete the Initial Training Program to Franchisor's satisfaction, the respective persons may repeat the course, or, in the case of an employee or attendee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Failure by Franchisee, an employee, attendee, or any Replacement Personnel to complete the Initial Training Program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

8.1.4    *Employee Training*. Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their respective duties in connection with the Franchised Business prior to such employee(s) undertaking these duties.

8.1.5    *Training Materials.* Franchisor may provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel.  Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel.  Updated training materials may be available to Franchisee in the Operations Manual or by other means in Franchisor's sole discretion.  All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates' title or rights in or to the training materials.  Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

8.2    **Additional and Remedial Training.** Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable), estimators, installers, and other employees to attend additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then-current Assistance Training Fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals, and employee wages incurred). Additional and/or refresher training may take place at Franchisor's facility in Omaha, Nebraska, or any other location that Franchisor may designate. Franchisor will provide Franchisee

with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

8.3 **Reasonable Training and Assistance Requests**. Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then-current Assistance Training Fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Franchisor's facility in Omaha, Nebraska, or on-site at Franchisee's Approved Location or within the Protected Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

# 9    INSURANCE

9.1 **General**. Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual or otherwise in writing. In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such insurance and minimum policy limits that are reasonable and customary in the roofing services industry. Franchisee must obtain the required insurance from Franchisor's designated vendor. The insurance policy or policies must be in effect upon the earlier of: (a) thirty (30) days prior to opening the Franchised Business; or (b) upon signing a lease agreement for the premises of the Franchised Business. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's respective, past, present, and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys, and agents against any loss, liability, personal injury, death, property damage or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use, or occupancy of the Franchised Business. Franchisee shall have MDR United LLC, and its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds as an additional insured under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. The employment practices liability policy is required to: (a) have an endorsement as listed on Form CG 20 29 or its equivalent; and (b) name Franchisor as Co-Defendant. Franchisor reserves the right to amend, modify, and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice (which need not exceed 30 days) through the Operations Manual or otherwise in writing by Franchisor. Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Franchisee must provide Franchisor with certificates of insurance evidencing the required coverage at least 30 days prior to opening. Franchisee shall continue to provide Franchisor with certificates of insurance evidencing the required coverage and any other documentation in connection therewith on an annual basis or as otherwise specified in the Operations Manual.

9.2 **Designation of Carrier; Insurance Rating, Approval, and Certification.** Franchisor has the sole right, exercisable at any time and upon notice to Franchisee, to designate a vendor or supplier, which may include an affiliate of Franchisor, from whom Franchisee must purchase all insurance policies required by Franchisor to operate the Franchised Business. All insurance carriers must be approved by Franchisor in advance and in writing. All insurance policies

must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance Report. Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy. Franchisee agrees to carry such insurance as may be required by the lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law. Franchisee must deliver a certificate of insurance to Franchisor at least thirty (30) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary and non-contributory to any policy or policies held by Franchisor or its affiliates.

9.3    **Designees.** All policies will list Franchisor, its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds and contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's agreement based on changes in risk factors for which Franchisee must comply with upon written notice from Franchisor.

9.4    **Claims Cancellation.** Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations. Franchisee has a twenty-four (24) hour opportunity to cure any lapses in insurance coverage. No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certification of insurance which demonstrates compliance with this Section 9.

9.5    **Failure to Maintain Insurance.** If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a reasonable administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6    **Modification of Requirements.** Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

9.7    **Third Party Subcontractors - Insurance.** Franchisee agrees not to permit any third party subcontractor to perform any work or offer any services on behalf of Franchisee in respect of the Franchised Business unless such subcontractor maintains insurance coverage in such amounts and types as Franchisee is required to maintain under the provisions of this Section 9, with the specific addition that subcontractors cannot exclude principals from its Workers' Compensation coverage and that liability policies name Franchisor as an additional insured. Franchisee agrees to maintain evidence that such insurance by its subcontractors is in effect and to provide such proof of insurance as Franchisor may require, in its sole discretion, from time to time.

## 10    FINANCIAL RECORDS AND REPORTS

10.1    **Reporting.** Franchisee must maintain, for at least five (5) fiscal years from their preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section 10.1 in accordance with generally accepted accounting principles.

10.1.1    Franchisee will, at its expense, submit to the Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2    Each financial statement shall be signed by Franchisee or by an individual authorized by the Franchisee, attesting that the statement is true and correct and prepared in accordance with the Franchisor's requirements.

10.1.3    Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider.

10.1.4    Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including all reports set forth in the Operations Manual.

10.2    **Tax Returns.**   In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns.

10.3    **Right to Disclose Information.** Franchisor has the right to disclose data derived from the reports Franchisee furnishes.

10.4    **Bookkeeping/Accounting Service**. To ensure Franchisee is properly reporting to Franchisor financial records and reports, Franchisee must use the services of Franchisor, its affiliate, or designated and preferred bookkeeping service providers.  Franchisee is required to pay the bookkeeping service its then current fee which is subject to future increases.

10.5    **Monthly Profit and Loss Statements**. Franchisee must send Franchisor finalized profit and loss statements by the 21st of the following month. Failure to do so upon 15 days' written notice is grounds for termination of the Franchise Agreement under Section 15.3.8.

# 11    BOOKS AND RECORDS

11.1    **Records and Audits**. Franchisee must maintain accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business, including a complete

listing of all work performed by any subcontractors. Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours, to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider(s). If any audit reveals that Franchisee has understated Franchisee's financial information, including but not limited to Royalty or Brand Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12) month period, Franchisee must pay the reasonable cost of such audit and/or inspection, including the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for Royalty and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

11.2    **Corporate or Limited Liability Company Franchisee Records**. If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

11.2.1  Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by-laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

11.2.2 Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

11.2.3  All members with or shareholders of Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by the Franchisor (see Exhibit "A" to this Agreement). All members and/or shareholders shall also be individually subject to the non-disclosure and confidentiality provisions as set forth in this Agreement, as well as any and all in-term and post-term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "Publicly Held Corporation").

11.2.4  The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to-day operations of the business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

11.2.5 All issued and outstanding stock certificates of such corporation shall bear the following legend:

*EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between _____ and MDR United LLC, dated _____."*

## 12    ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1    **Generally**.  With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing.  If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received.  If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing.  Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2    **Internet Website**. Franchisee must have and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section 12.2 from time to time in its sole discretion.

12.2.1    Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by franchised businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2    Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

12.2.3    Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in

writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s).

12.2.4    Franchisor may use a portion of the Brand Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

12.2.5    Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.mightydogroofing.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

12.3    **Brand Fund**.  Franchisor reserves the right to establish and administer a Brand Fund for the common benefit of System franchisees. If established, Franchisee will be required to participate in and contribute weekly (or on such other recurring basis as Franchisor may designate) up to three percent (3%) of the Franchised Business's Gross Revenues Collected to the Brand Fund. However, the total sum of the Brand Fund Contribution and the Royalty fee shall not exceed the then-current Royalty fee, as a percentage of weekly Gross Revenues Collected. If established, Franchisee will be required to pay the Brand Fund Contribution directly to the Brand Fund via EFT on a weekly basis on the same basis as the Royalties. Franchisor reserves the right to modify the frequency, manner, or method of payment upon providing reasonable notice to Franchisee (which need not exceed 30 days).

12.3.1    If established, Franchisor may use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis. Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: the cost of preparing and producing internet, television, radio, magazine and newspaper advertising campaigns; the cost of direct mail and outdoor billboard advertising; the cost of NORAs; the cost of public relations activities and advertising agencies; the cost of developing and maintaining an Internet website; personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit directly or on a pro rata basis from such expenditures.  If established, the Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available". Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the Mighty Dog Roofing brand.

12.3.2    Franchisor may periodically assist franchises to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys").

The cost of such programs will be borne by the Brand Fund. The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System established minimum standards for such Surveys.

12.3.3   Franchisor has the right to reimburse itself from the Brand Fund for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4   In Franchisor's sole discretion, businesses owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit Franchisor and its businesses, even though the businesses operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5   Franchisor will prepare on an annual basis and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund. The statement will be presented to Franchisee upon Franchisee's written request. The Brand Fund is not required to be independently audited.

12.3.6   Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7   Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8   Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9   Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

12.4   **Regional Advertising and Promotional Cooperative**. Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited towards the Local Marketing Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1   Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2 Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local marketing;

12.4.3 No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4 Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Marketing Requirement;

12.4.5 Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6 Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7 Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

12.5 **Grand Opening Advertising Requirement and Local Advertising Expenditures**.

12.5.1 *Grand Opening Advertising Requirement*. In connection with the grand opening campaign of the Franchised Business ("Grand Opening Campaign"), Franchisee shall spend a minimum amount of ten thousand dollars ($10,000) prior to opening the Franchised Business to satisfy Franchisee's advertising requirements for the Grand Opening Campaign ("Grand Opening Advertising Requirement"). Any Grand Opening Advertising Requirement expense must be conducted in accordance with Franchisor's standards and specification, as described in the Operations Manual or this Agreement. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Grand Opening Advertising Requirement expenditures.

12.5.2 *Local Advertising Expenditures*. In addition to the Brand Fund Contributions (if any) described above in Section 12.3, during the first three (3) months of operations of the Franchised Business, Franchisee shall spend $6,000 each month on local advertising and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Expenditures") through approved online vendors and/or in telephone directories distributed within Franchisee's Protected Territory, as well as direct mail and other forms of media advertising Franchisor may specify. Thereafter, for each month during the Term, Franchisee shall spend at least five percent (5%) of Gross Revenues Collected during the immediately preceding calendar month on Local Advertising Expenditures. Franchisee must spend the Local Advertising Expenditures as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or

engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Expenditures must be expended within Franchisee's Protected Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Expenditures must be expended regardless of the amount(s) spent by other System franchisees on local marketing. Franchisee may spend any additional sums Franchisee wishes on local marketing. Franchisee must submit, for Franchisor's approval, all proposed advertising and promotional materials prior to Franchisee's use or distribution. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Local Advertising Expenditures. Franchisor shall have the right to review Franchisee's books and records to determine these expenditures. If Franchisee does not meet the minimum Local Advertising Expenditures requirement, Franchisor shall have the right to require Franchisee to pay to Franchisor any such deficiency amount (the "Local Advertising Expenditure Deficiency"). Franchisor shall have the right to spend the Local Advertising Expenditure Deficiency on local advertising for the Franchised Business, or require that the Local Advertising Expenditure Deficiency be paid to the Brand Fund as an additional contribution. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center. If Franchisee desires to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit the materials Franchisee desires to use to Franchisor for prior written approval at least 30 days prior to Franchisee's intended use or publication. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of Franchisee's proposed materials within 15 days of the date Franchisor received the proposed materials from Franchisee. If Franchisee does not receive Franchisor's written approval during that period, the proposed materials shall be deemed disapproved. Once approved, Franchisee may use the materials unless Franchisor withdraws or revokes approval, which Franchisor may do at any time upon written notice. All advertising must prominently display the Proprietary Marks and must comply with any standards Franchisor establishes, as specified in the Operations Manual or in any other writing. Franchisor may require Franchisee to discontinue using any advertising or marketing material within a specified time frame, and at Franchisee's own cost and expense.

12.5.3 *Local Brand Optimization Fee*. Prior to opening, Franchisee must pay to Franchisor a Local Brand Optimization Fee of $12,000 for the first year of operations, which Franchisor collects and remits to its designated vendors.

12.5.4 *Creative Media Fund Fee*. Prior to opening, Franchisee must pay to Franchisor a Creative Media Fund Fee of $5,000 to cover costs associated with video production, actors' and actresses' compensation and video editing to create videos for national use on social media, YouTube, and other digital platforms.

12.6    **Advisory Council**. Franchisor reserves the right to establish a Mighty Dog Roofing Advisory Council for the purpose of exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts ("Advisory Council"). If established, elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the Advisory Council from time to time, in its sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to, exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating

franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change, or dissolve any Advisory Council at any time in its sole discretion.

# 13    INDEPENDENT CONTRACTOR; INDEMNIFICATION

13.1    **Independent Contractor Status**.    Franchisee is an independent contractor responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated Mighty Dog Roofing business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors. It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2    **Indemnification**.    Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for all claims, obligations, liabilities and damages ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising, and the sale and installation of all Approved Products by Franchisee, its employees or subcontractors and all warranty claims; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals. For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive and other damages, and costs reasonably incurred in the defense of any action, including attorneys', attorney assistants' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable in Franchisor's sole discretion. Such

an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 14    SALE OR TRANSFER

14.1    **Transfer**. Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchise Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein.

14.2    **Death or Disability**.

14.2.1 *Representative's Right to Continue as Franchisee*. In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative, or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180 Day Period"), such person (a) meets Franchisor then-current standards to become a franchisee, as described in Section 14.3.2.5, and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporate or limited liability company franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

14.2.2 *Franchised Business Operation During and After 180 Day Period.* Franchisor is under no obligation to operate the Franchised Business or incur any obligation on behalf of any incapacitated franchisee, during or after the 180 Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180 Day Period. In the event of Franchisee's death, disability, absence or otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time-to-time in Franchisor's sole and absolute discretion.

Franchisor may pay itself a reasonable amount to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3    **Ownership Changes**. A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership, (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer or any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement. A transfer pursuant to (i) and (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1 *Right of First Refusal.* If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth in Section 14.4 hereof), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party. Franchisee shall obtain from the third party and provide Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent"). If Franchisor elects not to accept the offer within a thirty (30) day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent subject to the conditions for approval set forth in Section 14.3.2 hereof. Franchisee shall affect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section 14.3.1. Any material change in the terms of the offer shall be deemed a new proposal subject to Franchisor's right of first refusal. So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder, or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner, in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2 *Conditions for Approval*. Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business, at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or transfer of the Franchise Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1   All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors, are satisfied;

14.3.2.2   Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's designated/approved suppliers and vendors, within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3   Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the release shall not be inconsistent with any applicable state statute regulating franchising;

14.3.2.4 That the transferor and transferee have executed a mutual general release, relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5  Franchisee or transferee shall provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6  The transferee shall demonstrate to Franchisor's satisfaction that he or she meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business to be transferred; and has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7  That, at Franchisor's option, the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8  Franchisee shall pay Franchisor a transfer fee equal to twenty percent (20%) of Franchisor's then-current Initial Franchise Fee per Protected Territory that is being transferred to transferee. In the event Franchisee transfers multiple Protected Territories at once, Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Protected Territories being transferred, by any amount;

14.3.2.9  The transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

14.3.2.10  Franchisee (and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company), and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11  The transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits, and licenses required for the operation of the Franchised Business;

14.3.2.12  To the extent required by the terms of any leases or other agreements, the lessors or other parties must have consented to the proposed transfer;

14.3.2.13  The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14  Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15  The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under the transferee's franchise agreement;

14.3.2.16  Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of disclosure document and Franchisor shall not be liable for any representations not included in the disclosure document;

14.3.2.17  Franchisor's approval of the transfer shall not constitute a waiver of any claims Franchisor may have against the transferring party;

14.3.2.18  Franchisor shall have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder; and

14.3.2.19  In any event, Franchisor may withhold or condition Franchisor's consent to any transfer as Franchisor deems appropriate based on the circumstances of the transfer or otherwise.

14.4    **Transfer to a Corporation or Limited Liability Company**.  If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fee set forth in Sections 14.3.2.7, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

14.4.1  The corporation or limited liability company is newly organized, and its activities are confined to operating the Franchised Business;

14.4.2    Franchisee is, and at all times remains, the owner of at least fifty-one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3    The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4    All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty; and

14.4.5    At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations, and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.5    **Franchisor's Right to Transfer**.  Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement in Franchisor's sole discretion.

## 15    BREACH AND TERMINATION

15.1    **Automatic Termination**.  This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

15.1.1    *Voluntary Bankruptcy*.  If Franchisee or any principal makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2    *Involuntary Bankruptcy*.  If proceedings are commenced to have Franchisee or any of its principals adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within 60 days.

15.1.4    *Loss of Premises*. If Franchisee loses the right to occupy the premises or operate the Franchised Business from the Approved Location, unless such loss of right is not the fault nor within the reasonable control of Franchisee and results from fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics or other national health crisis or civil disorders. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in whole or in part, as Franchisor deems reasonable.

15.2    **With Notice and Without Opportunity to Cure**.  Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1 *Criminal Acts.* If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2 *Fraud.* If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3 *Other Actions.* If Franchisee or Franchisee's principals, including any shareholder, member, guarantors or agents, engage in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4 *Misrepresentation.* If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation.

15.2.5 *Failure to Complete Training.* If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6 *Repeated Breaches.* If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any 12-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7 *Breach of Other Agreements.* If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8 *Misuse of the Proprietary Marks or Confidential Information*. If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9 *Discloses Confidential Information or Trade Secrets*. If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual, or any other Confidential Information or Trade Secret provided to Franchisee by the Franchisor or any of its affiliates to any third party;

15.2.10 *Violation of Law.* If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the public.

15.2.11 *Violation of In-term Restrictive Covenant.* If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

DocuSign Envelope ID: 57967120-1781-4B33-8C64-CC8B03F4876E

15.2.12 *Liens.* If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13 *Insolvency.* If Franchisee or any of Franchisee's principals become insolvent.

15.2.14 *Abandonment.* If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue operations of the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15 *Unauthorized Transfer.* If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof;

15.2.16 *Unauthorized Products or Services.* If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17 *Unapproved Purchases.* If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18 *Proprietary Software.* If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19 *Insurance.* If Franchisee fails to maintain insurance, purchase insurance from designated vendors, or to repay Franchisor for insurance paid for by it, or otherwise fail to adhere to the requirements of Section 9.

15.2.20 *Government Regulations.* If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21 *Government Actions.* If any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22 *Anti-Terrorist Activities.* If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23 *Personal Use of Franchised Business Property*. If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24 *Insufficient Funds.* If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12) month period.

15.2.25 *Failure to Open.* If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26 *Operating Outside of Protected Territory*. If Franchisee operates the Franchised Business outside of the Protected Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27 *Violation of Best Efforts.* If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.2.28 *Failure to Meet Minimum Annual Revenue Requirements or Minimum Royalty Fees.* If Franchisee fails to meet the Minimum Annual Revenue Requirements or Minimum Royalty Fee for any Territory granted hereunder in any period.

15.3. **Upon 15 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if any of the following defaults remains uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1 *Nonpayment.* If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's system suppliers or vendors, including but not limited to Royalties, Call Center Fees, Technology Fees, Brand Optimization Fees and Digital Management Fees.

15.3.2 *Endorsement of Checks.* If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3 *Failure to Maintain Sufficient Marketing Materials and Supplies*. If Franchisee fails to maintain sufficient levels marketing materials and other supplies necessary to adequately develop the Protected Territory and meet consumer demand.

15.3.4 *Interruption of Service.* If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5 *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.* If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel, as Franchisor requires from time to time.

15.3.6 *Quality Control.* If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

15.3.7 *Licenses and Permits.* If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.3.8 *Profit and Loss Statements*. If Franchisee fails to submit finalized Profit & Loss statements by the twenty-first (21st) of each month (or other date Franchisor may require).

15.4    **Upon 30 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement, or any ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5    **Step in Rights**. In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right, or any other rights, Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured, and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all reasonable costs and overhead, if any, incurred in connection with its operation of the Franchised Business including, without limitations, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business.

15.6    **Nonwaiver**. Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

# 16    RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1    **Franchisee's Obligations**. Upon termination of this Agreement, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost and expense:

16.1.1    Immediately cease all operations under this Agreement;

16.1.2    Immediately pay Franchisor all unpaid fees, and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3    Discontinue immediately the use of the Proprietary Marks;

16.1.4    Immediately cease using the proprietary software and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days and immediately and permanently cease use of such information and materials;

16.1.5    Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or Social Media Pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name attached hereto as Exhibit B, and transfer all usernames and passwords for all Social Media Pages to Franchisor;

16.1.6  Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease attached as Exhibit F, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7  Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks as Franchisor directs and all items which are a part of the trade dress of the System-immediately, no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8  Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9  Immediately cease to communicate with all Mighty Dog Roofing customers;

16.1.10 Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11 Permit Franchisor to make final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration, or transfer;

16.1.12 Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13 Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System; and

16.1.14 Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15 Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16.

16.2    **Option to Purchase Personal Property.** Upon the termination or expiration of this Agreement, Franchisor, or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice. For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10) year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes).  Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property

that is subject to a lease or finance agreement, the purchase price of such personal property shall equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable. Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

16.3    **Exclusions.** Franchisor may exclude from the personal property purchased under Section 16.2 cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

16.4    **Damages, Costs, and Expenses.**    In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 17    COVENANTS

Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

17.1    **During the Term of This Agreement.**  During the term of this Agreement, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.1.1    Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or  (ii) such person's ownership of  a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

17.1.2  Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.1.3  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.2    **After the Term of This Agreement.**  For a period of two (2) years after the expiration, transfer or termination of this Agreement, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers, directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.2.1  Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (a) within the Protected Territory, (b) within the Protected Territory of any other Franchised Business or any other Mighty Dog Roofing business, or within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (c) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or  (ii) such person's ownership of  a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

17.2.2  Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.2.3  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.3    **Intent and Enforcement**.  It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law.  Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable.  In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach.  Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other Mighty Dog Roofing franchisees, and the System.  Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement.  Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm.  Franchisee acknowledges and agrees on Franchisee's own behalf and on behalf of the persons who are liable under this Section 17 that each has previously worked or been gainfully employed in other careers and that the provisions of this Section 17 in no way prevent any such person from earning a living.  Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during

any default under this Section.

17.4    **Employees.**    Franchisee shall ensure that Franchisee's principals, managers, employees, and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit C to the Franchise Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

17.5    **No Defense**.  Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

## 18    DISPUTE RESOLUTION

18.1    **Choice of Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws principals.

18.2    **Internal Dispute Resolution.**  Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management, after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party.  This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

18.3    **Mediation; Arbitration**.  At Franchisor's option, all claims or disputes between Franchisee and Franchisor or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisee and Franchisor or its affiliates, or any of the parties' respective rights and obligations arising from such agreement, which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above, must be submitted first to mediation, in Douglas County, Nebraska under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect.  Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Franchisee as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.  Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor.  Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and Franchisor and Franchisee shall share mediation costs equally.  This agreement to mediate shall survive any termination or expiration of this Agreement.

18.3.1   The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 18.3 if such controversy, dispute, or

claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

    18.3.1.1    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

    18.3.1.2    Any claims pertaining to or arising out of any warranty issue;

    18.3.1.3    Any of the restrictive covenants contained in this Agreement.

    18.3.1.4    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

    18.3.1.5    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency

18.4    **Selection of Venue**.  Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests.  The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Douglas County, Nebraska and the jurisdiction and venue of the United States District Court for the District of Nebraska.  Franchisee acknowledges that this Agreement has been entered into in the State of Nebraska, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Omaha, Nebraska including but not limited to training, assistance, support and the development of the System.  In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of Nebraska as set forth in this Section.

18.5    **Third Party Beneficiaries**. Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation provision set forth in this Section 18, each having authority to specifically enforce the right to mediate claims asserted against such person(s) by Franchisee.

18.6    **Prior Notice of Claims.**  As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

18.7    **No Right to Offset**.  Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

18.8    **Injunctive Relief**.  Nothing in this Agreement shall prevent Franchisor from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause Franchisor loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.  If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief.  If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

DocuSign Envelope ID: E7967120-1781-4B33-8C64-CC8B03F4876E

18.9    **Limitation of Action**.  Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

18.9.1    Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any mediation, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2    Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10    **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages.  If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.  Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future royalties for the balance of the term of this Agreement.

**18.11    THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT.  THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY GOODS OR SERVICES.**

**19    REPRESENTATIONS**

19.1    **Proprietary Software**. Any proprietary software provided by Franchisor or an affiliate is on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for any proprietary software, or covenant that the proprietary software will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the software or services provided thereby.

DocuSign Envelope ID: 57967120-1781-4B33-8C64-CC8B03F4876E

FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE PROPRIETARY SOFTWARE, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE PROPRIETARY SOFTWARE, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2 **No Authority.** NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3 **Receipt.** THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT. IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4 **Opportunity for Review by Franchisee's Advisors.** FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5 **Execution of Agreement.** EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE

PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

## 20    GUARANTEE OF PRINCIPALS AND THEIR SPOUSES

Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity.  All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity.  All such personal guarantors and their spouses must execute a continuing personal guaranty in the form attached hereto as Exhibit A.

## 21    NOTICES

All notices and requests to be given under this Agreement are to be in writing, and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt, to the following addresses (which may be changed by written notice):

| | |
|---|---|
| Franchisee Name/Address: | Michael Greenstein |
| | 164 Edgemont Rd. |
| | Watchung, NJ 07069 |
| | |
| Franchisor | MDR United LLC |
| | 10820 Harney Street |
| | Omaha, NE 68154 |
| | |
| With a copy to: | Fisher Zucker, LLC |
| | 21 S. 21st Street |
| | Philadelphia, PA 19103 |
| | Attn: Lane Fisher |

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Express or a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

## 22    MISCELLANEOUS

22.1    **Entire Agreement.**  This Agreement contains the entire Agreement of the parties.  There are no representations either oral or written, except those contained in this Agreement.  This written Agreement includes all representations between the parties.  This Agreement may not be modified except by a written document signed by both parties.  Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee.

22.2    **Construction of Language.**  The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party.  All words in this Agreement refer to whatever number or gender the context requires.  If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several.  Headings are for reference purposes and do not control interpretation.  Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings and Franchisee's spouse's parents, children, and siblings.  Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members, and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement.  In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement

22.3    **Severability.**  If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other trade secrets, is declared invalid or unenforceable, then Franchisor at Franchisor's option may terminate this Agreement immediately upon written notice to Franchisee.

22.4    **State Law Applies.**  If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

22.5    **Additional Documentation**.  Franchisee must from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein.  In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

22.6    **Force Majeure.**  Neither Franchisee, Franchisor, or Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform its obligations is not the fault nor within the reasonable control of the person due to perform but results from, without limitation, fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics or other national health crisis or civil disorders.  Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in whole or in part, as Franchisor deems reasonable.

22.7    **Anti-Terrorist Activities.**  Franchisee certifies that neither Franchisee, nor Franchisee's owners, principals, employees or anyone associated with Franchisee is listed in the

Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex.  Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224.  Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below).  In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws.  Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7.  Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement.  As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8    **Attorneys' Fees.**  If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs.  If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

# 23    ACKNOWLEDGMENTS

23.1    **Independent Investigation.**    Franchisee acknowledges that Franchisee has conducted an independent investigation of the Franchised Business contemplated by this Agreement and recognizes that it involves business risks which make the success of the venture largely dependent upon Franchisee's business abilities and efforts.  Franchisee acknowledges that Franchisee has been given the opportunity to clarify any provision of this Agreement that Franchisee may not have initially understood and that Franchisor has advised Franchisee to have this Agreement reviewed by an attorney.

23.2    **No Guarantee of Earnings.**  Franchisee understands that Franchisor and any of Franchisor's representatives and/or agents with whom Franchisee has met have not made and are not making any guarantees as to the extent of Franchisee's success in Franchisee's Franchised Business,

and have not and are not in any way representing or promising any specific amounts of earnings or profits in association with Franchisee's Franchised Business.

23.3    **Receipt of Franchise Disclosure Document.**  Franchisee acknowledges that this Agreement and Franchisor's Franchise Disclosure Document have been in Franchisee's possession for at least fourteen (14) calendar days before Franchisee signed this Agreement or paid any monies to Franchisor or an affiliate and that any material changes to this Agreement were in writing in this Agreement for at least seven (7) calendar days before Franchisee signed this Agreement.

23.4    **No Personal Liability.**  Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason.  This is an important part of this Agreement.  Franchisee agrees that nothing that Franchisee believes Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement. This is an important part of this Agreement.  Do not sign this Agreement if there is any question concerning its contents or any representations made.

*Signatures appear on following page*

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**FRANCHISOR**

**MDR UNITED LLC**

By: _____
      *Josh Skolnick*
      9AD574030DF9458...

Josh Skolnick, Managing Member

By: _____
      *Zach Beutler*
      8ACE8F5A4D3645F...

Zach Beutler, Managing Member

**FRANCHISEE**

_____
      FEF8B4680DC34CD...

Michael Greenstein, individually

**EXHIBIT A**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PERSONAL GUARANTY**

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.  IF FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.  IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.

**ARTICLE I**
**PERSONAL GUARANTY**

The undersigned persons (individually and collectively "you") hereby represent to MDR United LLC ("Franchisor"), or all of the members and managers, or the spouse of any such shareholder, general partner, or member or manager of _____("Franchisee"), as the case may be.  In consideration of the grant by Franchisor to Franchisee as provided in the foregoing franchise agreement (the "Franchise Agreement"), each you hereby agree, in consideration of benefits received and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and individually) will not permit or cause any change in the percentage of Franchisee owned, directly or indirectly, by any person, without first obtaining the written consent of Franchisor prior to said proposed transfer, which consent must not be unreasonably withheld, and without first paying or causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise Agreement.  You further agree to be bound by the in-term and post-term non-competition and non-solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other covenants set forth in the Franchise Agreement, including but not limited to those concerning confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

**ARTICLE II**
**CONFIDENTIALITY**

During the term of this Agreement, you will receive information which Franchisor considers a trade secret and confidential information ("Confidential Information").  You shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation, or limited liability company any Confidential Information

including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to Franchisor's integrated bookkeeping system, and other methods, techniques, and know-how concerning the operation of a Mighty Dog Roofing Business of which you may be appraised by virtue of your role as a Guarantor of Franchisee.

**ARTICLE III**
**NON-COMPETITION**

1) **During the Term of the Franchise Agreement.** During the term of the Franchise Agreement, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2) **After the Term of the Franchise Agreement.** For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (i) within the Protected Territory, (ii) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (iii) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

    c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

3) **Intent and Enforcement**.  It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law.  Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable.  In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach.  You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm.  You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living.  You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV
## DISPUTE RESOLUTION

1) **Acknowledgment**.  You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's proprietary marks or its system.

2) **Governing Law.**  This Guaranty shall be deemed to have been made in and governed by the laws of the Commonwealth of Pennsylvania, without any reference to Pennsylvania conflict of laws principles.

3) **Internal Dispute Resolution.**  You must first bring any claim or dispute arising out of or relating to the Franchise Agreement or this Guaranty to Franchisor's management.  You agree to exhaust this internal dispute resolution procedure before bringing any dispute before a third party. This agreement to engage in internal dispute resolution first shall survive the termination or expiration of this Agreement.

4) **Mediation.**  At Franchisor's option, all claims or disputes between you and Franchisor arising out of, or in any way relating to, this Guaranty or the Franchise Agreement or any other agreement by and between you and the Franchisor, or any of the parties' respective rights and obligations arising from such agreements, must be submitted first to mediation, in Douglas County, Nebraska, under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect.  Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, you must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify you as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.  You may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written

DocuSign Envelope ID: 57967120-1781-4B33-8C64-CC8B03F4B76E

declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and the parties shall share the cost of mediator. This agreement to mediate at Franchisor's option shall survive the termination or expiration of the Franchise Agreement.

The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 4 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

     i.    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

     ii.    Any claims arising out of or pertaining to any warranty issued;

     iii.    Any of the restrictive covenants contained in this agreement;

     iv.    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

     v.    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency.

5) **Third Party Beneficiaries.** Franchisor's officers, directors, shareholders, agents and/or employees are express third party beneficiaries of the Franchise Agreement and this Guaranty, and the mediation provisions contained herein, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you.

6) **Injunctive Relief.** Nothing contained in this Guaranty shall prevent Franchisor from applying to or obtaining from any court having jurisdiction, without bond, a writ of attachment, temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interest prior to the filing of any mediation proceeding or pending the trial or handing down of a decision or award pursuant to any mediation or judicial proceeding conducted hereunder.

7) **Jurisdiction and Venue.** Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Douglas County, Nebraska and the jurisdiction and venue of the United States District Court for the District of Nebraska. The parties acknowledge and agree that this Agreement has been entered into in the State of Nebraska, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Douglas County, Nebraska, including but not limited to training, assistance, support and the development of the System. In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Nebraska as set forth herein.

8) **Jury Trial Waiver. THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN**

© 2022 MDR United LLC
Franchise Agreement

**ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY GOODS OR SERVICES.**

9) **Waiver of Punitive Damages.** You waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, your recovery shall be limited to actual damages. If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

10) **Limitation on Action.** You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide basis, and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

11) **Attorneys' Fees**. If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

12) **Nonwaiver.** Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Guaranty shall be cumulative. Franchisor' election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

13) **Severability.** The parties agree that if any provisions of this Guaranty may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable

and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party.  The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable.  If any material provision of this Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions.  In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

14) **Construction of Language.**  Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement.  The language of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party.  All words in this Guaranty refer to whatever number or gender the context requires.  If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

15) **Successors**.  References to "Franchisor" or "the undersigned, or "you" include the respective parties' successors or permitted assigns or transferees.

16) **No Personal Liability**.  You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

*THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK.*
*SIGNATURES APPEAR ON FOLLOWING PAGE*

**IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.**

**PERSONAL GUARANTORS**                    **SPOUSES**

By: _____              By: _____

Print Name: _____              Print Name: _____

Address: _____              Address: _____

_____              _____

Telephone: _____              Telephone: _____


By: _____              By: _____

Print Name: _____              Print Name: _____

Address: _____              Address: _____

_____              _____

Telephone: _____              Telephone: _____

© 2022 MDR United LLC
Franchise Agreement

**EXHIBIT B**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS,**
**FACSIMILE NUMBERS AND DOMAIN NAMES**

1.      _____, doing business as a Mighty Dog Roofing franchisee, ("Assignor"), in exchange for valuable consideration provided by MDR United LLC ("Assignee"), receipt of which is hereby acknowledged hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____
Facsimile Number(s): _____
Domain Name(s) (as permitted by Franchisor under the Franchise Agreement): _____

2.      The conditional agreement will become effective automatically upon termination, expiration of Assignor's franchise.  Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3.      Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment, and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR**:

By: _____     Date: _____

Name: _____

Title: _____

**ASSIGNEE**:

**MDR UNITED LLC**

By: _____     Date: _____

Name: _____

Title: _____

**EXHIBIT C**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors,*
*general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from MDR United LLC (the "Company") to establish and operate a Mighty Dog Roofing business (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Mighty Dog Roofing Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ (the "Franchised Business Premises").

1.      The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's  Manuals; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be appraised by virtue of my employment with Franchisee ("Confidential Information").

2.      Any and all information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

3.      In my position with the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual") and other general assistance during the term of this Agreement.

4.      I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.      The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential.  Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

© 2022 MDR United LLC
Franchise Agreement

DocuSign Envelope ID: 5796Z120-1781-4B33-8C64-CC8B03F4876E

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing businesses, except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.      This Agreement shall be construed under the laws of the State of Nebraska.  The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

By: _____

Name: _____

Title: _____

Date: _____

**ACKNOWLEDGED BY FRANCHISEE**

By: _____

Name: _____

DocuSign Envelope ID: 57967120-1781-4B33-8C64-CC8B03F4876E

**EXHIBIT D**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name: _____

ABA# : _____

Acct. No.: _____

Acct. Name: _____

1.      Effective as of the date of the signature below, _____ ("Franchisee") hereby authorizes MDR United LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise     Agreement     for     the     Franchised     Business     located     at: _____: (all Royalty fees; and all other fees due and owing to the Company, or to which the Company has rights to, under the Franchise Agreement, electronically or otherwise. Franchisee acknowledges that Royalty and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement.  Such withdrawals shall occur on a weekly and/or monthly basis, or on such other schedule as Company shall specify in writing.  If necessary, Company is also authorized to deposit the Gross Revenues of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur as needed or on such other schedule as Company shall specify in writing.   This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISOR**                                   **FRANCHISEE**

**MDR UNITED LLC**                              _____

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

© 2022 MDR United LLC
Franchise Agreement

**EXHIBIT E**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**SITE SELECTION ADDENDUM**

MDR United LLC, a Pennsylvania limited liability company with a principal business address at 10820 Harney Street, Omaha, Nebraska 68154 ("Franchisor"), Michael Greenstein, an individual with an address at 164 Edgemont Road, Watchung, New Jersey 07069, which is identified more fully in the attached Data Sheet ("Franchisee"), have this 9th day of September, 2022, entered into the foregoing Franchise Agreement(s) for the operation of a Mighty Dog Roofing franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.    Within ninety (90) days after Franchisee receives notice of approval of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Protected Territory granted under the Franchise Agreement.

2.    Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum. Time is of the essence.

3.    Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within forty five (45) days after execution of this Site Selection Addendum. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.    Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct up to one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's reasonable expenses including, without limitation, the costs of travel, lodging, and meals.

5.    If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

6.    After Franchisor has approved a site for the Franchised Business in writing and Franchisee has

acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.      Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty or any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose.  Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation.  Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.      This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and terms of this Site Selection Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISEE**

DocuSigned by:

FEF8B4680DC34CD...

Michael Greenstein, individually

**FRANCHISOR**

**MDR UNITED LLC**

DocuSigned by:

*Zach Beutler*

8ACE8F5A4D3645F...

Zach Beutler, Managing Member

**EXHIBIT F**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**COLLATERAL ASSIGNMENT OF LEASE**

      **FOR VALUE RECEIVED**, the undersigned ("Assignor") hereby assigns and transfers to MDR United LLC, a Pennsylvania limited liability company, with its principal place of business address at 10820 Harney Street, Omaha, Nebraska 68154 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto as Exhibit 1 (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee has no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

      Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of its interest in the Lease or the premises demised thereby.

      Upon a default by Assignor under the Lease or under the franchise agreement for a Franchised Business between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, or upon expiration or termination of the Franchise Agreement or this Agreement, Assignee has the right and is hereby empowered to take possession of the premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor will have no further right, title or interest in the Lease.  Assignor hereby authorizes the Lessor to disclose to Assignee, upon its request, sales and other information furnished to the Lessor by Assignor.

      Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee.  Throughout the term of the Franchise Agreement and any renewals thereto, Assignor agrees that it must elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing.

      If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and instead of Assignor for the purpose of effecting such extension or renewal.

<b>ASSIGNOR</b>:

Dated:_____

SIGNED AND SEALED this
day of _____, 20                    _____

Notary Public                                   _____

## CONSENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the aforedescribed Lease hereby:

(a)      Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

(b)      Agrees that Assignee has the right, but must not be obligated, to cure any default by Assignor under the Lease within thirty (30) days (or such longer period of time as reasonably necessary to cure the default, so long as Assignee commences the cure within 30 days and thereafter diligently pursues the cure to completion) after delivery by Lessor of notice thereof in accordance with paragraph (a) above;

(c)      Consents to the foregoing Collateral Assignment and agrees that if Assignee takes possession of the premises demised by the Lease and confirms to Lessor the assumption of the Lease by Assignee as tenant thereunder, Lessor must recognize Assignee as tenant under the Lease, provided that Assignee cures within the time period set forth above the defaults, if any, of Assignor under the Lease;

(d)      Agrees that Assignee may further assign the Lease to a person, firm or corporation who must agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Lessor and upon such assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise.

DATED:_____

_____

_____

DocuSign Envelope ID: E7967120-1781-4B33-8C64-CC8B03F4976E

**Exhibit "1" to Collateral Assignment of Lease**

**LEASE**

**Lease Agreement attached**

**EXHIBIT G**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PROTECTED TERRITORY MAP**

**Protected Territory 1 Map Attached**

Territory : APPROVEDPENDING-M.GREENSTEIN-1



Territories

ZIP Codes

# Territory Demographics for APPROVEDPENDING M.GREENSTEIN-1

| ZIP Code | ZIP Code Name | Owner Occupied Homes |
|----------|---------------|----------------------|
| 07002 | BAYONNE | 10,239 |
| 07017 | EAST ORANGE | 4,304 |
| 07018 | EAST ORANGE | 2,793 |
| 07040 | MAPLEWOOD | 6,954 |
| 07050 | ORANGE | 3,250 |
| 07079 | SOUTH ORANGE | 4,190 |
| 07102 | NEWARK | 452 |
| 07103 | NEWARK | 2,898 |
| 07105 | NEWARK | 3,702 |
| 07106 | NEWARK | 3,881 |
| 07107 | NEWARK | 2,873 |
| 07108 | NEWARK | 2,009 |
| 07111 | IRVINGTON | 6,494 |
| 07112 | NEWARK | 2,827 |
| 07114 | NEWARK | 656 |
| Totals | | 57,522 |

**EXHIBIT H**
**to**
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**
**MULTI-UNIT ADDENDUM**

THIS MULTI-UNIT ADDENDUM (the "Addendum") is made and entered into this 9th day of September, 2022 by and between MDR United LLC, a Pennsylvania limited liability company with an address at 10820 Harney Street, Omaha, Nebraska 68154 ("Franchisor"), and Michael Greenstein, an individual with an address at 164 Edgemont Road, Watchung, New Jersey 07069, which is identified more fully in the attached Data Sheet ("Franchisee").

**BACKGROUND**

A.  Contemporaneous with the execution of this Addendum, Franchisee and Franchisor entered into those certain five (5) franchise agreements (collectively, the "Applicable Franchise Agreements") pursuant to which Franchisee obtained the right and undertook the obligation to operate Mighty Dog Roofing franchised businesses within the territories defined therein (each a "Franchised Business").

B.   Each Franchised Business will operate within a designated protected territory wherein Franchisee is required to actively promote and operate the Franchised Businesses (collectively, the territories granted under the Applicable Franchise Agreements will be referred to as the "Protected Territories").

C.   Franchisor expects that Franchisee will operate the Franchised Business from a single Approved Location using the same vehicles, supplies, equipment and inventory as required by Franchisor.

D.   The parties now wish to amend certain provisions of the Applicable Franchise Agreements pursuant to the terms and conditions set forth in this Addendum.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   **Multi-Unit Initial Franchise Fees**. Notwithstanding anything contained in Section 3.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor an Initial Franchise Fee under any Applicable Franchise Agreement. Instead, Franchisee shall pay Franchisor lump-sum multi-unit Initial Franchisee Fee as follows (the "Multi-Unit Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | | Individual Franchise Fee | | Cumulative Number Owner Occupied Homes |
|---|---|---|---|---|---|
| #1 | $59,500 | | $59,500 | | 50,000 |
| #2 | $99,500 | | $40,000 | | 100,000 |
| #3 | $134,500 | | $35,000 | | 150,000 |
| #4 | $164,500 | | $30,000 | | 200,000 |
| #5 | $194,500 | | $30,000 | | 250,000 |

The entire Multi-Unit Initial Franchise Fee must be paid upon execution of the Applicable Franchise Agreements and this Addendum, and this fee is deemed fully earned upon payment and non-refundable under any circumstances.

2.    **Initial Training Program**. Franchisee is only required to attend and complete Franchisor's Initial Training Program described more fully in Section 8.1 of the Applicable Franchise Agreements, respectively, once in connection with the Franchised Businesses governed by this Addendum. All other provisions regarding Franchisee's training obligations in the Applicable Franchise Agreements are hereby ratified and confirmed.

3.    **Minimum Royalty Fee and Minimum Annual Revenue Requirement**.

a.    <u>Minimum Royalty Fee</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor a separate Minimum Royalty Fee under each Applicable Franchise Agreement. Instead, Franchise shall pay Franchisor the following Minimum Royalty Fees depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation:

| Mighty Dog Roofing Minimum Royalty Fees Per Week | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $750 | $438 | $333 | $281 | $250 |
| Months 25 - 36 | $875 | $563 | $500 | $469 | $438 |
| Months 37 - 48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49 - 60+ | $1,250 | $938 | $833 | $781 | $750 |

The parties further acknowledge and agree that Franchisee is subject to the Minimum Royalty Fees set forth herein in the event the Franchisee's Royalty based on the Gross Revenues Collected is less than the

Minimum Royalty Fee obligation for any given week.

b.      <u>Minimum Annual Revenue Requirement</u>. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee shall meet and maintain the following minimum annual Gross Revenue requirements depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation, as follows (the "Minimum Annual Revenue Requirements"):

| Mighty Dog Roofing Minimum Annual Revenue Requirements | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13 - 24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25 - 36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37 - 48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49 - 60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

All other provisions regarding Franchisee's payment obligations, including those related to Franchisee's Royalty or other fees, of the Franchise Agreements are hereby confirmed and ratified. Franchisor reserves the right, but not the obligation, to offer a royalty incentive programs for the benefit of qualifying franchisees. To qualify for such programs, Franchisee must satisfy Franchisor's then-current specifications and standards as provided in the Operations Manual or otherwise in writing by Franchisor. Franchisor reserves the right to modify, supplement, or terminate any royalty incentive programs upon notice to Franchisee.  If Franchisee fails to meet the Minimum Annual Revenue Requirements in any period, Franchisor may terminate the Franchisee's Protected Territories or otherwise terminate the Franchise Agreements.

4.      **Opening Package.**  Notwithstanding anything contained in Section 3.5 of the Applicable Franchise Agreements, Franchisee will not be required to purchase a separate Opening Package under each Applicable Franchise Agreement. If Franchisee purchases four (4) or more Protected Territories, Franchisor recommends, but does not require, Franchisee to purchase an additional Opening Package.

5.      **Local Brand Optimization Fee (First Year)**. Notwithstanding anything contained in Section 3.6 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Local Brand Optimization Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following Local Brand Optimization Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 1 | $12,000 |

| Number of Applicable Franchise Agreements/ Territories Purchased | Local Brand Optimization Fee |
|---|---|
| 2-3 | $12,000 |
| 4-5 | $24,000 |

6.      **Technology Fee**.  Notwithstanding anything contained in Section 3.8 of the Applicable Franchise Agreements, Franchisee will not be required to pay separate Technology Fees under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Technology Fee regardless of the number of Applicable Franchise Agreements executed.

7.      **Call Center Fee**.  Notwithstanding anything contained in Section 3.9 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Call Center Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Call Center Fee regardless of the number of Applicable Franchise Agreements executed.

8.      **Creative Media Fund Fee**.  Notwithstanding anything contained in Section 3.10 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Creative Media Fund Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Creative Media Fund Fee regardless of the number of Applicable Franchise Agreements executed.

9.      **Monthly Digital Management Fee**.  Notwithstanding anything contained in Section 3.11 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate monthly Digital Management Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay the following monthly Digital Management Fee:

| Number of Applicable Franchise Agreements/ Territories Purchased | Monthly Digital Management Fee |
|---|---|
| 1 | $500 |
| 2-3 | $1,000 |
| 4-5 | $1,500 |

10.      **Vehicles, Equipment and Inventory**.  Notwithstanding anything contained in Section 7.6.7 of the Applicable Franchise Agreements, if Franchisee purchases four (4) or more Protected Territories, Franchisee must add an additional crew, an additional salesperson, and an additional separate sales vehicle by the end of the second (2nd) year of operations of the Franchised Business.

11.      **Approved Location**. Notwithstanding anything contained in Section 1.3 of the Applicable Franchise Agreements, Franchisee shall only be required to have one physical location that satisfies Franchisee's Approved Location requirement, if, and only if, Franchisee's Territories are contiguous.

12.      **Default of Addendum Constitutes Default Under All Applicable Franchise Agreements**. In the event Franchisee breaches any of the provisions of this Addendum, such breach will

constitute a material default of all Applicable Franchise Agreements and must be cured within 30 days from Franchisee's receipt of Franchisor's written notice of such breach as set forth in Section 15.4 of the Applicable Franchise Agreements. If Franchisee fails to cure such breaches within the prescribed period, Franchisor may, at its option, terminate one or more of the Applicable Franchise Agreements immediately upon providing written notice, or otherwise terminate Franchisee's Protected Territories.

13. **Ratification and Confirmation of the Applicable Franchise Agreements**. Except as amended by this Addendum, any and all other terms and conditions set forth in the Applicable Franchise Agreements are hereby ratified and confirmed as if fully restated herein, including without limitation, those provisions regarding dispute resolution and venue, which will also apply to any claims or disputes arising out of or related to this Addendum. All capitalized terms not specifically defined in this Addendum will be afforded the definition given to them in the Applicable Franchise Agreements.

14. **Entire Agreement**. The Applicable Franchise Agreements and this Addendum constitute the entire, full, and complete agreement between the parties concerning the subject matter set forth herein and supersede any and all prior agreements. In the event of a conflict between the terms of any Applicable Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. This Addendum constitutes an amendment to all Applicable Franchise Agreements.

*Signatures appear on the following page.*

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Addendum the date and year first written above.

**FRANCHISOR:**
**MDR United LLC**

By: Josh Skolnick                                    Date: 9/9/2022
9AD574030DF9458...
Josh Skolnick, Managing Member

By: Zach Beutler                                      Date: 9/9/2022
8ACE8F5A4D3645F...
Zach Beutler, Managing Member

**FRANCHISEE:**

By: Michael Greenstein                               Date: 9/9/2022
FEF8B4680DC34CD...
Michael Greenstein, individually

# Exhibit D

# MDR UNITED LLC



# FRANCHISE AGREEMENT

© 2023 MDR United LLC
Franchise Agreement

i

## TABLE OF CONTENTS

**SECTION**                                                                                           **PAGE**

DATA SHEET ............................................................................................................ xii

1    GRANT OF FRANCHISE ................................................................................... 2

2    TERM AND RENEWAL ..................................................................................... 5

3    FEES ................................................................................................................... 7

4    PROPRIETARY MARKS ................................................................................. 14

5    CONFIDENTIAL INFORMATION ................................................................. 16

6    FRANCHISOR'S OBLIGATIONS ................................................................... 17

7    FRANCHISEE'S OBLIGATIONS .................................................................... 19

8    TRAINING ......................................................................................................... 29

9    INSURANCE ...................................................................................................... 31

10   FINANCIAL RECORDS AND REPORTS ....................................................... 32

11   BOOKS AND RECORDS ................................................................................. 33

12   ADVERTISING .................................................................................................. 35

13   INDEPENDENT CONTRACTOR; INDEMNIFICATION ............................. 40

14   SALE OR TRANSFER ...................................................................................... 41

15   BREACH AND TERMINATION ..................................................................... 45

16   RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION ............. 49

17   COVENANTS ..................................................................................................... 52

18   DISPUTE RESOLUTION ................................................................................. 53

19   REPRESENTATIONS ....................................................................................... 56

20   GUARANTEE OF PRINCIPALS THEIR AND SPOUSES ............................ 57

21   NOTICES ............................................................................................................ 58

22   MISCELLANEOUS ........................................................................................... 58

23   ACKNOWLEDGMENTS .................................................................................. 60

ii

**EXHIBITS**

Exhibit A       Personal Guaranty and Guaranty of Spouses

Exhibit B       Conditional Assignment of Franchisee's Telephone Numbers, Facsimile Numbers and Domain Names

Exhibit C       Confidentiality and Restrictive Covenant Agreement for Employees

Exhibit D       Electronic Funds Withdrawal Authorization

Exhibit E       Site Selection Addendum

Exhibit F       Collateral Assignment of Lease

Exhibit G       Territory Map

Exhibit H       Multi-Unit Addendum

Exhibit I       State Specific Addenda

© 2023 MDR United LLC
Franchise Agreement

## DATA SHEET

| | |
|---|---|
| Franchisee: | Donald Gaudreau Jr.<br>505 Drakestown Road,<br>Flanders, NJ 07836 |
| Guarantors: | Donald Gaudreau Jr.<br>505 Drakestown Road,<br>Flanders, NJ 07836 |
| Effective Date: | June ___, 2023 |
| Approved Location: | _____<br><br>_____ |
| Protected Territory: | See "Territory 2" set forth on the Map attached as Exhibit "G" to Franchise Agreement |
| Telephone Number: | (973) 980-8680 |
| E-Mail Address: | dgcues@hotmail.com |
| Initial Franchise Fee: | $40,000.00 |

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

## MDR UNITED LLC
## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective this __ day of June, 2023, by and between MDR United LLC, a Pennsylvania limited liability company, with its principal place of business at 2525 N. 117th Avenue, Third Floor, Omaha, Nebraska 68164 ("Franchisor"), and Donald Gaudreau Jr., an individual with an address at 505      Drakestown      Road, Flanders, NJ 07836, which is identified more fully in the attached Data Sheet ("Franchisee").

## RECITALS

A.     Through the expenditure of a considerable amount of time, effort, and money, Franchisor has developed a system for the operation of Mighty Dog Roofing businesses (each, a "Franchised Business") that offer, sell and perform roofing services in residential and commercial properties, including: (i) new and replacement roofing services; (ii) emergency tarping services; (iii) gutter replacement; (iv) siding replacement; (v) window replacement; and (vi) other products, services and events that Franchisor may approve and modify from time to time (collectively, the "Approved Products and Services").

B.     Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which currently include: (i) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Services to customers; (ii) certain proprietary products developed by Franchisor; (iii) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (iv) Franchisor's centralized System-wide call center (the "Call Center"); (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential operations manual (the "Operations Manual") that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.     The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin and intellectual property, including, without limitation, the "Mighty Dog Roofing" word mark registered on the Principal Register of the United States Patent and Trademark Office, as well as the "Mighty Dog Roofing" design mark(s) pending registration on the Principal Register of the United States Patent and Trademark Office (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.     Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Protected Territory").

© 2023 MDR United LLC
Franchise Agreement

E.    Franchisee desires to establish and operate a Franchised Business within the Protected Territory hereinafter designated, to use in connection therewith the Franchisor's System and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.    Franchisor wishes to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.    Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

## 1    GRANT OF FRANCHISE

1.1    **Grant and Acceptance**. Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisee may offer, sell and perform Franchisor's Approved Products and Services within the Protected Territory set forth in Section 1.2 herein. Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional Protected Territories.

1.2    **Protected Territory**. Except as otherwise provided in this Agreement and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third-party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Protected Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including without limitation, those rights set forth in Sections 1.4 through Section 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Protected Territory provided that (a) Franchisee will not be operating within another franchisee's Protected Territory, and (b) Franchisee received Franchisor's prior written consent, which may be withheld for any reason. Other than these operations, Franchisee is not permitted to operate the Franchised Business outside of the Protected Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Protected Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and

© 2023 MDR United LLC
Franchise Agreement

specifications as set forth in the Operations Manual (as defined in Section 6.1 herein). If, at any time during the term of this Agreement, more than 5% of Franchisee's Gross Revenues are derived from or within specific locations or areas that are outside of the Protected Territory, Franchisor may, among other conditions, require Franchisee to purchase an additional franchise, enter into Franchisor's then-current franchise agreement and pay to Franchisor its then-current initial franchise fee. Franchisor is not required to offer Franchisee the opportunity to enter into a franchise agreement to continue operations in any area outside of the Protected Territory and may revoke any prior granted approval allowing Franchisee permission to operate outside of the Protected Territory at any time, effective on notice to Franchisee.

1.3    **Approved Location**. Franchisee must operate the Mighty Dog Roofing Business from an approved facility that meets Franchisor's current standards and specifications (the "Approved Location"). Franchisee may use either a home office or leased commercial property as the Franchisee's Approved Location, however, if Franchisee elects to utilize a leased commercial property as Franchisee's Approved Location, such proposed location must: (i) be secured within ninety (90) days after the date of execution of the Franchise Agreement; (ii) be located in a Protected Territory; (iii) be approved and consented to by Franchisor in writing, prior to execution of any lease thereon; and (iv) meet Franchisor's current standards and specifications, including, but not limited to, square footage, design, layout, signage, equipment and inventory storage. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (attached hereto as Exhibit E), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

1.4    **National and Regional Accounts**. Franchisor has the exclusive right to create National and Regional Account ("NORA") programs for a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations, Chain Customers (as defined below) and other similar organizations for the benefit of the System. Franchisor or any party Franchisor may designate has the exclusive right to solicit and service NORA customers within or outside of the Protected Territory, including, the right to offer and sell Approved Products and Services. Franchisee may not solicit, service or otherwise pursue any NORA relationships, whether the contacts for these relationships are in the Protected Territory or not, without Franchisor's prior written consent. Franchisee may not service, solicit or otherwise pursue a relationship with a NORA or potential NORA or any of its members or associates, without notice to Franchisor and Franchisee's prior written consent. Any dispute as to whether a particular customer is considered a NORA customer will be determined by Franchisor, and its determination will be final and binding. A Chain Customer' is a non-residential customer, a group of customers, a partnership or group of partners, that operate under common ownership or control, under the same trademarks or service marks through independent franchises, dealers or licensees, or some other association, located at multiple locations whose presence is not confined within any one particular territory. Following the execution of a contract with or the acceptance of a bid by a NORA customer which contemplates the provision of services to one or more NORA locations within the Protected Territory, Franchisor may, at its sole option, provide Franchisee the option to perform such services pursuant to the terms and conditions of the NORA contract or on such terms and conditions as Franchisor determines in its sole discretion. In order to service any NORA customers, Franchisee must enter into Franchisor's then-current form of NORA participation agreement, the terms of which will govern all NORA work. Franchisee is not entitled to any right to compensation or

consideration for work performed by others in the Protected Territory for NORAs.

    1.4.1    Franchisor also shall have the right, exercisable in its sole discretion, to:

        A.  provide, directly or through any other licensee or franchisee utilizing the Proprietary Marks, services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract; and/or

        B.  contract with another party to provide such services to the NORA customer location(s) within the Protected Territory on the terms and conditions contained in the NORA bid or contract between Franchisor and the NORA customer, utilizing the Proprietary Marks or any other trademarks, service marks or trade names.

Neither the direct provision by Franchisor (or a System franchisee, licensee, or Franchisor's agent or designee) of services to NORA customers, nor Franchisor's contracting with another party to provide such services shall constitute a violation of Franchisee's rights in the Protected Territory. Franchisee disclaims any compensation or consideration for work performed by others in the Protected Territory on account of NORA customers within the Protected Territory.

    1.5    **Reservation of Rights**. Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Services, and otherwise use the Proprietary Marks and System, within the Protected Territory is non-exclusive and Franchisor and its affiliates expressly reserve the right to: (i) establish and operate, and license third parties the right to establish and operate, Franchised Businesses using the Proprietary Marks and System at any location outside of the Protected Territory; (ii) acquire, merge with, engage in joint ventures with, or otherwise affiliate with, and thereafter own and operate and franchise others the right to own and operate, any business of any kind regardless of location, except for businesses that offer roof repair and roof replacement within the Protected Territory; (iii) establish and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark other than the Proprietary Marks at any location, within or outside the Protected Territory; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service NORAs within and outside the Protected Territory as set forth more fully in Section 1.4; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center in accordance with Section 1.8 of this Agreement; (vii) sell and distribute, directly or indirectly, or license others to sell and distribute within or outside the Protected Territory, directly or indirectly, any products, services or merchandise, including Approved Products and Services, from any location or to any purchaser or through any alternative channel or method of distribution including, but not limited to, via retail and wholesale distribution, in supermarkets, hardware stores, club stores and other retail facilities, via mail order and e-commerce channels; and (viii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

    1.6    **Events of Catastrophe.**  Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliates and/or other System franchisees may be permitted to provide support to Franchisee and/or

perform work in the Protected Territory, including the provision of labor, materials, equipment, and project management on projects in the Protected Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Protected Territory.

1.7    **Alternate Channels of Distribution.** Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Protected Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine. Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Services as described in this Section 1.7; or (ii) to share in any of the proceeds received by any such party therefrom.

1.8    **Right to Service Customers in Protected Territory; Use of Call Center.**

1.8.1    Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor (or its designee) will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Protected Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and (a) Franchisee does not respond to the assignment within a time period Franchisor deems in its sole discretion appropriate under the circumstances, or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems appropriate in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that the Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Protected Territory has been subjected to a disaster or catastrophe.

1.8.2    Franchisee agrees and acknowledges that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Protected Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

## 2    TERM AND RENEWAL

2.1 **Term**. The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

2.2 **Renewal**. Franchisee has the right to renew this Agreement for one successive, additional ten (10) year period, provided Franchisee has met the following conditions:

2.2.1 Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

2.2.2 Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location and within the Protected Territory for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Protected Territory acceptable to Franchisor;

2.2.3 Franchisee has completed, to Franchisor's satisfaction, ninety (90) days prior to the expiration of the then-current term, any updates to all required equipment, tools, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications and, Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

2.2.4 Franchisee is not in breach of any provision of this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

2.2.5 Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

2.2.6 Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without limitation, increased royalty and other fees and insurance requirements);

2.2.7 Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to operating the Franchised Business or providing the Approved Products and Services at any location within the Protected Territory;

2.2.8 Franchisee and its principals execute a general release in the form Franchisor prescribes; and

2.2.9 Franchisee pays a renewal fee in the amount of twenty percent (20%) of the then-

current initial franchise fee.

## 3    FEES AND MANNER OF PAYMENT

3.1    **Initial Franchise Fee**. In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee, calculated as follows (the "Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | Cumulative Number Owner Occupied Homes |
|---|---|---|---|
| #1 | $59,500 | $59,500 | 50,000 |
| #2 | $99,500 | $40,000 | 100,000 |
| #3 | $134,500 | $35,000 | 150,000 |
| #4 | $164,500 | $30,000 | 200,000 |
| #5 | $194,500 | $30,000 | 250,000 |

The Initial Franchise Fee is due upon execution of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise others. If the cumulative number of owner-occupied homes figures used to calculate Franchisee's Protected Territory exceeds the number of owner-occupied homes figures set forth in this Section 3.1, Franchisee shall pay, in addition to the Initial Franchise Fee set forth in this Section 3.1, an overage fee in an amount equal to the number of excess owner-occupied home(s) figures multiplied by one dollar and nineteen cents ($1.19) per home.

3.2    **Royalty Fee**. Franchisee must pay Franchisor a weekly royalty fee (the "Royalty") in an amount equal to the greater of: (i) eight and one-half percent (8.5%) of Gross Revenues Collected during the immediately preceding week; or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.1.

3.2.1    *Minimum Royalty Fee and Minimum Annual Revenue Requirements.*

Franchisee must meet and maintain the following weekly Minimum Royalty Fees per Protected Territory throughout the Term. Franchisee's weekly Minimum Royalty Fees are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Franchised Business(es) have been open and operating.

Franchisee's Minimum Royalty Fees are as follows:

| Mighty Dog Roofing Minimum Royalty Fees Per Week Per Territory | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13-24 | $750 | $438 | $333 | $281 | $250 |

| | | | | |
|---|---|---|---|---|
| Months 25-36 | $875 | $563 | $500 | $469 | $438 |
| Months 37-48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49-60+ | $1,250 | $938 | $833 | $781 | $750 |

In addition, Franchisee must meet and maintain the following minimum annual Gross Revenue requirements ("Minimum Annual Revenue Requirements") per Protected Territory throughout the Term. Franchisee's Minimum Annual Revenue Requirements are based upon: (a) the number of Protected Territories Franchisee has purchased, and (b) the number of months the Franchised Business(es) have been open and operating.

Franchisee's Minimum Annual Revenue Requirements are as follows:

| Mighty Dog Roofing Minimum Annual Revenue Requirements Per Territory | | | | | |
|---|---|---|---|---|---|
| Months of Operation | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5 Territories |
| Months 13-24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25-36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37-48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49-60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

The parties will true-up all Royalty payments, whether actual or Minimum Royalty Fee payments for each applicable 12-month period, at the period's end by evaluating each period's obligations on an annualized basis. In the event Franchisee's fails to meet the above Minimum Royalty Fees or Minimum Annual Revenue Requirements, Franchisor may terminate the Protected Territory or otherwise terminate this Agreement.

However, Franchisee will not be subject to a Minimum Royalty Fee during the first twelve (12) months of operations on the condition that Franchisee strictly complies with all its obligations during the first twelve (12) months of operations and Franchisee shall pay the Royalty fee equal to eight and one-half percent (8.5%) of Gross Revenues Collected by the Franchised Business during the first twelve (12) months of operations.

"Gross Revenues Collected" means any and all revenue or other compensation actually collected by Franchisee from customers of the Franchised Business.

"Gross Revenues" are defined in the Franchise Agreement to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by or on account of the operation of the Franchised Business at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including but not limited to cash, services, in kind from barter and/or exchange, on credit or otherwise as well as business interruption insurance proceeds. Gross Revenues shall also include the total amount of all sales for labor, material, equipment and/or services performed or rendered by: (a) Franchisee, or (b) any third-party subcontractors or agents of Franchisee who perform services for Franchisee's customers or clients as part of Franchisee's services. Gross Sales shall also include all commissions, finder's fees, referral fees, construction management fees or other compensation received by Franchisee on the value of any work performed. Franchisee agrees that all

Royalty Fees, including any Minimum Royalty Fee, are non-refundable. However, the definition of Gross Revenues does not include sales tax that is collected from customers and transmitted to the appropriate taxing authorities.

3.2.2 *Special Programs*. Franchisor reserves the right, but not the obligation, to establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

3.3     **Gross Revenue Reporting**. Franchisee agrees to report Gross Revenue in such form or format as Franchisor may specify from time to time. Franchisor may, at any time, and from time to time, modify the required form or format. Franchisor reserves the right to require Franchisee to provide Franchisor with verified Gross Revenue Reports in the event Franchisor is unable to process electronic funds transfer based upon information Franchisee inputs into the POS System. Each Gross Revenue Report must set forth: (i) Gross Revenues Collected generated during the previous week; (ii) calculation of the Royalty; and (iii) any other information Franchisor may require. If a Gross Revenue Report is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the electronic funds transfer, then Franchisor may withdraw additional funds through an electronic funds transfer from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the electronic funds transfer, then Franchisor will credit the excess amount to the payment of Franchisee's future obligations.

3.4     **Method of Payment**. With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement, or any other agreement between Franchisee and Franchisor or its affiliates, via wire transfer or from the bank account Franchisee provides to Franchisor for use in connection with EFT Program (the "EFT Account"). Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks, and credit card receipts. At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Authorization Form attached as Exhibit D to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer. Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account. Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement by such other means as Franchisor may specify from time to time.

3.5     **Opening Package**. Within forty-five (45) days after execution of this Agreement, Franchisee must purchase from Franchisor, or its affiliate or designated vendor (as designated by Franchisor), the required opening package at its then-current cost, which includes items such as tarp, catch all system promotional materials, including printed items, pitch books, yard signs, clothing, and other equipment, tools, and supplies related to the operation of the franchised Mighty Dog Roofing Business (the "Opening Package"). The current cost of the Opening Package is $22,000 to $31,000, plus

shipping and freight costs. Franchisor reserves the right to modify the components, standards and/or specifications of the Opening Package, which may modify the total costs associated with the Opening Package. The Opening Package includes the cost of Franchisor's insurance claims assistance fee ("Insurance Claims Assistance Fee"), that covers third-party vendor costs and other expenses associated with insurance claim assistance services provided to Franchisee by Franchisor or its affiliate or designated vendor, including investigating the building requirements in Franchisee's market on a state, county and at local level, and assisting Franchisee in the preparation of insurance claims. If Franchisee purchases more than one (1) Protected Territory, Franchisee may, but shall not be required, to purchase additional Opening Packages.

3.6    **Local Brand Optimization Fee (First Year)**. Within forty-five (45) days after execution of this Agreement, Franchisee must pay to Franchisor or its affiliate a local brand optimization fee in the amount of $15,000 (the "Local Brand Optimization Fee"), in connection with the costs of local SEO optimization for Franchisee's first twelve (12) months of invoices (as determined by Franchisor).

3.7    **Brand Fund Contribution**. As set forth more fully in Section 12.3 of this Agreement, Franchisor reserves the right to re-establish a national brand fund for advertising and brand promotion (the "Brand Fund"). If re-established, Franchisee shall be required to make weekly contributions of up to three percent (3%) of Gross Revenues Collected by the Franchised Business for sales made during the immediately preceding week (the "Brand Fund Contribution"). The Brand Fund Contribution shall not exceed three percent (3%) of Franchisee's weekly Gross Revenues Collected, nor shall the sum of the Brand Fund Contribution and the Royalty fee exceed the then-current Royalty fee immediately preceding re-establishment of the Brand Fund, as a percentage of weekly Gross Revenues. If re-established, Franchisee must pay the Brand Fund Contribution to Franchisor each week in the same manner as Franchisee is required to pay their Royalty fees. Franchisor may require Brand Fund Contributions to be paid as directed by Franchisor via the EFT Program, or as otherwise required by the Operations Manual or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Franchisor reserves the right to modify the Brand Fund Contribution and/or modify the digital marketing and advertising requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Brand Fund Contribution, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee (which need not exceed 30 days).

3.8    **Technology Fee**. Within forty-five (45) days after execution of this Agreement, Franchisee must pay Franchisor a then current annual technology fee (the "Technology Fee") for Franchisee's first twelve (12) months of invoices (as determined by Franchisor), which Franchisor will collect on Franchisee's behalf and remit to its designated vendors. Thereafter, Franchisee must pay Franchisor or its designated vendors the Technology, on a monthly basis. The current annual Technology Fee is $9,500. The current monthly Technology Fee is $792. The Technology Fee covers the costs associated with using and maintaining the required computer hardware and software, hosting services and solutions, system network functions, updating microsites, data reporting, various software programs, and any other technology Franchisee must utilize in connection with the operation of, or otherwise used in the operation of, the Franchised Business, including software to assist in measuring, training, business efficiencies, dashboard and KPIs. Franchisee shall pay the Technology Fee to Franchisor in the manner prescribed by Franchisor or the designated vendor, as applicable, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer

or technology requirements or as required by the third-party service provider(s) or by any regulatory agency. If Franchisee purchases more than one Protected Territory, Franchisee shall only be required to pay one Technology Fee.

3.9    **Call-Center Fee**. Franchisor, or Franchisor's affiliate HPB Call Center, has established a call center ("Call Center") which will field all calls and manage prospective and existing Mighty Dog Roofing customers and route/assign work orders/inquiries as Franchisor deems necessary in Franchisor's sole discretion. Within forty-five (45) days after execution of this Agreement, Franchisee must pay Franchisor or Franchisor's affiliate HPB Call Center (as Franchisor designates) all associated start-up fees, monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call-Center Fee"), which are subject to change at any time. In addition to the Call Center Fee, Franchisee must pay $15 per scheduled lead. As of the date of this disclosure document, the current annual Call Center Fee is $3,600 for Franchisee's first twelve (12) months of invoices (as determined by Franchisor). Thereafter, Franchisee will be billed on a monthly basis. As of the date of this disclosure document, the current monthly Call Center Fee is $300 per month. All scheduled lead fees will be paid as incurred or as required by Franchisor, or Franchisor's affiliate HPB Call Center. All Call Center Fees and scheduled lead fees that Franchisee must pay are subject to change at any time. Franchisor reserves the right to modify the Call Center Fee as call center or lead generation fees increase, new call center or lead generation technology and software becomes available, and/or Franchisor modifies the call center or lead generation requirements, at any time upon providing reasonable notice. Franchisor also reserves the right to change the amount of the Call Center Fee as changes are made to the Call Center or as required by any third-party service provider(s) or by any regulatory agency, at any time upon providing reasonable notice to Franchisee, and to designate and/or change the amount, scope, structure, or manner of payment of the Call Center Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

3.10    **Creative Media Fund Fee.** Within forty-five (45) days after execution of this Agreement, Franchisee must pay Franchisor a creative media fund fee ("Creative Media Fund Fee") of $6,500 to cover costs associated with video production, actors' and actresses' compensation, video editing, and related advertising or marketing expenses. This is a one-time fee. If Franchisee purchases more than one (1) Protected Territory, Franchisee shall only be required to pay one Creative Media Fund Fee.

3.11    **Digital Management Fee.** Franchisee must pay Franchisor's affiliate, Franchise Rocket, a monthly digital management fee (the "Digital Management Fee"). Currently, the Digital management Fee is $1000 per month. The Digital Management Fee covers the costs of digital marketing and website management. Franchisor reserves the right to modify the Digital Management Fee as Franchisor modifies the digital marketing and advertising requirements that Franchisee must use for the Franchised Business, and to designate and/or change the amount, scope, structure, or manner of payment of the Digital Management Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days). If Franchisee purchases more than one (1) Protected Territory, Franchisee shall only be required to pay one Digital Management Fee.

3.12    **Late and/or Under Payments and Interest.** All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company, and other amounts which Franchisee owes to the Franchisor and/or its affiliated company, not received on or before the due date, shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to the Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one

and one half percent (1.5%) per month, or the maximum rate permitted by law, whichever is greater. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement.

3.13    **No Right to Off Set.** Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.14    **Non-Exclusive Remedies**. Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waive, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

3.15    **Taxes on Payments**. In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.16    **Administrative Fee**. Franchisee must pay Franchisor its then-current administrative fee (the "Administrative Fee") in the event Franchisor makes and processes any amendments, modifications, or otherwise supplements this Agreement at the request of Franchisee or is otherwise required due to Franchisee's actions.

3.17    **Outstanding A/R Collection Fee**. Franchisor has the right to assist Franchisee in collecting outstanding balances from Franchisee's customers for amounts more than 60 days past due. If Franchisor assists in collecting such outstanding amounts, Franchisee must pay Franchisor a fee in the amount of 15% of the amount collected.

3.18    **Insurance Claims Assistance Fee**. Prior to opening, Franchisee must pay Franchisor a fee of $1,000 to cover Franchisor's costs in providing Franchisee insurance claim assistance services, in which Franchisor will investigate the building requirements on a state, county and at local level in Franchisee's market in order to assist Franchisee in preparing insurance claims. Such costs may be used to cover third-party vendors costs that are non-refundable upon payment. This Insurance Claims Assistance Fee is included in the cost of the Opening Package.

3.19    **Memberships and Subscriptions**. Franchisee must participate in all membership and subscription services that Franchisor requires. Currently, Franchisee must participate in the Owens Corning Platinum Preferred Contractor program immediately upon launching the Franchised Business and pay all dues associated with the program, currently $2,500 per year, which are subject to increases from time to time. Franchisees must continue this annual membership, or any similar membership that Franchisor may require from time to time.

3.20    **Accounting Services Fee**. Within forty-five (45) days after execution of this Agreement, Franchisee must pay Franchisor's designated affiliate HPB Accounting LLC d/b/a ZeeBOOKS, a then-current fee for all bookkeeping, payroll, and certain billing services for Franchisee's first twelve (12) months of invoices (as determined by Franchisor), excluding the monthly subscription fees set forth below ("Accounting Services Fee"). As of the date of this Agreement the current annual Accounting Services Fee is $4,999 and is due within forty-five (45) days after execution of this Agreement. Thereafter, Franchisee will be billed on a monthly basis. As of the date of this Agreement the current

monthly Accounting Services Fee is $399 per month, which is subject to increases over the term of the Franchise Agreement. Franchisor reserves the right to increase Franchisee's required spend on the Accounting Services Fee up to 0.5% of Franchisee's total Gross Revenues Collected. The Accounting Services Fee does not include the costs of: (i) Franchisee's required monthly subscription to online accounting software, which is currently $60 per month per user; (ii) Franchisee's required monthly payroll fee, which is currently $70 per month; or (iii) a $1 fee for each accounting service transaction. These fees are subject to change at any time. Franchisor also reserves the right to modify the Accounting Services Fee as new bookkeeping resources and technology becomes available or changes, and/or modify the bookkeeping requirements that Franchisee must use for the Mighty Dog Roofing Business, and to designate and/or change the amount, scope, structure, or manner of payment of the Accounting Services Fee, including the party to whom payment is made, at any time upon providing reasonable notice.

3.21    **Annual Conference Fee**. Franchisee must pay to Franchisor an annual fee for Franchisee's registration and attendance to Franchisor's annual conference for the System (the "Annual Conference"), if held by Franchisor, and as further described in Section 6.8. Franchisee and Franchisee management (if applicable) must register for and attend the Annual Conference and pay Franchisor the then-current registration and attendance fee (the "Annual Conference Fee"), which shall not exceed $1,000 per attendee. If Franchisee does not register for the Annual Conference, Franchisee must pay Franchisor a fee of $1,000.

3.22    **Drone Kit Fee**. Franchisee must pay to Franchisor's designated vendor a then current drone kit fee ("Drone Kit Fee") for Franchisee's first twelve (12) months of invoices (as determined by Franchisor). The current Drone Kit Fee is between $8,600-$10,000 depending on the Drone Kit package and options Franchisee selects. Franchisor also reserves the right to modify the Drone Kit Fee, to modify the drone kit requirements that Franchisee must use in the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the Drone Kit Fee, including the party to whom payment is made, at any time upon providing reasonable notice to Franchisee.

3.23    **National Permit Database Fee**. Franchisee must pay to Franchisor a then current monthly National Permit Database Fee in the amount designated by Franchisor. This budget is directed towards access, training, and use of certain real property permit databases in Franchisee's local market. As of the date of this disclosure document, the National Permit Database Fee is $99 per month. Franchisor reserves the right to modify the National Permit Database Fee as new permit database resources and technology becomes available or changes, and/or modify the new permit database requirements that Franchisee must use for the operation of the Franchised Business, and to designate and/or change the amount, scope, or manner of payment of the National Permit Database Fee, including the party to whom payment is made, at any time upon providing reasonable notice (which need not exceed 30 days).

3.24    **Recruiting Fee**. Franchisor offers optional recruiting services to Franchisee to assist Franchisee in recruiting key employees and subcontractors. Franchisee may, but is not required to, elect this service, and if so elected, Franchisee must pay Franchisor, or its affiliate, a then-current recruiting fee.

**4    PROPRIETARY MARKS**

4.1     **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**.

4.1.1    Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

4.1.2    Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Protected Territory and in sales and marketing for the Franchised Business.

4.1.3    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable. Franchisee may not use the Proprietary Marks in connection with the offer or sale of any services or products which Franchisor has not authorized for use in connection with the System. Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name. Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use. Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (collectively the "Proprietary Material"). Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material. Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material. If Franchisor, in

© 2023 MDR United LLC
Franchise Agreement

14

Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement. If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement. In the event of any litigation relating to Franchisee's use of the Proprietary Material, Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution including, without limitation, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

      4.1.9    Franchisee expressly understands and acknowledges that:

      4.1.9.1    Franchisor or its affiliates or licensors own all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

      4.1.9.2    The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

      4.1.9.3    During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

      4.1.9.4    Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

      4.1.9.5    Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

      4.1.9.6    Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

      4.1.9.7    Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder. Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within ten (10) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

## 5    CONFIDENTIAL INFORMATION

5.1    **Nondisclosure**. During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information. Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any Confidential Information, as defined in Section 5.2. Upon termination or expiration of this Agreement, regardless of reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately and Franchisee may not use the Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2    **Confidential Information**. Confidential Information hereby includes, without limitation, any and all confidential, proprietary, and trade secret information relating to the operation of a Franchised Business, such as: all financial, operational, technical and marketing information; the Operations Manual and Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; cost data; pricing information; business plans; financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; photographs, devices, samples, models, and illustrations; software developed by or for Franchisor; customer lists and any information relating to Franchisor's customers or the customers of other System franchisees; patent, trademark, service mark, and copyright applications; information relating to inventions, discoveries, software and any other research and development information; methods of conducting the Franchised Business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; any information of a customer not generally known or available to the public; any Trade Secrets (as defined in Section 5.3 of this Agreement), or of a customer of Franchisor, or of any other franchisee; and any information about or originating from any Franchisee which, if it was information of Franchisor, are expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3    **Trade Secrets**. Notwithstanding Section 5.2, trade secret means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, list of actual or potential customers or suppliers) that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4    **Employees and Subcontractors**. All of Franchisee's employees and subcontractors must execute covenants that they will maintain the confidentiality of information they receive in connection

with their employment or engagement by Franchisee at the Franchised Business. Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant attached as Exhibit C to this Agreement. Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5     **New Concepts.** If Franchisee, or Franchisee's employees, principals or subcontractors, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation.    Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent applications, trademarks, copyrights and other intellectual property rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentations for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

5.6     **Customer Privacy**.  Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop.  Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

# 6     FRANCHISOR'S OBLIGATIONS

6.1     **Operations Manual**. Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual and intranet system, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre-opening procedures, systems and procedures, personnel policies, specifications for vehicles and vehicle wraps, supplies, equipment and inventory, marketing, accounting and bookkeeping and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of the Franchisor, constituting a trade secret of Franchisor, and may not be, shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right

to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System.

6.2    **Opening Package; Initial Equipment, Tools and Supplies**. Franchisor, or its affiliates or designated vendors, as determined by Franchisor in its sole discretion, will provide Franchisee with an Opening Package upon Franchisee's payment of the required fees. Franchisor will also provide a list of all items, equipment, tools, and supplies required to open and operate the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), which may include Franchisor its affiliates, and designated third-party suppliers, with which Franchisee must comply.

6.3    **Ongoing Assistance**. Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means. If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current Assistance Training Fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion. Franchisor may also use the Operations Manual, as defined in Section 6.6, to provide some self-serve training materials.

6.4    **Additional Training**. As set forth more fully in Section 8.2, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee and Franchisee's personnel to attend such additional training at a location to be selected by Franchisor and pay Franchisor's then current additional assistance or refresher training fee ("Assistance Training Fee"). All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.5    **Remedial Training**. In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to remedial training (in addition to any required training under Section 6.4). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current Assistance Training Fee to provide such remedial training. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Protected Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal, and lodging expenses.

6.6     **Call Center**. Franchisor, or Franchisor's affiliate HPB Call Center, has established and currently maintains the Call Center. Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay to Franchisor or Franchisor's affiliate HPB Call Center (as Franchisor designates) in connection with administering and maintaining Call Center services. Franchisor or Franchisor's affiliate HPB Call Center has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls, as well as provide digital sales services, including an online sales platform, as Franchisor deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Protected Territory. All Franchised Business-related phone numbers and internet lead sources are required to be ported to or directed to Franchisor or its affiliates. Franchisor or Franchisor's affiliate HPB Call Center reserves the right to discontinue the Call Center and the Call Center services at any time.

6.7     **Pricing**. Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. Franchisee may charge whatever prices it deems appropriate without regard to Franchisor's suggested pricing.

6.8     **Annual Conference**. Franchisor may, in Franchisor's discretion, hold an annual conference at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if it chooses to charge a registration fee in its sole discretion. Franchisor reserves the right to charge Franchisee a fee to cover convention expenses in the event the Franchisee chooses not to attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals, and salaries during the Annual Conference, are Franchisee's sole responsibility. Franchisor may use Brand Fund Contributions for purposes related to the Annual Conference, including costs related to productions, programs, and materials.

6.9     **Resale of Certain Surplus Equipment or Vehicles.** In the event that Franchisee holds a surplus of certain equipment or vehicles that Franchisee no longer needs for the operation of the Franchised Business, Franchisor may, in Franchisor's sole discretion, assist Franchisee in the resale of certain equipment or vehicles, using commercially reasonable best efforts, through Franchisor or Franchisor's affiliates, including the resale of vehicles through Franchisor's affiliate HPB Fleet.

# 7    FRANCHISEE'S OBLIGATIONS

7.1    **Site Location and Lease Approval**. Franchisee shall operate the Franchised Business from an approved facility that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee may use either a home office or leased commercial property as Franchisee's Approved Location, however, if Franchisee elects to utilize a leased commercial property as the Approved Location, such proposed location must: (i) be secured within ninety (90) days after the date of execution of this Agreement; (ii) be located in a Protected Territory; (iii) be approved and consented to by Franchisor in writing, prior to execution of any lease thereon; and (iv) meet Franchisor's current standards and specifications, including, but not limited to, square footage, design, layout, signage, equipment and inventory storage. Franchisee must continuously maintain an Approved Location throughout the Term of the Franchise Agreement without interruption. Franchisee may not relocate the Mighty Dog Roofing Business without Franchisor's prior written consent. Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form attached hereto as Exhibit F

7.1.1    *Relocation*. If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Protected Territory to complete the unexpired portion of the term of this Agreement. Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within forty-five (45) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its reasonable costs and expenses associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation.

7.1.2    *Franchised Business Appearance and Approved Location Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout, and design of a Franchised Business. Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permits requirements, and any other applicable local, state, or federal law.

7.1.3    *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

7.2    **Training**. Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program as set forth more fully in Section 8 of this Agreement. Franchisor has the right to require up to two (2) individuals to attend in addition to Franchisee, one of which must be Franchisee's general manager or Designated Manager.

7.3    **Opening Requirements**. Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. In addition to any other pre-opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to

commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Protected Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, tools, supplies, and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers, that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program as described defined in this Agreement, as well as any other pre-opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement.

7.4    **Purchasing Requirements**.

7.4.1    *Compliance with Standards.* Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System. Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same. Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion. Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

7.4.2    *Designated and Approved Suppliers.* Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "Approved Supplier"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliates and/or a third party may be one of several, or the only, Approved Supplier of any item. Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue and other material consideration on any products and/or services that Franchisor, Franchisor's affiliates and/or Franchisor's Approved Suppliers supply and/or provide to Franchisee. Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

7.4.3    *Supplier Approval.* In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known. At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier. Franchisor may base Franchisor's approval of any such proposed item or supplier on

considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency, and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information. Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate. Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

7.4.3.1 Franchisee, or the proposed supplier, must pay Franchisor in advance for Franchisor's reasonable costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

7.4.3.2 Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

7.4.3.3 Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third-party to supply, provided that third-party executes Franchisor's prescribed form of non-disclosure agreement.

7.4.3.4 Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

7.4.3.5 Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

7.4.4    *System Suppliers.* Franchisor may establish business relationships, from time to time, with suppliers, including affiliates of Franchisor, who may produce and/or provide certain goods or services that Franchisee is required to purchase from only that supplier (each a "System Supplier"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software, and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally. Franchisee further recognizes that Franchisee's failure to pay System Suppliers

may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product or ability to obtain product only on less favorable credit terms. Accordingly, Franchisee agrees to pay System Suppliers as and when due. Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

      7.4.5    *Rebate Program*. Franchisor and/or its affiliates and/or designated suppliers reserve the right to establish one or more rebate programs for qualifying purchases of certain products and/or services, and/or use of Franchisor's approved suppliers or designated vendors (the "Rebate Program") which may include discounted pricing, special terms, rebates, or other incentives or benefits (individually and collectively, the "Rebate"). Franchisee may, but is not required to, participate in the Rebate Program. Franchisor, or its affiliate, approved supplier, or designated vendor, shall provide a Rebate to Franchisee upon Franchisee's election to participate in the Rebate Program and Franchisee's compliance with the terms and conditions of the Rebate Program, on the terms and conditions set forth by Franchisor, in its sole discretion. Franchisor and/or its affiliates and/or third party suppliers reserve the right to (but are not contractually required to) establish and offer Franchisee an opportunity to participate in one or more Rebate Programs and to condition Franchisee's participation in any such Rebate Program on, among other conditions Franchisor may designate, Franchisee: (i) meeting certain eligibility requirements; (ii) executing Franchisor's designated form of Rebate Program participation agreement or amendment, which may include, among other terms, a general release of any and all claims in favor of Franchisor and its owners, officers, directors, affiliates, parents, subsidiaries, predecessors, successors and assigns; and (iii) compliance with purchasing requirements. Franchisor, its affiliates and third-party suppliers are not required to establish or offer Rebate Programs, but may do so at any time. The determination of qualifying purchases of certain products or services, or use of Franchisor's approved suppliers or designated vendors for the Rebate Program shall be made by Franchisor in its sole discretion. If Franchisee elects to participate in the Rebate program, Franchisee's participation in the Rebate Program may require Franchisee to meet certain conditions, which shall be communicated to Franchisee by Franchisor in writing. The terms and conditions of the Rebate Program, including the administration and/or establishment or continuance thereof, shall be determined by Franchisor in its sole discretion and may change at any time, upon reasonable notice to Franchisee. Franchisee must comply with all of the terms and conditions of the Rebate Program to receive the Rebate. Franchisee acknowledges, understands, and agrees that regardless of Franchisee's election to participate in the Rebate Program, Franchisee shall meet the purchasing requirements, terms, and conditions set forth in the disclosure document, Franchise Agreements, Operations Manual, or Franchisor policies and procedures. All fees or Rebates that are not provided to Franchisee under the Rebate Program may retained by Franchisor, or its affiliate, approved supplier or designated vendor, to cover administrative costs, promotion of Franchisor's System, or Franchisor's brand. Additionally, if established, Franchisor, its affiliates and third-party suppliers reserve the right to discontinue or terminate any Rebate Program at any time effective upon reasonable notice to Franchisee. Franchisee acknowledges, understands, and agrees that Franchisor, and/or its affiliates, may derive revenue or receive a commission or fee from the Rebate Program and hereby consents thereto.

      7.5    **Authorized Products and Services**. Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization. Franchisee shall at all times maintain sufficient levels of inventory, as

specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees. In the event Franchisee wishes to offer any Approved Products or Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Services.

7.6     **Operations.**

7.6.1     *Hours of Operation.* Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

7.6.2     *Maintenance of Premises and Project Sites.* Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual. Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

7.6.3     *Personnel/Staffing.* Franchisee must employ a sufficient number of qualified, competent personnel, offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

7.6.4     *Compliance with Operations Manual and Training of Employees.* Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual and shall continue such training and instruction as long as each employee is employed. Franchisee shall cause any third-party subcontractor engaged by Franchisee to perform work on behalf of Franchisee with respect to the Franchised Business to comply with all applicable requirements of this Agreement, including, but not limited to, Franchisor's quality and performance standards. The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

7.6.5     *Management Participation.* Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote his or her personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon Franchisee's written request, Franchisor shall permit Franchisee to employ a manager to manage the day-to-day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program before assuming any managerial responsibility. The Franchised Business must, at all times, be staffed with at least one (1) individual who has successfully completed Franchisor's Initial Training Program as

set forth in Section 8.1. In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business. In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly.

7.6.6    *Working Capital.* Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7    *Equipment and Inventory.* Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with representative vehicles (each wrapped in accordance with Franchisor's specifications), equipment, tools, supplies, and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by the Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand. Franchisor reserves the right to require Franchisee to invest in additional infrastructure and/or equipment and staffing requirements, as may be set forth more specifically in the Manual or otherwise in writing, to ensure adequate brand servicing in the Protected Territories, including in the event Franchisee's accounts receivable grows in excess of 40% (or such other percentage as Franchisor may designate) of Franchisee's overall Gross Revenues Collected or Franchisee's backlog of jobs reaches 12 weeks (or such other time period as Franchisor may designate).

7.6.8    *Products with Proprietary Marks.* Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor. Franchisee must wrap each vehicle used in connection with the operation of the Franchised Business in accordance with Franchisor's specifications.

7.6.9    *Market Research.* Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.7    **Franchised Business Inspection.** Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to

Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

7.8  **Computer Software and Hardware.**

7.8.1  *Computer System.* Franchisor shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, applications, and hardware be used by Franchisee, including without limitation: (a) a compatible computer system that complies with Franchisor's standards and specifications and is capable of operating financial and other business software; (b) printers and other peripheral hardware or devices; (c) archival back-up systems; and (d) Internet access mode and bandwidth (collectively, the "Computer System").

7.8.2  *Required Software.* Franchisor shall have the right, but not the obligation, to develop or designate: (a) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's proprietary software (collectively, the "Required Software"), which Franchisee must license from Franchisor; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee must install at its expense; (c) the tangible media upon which Franchisee records data; and (d) the database file structure of the Computer System.

7.8.3  *Compliance with Requirements.* At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section 7.8.3 shall be at Franchisee's sole cost and expense.

7.8.4  *Franchisor's Access.* Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section 7.8 within thirty (30) days of opening the Franchised Business.

7.8.5  *Proprietary Software.* Franchisor has a proprietary interest in all databases, lists, templates, programs and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create programs that conduct, among other things, scheduling, accounting, inventory, and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's confidential information.

7.8.6    *Computer Network*. Franchisee is required to participate in any System-wide computer network, intranet system, or extranet system that Franchisor implements and may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor on-line; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) to complete any initial or ongoing training, in the event Franchisor makes such training accessible through this medium. Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

7.9    **Personal Conduct**. Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

7.10    **Best Efforts**. Franchisee (or Franchisee's principals or designated manager) must devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Protected Territory. Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and System. Franchisee acknowledges that Franchisee's (or Franchisee's principals' or designated manager) violation of the terms in this Section 7.10 will be a material breach of this Agreement, and Franchisor may terminate this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

7.11    **Telephone and Email Access.** Franchisor reserves the right to procure and supply dedicated telephone numbers and email accounts associated with the Franchised Business.

7.12    **Payment of Debts**. Franchisee is solely responsible for: selecting, retaining and paying Franchisee's employees; the payment of all invoices for the purchase of goods and services used in connection with operating the Franchised Business; and determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business. Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors, and creditors on a timely basis. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System suppliers and System franchisees. Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, personal property and real estate taxes arising from Franchisee's operation of the Franchised Business. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13    **Compliance with Applicable Laws.** Franchisee must comply with all applicable

federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to occupational hazards and health, trademark and copyright infringement, fair marketing laws, consumer protection, trade regulation, workers' compensation, unemployment insurance, withholding and payment of Federal and State income taxes and social security taxes and sales, use and property taxes, and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the operation of the Franchised Business). Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors. Franchisee agrees to be solely responsible for all employment decisions and to comply with all state, federal, and local hiring laws and functions of the Franchised Business, including without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part-time. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates.

7.14    **Trade Secrets and Confidential Information.** Franchisee and all employees and subcontractors must maintain the confidentiality of all Confidential Information as set forth in Section 5 of this Agreement.

7.15    **Image.** Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other roofing service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service. Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System. Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity and increase the demand for the products sold and services rendered by System franchisees. Franchisee agrees to comply with the standards, specifications and requirements Franchisor set forth in order to uniformly convey the distinctive image of a Mighty Dog Roofing franchised business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16    **Pending Actions.** Franchisee shall notify Franchisor, in writing, within five (5) days of the commencement of any action, suit or proceeding and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17    **Standard Maintenance and System Conformity.** Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s), equipment, tools and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the

premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

7.18 **Customer Service**. Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, warranties on any Approved Products or Services offered or sold by the Franchised Business, refund policies and other standards and specifications.

7.19 **Warranty**. Franchisee agrees to offer and honor such warranty on all materials and workmanship sold by Franchisee as Franchisor may designate from time to time in the Operations Manual or otherwise in writing. Franchisee shall cooperate with Franchisor warranty claims and shall make no statements or admissions as to liability. Franchisee shall promptly report all warranty claims to Franchisor and shall undertake all warranty work under the Proprietary Marks. All costs associated with administering and honoring the warranty service shall be borne by Franchisee. Franchisee agrees that it shall remain liable during the Term or upon the termination or expiration of this Agreement for all warranties issued by Franchisee. If Franchisee does not remedy, in full, any warranty claim made by a customer within a reasonable amount of time after receiving notice of such claim, as determined by Franchisor in its sole discretion, Franchisee and its principals acknowledge and agree that Franchisor may thereafter address such warranty claim, and Franchisee and principals are required to promptly reimburse Franchisor for all warranty costs or customer reimbursements incurred by Franchisor plus Franchisor's then current administration charge.

## 8    TRAINING

8.1 **Initial Training Program**. Franchisee and up to two (2) additional attendees that Franchisee designates, one of which must be Franchisee's Designated Manager, must attend Franchisor's then-current initial training program (the "Initial Training Program"). Within forty-five (45) days after execution of this Agreement, Franchisee must pay Franchisor its then-current initial training tuition fee for the Initial Training Program. The current training tuition fee for the Initial Training Program is $4,995. The training tuition fee covers the costs of training, lodging, and certain meals during the Initial Training Program, however, the training tuition fee does not include travel expenses, meals outside of the Initial Training Program hours, and other living or miscellaneous expenses Franchisee or Franchisee's attendees may incur during the time of training. Any additional personnel, replacement personnel, or otherwise attendees Franchisee wishes to attend Initial Training Program must pay an additional $2,500 per attendee to attend the Initial Training Program (subject to class availability and the schedule/availability of Franchisor personnel). Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's facility in Omaha, Nebraska, or other location that Franchisor may designate, prior to commencing operations of the Franchised Business. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. Except as expressly set forth above or herein, Franchisee will be solely responsible for all out-of-pocket expenses (including travel costs, if any) Franchisee and its attendees incur in connection with attending the Initial Training Program. Franchisor reserves the right to substitute any in-person

training for virtual training at its discretion.

    8.1.1   *Timing for Completion*. Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction prior to opening the Franchised Business and within one hundred eighty (180) days from the date this Agreement is fully executed. In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction, then Franchisor may terminate this Agreement.

    8.1.2   *Additional Employees*. In the event Franchisee wishes for more than two (2) additional persons to participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee.

    8.1.3   *Replacement Personnel*. In the event Franchisee or Franchisee's employee(s) or attendee(s) fail to complete the Initial Training Program to Franchisor's satisfaction, the respective persons may repeat the course, or, in the case of an employee or attendee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Failure by Franchisee, an employee, attendee, or any Replacement Personnel to complete the Initial Training Program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

    8.1.4   *Employee Training*. Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their respective duties in connection with the Franchised Business prior to such employee(s) undertaking these duties.

    8.1.5   *Training Materials*. Franchisor may provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel. Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel. Updated training materials may be available to Franchisee in the Operations Manual or by other means in Franchisor's sole discretion. All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates' title or rights in or to the training materials. Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

    8.2   **Additional and Remedial Training.** Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable), estimators, installers, and other employees to attend additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then-current Assistance Training Fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals, and employee wages incurred). Additional and/or refresher training may take place at Franchisor's facility in Omaha, Nebraska, or any other location that Franchisor may designate. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or

refresher training that Franchisee is required to attend.

8.3 **Reasonable Training and Assistance Requests**. Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then-current Assistance Training Fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Franchisor's facility in Omaha, Nebraska, or on-site at Franchisee's Approved Location or within the Protected Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

## 9 INSURANCE

9.1 **General**. Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual or otherwise in writing. In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such insurance and minimum policy limits that are reasonable and customary in the roofing services industry. Franchisee must obtain the required insurance from Franchisor's designated vendor. The insurance policy or policies must be in effect upon the earlier of: (a) thirty (30) days prior to opening the Franchised Business; or (b) upon signing a lease agreement for the premises of the Franchised Business. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's respective, past, present, and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys, and agents against any loss, liability, personal injury, death, property damage or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use, or occupancy of the Franchised Business.  Franchisee shall have MDR United LLC, and its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. The employment practices liability policy is required to: (a) have an endorsement as listed on Form CG 20 29 or its equivalent; and (b) name Franchisor as Co-Defendant. Franchisor reserves the right to amend, modify, and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice (which need not exceed 30 days) through the Operations Manual or otherwise in writing by Franchisor.  Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Franchisee must provide Franchisor with certificates of insurance evidencing the required coverage at least 30 days prior to opening. Franchisee shall continue to provide Franchisor with certificates of insurance evidencing the required coverage and any other documentation in connection therewith on an annual basis or as otherwise specified in the Operations Manual.

9.2 **Designation of Carrier; Insurance Rating, Approval, and Certification.** Franchisor has the sole right, exercisable at any time and upon notice to Franchisee, to designate a vendor or supplier, which may include an affiliate of Franchisor, from whom Franchisee must purchase all insurance policies required by Franchisor to operate the Franchised Business. All insurance carriers must be approved by Franchisor in advance and in writing.  All insurance policies must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance

Report. Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy. Franchisee agrees to carry such insurance as may be required by the lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law. Franchisee must deliver a certificate of insurance to Franchisor at least thirty (30) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary and non-contributory to any policy or policies held by Franchisor or its affiliates.

9.3    **Designees.** All policies will list Franchisor, its subsidiaries, affiliates, and respective officers, directors, members, shareholders and employees as additional insureds and contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's agreement based on changes in risk factors for which Franchisee must comply with upon written notice from Franchisor.

9.4    **Claims Cancellation.** Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations. Franchisee has a twenty-four (24) hour opportunity to cure any lapses in insurance coverage. No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certification of insurance which demonstrates compliance with this Section 9.

9.5    **Failure to Maintain Insurance.** If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a reasonable administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6    **Modification of Requirements.** Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

9.7    **Third Party Subcontractors - Insurance**. Franchisee agrees not to permit any third party subcontractor to perform any work or offer any services on behalf of Franchisee in respect of the Franchised Business unless such subcontractor maintains insurance coverage in such amounts and types as Franchisee is required to maintain under the provisions of this Section 9, with the specific addition that subcontractors cannot exclude principals from its Workers' Compensation coverage and that liability policies name Franchisor as an additional insured. Franchisee agrees to maintain evidence that such insurance by its subcontractors is in effect and to provide such proof of insurance as Franchisor may require, in its sole discretion, from time to time.

## 10    FINANCIAL RECORDS AND REPORTS

10.1    **Reporting.** Franchisee must maintain, for at least five (5) fiscal years from their

preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section 10.1 in accordance with generally accepted accounting principles.

10.1.1    Franchisee will, at its expense, submit to the Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2 Each financial statement shall be signed by Franchisee or by an individual authorized by the Franchisee, attesting that the statement is true and correct and prepared in accordance with the Franchisor's requirements.

10.1.3 Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider.

10.1.4 Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including all reports set forth in the Operations Manual.

10.2    **Tax Returns.** In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns.

10.3    **Right to Disclose Information.** Franchisor has the right to disclose data derived from the reports Franchisee furnishes.

10.4    **Bookkeeping/Accounting Service.** To ensure Franchisee is properly reporting to Franchisor financial records and reports, Franchisee must use the services of Franchisor, its affiliate, or designated and preferred bookkeeping service providers. Franchisee is required to pay the bookkeeping service its then current fee which is subject to future increases.

10.5    **Monthly Profit and Loss Statements.** Franchisee must send Franchisor finalized profit and loss statements by the 21st of the following month. Failure to do so upon 15 days' written notice is grounds for termination of the Franchise Agreement under Section 15.3.8.

## 11    BOOKS AND RECORDS

11.1    **Records and Audits**. Franchisee must maintain accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business, including a complete listing of all work performed by any subcontractors.  Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours, to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's proprietary software provider(s). If any audit reveals that Franchisee has understated Franchisee's financial information, including but not limited to Royalty or Brand Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12) month period, Franchisee must pay the reasonable cost of such audit and/or inspection, including the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for Royalty and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

11.2    **Corporate or Limited Liability Company Franchisee Records**. If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

11.2.1   Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by-laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

11.2.2   Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

11.2.3   All members with or shareholders of Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by the Franchisor (see Exhibit "A" to this Agreement). All members and/or shareholders shall also be individually subject to the non-disclosure and confidentiality provisions as set forth in this Agreement, as well as any and all in-term and post-term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "Publicly Held Corporation").

11.2.4   The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to-day operations of the business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

11.2.5 All issued and outstanding stock certificates of such corporation shall bear the following legend:

*EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between _____and MDR United LLC, dated _____.*

## 12    ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1    **Generally**. With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing. If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received. If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing. Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2    **Internet Website**. Franchisee must have and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section 12.2 from time to time in its sole discretion.

12.2.1    Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by franchised businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2    Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

12.2.3    Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the

Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s).

       12.2.4  Franchisor may use a portion of the Brand Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

       12.2.5  Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.mightydogroofing.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

    12.3   **Brand Fund**. Franchisor reserves the right to re-establish and administer a Brand Fund for the common benefit of System franchisees. If re-established, Franchisee will be required to participate in and contribute weekly (or on such other recurring basis as Franchisor may designate) up to three percent (3%) of the Franchised Business's Gross Revenues Collected to the Brand Fund. However, the total sum of the Brand Fund Contribution and the Royalty fee shall not exceed the then-current Royalty fee, as a percentage of weekly Gross Revenues Collected. If re-established, Franchisee will be required to pay the Brand Fund Contribution directly to the Brand Fund via EFT on a weekly basis on the same basis as the Royalties. Franchisor reserves the right to modify the frequency, manner, or method of payment upon providing reasonable notice to Franchisee (which need not exceed 30 days).

       12.3.1  If re-established, Franchisor may use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis. Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: the cost of preparing and producing internet, television, radio, magazine and newspaper advertising campaigns; the cost of direct mail and outdoor billboard advertising; the cost of soliciting NORAs; the cost of public relations activities and advertising agencies; the cost of developing and maintaining an Internet website; personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit directly or on a pro rata basis from such expenditures. If established, the Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available." Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the Mighty Dog Roofing brand.

12.3.2  Franchisor may periodically assist franchises to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys").  The cost of such programs will be borne by the Brand Fund.  The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System established minimum standards for such Surveys.

12.3.3  Franchisor has the right to reimburse itself from the Brand Fund for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4  In Franchisor's sole discretion, businesses owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit Franchisor and its businesses, even though the businesses operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5  Franchisor will prepare on an annual basis and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund.  The statement will be presented to Franchisee upon Franchisee's written request.  The Brand Fund is not required to be independently audited.

12.3.6  Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7  Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8  Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9  Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

12.4     **Regional Advertising and Promotional Cooperative**. Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited towards the Local Marketing Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1  Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2  Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local marketing;

12.4.3  No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4  Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Marketing Requirement;

12.4.5  Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6  Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7  Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

12.5    **Initial Marketing Expenditure Requirements and Local Advertising Expenditure Requirements.**

12.5.1  *Initial Marketing Expenditure Requirements*. Franchisee is required to spend a minimum amount of twenty thousand dollars ($20,000) no later than ninety (90) days after the commencement of operations or opening of the Franchised Business to satisfy Franchisee's initial marketing expenditure requirements ("Initial Marketing Expenditure Requirements"). Any Initial Marketing Expenditures must be conducted in accordance with Franchisor's standards and specification, as described in the Operations Manual or this Agreement. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Initial Marketing Expenditures.

12.5.2  *Local Advertising Expenditure Requirements*. In addition to the Brand Fund Contributions (if any) described above in Section 12.3, and the Initial Marketing Expenditure Requirements describe above in Section 12.5.1, after the first ninety (90) days of operations of the Franchised Business, for each month during the Term, Franchisee shall be required to spend the greater of: (i) $2,000 per month; or (ii) at least five percent (5%) of Gross Revenues Collected during the immediately preceding calendar month, on local advertising and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Expenditure Requirements") of which, a minimum of $2,000 per month must be spent on advertising, marketing, and/or related expenses, through Franchisor's affiliate HPB Franchise Marketing LLC d/b/a Franchise Rocket (however the above

does not contemplate or include Franchisee's required monthly Digital Management Fee, see Section 3.11 of this Franchise Agreement) or Designated vendors. Franchisee must spend the Local Advertising Expenditures as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Expenditures must be expended within Franchisee's Protected Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Expenditures must be expended regardless of the amount(s) spent by other System franchisees on local marketing. Franchisee may spend any additional sums Franchisee wishes on local marketing. Franchisee must submit, for Franchisor's approval, all proposed advertising and promotional materials prior to Franchisee's use or distribution. Franchisee must submit to Franchisor, upon Franchisor's request, evidence of Franchisee's Local Advertising Expenditures. Franchisor shall have the right to review Franchisee's books and records to determine these expenditures. If Franchisee does not meet the minimum Local Advertising Expenditures requirement, Franchisor shall have the right to require Franchisee to pay to Franchisor any such deficiency amount (the "Local Advertising Expenditure Deficiency"). Franchisor shall have the right to spend the Local Advertising Expenditure Deficiency on local advertising for the Franchised Business, or, if applicable, require that the Local Advertising Expenditure Deficiency be paid to the Brand Fund as an additional contribution. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center. If Franchisee desires to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit the materials Franchisee desires to use to Franchisor for prior written approval at least 30 days prior to Franchisee's intended use or publication. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of Franchisee's proposed materials within 15 days of the date Franchisor received the proposed materials from Franchisee. If Franchisee does not receive Franchisor's written approval during that period, the proposed materials shall be deemed disapproved. Once approved, Franchisee may use the materials unless Franchisor withdraws or revokes approval, which Franchisor may do at any time upon written notice. All advertising must prominently display the Proprietary Marks and must comply with any standards Franchisor establishes, as specified in the Operations Manual or in any other writing. Franchisor may require Franchisee to discontinue using any advertising or marketing material within a specified time frame, and at Franchisee's own cost and expense.

12.5.3  *Local Brand Optimization Fee*. Within forty-five (45) days after execution of this Agreement, Franchisee must pay to Franchisor or its affiliate (as designated by Franchisor) a Local Brand Optimization Fee of $15,000 to cover the costs of local SEO optimization for Franchisee's first year of operations.

12.5.4  *Creative Media Fund Fee*. Within forty-five (45) days after execution of this Agreement, Franchisee must pay to Franchisor a Creative Media Fund Fee of $6,500 to cover costs associated with video production, actors' and actresses' compensation, video editing, and related advertising or marketing expenses.

12.6  **Advisory Council**. Franchisor reserves the right to establish a Mighty Dog Roofing Advisory Council for the purpose of exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts ("Advisory Council"). If established, elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the Advisory Council from time to time, in

its sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to, exchanging ideas and problem-solving methods, advising Franchisor on expenditures for System-wide advertising, and coordinating franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change, or dissolve any Advisory Council at any time in its sole discretion.

## 13    INDEPENDENT CONTRACTOR; INDEMNIFICATION

13.1    **Independent Contractor Status**. Franchisee is an independent contractor responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated Mighty Dog Roofing business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors. It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2    **Indemnification**. Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for all claims, obligations, liabilities and damages ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising, and the sale and installation of all Approved Products by Franchisee, its employees or subcontractors and all warranty claims; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals. For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive and other damages, and costs reasonably

incurred in the defense of any action, including attorneys', attorney assistants' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable in Franchisor's sole discretion. Such an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 14    SALE OR TRANSFER

14.1    **Transfer**. Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchise Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein.

14.2    **Death or Disability**.

14.2.1    *Representative's Right to Continue as Franchisee*. In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative, or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180 Day Period"), such person (a) meets Franchisor then-current standards to become a franchisee, as described in Section 14.3.2.5, and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporate or limited liability company franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

14.2.2    *Franchised Business Operation During and After 180 Day Period*. Franchisor is under no obligation to operate the Franchised Business or incur any obligation on behalf of any incapacitated franchisee, during or after the 180 Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180 Day Period. In the event of Franchisee's death, disability, absence

or otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time-to-time in Franchisor's sole and absolute discretion. Franchisor may pay itself a reasonable amount to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3    **Ownership Changes**. A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership, (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer or any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement. A transfer pursuant to (i) and (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1  *Right of First Refusal*. If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth in Section 14.4 hereof), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party. Franchisee shall obtain from the third party and provide Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent"). If Franchisor elects not to accept the offer within a thirty (30) day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent subject to the conditions for approval set forth in Section 14.3.2 hereof. Franchisee shall affect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section 14.3.1. Any material change in the terms of the offer shall be deemed a new proposal subject to Franchisor's right of first refusal. So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder, or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner, in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2 *Conditions for Approval.* Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business, at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or transfer of the Franchise Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1        All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors, are satisfied;

14.3.2.2        Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, Franchisor's designated/approved suppliers and vendors, within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3        Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the release shall not be inconsistent with any applicable state statute regulating franchising;

14.3.2.4        That the transferor and transferee have executed a mutual general release, relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5        Franchisee or transferee shall provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6        The transferee shall demonstrate to Franchisor's satisfaction that he or she meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the business to be transferred; and has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7        That, at Franchisor's option, the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which

term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8       Franchisee shall pay Franchisor a transfer fee equal to twenty percent (20%) of Franchisor's then-current Initial Franchise Fee per Protected Territory that is being transferred to transferee. In the event Franchisee transfers multiple Protected Territories at once, Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Protected Territories being transferred, by any amount;

14.3.2.9       The transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

14.3.2.10      Franchisee (and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company), and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11      The transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits, and licenses required for the operation of the Franchised Business;

14.3.2.12      To the extent required by the terms of any leases or other agreements, the lessors or other parties must have consented to the proposed transfer;

14.3.2.13      The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14      Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15      The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under the transferee's franchise agreement;

14.3.2.16      Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of disclosure document and Franchisor shall not be liable for any representations not included in the disclosure document;

14.3.2.17      Franchisor's approval of the transfer shall not constitute a waiver of any claims Franchisor may have against the transferring party;

14.3.2.18      Franchisor shall have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder; and

14.3.2.19      In any event, Franchisor may withhold or condition Franchisor's

consent to any transfer as Franchisor deems appropriate based on the circumstances of the transfer or otherwise.

14.4    **Transfer to a Corporation or Limited Liability Company**. If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fee set forth in Sections 14.3.2.8, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

14.4.1    The corporation or limited liability company is newly organized, and its activities are confined to operating the Franchised Business;

14.4.2    Franchisee is, and at all times remains, the owner of at least fifty- one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3    The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4    All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty; and

14.4.5    At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations, and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.5    **Franchisor's Right to Transfer**. Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement in Franchisor's sole discretion.

## 15    BREACH AND TERMINATION

15.1    **Automatic Termination**. This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

15.1.1    *Voluntary Bankruptcy.* If Franchisee or any principal makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2    *Involuntary Bankruptcy.* If proceedings are commenced to have Franchisee or any of its principals adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within 60 days.

15.1.4 *Loss of Premises*. If Franchisee loses the right to occupy the premises or operate the Franchised Business from the Approved Location, unless such loss of right is not the fault nor within the reasonable control of Franchisee and results from fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics or other national health crisis or civil disorders. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in whole or in part, as Franchisor deems reasonable.

15.2    **With Notice and Without Opportunity to Cure**. Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1    *Criminal Acts*. If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2    *Fraud*. If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3    *Other Actions*. If Franchisee or Franchisee's principals, including any shareholder, member, guarantors or agents, engage in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4    *Misrepresentation*. If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation.

15.2.5    *Failure to Complete Training*. If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6    *Repeated Breaches*. If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any 12-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7    *Breach of Other Agreements*. If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8    *Misuse of the Proprietary Marks or Confidential Information*. If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or

Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9 *Discloses Confidential Information or Trade Secrets.* If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual, or any other Confidential Information or Trade Secret provided to Franchisee by the Franchisor or any of its affiliates to any third party;

15.2.10 *Violation of Law.* If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the public.

15.2.11 *Violation of In-term Restrictive Covenant.* If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

15.2.12 *Liens.* If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13 *Insolvency.* If Franchisee or any of Franchisee's principals become insolvent.

15.2.14 *Abandonment.* If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue operations of the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15 *Unauthorized Transfer.* If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof;

15.2.16 *Unauthorized Products or Services.* If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17 *Unapproved Purchases.* If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18 *Proprietary Software.* If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19 *Insurance.* If Franchisee fails to maintain insurance, purchase insurance from designated vendors, or to repay Franchisor for insurance paid for by it, or otherwise fail to adhere to the requirements of Section 9.

15.2.20 *Government Regulations.* If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21    *Government Actions.* If any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22    *Anti-Terrorist Activities.* If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23    *Personal Use of Franchised Business Property.* If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24    *Insufficient Funds.* If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12) month period.

15.2.25    *Failure to Open.* If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26    *Operating Outside of Protected Territory.* If Franchisee operates the Franchised Business outside of the Protected Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27    *Violation of Best Efforts.* If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.2.28    *Failure to Meet Minimum Annual Revenue Requirements or Minimum Royalty Fees.* If Franchisee fails to meet the Minimum Annual Revenue Requirements or Minimum Royalty Fee for any Territory granted hereunder in any period.

15.3.    **Upon 15 Days' Notice to Cure.** Franchisor has the right to terminate this Agreement if any of the following defaults remains uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1    *Nonpayment.* If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's system suppliers or vendors, including but not limited to Royalties, Call Center Fees, Technology Fees, Local Brand Optimization Fees, and Digital Management Fees.

15.3.2    *Endorsement of Checks.* If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3    *Failure to Maintain Sufficient Marketing Materials and Supplies.* If Franchisee fails to maintain sufficient levels marketing materials and other supplies necessary to

adequately develop the Protected Territory and meet consumer demand.

15.3.4     *Interruption of Service.* If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5     *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.* If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel, as Franchisor requires from time to time.

15.3.6     *Quality Control.* If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

15.3.7     *Licenses and Permits.* If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.3.8     *Profit and Loss Statements.* If Franchisee fails to submit finalized Profit & Loss statements by the twenty-first (21st) of each month (or other date Franchisor may require).

15.4     **Upon 30 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement, or any ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5     **Step in Rights**. In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right, or any other rights, Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured, and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all reasonable costs and overhead, if any, incurred in connection with its operation of the Franchised Business including, without limitations, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business.

15.6     **Nonwaiver**. Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

## 16     RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1     **Franchisee's Obligations**. Upon termination of this Agreement, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost

and expense:

16.1.1  Immediately cease all operations under this Agreement;

16.1.2  Immediately pay Franchisor all unpaid fees, and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3  Discontinue immediately the use of the Proprietary Marks;

16.1.4  Immediately cease using the proprietary software and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days and immediately and permanently cease use of such information and materials;

16.1.5  Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or Social Media Pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name attached hereto as Exhibit B, and transfer all usernames and passwords for all Social Media Pages to Franchisor;

16.1.6  Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease attached as Exhibit F, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7  Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks as Franchisor directs and all items which are a part of the trade dress of the System-immediately, no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8  Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9  Immediately cease to communicate with all Mighty Dog Roofing customers;

16.1.10    Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11    Permit Franchisor to make final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration, or transfer;

16.1.12    Comply with the post-termination covenants set forth in Section 17

hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13    Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System; and

16.1.14    Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15  Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16.

16.2    **Option to Purchase Personal Property.** Upon the termination or expiration of this Agreement, Franchisor, or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice. For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10) year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes). Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property that is subject to a lease or finance agreement, the purchase price of such personal property shall equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable. Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

16.3    **Exclusions.** Franchisor may exclude from the personal property purchased under Section 16.2 cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

16.4    **Damages, Costs, and Expenses.** In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the

Franchised Business.

## 17    COVENANTS

Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, trade secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

17.1    **During the Term of This Agreement.** During the term of this Agreement, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.1.1    Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

17.1.2    Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.1.3    Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.2    **After the Term of This Agreement.** For a period of two (2) years after the expiration, transfer or termination of this Agreement, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers, directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.2.1    Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (a) within the Protected Territory, (b) within the Protected Territory of any other Franchised Business or any other Mighty Dog Roofing business, or within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (c) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

17.2.2  Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

17.2.3  Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

17.3  **Intent and Enforcement**. It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other Mighty Dog Roofing franchisees, and the System. Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement. Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm. Franchisee acknowledges and agrees on Franchisee's own behalf and on behalf of the persons who are liable under this Section 17 that each has previously worked or been gainfully employed in other careers and that the provisions of this Section 17 in no way prevent any such person from earning a living. Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during any default under this Section.

17.4  **Employees.** Franchisee shall ensure that Franchisee's principals, managers, employees, and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit C to the Franchise Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

17.5  **No Defense**. Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

## 18    DISPUTE RESOLUTION

18.1  **Choice of Law.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflict of laws principals.

18.2  **Internal Dispute Resolution.** Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management, after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party. This agreement to first attempt resolution of disputes internally

shall survive termination or expiration of this Agreement.

18.3   **Mediation; Arbitration**. At Franchisor's option, all claims or disputes between Franchisee and Franchisor or its affiliates arising out of, or in any way relating to, this Agreement or any other agreement by and between Franchisee and Franchisor or its affiliates, or any of the parties' respective rights and obligations arising from such agreement, which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above, must be submitted first to mediation, in Douglas County, Nebraska under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect.   Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute.  Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify Franchisee as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation.   Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor.  Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and Franchisor and Franchisee shall share mediation costs equally.  This agreement to mediate shall survive any termination or expiration of this Agreement.

18.3.1  The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 18.3 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

18.3.1.1   Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

18.3.1.2   Any claims pertaining to or arising out of any warranty issue;

18.3.1.3   Any of the restrictive covenants contained in this Agreement.

18.3.1.4   Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

18.3.1.5   Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency

18.4   **Selection of Venue**. Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests.  The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in

Douglas County, Nebraska and the jurisdiction and venue of the United States District Court for the District of Nebraska. Franchisee acknowledges that this Agreement has been entered into in the State of Nebraska, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Omaha, Nebraska including but not limited to training, assistance, support and the development of the System. In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of Nebraska as set forth in this Section.

18.5 **Third Party Beneficiaries**. Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation provision set forth in this Section 18, each having authority to specifically enforce the right to mediate claims asserted against such person(s) by Franchisee.

18.6 **Prior Notice of Claims.** As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

18.7 **No Right to Offset**. Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

18.8 **Injunctive Relief**. Nothing in this Agreement shall prevent Franchisor from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause Franchisor loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions. If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

18.9 **Limitation of Action**. Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

18.9.1 Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any mediation, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2 Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's

guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10   **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages.  If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.  Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future royalties for the balance of the term of this Agreement.

18.11   **THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT.  THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY GOODS OR SERVICES.**

## 19    REPRESENTATIONS

19.1   **Proprietary Software**. Any proprietary software provided by Franchisor or an affiliate is on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for any proprietary software, or covenant that the proprietary software will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the software or services provided thereby.

FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE PROPRIETARY SOFTWARE, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE PROPRIETARY SOFTWARE, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2   **No Authority.** NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT

NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE.    FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3    **Receipt.**    THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT.    IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4    **Opportunity for Review by Franchisee's Advisors.**    FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5    **Execution of Agreement.** EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

## 20    GUARANTEE OF PRINCIPALS AND THEIR SPOUSES

Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing personal

guaranty in the form attached hereto as Exhibit A.

## 21    NOTICES

All notices and requests to be given under this Agreement are to be in writing, and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt, to the following addresses (which may be changed by written notice):

Franchisee Name/Address:    Donald Gaudreau Jr.
505 Drakestown Road,
Flanders, NJ 07836

Franchisor:    MDR United LLC
2525 N. 117th Avenue
Omaha, Nebraska 68164

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Express or a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

## 22    MISCELLANEOUS

22.1    **Entire Agreement.** This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be modified except by a written document signed by both parties. Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee.

22.2    **Construction of Language.** The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party. All words in this Agreement refer to whatever number or gender the context requires. If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several. Headings are for reference purposes and do not control interpretation. Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings and Franchisee's spouse's parents, children, and siblings. Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members, and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement. In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement.

22.3    **Severability.** If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in

full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other trade secrets, is declared invalid or unenforceable, then Franchisor at Franchisor's option may terminate this Agreement immediately upon written notice to Franchisee.

22.4    **State Law Applies.** If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

22.5    **Additional Documentation**. Franchisee must from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein. In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

22.6    **Force Majeure.** Neither Franchisee, Franchisor, or Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform its obligations is not the fault nor within the reasonable control of the person due to perform but results from, without limitation, fire, flood, natural disasters, acts of God, governmental acts or orders, pandemics or other national health crisis or civil disorders. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in whole or in part, as Franchisor deems reasonable.

22.7    **Anti-Terrorist Activities.** Franchisee certifies that neither Franchisee, nor Franchisee's owners, principals, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement

and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8    **Attorneys' Fees.** If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

## 23    ACKNOWLEDGMENTS

23.1    **Independent Investigation.** Franchisee acknowledges that Franchisee has conducted an independent investigation of the Franchised Business contemplated by this Agreement and recognizes that it involves business risks which make the success of the venture largely dependent upon Franchisee's business abilities and efforts. Franchisee acknowledges that Franchisee has been given the opportunity to clarify any provision of this Agreement that Franchisee may not have initially understood and that Franchisor has advised Franchisee to have this Agreement reviewed by an attorney.

23.2    **No Guarantee of Earnings.** Franchisee understands that Franchisor and any of Franchisor's representatives and/or agents with whom Franchisee has met have not made and are not making any guarantees as to the extent of Franchisee's success in Franchisee's Franchised Business, and have not and are not in any way representing or promising any specific amounts of earnings or profits in association with Franchisee's Franchised Business.

23.3    **Receipt of Franchise Disclosure Document.** Franchisee acknowledges that this Agreement and Franchisor's Franchise Disclosure Document have been in Franchisee's possession for at least fourteen (14) calendar days before Franchisee signed this Agreement or paid any monies to Franchisor or an affiliate and that any material changes to this Agreement were in writing in this Agreement for at least seven (7) calendar days before Franchisee signed this Agreement.

23.4    **No Personal Liability.** Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason. This is an important part of this Agreement. Franchisee agrees that

nothing that Franchisee believes Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement. This is an important part of this Agreement. <u>Do not sign this Agreement if there is any question concerning its contents or any representations made</u>.

*Signatures appear on following page*

IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.

**FRANCHISOR**

**MDR UNITED LLC**

By: _____
Josh Skolnick, Managing Member

By: _____
Zach Beutler, Managing Member

**FRANCHISEE**

_____
Donald Gaudreau Jr., individually

**EXHIBIT A**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PERSONAL GUARANTY**

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.

## ARTICLE I PERSONAL GUARANTY

The undersigned persons (individually and collectively "you") hereby represent to MDR United LLC ("Franchisor"), or all of the members and managers, or the spouse of any such shareholder, general partner, or member or manager of _____ ("Franchisee"), as the case may be. In consideration of the grant by Franchisor to Franchisee as provided in the foregoing franchise agreement (the "Franchise Agreement"), each of you hereby agree, in consideration of benefits received and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and individually) will not permit or cause any change in the percentage of Franchisee owned, directly or indirectly, by any person, without first obtaining the written consent of Franchisor prior to said proposed transfer, which consent must not be unreasonably withheld, and without first paying or causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise Agreement. You further agree to be bound by the in-term and post-term non-competition and non-solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other covenants set forth in the Franchise Agreement, including but not limited to those concerning confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

## ARTICLE II CONFIDENTIALITY

During the term of this Agreement, you will receive information which Franchisor considers a trade secret and confidential information ("Confidential Information"). You shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation, or limited liability company any Confidential Information including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to Franchisor's integrated

© 2023 MDR United LLC
Franchise Agreement

bookkeeping system, and other methods, techniques, and know-how concerning the operation of a Mighty Dog Roofing Business of which you may be appraised by virtue of your role as a Guarantor of Franchisee.

## ARTICLE III NON-COMPETITION

1) **During the Term of the Franchise Agreement.** During the term of the Franchise Agreement, neither your, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal or of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers commercial or residential roofing installation, repairs, gutters, rain spouts or any other products or services authorized or offered for sale by System franchisees (a "Competitive Business") regardless of location provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2) **After the Term of the Franchise Agreement.** For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

   a) Own, maintain, engage in, be employed as an officer, director, principal, or of, lend money to, extend credit to or have any interest in any Competitive Business (i) within the Protected Territory, (ii) within a twenty-five (25) mile radius of the Protected Territory of any other Franchised Business, or (iii) within a twenty-five (25) mile radius of any Mighty Dog Roofing business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing services the same as or similar to a Competitive Business;

   b) Directly or indirectly induce or seek to induce anyone employed by Franchisor, an affiliate or any other System franchisee to leave his or her employment thereat; or

   c) Solicit any current, former, or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to

© 2023 MDR United LLC
Franchise Agreement

Franchisor's System or other franchisees for any competitive purpose.

3) **Intent and Enforcement**. It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm. You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living. You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV DISPUTE RESOLUTION

1) **Acknowledgment**. You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's proprietary marks or its system.

2) **Governing Law.** This Guaranty shall be deemed to have been made in and governed by the laws of the Commonwealth of Pennsylvania, without any reference to Pennsylvania conflict of laws principles.

3) **Internal Dispute Resolution.** You must first bring any claim or dispute arising out of or relating to the Franchise Agreement or this Guaranty to Franchisor's management. You agree to exhaust this internal dispute resolution procedure before bringing any dispute before a third party. This agreement to engage in internal dispute resolution first shall survive the termination or expiration of this Agreement.

4) **Mediation.** At Franchisor's option, all claims or disputes between you and Franchisor arising out of, or in any way relating to, this Guaranty or the Franchise Agreement or any other agreement by and between you and the Franchisor, or any of the parties' respective rights and obligations arising from such agreements, must be submitted first to mediation, in Douglas County, Nebraska, under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. Before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, you must submit a notice to Franchisor, which specifies, in detail, the precise nature and grounds of such claim or dispute. Franchisor will have a period of thirty (30) days following receipt of such notice within which to notify you as to whether Franchisor or its affiliates elects to exercise its option to submit such claim or dispute to mediation. You may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless Franchisor fails to exercise its option to submit such claim or dispute to mediation, or such mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor. Franchisor's rights to mediation, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and the parties shall share the cost of mediator. This agreement to mediate at Franchisor's option shall survive the termination or expiration of the Franchise Agreement.

© 2023 MDR United LLC
Franchise Agreement

The parties shall not be required to first attempt to mediate a controversy, dispute, or claim through mediation as set forth in this Section 4 if such controversy, dispute, or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

    i.    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

    ii.    Any claims arising out of or pertaining to any warranty issued;

    iii.    Any of the restrictive covenants contained in this agreement;

    iv.    Any of Franchisee's payment obligations that are more than forty-five (45) days past due; or

    v.    Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency.

5) **Third Party Beneficiaries.** Franchisor's officers, directors, shareholders, agents and/or employees are express third party beneficiaries of the Franchise Agreement and this Guaranty, and the mediation provisions contained herein, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by you.

6) **Injunctive Relief.** Nothing contained in this Guaranty shall prevent Franchisor from applying to or obtaining from any court having jurisdiction, without bond, a writ of attachment, temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interest prior to the filing of any mediation proceeding or pending the trial or handing down of a decision or award pursuant to any mediation or judicial proceeding conducted hereunder.

7) **Jurisdiction and Venue.** Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Douglas County, Nebraska and the jurisdiction and venue of the United States District Court for the District of Nebraska. The parties acknowledge and agree that this Agreement has been entered into in the State of Nebraska, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Douglas County, Nebraska, including but not limited to training, assistance, support and the development of the System. In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Nebraska as set forth herein.

8) **Jury Trial Waiver. THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY GOODS**

© 2023 MDR United LLC
Franchise Agreement

**OR SERVICES.**

9) **Waiver of Punitive Damages.** You waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, your recovery shall be limited to actual damages. If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

10) **Limitation on Action.** You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide basis, and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

11) **Attorneys' Fees.** If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

12) **Nonwaiver.** Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Guaranty shall be cumulative. Franchisor' election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

13) **Severability.** The parties agree that if any provisions of this Guaranty may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party. The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable. If any material provision of this

Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions.  In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

14) **Construction of Language.**  Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement.  The language of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party. All words in this Guaranty refer to whatever number or gender the context requires.  If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

15) **Successors**.  References to "Franchisor" or "the undersigned, or "you" include the respective parties' successors or permitted assigns or transferees.

16) **No Personal Liability**.  You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

*THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK. SIGNATURES APPEAR ON FOLLOWING PAGE*

IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.

**PERSONAL GUARANTORS**                     **SPOUSES**

By: _____        By:

Print Name: _____        Print Name:

Address: _____        Address:

_____          _____

Telephone: _____        Telephone:

By: _____        By:

Print Name: _____        Print Name:

Address: _____        Address:

_____          _____

Telephone: _____        Telephone:

**EXHIBIT B**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

## CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS, FACSIMILE NUMBERS AND DOMAIN NAMES

1._____,    doing    business    as    a    Mighty    Dog    Roofing    franchisee, ("Assignor"), in exchange for valuable consideration provided by MDR United LLC ("Assignee"), receipt of which is hereby acknowledged hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____

Facsimile Number(s): _____

Domain Name(s) (as permitted by Franchisor under the Franchise Agreement):

_____

2.    The conditional agreement will become effective automatically upon termination, expiration of Assignor's franchise. Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3.    Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment, and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR:**

By: _____        Date: _____

Name: _____

Title: _____

**ASSIGNEE:**

**MDR UNITED LLC**

By: _____        Date: _____

Name: _____

Title: _____

© 2023 MDR United LLC
Franchise Agreement

**EXHIBIT C**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors, general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from MDR United LLC (the "Company") to establish and operate a Mighty Dog Roofing business (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Mighty Dog Roofing Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ (the "Franchised Business Premises").

1.    The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's Manuals; price lists and standards and specifications for the Approved Products and Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be appraised by virtue of my employment with Franchisee ("Confidential Information").

2.    Any and all information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

3.    In my position with the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual") and other general assistance during the term of this Agreement.

4.    I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.    The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential. Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

© 2023 MDR United LLC
Franchise Agreement

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing businesses, except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.     This Agreement shall be construed under the laws of the Commonwealth of Pennsylvania. The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

*Signatures appear on following page*

© 2023 MDR United LLC
Franchise Agreement

By: _____

Name: _____

Title: _____

Date: _____

**ACKNOWLEDGED BY FRANCHISEE**

By:_____

Name: _____

Date: _____

**EXHIBIT D**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name: _____

ABA# : _____

Acct. No.: _____

Acct. Name: _____

Effective as of the date of the signature below, _____ ("Franchisee") hereby authorizes MDR United LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise Agreement for the Franchised Business located at: _____: all Royalty fees; and all other fees due and owing to the Company, or to which the Company has rights to, under the Franchise Agreement, electronically or otherwise. Franchisee acknowledges that Royalty and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement. Such withdrawals shall occur on a weekly and/or monthly basis, or on such other schedule as Company shall specify in writing. If necessary, Company is also authorized to deposit the Gross Revenues of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur as needed or on such other schedule as Company shall specify in writing.   This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISOR**                    **FRANCHISEE**

**MDR UNITED LLC**
_____

By: _____        By: _____

Name: _____        Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

© 2023 MDR United LLC
Franchise Agreement

**EXHIBIT E**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

### SITE SELECTION ADDENDUM

MDR United LLC, a Pennsylvania limited liability company with a principal business address at 2525 N. 117th Avenue, Omaha, Nebraska 68164 ("Franchisor"), Donald Gaudreau Jr., an individual with an address at 505 Drakestown Road, Flanders, NJ 07836, which is identified more fully in the attached Data Sheet ("Franchisee"), have this ___ day of June, 2023, entered into the foregoing Franchise Agreement(s) for the operation of a Mighty Dog Roofing franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.    Within ninety (90) days after Franchisee receives notice of approval of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Protected Territory granted under the Franchise Agreement.

2.    Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum. Time is of the essence.

3.    Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within forty five (45) days after execution of this Site Selection Addendum. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.    Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct up to one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's reasonable expenses including, without limitation, the costs of travel, lodging, and meals.

5.    If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

6.    After Franchisor has approved a site for the Franchised Business in writing and Franchisee has acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.    Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty or any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose. Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation. Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.    This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and terms of this Site Selection Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISEE**

_____

Donald Gaudreau Jr., individually

**FRANCHISOR**

**MDR UNITED LLC**

_____

Zach Beutler, Managing Member

**EXHIBIT F**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**
**COLLATERAL ASSIGNMENT OF LEASE**

**FOR VALUE RECEIVED**, the undersigned ("Assignor") hereby assigns and transfers to MDR United LLC, a Pennsylvania limited liability company, with its principal place of business address at 2525 N. 117th Avenue, Omaha, Nebraska 68164 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto as Exhibit 1 (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee has no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

Assignor represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of its interest in the Lease or the premises demised thereby.

Upon a default by Assignor under the Lease or under the franchise agreement for a Franchised Business between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, or upon expiration or termination of the Franchise Agreement or this Agreement, Assignee has the right and is hereby empowered to take possession of the premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor will have no further right, title or interest in the Lease. Assignor hereby authorizes the Lessor to disclose to Assignee, upon its request, sales and other information furnished to the Lessor by Assignor.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereto, Assignor agrees that it must elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing.

If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and instead of Assignor for the purpose of effecting such extension or renewal.

ASSIGNOR:

Dated:_____

_____

SIGNED AND SEALED this
day of_____ , 20

Notary Public

© 2023 MDR United LLC
Franchise Agreement

## CONSENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the afore described Lease hereby:

(a)    Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

(b)    Agrees that Assignee has the right, but must not be obligated, to cure any default by Assignor under the Lease within thirty (30) days (or such longer period of time as reasonably necessary to cure the default, so long as Assignee commences the cure within 30 days and thereafter diligently pursues the cure to completion) after delivery by Lessor of notice thereof in accordance with paragraph (a) above;

(c)    Consents to the foregoing Collateral Assignment and agrees that if Assignee takes possession of the premises demised by the Lease and confirms to Lessor the assumption of the Lease by Assignee as tenant thereunder, Lessor must recognize Assignee as tenant under the Lease, provided that Assignee cures within the time period set forth above the defaults, if any, of Assignor under the Lease;

(d)    Agrees that Assignee may further assign the Lease to a person, firm or corporation who must agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Lessor and upon such assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise.

DATED:_____

_____

_____

Exhibit "1" to Collateral Assignment of Lease

Agreement attached

**EXHIBIT G**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**PROTECTED TERRITORY MAP**

**Protected Territory 2 Map Attached**

Territory : Pending - Gaudreau - Hampton - 2



Territories
ZIP Codes

6/6/2023

# Territory Demographics for Pending - Gaudreau - Hampton - 2

| ZIP Code | ZIP Code Name | Owner Occupied Homes |
|----------|---------------|----------------------|
| 07823 | BELVIDERE | 2,510 |
| 07828 | BUDD LAKE | 3,454 |
| 07830 | CALIFON | 2,427 |
| 07836 | FLANDERS | 3,820 |
| 07840 | HACKETTSTOWN | 10,799 |
| 07853 | LONG VALLEY | 4,375 |
| 07857 | NETCONG | 706 |
| 07863 | OXFORD | 1,480 |
| 07865 | PORT MURRAY | 458 |
| 07870 | SCHOOLEYS MOUNTAIN | 0 |
| 07882 | WASHINGTON | 4,462 |
| 07930 | CHESTER | 2,670 |
| 08804 | BLOOMSBURY | 983 |
| 08826 | GLEN GARDNER | 2,153 |
| 08865 | PHILLIPSBURG | 8,651 |
| 08886 | STEWARTSVILLE | 2,106 |
| Totals | | 50,854 |

**EXHIBIT H**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**MULTI-UNIT ADDENDUM**

THIS MULTI-UNIT ADDENDUM (the "Addendum") is made and entered into this ____ day of June, 2023, by and between MDR United LLC, a Pennsylvania limited liability company with an address at 2525 N. 117th Avenue, Omaha, Nebraska 68164 ("Franchisor"), and Donald Gaudreau Jr., an individual with an address at 505 Drakestown Road, Flanders, NJ 07836, which is identified more fully in the attached Data Sheet ("Franchisee").

**BACKGROUND**

A. Contemporaneous with the execution of this Addendum, Franchisee and Franchisor have entered into those certain three (3) franchise agreements (collectively, the "Applicable Franchise Agreements") pursuant to which Franchisee obtained the right and undertook the obligation to operate Mighty Dog Roofing franchised businesses within the territories defined therein (each a "Franchised Business").

B. Each Franchised Business will operate within a designated protected territory wherein Franchisee is required to actively promote and operate the Franchised Businesses (collectively, the territories granted under the Applicable Franchise Agreements will be referred to as the "Protected Territories").

C. Franchisor expects that Franchisee will operate the Franchised Business from a single Approved Location using the same vehicles, supplies, equipment and inventory as required by Franchisor.

D. The parties now wish to amend certain provisions of the Applicable Franchise Agreements pursuant to the terms and conditions set forth in this Addendum.

**AGREEMENT**

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Multi-Unit Initial Franchise Fees**. Notwithstanding anything contained in Section 3.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor an Initial Franchise Fee under any Applicable Franchise Agreement. Instead, Franchisee shall pay Franchisor lump-sum multi-unit Initial Franchisee Fee as follows (the "Multi-Unit Initial Franchise Fee"):

| Number of Territories | Cumulative Initial Franchise Fees | Individual Franchise Fee | Cumulative Number Owner Occupied Homes |
|---|---|---|---|
| #1 | $59,500 | $59,500 | 50,000 |
| #2 | $99,500 | $40,000 | 100,000 |
| #3 | $134,500 | $35,000 | 150,000 |
| #4 | $164,500 | $30,000 | 200,000 |
| #5 | $194,500 | $30,000 | 250,000 |

© 2023 MDR United LLC
Franchise Agreement

The entire Multi-Unit Initial Franchise Fee must be paid upon execution of the Applicable Franchise Agreements and this Addendum, and this fee is deemed fully earned upon payment and non-refundable under any circumstances.

2.        **Initial Training Program**. Franchisee is only required to attend and complete Franchisor's Initial Training Program described more fully in Section 8.1 of the Applicable Franchise Agreements, respectively, once in connection with the Franchised Businesses governed by this Addendum. All other provisions regarding Franchisee's training obligations in the Applicable Franchise Agreements are hereby ratified and confirmed.

3.        **Minimum Royalty Fee and Minimum Annual Revenue Requirement**.

a.    Minimum Royalty Fee. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee will not be required to pay Franchisor a separate Minimum Royalty Fee under each Applicable Franchise Agreement. Instead, Franchise shall pay Franchisor the following Minimum Royalty Fees depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation:

| Mighty Dog Roofing Minimum Royalty Fees Per Week Per Territory | | | | | |
|---|---|---|---|---|---|
| **Months of Operation** | **1 Territory** | **2 Territories** | **3 Territories** | **4 Territories** | **5 Territories** |
| Months 13-24 | $750 | $438 | $333 | $281 | $250 |
| Months 25-36 | $875 | $563 | $500 | $469 | $438 |
| Months 37-48 | $1,000 | $719 | $625 | $563 | $550 |
| Months 49-60+ | $1,250 | $938 | $833 | $781 | $750 |

The parties further acknowledge and agree that Franchisee is subject to the Minimum Royalty Fees set forth herein in the event the Franchisee's Royalty based on the Gross Revenues Collected is less than the Minimum Royalty Fee obligation for any given week.

b.    Minimum Annual Revenue Requirements. Notwithstanding anything contained in Section 3.2.1 of the Applicable Franchise Agreements, Franchisee shall meet and maintain the following minimum annual Gross Revenue requirements depending on (a) the number of Applicable Franchise Agreements the parties entered into, and (b) the number of months the Franchised Businesses have been in operation, as follows (the "Minimum Annual Revenue Requirements"):

| Mighty Dog Roofing Minimum Annual Revenue Requirements Per Territory | | | | | |
|---|---|---|---|---|---|
| **Months of Operation** | **1 Territory** | **2 Territories** | **3 Territories** | **4 Territories** | **5 Territories** |
| Months 13-24 | $600,000 | $350,000 | $266,667 | $225,000 | $200,000 |
| Months 25-36 | $700,000 | $450,000 | $400,000 | $375,000 | $350,000 |
| Months 37-48 | $800,000 | $575,000 | $500,000 | $450,000 | $440,000 |
| Months 49-60+ | $1,000,000 | $750,000 | $666,667 | $625,000 | $600,000 |

All other provisions regarding Franchisee's payment obligations, including those related to Franchisee's Royalty or other fees, of the Franchise Agreements are hereby confirmed and ratified. Franchisor reserves the right, but not the obligation, to offer a royalty incentive programs for the benefit of qualifying franchisees. To qualify for such programs, Franchisee must satisfy Franchisor's then-current specifications and standards as provided in the Operations Manual or otherwise in writing by Franchisor. Franchisor reserves the right to modify, supplement, or terminate any royalty incentive programs upon notice to Franchisee. If Franchisee fails to meet the Minimum Annual Revenue Requirements in any period, Franchisor may terminate the Franchisee's Protected Territories or otherwise terminate the Franchise Agreements.

4.        **Opening Package.** Notwithstanding anything contained in Section 3.5 of the Applicable Franchise Agreements, Franchisee will not be required to purchase a separate Opening Package under each Applicable Franchise Agreement. If Franchisee purchases four (4) or more Protected Territories, Franchisor recommends, but does not require, Franchisee to purchase an additional Opening Package.

5.        **Technology Fee**. Notwithstanding anything contained in Section 3.8 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Technology Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Technology Fee regardless of the number of Applicable Franchise Agreements executed.

6.        **Call Center Fee**. Notwithstanding anything contained in Section 3.9 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Call Center Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Call Center Fee regardless of the number of Applicable Franchise Agreements executed.

7.        **Creative Media Fund Fee**. Notwithstanding anything contained in Section 3.10 of the Applicable Franchise Agreements, Franchisee will not be required to pay a separate Creative Media Fund Fee under each Applicable Franchise Agreement. Instead, Franchisee shall pay a single Creative Media Fund Fee regardless of the number of Applicable Franchise Agreements executed.

8.        **Approved Location**. Notwithstanding anything contained in Section 1.3 of the Applicable Franchise Agreements, Franchisee shall only be required to have one physical location that satisfies Franchisee's Approved Location requirement, if, and only if, Franchisee's Territories are contiguous.

9.        **Default of Addendum Constitutes Default Under All Applicable Franchise Agreements**. In the event Franchisee breaches any of the provisions of this Addendum, such breach will constitute a material default of all Applicable Franchise Agreements and must be cured within 30 days from Franchisee's receipt of Franchisor's written notice of such breach as set forth in Section 15.4 of the Applicable Franchise Agreements. If Franchisee fails to cure such breaches within the prescribed period, Franchisor may, at its option, terminate one or more of the Applicable Franchise Agreements immediately upon providing written notice, or otherwise terminate Franchisee's Protected Territories.

10.       **Ratification and Confirmation of the Applicable Franchise Agreements**. Except as amended by this Addendum, any and all other terms and conditions set forth in the Applicable Franchise Agreements are hereby ratified and confirmed as if fully restated herein, including without limitation, those provisions regarding dispute resolution and venue, which will also apply to any claims or disputes arising out of or related to this Addendum. All capitalized terms not specifically defined in this Addendum will be afforded the definition given to them in the Applicable Franchise Agreements.

11.    **Entire Agreement**. The Applicable Franchise Agreements and this Addendum constitute the entire, full, and complete agreement between the parties concerning the subject matter set forth herein and supersede any and all prior agreements. In the event of a conflict between the terms of any Applicable Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. This Addendum constitutes an amendment to all Applicable Franchise Agreements.

Notwithstanding the foregoing, nothing in this or any related agreement is intended to disclaim the representations made in the franchise disclosure document.

*Signatures appear on following page*

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Addendum the date and year first written above.

**FRANCHISOR:**

**MDR UNITED LLC**


By: _____          Date: _____
    Josh Skolnick, Managing Member


By: _____          Date: _____
    Zach Beutler, Managing Member


**FRANCHISEE:**


_____          Date: _____
Donald Gaudreau Jr., individually

**EXHIBIT I**
to
**MDR UNITED LLC**
**FRANCHISE AGREEMENT**

**STATE SPECIFIC ADDENDA**

© 2023 MDR United LLC
Franchise Agreement

### ADDENDUM TO MDR UNITED LLC
### FRANCHISE AGREEMENT
### <u>REQUIRED BY THE STATE OF MINNESOTA</u>

**The Franchise Agreement is specifically amended as follows:**

In recognition of the Minnesota Franchise Law, Minn. Stat., Chapter 80C, Sections 80C.01 through 80C.22, and the Rules and Regulations promulgated pursuant thereto by the Minnesota Commission of Securities, Minnesota Rule 2860.4400, et seq., the parties to the attached Franchise Agreement ("Agreement") agree as follows:

With respect to franchises governed by Minnesota law, Franchisor will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4 and 5 which require, except in certain specified cases, that Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice of non- renewal of the Agreement.

As required by Minnesota Franchise Act, Minn. Stat. Sec. 80C.12(g), Franchisor will reimburse Franchisee for any costs incurred by Franchisee in the defense of Franchisee's right to use the Marks, so long as Franchisee was using the Marks in the manner authorized by Franchisor, and so long as Franchisor is timely notified of the claim and is given the right to manage the defense of the claim including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim.

With respect to franchises governed by Minnesota law, Franchisor will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4 and 5 which require, except in certain specified cases, that Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice of non- renewal of the Agreement.

A general release shall not relieve any person from liability imposed by the Minnesota Franchise Law, Minn. Stat., Chapter 80C, Section 80C.22.

The franchisee cannot consent to franchisor obtaining injunctive relief. The franchisor may <u>seek</u> injunctive relief. *See* Minn. Rule 2860.4400J. A court will determine if a bond is required.

Nothing in the Disclosure Document or Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes 1984, Chapter 80C, or your rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

Any claims brought pursuant to the Minnesota Franchises Act, § 80.C.01 et seq. must be brought within 3 years after the cause of action accrues. To the extent that any provision of the Franchise Agreement imposes a different limitations period, the provision of the Act shall control.

Any checks that are dishonored due to insufficient funds are governed by Minnesota Statute 604.113, which limits the service charge imposed on the payee of the dishonored check to a $30 service charge. To the extent that any provision of the Franchise Agreement imposes a different service charge, Minnesota Statute 604.113 shall control.

© 2023 MDR United LLC
Franchise Agreement

No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

**IN WITNESS WHEREOF**, each of the undersigned hereby acknowledges having read this Amendment, understands and consents to be bound by all of its terms.

MDR United LLC                          Franchisee: _____

By: _____            By: _____

Title: _____         Title: _____

© 2023 MDR United LLC
Franchise Agreement

## ADDENDUM TO MDR UNITD LLC
## FRANCHISE AGREEMENT
## REQUIRED BY THE STATE OF NORTH DAKOTA

For franchises and franchisees subject to the North Dakota Franchise Investment Law, the following information supersedes or supplements, as the case maybe, the corresponding disclosures in the main body of the text of the MDR United LLC Franchise Agreement.

1.      Section 2.2.8 of the Franchise Agreement is hereby amended to provide that any provision requiring a franchisee to sign a general release upon renewal of a franchise agreement is deleted in its entirety.

2.      Section 3.1 is amended as follows:

Based on our financial statements and our duties to furnish goods and services, the North Dakota Securities Commissioner requires that we defer all initial franchise fees until we have fulfilled all of our pre-opening obligations to you under the Franchise Agreement and the franchisee has commenced during business pursuant to the franchise agreement.

3.      Section 17.2 of the Franchise Agreement is hereby amended to add the following language: "Covenants not to compete such as those mentioned above are generally considered unenforceable in the State of North Dakota."

4.      Section 18.1 of the Franchise Agreement is hereby amended to add the following language:

Any provision requiring that the Franchise Agreement be construed according to the laws of a state other than North Dakota is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law and is void. These provisions are hereby amended to provide that the Franchise Agreement is to be construed according to the laws of North Dakota.

5.      Section 18.2 of the Franchise Agreement is hereby amended to add the following language:

Any provision requiring a franchisee to agree to mediation or courts outside of North Dakota has been determined to be unfair, unjust and inequitable within the intent of Section 51-19- 09 of the North Dakota Franchise Investment Law. These provisions are amended to provide the site of mediation or litigation must be agreeable to all parties and may not be remote from the franchisee's place of business.

6.      Section 18.3 of the Franchise Agreement is hereby amended to add the following language:

Any provision requiring a franchisee to agree that arbitration or mediation disputes are to be held in Nebraska has been determined to be unfair, unjust, and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law. This provision is hereby amended to provide that the site of arbitration or mediation must be agreeable to all parties and may not be remote from the franchisee's place of business.

7.      Section 18.4 of the Franchise Agreement is hereby amended to add the following language: Any provision which designates jurisdiction or venue or requires the franchisee to agree to jurisdiction or venue in a forum outside of North Dakota is void with respect to any cause of action which is otherwise enforceable in North Dakota.

© 2023 MDR United LLC
Franchise Agreement

8.    Section 18.9 of the Franchise Agreement is hereby amended to provide that the statute of limitations under North Dakota law will apply.

9.    Section 18.10 of the Franchise Agreement are hereby amended to provide that any provision requiring a franchisee to consent to a waiver of exemplary and punitive damages is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law and is void.

10.    Section 18.11 of the Franchise Agreement is hereby amended to provide that any provision requiring a franchisee to waive his or her right to a jury trial has been determined to be unfair, unjust and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law and is void.

11.    Section 16.4 is hereby deleted in its entirety.

12.    Section 22.8 of the Franchise Agreement is hereby amended to provide that any provision requiring a franchisee to pay all costs and expenses incurred by the franchisor in enforcing the Franchise Agreement is unfair, unjust, and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law. This provision is amended to provide that the prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

_____          _____
Franchisee Initials/Date                                    Franchisor's Initials/Date

## ADDENDUM TO MDR UNITED LLC
## FRANCHISE DISCLOSURE DOCUMENT, FRANCHISE AGREEMENT
## AND MULTI-UNIT AGREEMENT
## <u>REQUIRED BY THE STATE OF ILLINOIS</u>

Illinois law shall apply to and govern the Franchise Agreement.

In conformance with Section 4 of the Illinois Disclosure Act, any provision in a franchise agreement that designates jurisdiction and venue in a forum outside of the State of Illinois is void. However, a franchise agreement may provide for arbitration to take place out of Illinois.

Franchisees' right upon Termination and Non-Renewal are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

In conformance with section 41 of the Illinois Franchise Disclosure Act, any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

Item 5 of Franchise Disclosure Document—*Initial Franchise Fee*, and Section 3.1 of the Franchise Agreement—**Initial Franchise Fee**, are amended as follows:

Based on Franchisor's financial statements and Franchisor's duty to furnish goods and services, the Illinois Attorney General's Office requires that Franchisor defer all initial franchise fees until Franchisor has fulfilled all of Franchisor's pre-opening obligations to Franchisee under the Franchise Agreement and the Franchisee has commenced doing business pursuant to the Franchise Agreement. The Illinois Attorney General's Office imposed this deferral requirement due to Franchisor's financial condition.

No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

_____          _____
Franchisee Initials/Date                          Franchisor's Initials/Date

© 2023 MDR United LLC
Franchise Agreement